# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 17-10371 |
| **SUNSOUTH BANCSHARES, INC.,** | CHAPTER 11 |
| Debtor and Debtor-In-Possession. | |

DISCLOSURE STATEMENT
WITH RESPECT TO CHAPTER 11 PLAN OF
SUNSOUTH BANCSHARES, INC. PURSUANT TO
SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE

**Dated: February 17, 2017**

MEMORY & DAY
Von G. Memory
ASB-8137-071V
Post Office Box 4054
Montgomery, AL 36103-4054
Telephone (334) 834-8000
Facsimile  (334) 834-8001

BUSH ROSS, P.A.
Adam Lawton Alpert
Fla. Bar No. 0490857*
Post Office Box 3913
Tampa, Florida 33601-3913
Telephone (813) 224-9255
Facsimile (813) 223-9620
*Pro hac vice admission pending*

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SUBMITTED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

The information contained in this disclosure statement (the "<u>Disclosure Statement</u>") is provided by SunSouth Bancshares, Inc. (the "<u>Company</u>" or the "<u>Debtor</u>") in connection with the *Chapter 11 Plan of SunSouth Bancshares, Inc. Pursuant to Sections 1121, 1122, and 1123 of the United States Bankruptcy Code* (the "<u>Plan</u>"), which is attached to this Disclosure Statement as Exhibit A. Capitalized terms used but not defined in the Disclosure Statement shall have the meanings ascribed to them in Article II of the Plan. Any term used in capitalized form that is not defined in the Plan or the Disclosure Statement but that is defined in section 101 of the Bankruptcy Code shall have the meaning ascribed to such term in the Bankruptcy Code. The information contained in the Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan.

All Holders of Claims against and Interests in the Debtor are urged to read the Disclosure Statement and the Plan in their entirety before voting to accept or reject the plan. No person has been authorized to give any information or to make any representation about the Plan not contained in this Disclosure Statement. The statements in this Disclosure Statement are made as of the date hereof. Neither the Disclosure Statement's distribution nor the Plan's consummation will, under any circumstance, create any implication that the information herein is correct at any time after the date hereof. Plan summaries and statements made in the Disclosure Statement are qualified in their entirety by reference to the Plan.

The statements and financial information of the Debtor, including all financial projections and information regarding claims or interests contained herein, have been prepared from documents and information prepared by the Debtor or provided to the Debtor's professionals by the Debtor. The Debtor has not taken any independent action to verify the accuracy or completeness of such statements and information and expressly disclaims any representation concerning the accuracy or completeness thereof.

In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability but shall be deemed a statement made in settlement negotiations. Unless otherwise indicated, the Debtor's management has provided the factual information in this Disclosure Statement. The Debtor believes that the information herein is accurate but is unable to warrant that it is without any inaccuracy or omission.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(c) and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of chapter 11. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "<u>SEC</u>"), nor has the SEC passed upon the accuracy or adequacy of the statements contained herein.

In making a decision in connection with the Plan, holders of Claims and Interests must rely on their own examinations of the Debtor and the terms of the Plan, including the merits and risks involved. They should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice, and each holder should consult its own advisors with respect to those matters.

The Debtor believes that it is in the best interests of all parties to vote to accept the Plan because the Plan fairly and equitably treats all Holders of Claims and Interests by providing the earliest possible and maximum recovery to such Holders.

Case 17-10371   Doc 14   Filed 02/17/17   Entered 02/17/17 17:49:05   Desc Main
Document   Page 2 of 211

## SECURITIES LAW MATTERS

The Debtor is relying on section 1145(a) of the Bankruptcy Code to exempt the exchange, issuance, and distribution of any securities contemplated in the Plan from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") and state securities and "blue sky" laws insofar as (i) the securities are issued by a debtor, an affiliate of the debtor, or a successor to a debtor under a plan approved by a bankruptcy court; (ii) the recipients of securities hold a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor or such affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.

The Debtor also believes that the issuance and distribution of the SunSouth Bancshares, Inc. stock will be exempt from the registration requirements of the Securities Act, and any state or local laws requiring registration, by reason of one or more exemptions therefrom. Persons who receive stock under the Plan are urged to consult their own legal advisors with respect to restrictions applicable under the Securities Act and any appropriate rules and the circumstances under which securities may be sold in reliance upon any such rules.

## FORWARD-LOOKING STATEMENTS

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information. These statements involve known and unknown risks and relate to future events, our future financial performance, or our projected business results. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential," or "continue" or the negative of these terms or other comparable terminology. Forward-looking statements are only predictions. Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein. Although the Debtor believes that the expectations reflected in the forward-looking statements are reasonable, the Debtor cannot guarantee future results, events, levels of activity, performance, or achievements. The Debtor expressly disclaims a duty to update any of the forward-looking statements.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................................... 1

    A. Explanation of the Reorganization Process .......................................................................... 1

    B. Approval of the Disclosure Statement .................................................................................. 2

    C. Voting Procedures, Ballots, and Voting Deadline ............................................................... 2

    D. Confirmation Hearing and Deadline for Objections ............................................................ 3

II. HISTORY OF THE DEBTOR ....................................................................................................... 4

    A. Overview of Business Operations ........................................................................................ 4

    B. Management of the Debtor .................................................................................................... 6

    C. Operation of SunSouth Bank and Events Leading to the Restructuring Proposal .............. 6

    D. Proposed Recapitalization Transaction ................................................................................ 8

III. ASSET AND LIABILITY EVALUATION ................................................................................... 8

    A. The Debtor's Assets ............................................................................................................. 8

    B. The Debtor's Liabilities ....................................................................................................... 9

IV. THE PLAN .................................................................................................................................... 9

    A. Classification and Treatment of Claims and Interests ......................................................... 9

    B. The Plan Summary ............................................................................................................. 10

    C. Means for Implementation of the Plan ............................................................................... 15

    D. Provisions Governing Distributions ................................................................................... 18

    E. Treatment of Executory Contracts and Unexpired Leases ................................................ 19

    F. Conditions Precedent to the Plan's Confirmation and Effective Date .............................. 20

    G. Modification and Withdrawal ............................................................................................ 21

    H. Retention of Jurisdiction .................................................................................................... 21

    I. Effects of Confirmation ..................................................................................................... 22

    J. Miscellaneous Provisions ................................................................................................... 23

    K. Governing Law ................................................................................................................... 24

V. CERTAIN RISK FACTORS TO BE CONSIDERED .................................................................. 24

    A. Failure to Confirm the Plan ............................................................................................... 24

    B. Potential Adverse Effects of Chapter 11 ........................................................................... 24

    C. Underlying Risks at the Bank Level ................................................................................... 24

    D. Absence of Public Market; Restriction on Transferability ................................................ 29

    E. Dividends ............................................................................................................................ 29

    F. Regional Concentration ...................................................................................................... 30

G.    Regulatory Matters......................................................................................................30

H.    Potential Dilution .........................................................................................................30

VI.    CONFIRMATION OF THE PLAN.........................................................................30

A.    Voting Requirements ....................................................................................................31

B.    Feasibility of the Plan ..................................................................................................31

C.    Best Interests Test........................................................................................................32

D.    Liquidation Analysis....................................................................................................33

E.    Confirmation Without Acceptance of All Impaired Classes – "Cramdown" .................33

VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN..............34

VIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN 34

A.    Certain United States Federal Income Tax Consequences to the Debtor .......................36

B.    Certain United States Federal Income Tax Consequences to Holders of Claims or Interests ........36

C.    Importance of Obtaining Professional Tax Assistance ..................................................38

IX.    RECOMMENDATION AND CONCLUSION ...........................................................38

# I.     INTRODUCTION

On February 17, 2017, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Middle District of Alabama, Southern Division (the "<u>Bankruptcy Court</u>"). The Debtor, through its authorized representatives, Memory & Day and Bush Ross, P.A., submits this Disclosure Statement to the Holders of Allowed Claims against and Allowed Interests in the Debtor in connection with (i) the solicitation of acceptances or rejections of the Debtor's Plan, as may be amended and filed by the Debtor with the Bankruptcy Court and (ii) the hearing to consider confirmation of the Plan to be scheduled by the Bankruptcy Court after the approval of the Disclosure Statement.

## A.     Explanation of the Reorganization Process

Chapter 11 of the Bankruptcy Code contemplates the formulation of a plan of reorganization and outlines how a debtor's debts will be paid. The debtor typically remains in control of its assets and business affairs as a "debtor-in-possession" with most of the powers and duties of a trustee. Formulation of a plan of reorganization is the principal purpose of a chapter 11 case. A plan of reorganization sets forth the means by which claims against and interests in the debtor will be satisfied. After a plan of reorganization has been filed, it must be accepted by holders of claims against or interests in the debtor. Section 1125 of the Bankruptcy Code requires full disclosure before solicitation of acceptances of a plan of reorganization. This Disclosure Statement is presented to Holders of Claims and Interests to satisfy the disclosure requirements of section 1125 of the Bankruptcy Code.

It is the judgment of the Debtor's board of directors, management, and advisors that the Plan and the transactions contemplated by the Plan afford the best opportunity for a restructuring that will maximize value for stakeholders under the circumstances. The Plan provides for a reorganization and restructuring of the Debtor's capital structure in a manner designed to maximize recoveries for creditors and to enhance the financial stability of the Reorganized Debtor and SunSouth Bank. Under the Plan, the Debtor will restructure the FNBB Loan, providing for payment in full of the FNBB Claim over time. Other than the subordinated debt obligations associated with the trust preferred securities discussed herein, specifically the TruPS Claims and the Guarantee Claims, the Debtor will pay all Allowed Administrative Claims, Allowed Priority Claims, and Allowed Priority Tax Claims and will not impair Allowed general Unsecured Claims in full upon confirmation of the Plan. Subject to the approval of the Debtor's regulators, the Debtor will issue new junior subordinated debt securities to the Trusts in satisfaction of the outstanding $9.7 million in junior subordinated debt securities and the Debtor's corresponding guaranty liability to the holders of trust preferred securities, the Trust Beneficiaries. All current stock and equity interests in the Debtor shall be cancelled, and new common stock shall be issued to the New Investors in exchange for new value contributed to the Reorganized Debtor of at least $1.25 million on the Effective Date and/or via any DIP Facility funded by the New Investors. Any outstanding options and contractual rights to purchase or acquire any equity interest in the Debtor will be cancelled.

The Debtor will fund its reorganization, recapitalization, and operations primarily with a $1.25 million cash infusion resulting from the New Investment via a new value contribution (or DIP Financing). The infusion will be supplemented with distributions, if any, received by the Reorganized Debtor from SunSouth Bank on account of the shares of SunSouth Bank common stock owned by the Debtor.

The Debtor believes it is important that the length of its stay in chapter 11 be as short as practicable. One reason is that chapter 11 poses serious risks to banking businesses such as the Debtor's, which is affected by the public's and government agencies' confidence in the Debtor's financial stability and ability to perform services and obligations going forward. It therefore is critical that the restructuring and recapitalization contemplated by the Plan be effectuated as expeditiously as possible.

1

This Disclosure Statement, among other things, (i) contains certain information regarding the Debtor's prepetition history and its assets and liabilities, (ii) describes the Plan, alternatives to the Plan, means for implementing the Plan, distributions under the Plan, and effects of confirmation of the Plan, and (iii) discusses the confirmation process and voting procedures that Holders of Allowed Claims must follow for their votes to be counted.

> **B.** **Approval of the Disclosure Statement**

After notice and a hearing, the Bankruptcy Court may approve this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor, typical of the Debtor's creditors, to make an informed decision as to whether to accept or reject the Plan. Approval by the Bankruptcy Court of this Disclosure Statement does not in and of itself constitute a determination by the Bankruptcy Court as to the fairness, merits, or confirmability of the Plan.

> **C.** **Voting Procedures, Ballots, and Voting Deadline**

Accompanying this Disclosure Statement and forming a part of the solicitation package (the "Solicitation Package") are copies of (i) the Plan (**Exhibit A**) and (ii) one or more Ballots for Holders of Allowed Claims who are entitled to vote on the Plan (such Holders, the "Voting Entities").

> (1) Persons Entitled to Vote. Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are Impaired under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan. Furthermore, if a Class of Claims or Interests is not entitled to receive any Distribution under the Plan, such Class is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Disputed Claims are not entitled to vote on the Plan unless the Bankruptcy Court, upon motion of such Holder, temporarily allows the Claim in the Estimated Amount defined by the Court for purposes of voting to accept or reject the Plan.

> (2) Voting Instructions.

>> (i) Ballots. In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. If you have Claims or Interests in more than one Class, you may receive multiple Ballots. **IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM OR INTEREST AND YOU SHOULD COMPLETE AND RETURN ALL BALLOTS.** If you did not receive a Ballot in your package and believe that you are entitled to vote on the Plan, please contact counsel for the Debtor at the addresses and telephone numbers set forth on the cover of this Disclosure Statement.

>> (ii) Returning Ballots. **YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND FILE IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF ALABAMA, ONE CHURCH STREET, MONTGOMERY, AL 36104, IN ACCORDANCE WITH ANY DEADLINES THAT MAY BE ESTABLISHED BY SUBSEQUENT ORDER OF THE BANKRUPTCY COURT. IN ORDER TO BE COUNTED, BALLOTS MUST BE FILED WITH THE BANKRUPTCY COURT ON OR BEFORE THAT TIME.**

**IT IS OF THE UTMOST IMPORTANCE TO THE DEBTOR THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.**

(iii)     Incomplete or Irregular Ballots.  Ballots which fail to designate the Class to which they apply shall be counted, subject only to contrary determinations by the Bankruptcy Court, in the Class determined by the Debtor.  **BALLOTS THAT ARE NOT SIGNED AND BALLOTS THAT ARE SIGNED BUT NOT EXPRESSLY VOTED EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

You may obtain additional copies of the Plan, Disclosure Statement, or other material in this Solicitation Package from counsel to the Debtor.

### D.     Confirmation Hearing and Deadline for Objections

The Debtor will ask the Bankruptcy Court to consider the confirmation of the Plan at a hearing (the "Confirmation Hearing") to be held as soon as practicable at such time that the Bankruptcy Court may allow, before the United States Bankruptcy Court for the Middle District of Alabama, 100 West Troy Street, Dothan AL 36303.

For the Debtor's Plan to be confirmed, chapter 11 requires that a requisite number of votes be cast in favor of the Plan.  However, chapter 11 does not require that every Holder of a Claim or Interest vote in favor of the Plan for it to be confirmed by the Bankruptcy Court.  For any Class of Impaired Claims to accept the Plan, section 1126(c) of the Bankruptcy Code requires that claimants who hold a majority in number and at least two-thirds (2/3) in the amount of the Allowed Claims in such Class that actually vote on the Plan must vote to accept the Plan.  For a Class of Impaired Interests to accept the Plan, section 1126(d) of the Bankruptcy Code requires that Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that actually vote on the Plan must vote to accept the Plan.  Even if all Classes of Claims and Interests accept the Plan, section 1129 of the Bankruptcy Code requires that the Bankruptcy Court find, among other things, that the Plan is in the best interests of Holders of Claims and Interests.  Section 1129 generally requires that the value to be distributed to Holders of Claims and Interests may not be less than such parties would receive if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

Pursuant to section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though less than all of the Classes of Claims and Interests accept it.  Confirmation of the Plan over the objection of one or more Impaired Classes of Claims or Interests is generally referred to as a "cramdown."  For the Plan to be confirmed over the objection of an Impaired Class of Claims or Interests, the Debtor must show that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan.  At the Confirmation Hearing, the Debtor may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtor may modify the Plan, to the extent permitted by section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, as necessary to confirm the Plan.

Notice of the Confirmation Hearing and the time to present objections will be provided in accordance with the instructions to be provided by the Bankruptcy Court. The Debtor will request that the Bankruptcy Court, among other things, require that any objections to confirmation of the Plan or related matters be filed with the Bankruptcy Court and served so that they are RECEIVED on or before the objection deadline fixed by the Bankruptcy Court by the following:

**The Debtor:**

SunSouth Bancshares, Inc.
108 Jamestown Boulevard
Dothan, AL 36301
Attn: H. Monty Weigel

**Counsel to the Debtor:**

Memory & Day
Von G. Memory
Post Office Box 4054
Montgomery, AL 36103-4054

-and-

Bush Ross, P.A.
Adam Lawton Alpert
Post Office Box 3913
Tampa, Florida 33601-3913

-and-

**United States Bankruptcy Administrator:**

Teresa Jacobs, Esq.
Office of the United States Bankruptcy Administrator
Frank M. Johnson, Jr. Federal Building & U.S. Courthouse
One Church Street, Suite 103
Montgomery, AL 36104

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II. <u>HISTORY OF THE DEBTOR</u>

### A. **Overview of Business Operations**

The Debtor is bank holding company whose business is conducted by its wholly owned subsidiary, SunSouth Bank. SunSouth Bank is a commercial bank located in Dothan, Houston County, Alabama. SunSouth Bank established its early roots in the soil of rural Clio, Alabama, as The Peoples Bank in 1954. The Peoples Bank began as a small family-owned bank serving the financial needs of the farmers and merchants of the community. To enhance growth, the charter was moved to Dothan, Alabama in 2002, and the name was changed to SunSouth Bank.

Today, SunSouth Bank provides a full range of banking services in its primary market area of Houston and Barbour Counties, Alabama. Dothan, Alabama is the county seat of Houston County. The economy of Houston County is diverse, consisting of industrial, medical, and other employers. Fort Rucker Army Base, which serves as the U.S. Army Aviation Center for flight training, is just north of Enterprise, Alabama, straddling Dale and Coffee Counties to the west of Dothan. Fort Rucker is another

significant force in the local economy. Clio, Alabama is located in Barbour County. The largest employers in Barbour County are the Board of Education, Wolf Run Mining Company, Broaddus Hospital Association, Inc., and Alderson Broaddus University.

The Debtor also owns 100% of the common stock of SunSouth Bancshares Capital Trust I ("Trust I") and SunSouth Bancshares Capital Trust II ("Trust II," and together with Trust I, the "Trusts"). The Trusts are Delaware statutory trusts that were established for the sole purpose of issuing capital securities (the "Trust Preferred Securities" or "TruPS"). JPMorgan Chase Bank is the trustee of Trust I, and the Wilmington Trust Company is the trustee of Trust II.

As a bank holding company, the Debtor and its non-bank subsidiaries are subject to oversight and regulation by the Board of Governors of the Federal Reserve System and, in certain instances, various federal and state banking authorities.

As an Alabama state-chartered nonmember bank, SunSouth Bank is also subject to extensive regulation, examination, and supervision by the FDIC as its primary federal regulator and, at the state level, by the Alabama State Banking Department. As the sole shareholder of the capital stock of SunSouth Bank, the Debtor is required to serve as a source of managerial and financial strength for SunSouth Bank and oversee its policies and financial resources.

The Debtor formed the Trusts to issue Trust Preferred Securities to raise capital for SunSouth Bank. This financing mechanism is a common one in the banking industry. The Trust Preferred Securities are governed by a series of agreements and declarations among the Debtor, the trustees of the Trusts, and other parties and the terms of written debentures (the "TruPS Documents"). The Debtor formed the statutory trusts and issued subordinated notes to the Trusts as detailed below. The notes are the sole assets of the Trusts. The Trusts, in turn, issued Trust Preferred Securities mirroring the economic terms of the subordinated notes to various investors, in addition to common stock to the Debtor. The Debtor used the proceeds of the notes to invest capital in SunSouth Bank. Under the proposed capital structure, it was contemplated that SunSouth Bank then in turn would make dividend payments to the Debtor, enabling it to service the obligations under the notes. As is typical for these securities, the Debtor and the Trusts have the option to defer all interest due under the notes for a period of twenty consecutive quarters, provided that no extension period may extend beyond the stated maturity of the debentures. During any extension period, distributions on the Trust Preferred Securities would also be deferred. As the primary source of liquidity for the Debtor is the receipt of dividends from SunSouth Bank, any weakness in SunSouth Bank or inability to make payment impairs the value of the Trust Preferred Securities.

On June 25, 2004, the Debtor issued Junior Subordinated Debt Securities to Trust I (the "TruPS I Debentures"), and Trust I issued the corresponding Trust Preferred Securities. Specifically, Trust I issued 3,000 shares of Trust Preferred Securities to the holders of the beneficial interests in Trust I for $3,000,000, and 93 shares of common securities to the Debtor for $93,000. The proceeds from the sale of the Trust Preferred Securities and the common securities were used by Trust I to purchase an equivalent aggregate principal amount of the Trust I Debenture from the Debtor. The Debtor is the sole owner of the common securities, and, in the event that the TruPS I Debentures are in default, the common securities are subordinated to the Trust Preferred Securities. The TruPS I Debentures can be redeemed prior to maturity at the option of the Debtor on or after July 23, 2009. The TruPS I Debentures bear interest at a variable rate per annum, equal to LIBOR plus 2.75 percent. The Trust Preferred Securities for Trust I have the same interest rate as the TruPS I Debentures. The Debtor also guaranteed the obligation of Trust I to make the distributions on the TruPS to the Trust I Beneficiaries and to assume any other costs, expenses, or liabilities (with the exception of tax liabilities) of Trust I.

5

Nearly two years later, on June 23, 2006, the Debtor issued Junior Subordinated Debt Securities to Trust II (the "TruPS II Debentures"), and Trust II issued the corresponding Trust Preferred Securities. Specifically, Trust II issued 5,000 shares of Trust Preferred Securities to the holders of the beneficial interests in Trust II for $5,000,000, and 155 shares of common securities to the Debtor for $155,000. The proceeds from the sale of the Trust Preferred Securities and the common securities were used by Trust II to purchase an equivalent aggregate principal amount of the Trust II Debenture from the Debtor. The Debtor is the sole owner of the common securities, and, in the event that the TruPS II Debentures are in default, the common securities are subordinated to the Trust Preferred Securities. The TruPS II Debentures can be redeemed prior to maturity at the option of the Debtor on or after July 23, 2011. The TruPS II Debentures bear interest at a variable rate per annum, equal to LIBOR plus 2.75 percent. The Trust Preferred Securities for Trust II have the same interest rate as the TruPS II Debentures. The Debtor also guaranteed the obligation of Trust I to make the distributions on the TruPS to the Trust II Beneficiaries and to assume any other costs, expenses, or liabilities (with the exception of tax liabilities) of Trust II.

As of December 31, 2016, the Debtor had outstanding principal indebtedness in the amount of $3,093,000 and accrued and unpaid interest attributable to the TruPS I Debentures in the amount of $746,930. As of December 31, 2016, the Debtor had outstanding principal indebtedness in the amount of $5,155,000 and accrued and unpaid interest attributable to the TruPS II Debentures in the amount of $743,321. In sum, the Debtor had outstanding principal indebtedness totaling $8,248,000 attributable to the Junior Subordinated Debentures underlying the Trust Preferred Securities for the Trusts, and accrued and unpaid interest of approximately $1,490,251 in connection with the same.

B.      **Management of the Debtor**

Set forth in the table below are the names, position(s), and periods of service of the current Board of Directors of the Debtor and key executive officers. The Board of Directors oversees the business and affairs of the Debtor.

| Name | Position | Period of Service |
|------|----------|-------------------|
| Henry Monty Weigel | President & CEO, Director | 2014 - Present |
| Dawn Wise Dunning-Theune | Director | 2003 - Present |
| Milton Roger Peterson | Director | 2001 - Present |
| James Steven Roy | Director | 2002 - Present |
| Douglas Shane Sinquefield | Director | 2015 - Present |
| Calvin Ray Turner, Jr. | Director | 2014 - Present |

C.      **Operation of SunSouth Bank and Events Leading to the Restructuring Proposal**

SunSouth Bank is organized as Alabama chartered nonmember institution. SunSouth Bank's deposits are insured up to the maximum allowable amount by the FDIC. SunSouth Bank is regulated by the Alabama State Banking Department and the FDIC.

As of December 31, 2016, SunSouth Bank has total assets of approximately $148.3 million, down from $198.7 million as of year-end 2011, outstanding loans of approximately $95 million, and total deposits of approximately $128 million.

SunSouth Bank has approximately 31 employees. SunSouth Bank provides full-service banking out of its home office in Dothan, Alabama and a second branch location in Clio, Alabama. The Bank specializes in commercial and industrial lending but also offers checking, savings, money market accounts, mortgages, home equity and other consumer loans, credit cards, and related consumer financial

services. The Bank also provides banking services to businesses, including checking accounts, lines of credit, secured loans and commercial real estate loans. SunSouth Bank's branches serve as the primary vehicle through which it offers products, cross sells additional products to existing customers, and generates new customer relationships. In addition to its branch network, the Bank provides products and services through its online banking system.

On May 2, 2013, the Bank entered into a Consent Order with the FDIC (the "FDIC Agreement"). A true and accurate copy of the FDIC Agreement is attached as **Composite Exhibit B**. Among other things, the FDIC Agreement requires SunSouth Bank (i) to maintain its Tier I Leverage Ratio and the Total Risk Based Capital Ratio at a minimum of 9 percent and 12 percent, respectively, (ii) to develop and implement a plan to reduce adversely classified assets, and (iii) to continue to implement various policy and procedure changes to enhance credit monitoring, asset quality, earnings, liquidity, funds management, and Board of Directors oversight. Critically, the FDIC Agreement proscribes SunSouth Bank from paying any cash dividends on common stock without prior regulatory approval. This limitation on the payment of dividends has created significant liquidity issues for the Debtor, as the dividends were the primary source of liquidity for the Debtor. Compliance with the FDIC Agreement is monitored internally by a committee comprised of members of the Debtor's Board of Directors. The FDIC Agreement also required the Bank to add two new independent members to its Board of Directors. The Bank is currently not in compliance with all components of the FDIC Agreement and failure to comply with the FDIC Agreement could result in further regulatory action and oversight.

On May 24, 2013, the Debtor entered into a Consent Order with the Alabama State Banking Department (the "ASBD Agreement"). A true and accurate copy of the ASBD Agreement is attached as **Composite Exhibit B**. Under the ASBD Agreement, the Debtor was required to add the same two new independent members to its Board of Directors that were added to the Bank's Board of Directors by the FDIC Agreement. The Debtor was also tasked with implementing a written policy to govern the relationship between the Company and the Bank and the Company and its affiliates. Among other things, the policy was to limit the payment of management, consulting or other fees. The ASBD Order also proscribed the Debtor from making any payment to or for the benefit of SunSouth Bank or any other affiliate without prior written consent of the Department and from declaring or paying dividends, bonuses, or making any other form of payment outside the ordinary course of business resulting in a reduction of capital, without prior written approval of the Alabama State Banking Department.

On September 20, 2013, the Debtor also entered into a Consent Order with Federal Reserve Bank of Atlanta and the Alabama State Banking Department (the "Federal Reserve Agreement" and together with the FDIC Agreement and ASBD Agreement, the "Consent Orders"). A true and accurate copy of the Federal Reserve Agreement is attached as **Composite Exhibit B**. The terms of the Federal Reserve Agreement parallel and correlate with the FDIC Agreement and the ASBD Agreement. Without prior regulatory approval, the Debtor is prohibited from (i) declaring or paying any dividends, (ii) directly or indirectly taking dividends or any other form of payment representing a reduction in capital from the Bank, (iii) making distributions to the Trusts on account of the subordinated debentures or Trust Preferred Securities, and (iv) purchasing or redeeming shares of its stock. The Debtor and any nonbank subsidiary must also obtain prior regulatory approval before incurring, increasing, or guaranteeing any debt. The Debtor was also required to increase the number of outside directors and provide a quarterly status report regarding the Debtor's effort to secure new directors to the regulators.

Since the entry of the Consent Orders, the Debtor and SunSouth Bank have been diligently pursuing alternative solutions to meet the required capital ratios and otherwise satisfy the obligations of the Consent Orders. These alternatives have included raising outside capital with the assistance of the Debtor's legal and financial advisors. The Debtor has also focused its efforts on improving the overall financial performance and efficiency of the Bank. The failure to meet those requirements could result in

the regulators taking additional actions against the Bank. Absent conformance to the terms of the Consent Orders, the Debtor and SunSouth Bank are prohibited from making any payment of subordinated debt principal or interest without regulatory approval.

Additional information about the Debtor and SunSouth Bank, including their operations and financial condition, is set forth in **Composite Exhibit C**, which is comprised of the Consolidated Financial Reports for the Fiscal Years Ended December 31, 2014 and December 31, 2015, as well as the separate financial statements for the Debtor and SunSouth Bank for year-end December 31, 2016 (collectively, the "Financial Statements").

D.    **Proposed Recapitalization Transaction**

The Debtor has recently been successful in attracting interest in a $1.25 million capital raise from potential new and existing investors in the Debtor (the "New Investment"). The Bank's Tier I Leverage Capital Ratio was 4.04% as of December 31, 2016. The New Investment will enhance the Bank's capital adequacy by raising the Bank's Tier I Capital Ratio at the time of the closing of the New Investment. A pro forma balance sheet and associated assumptions detailing the effect of the New Investment is attached hereto as **Exhibit D**.

III.    **ASSET AND LIABILITY EVALUATION**

A.    **The Debtor's Assets**

The following chart describes and summarizes the Debtor's assets, any encumbrances thereon, and the Debtor's estimation of the amount that may be realized on disposition of the assets in a chapter 7 case after payment of Allowed Secured Claims. This chart is intended as a summary, and the Debtor's assets are described in more detail in the Schedules filed with the Bankruptcy Court.

| Asset | Description/Liens | Estimated Value | Notes |
|---|---|---|---|
| Cash on Hand | FNBB holds a first priority lien in all assets of the Debtor. | $810.50 | 1 |
| 100% of the Issued and Outstanding Capital Stock of SunSouth Bank | FNBB holds a first priority lien in all assets of the Debtor. The Debtor pledged 100% of the Bank Stock to FNBB. | $2,283,000.00 | 2 |
| 93 shares of common stock in Trust I | FNBB holds a first priority lien in all assets of the Debtor. | $0.00 | 3 |
| 155 shares of common stock in Trust II | FNBB holds a first priority lien in all assets of the Debtor. | $0.00 | 3 |

Notes
1    The Debtor maintains minimal Cash on hand.
2    Prior to the Petition Date, the Debtor retained Southard Financial to complete a valuation analysis for the Bank Stock. The value of the Bank Stock reflected in the Schedules is consistent with the conclusions reached by the valuation professional.
3    As the common securities of the Trusts are subordinated to the Trust Preferred Securities in the event of default and the Debtor's assets are insufficient to satisfy the obligations under the TruPS I Debenture and the TruPS II Debenture, the common stock in the Trusts has zero or negligible value.

8

### B. The Debtor's Liabilities

The following chart describes and summarizes the Debtor's liabilities. This chart is intended as a summary, and the Debtor's liabilities are described in more detail in the Schedules filed with the Bankruptcy Court.

| Claim | Nature of Claim | Amount |
|---|---|---|
| Memory & Day | Administrative | $35,000.00* |
| Bush Ross, P.A. | Administrative | $50,000.00* |
| Southard Financial | Administrative | $10,000.00* |
| Alabama Department of Revenue | Priority Tax | $7,566.05 |
| FNBB | Secured | $2,451,345.11 |
| General Unsecured Claims | Unsecured | Unknown |
| TruPS I Claim | Unsecured Subordinated | $3,839,930.00 |
| TruPS II Claim | Unsecured Subordinated | $5,898,321.00 |
| Guarantee Claims | Unsecured Subordinated, Contingent | Unknown |

 * Estimated

## IV.   THE PLAN

The following is a summary of the classification and treatment under the Plan of the Claims against and Interests in the Debtor. The summaries of the Plan and other documents referred to herein do not purport to be precise or complete statements of all of the terms and provisions of those documents, and reference is made to the Plan and other documents for the full and complete statements of their terms and provisions. The Plan itself and the documents referred to therein control the actual treatment of claims against and interests in the Debtor under the Plan and will, upon the Effective Date, be binding upon all holders of claims against and interests in the Debtor and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan or other operative document, as applicable, will control.

### A.   Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and interest holders. In accordance with section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class. The Plan places the various Claims and Interests in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class or the treatment of such Claims or Interests is substantially similar. In general, the proponent of a chapter 11 plan has broad discretion to classify Claims and Interests in the plan according to the particular facts and circumstances of each case. *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990). Holders of Claims and Interests are classified in the Plan as follows:

| Class | Description | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Administrative Claims | Unimpaired | No |
| 2 | Priority Claims | Unimpaired | No |
| 3 | Priority Tax Claims | Unimpaired | No |
| 4 | Secured Claim of FNBB | Impaired | Yes |
| 5 | General Unsecured Claims | Unimpaired | No |
| 6 | TruPS Claims | Impaired | Yes |
| 7 | Guarantee Claims | Impaired | Yes |
| 8 | Equity Interests | Impaired | No |

9

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122; however, the Debtor reserves the right to modify the classification of Claims or create additional classes of Claims. It is possible that a holder of a Claim or an Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of a Claim or Interest after approval of the Plan could necessitate a re-solicitation of acceptances of the Plan.

## B.   The Plan Summary

The table below summarizes the classification and treatment of the Claims and Interests under the Plan. In all Classes, Claimants have the ability to consent to a treatment of their Claim that is different than that proposed under the Plan if such modification does not have a material adverse impact on other Classes. Additionally, the Debtor may modify, with the Bankruptcy Court's approval, the treatment currently proposed in the Plan. Any estimated Claim amounts are calculated as of the date of this Disclosure Statement. Estimated percentage recoveries are also set forth below for certain Classes of Claims.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. The Debtor has not yet fully analyzed all Proofs of Claim filed in the Reorganization Case to determine whether the amounts stated in such Proofs of Claim are accurate. The estimated Claim amounts set forth below are consolidated amounts based upon the Debtor's review of its books and records and of certain Proofs of Claim, and may include estimates of a number of Claims that are contingent, Disputed, and/or unliquidated.

| Class Description | Summary of Treatment Under the Plan |
|---|---|
| **Class 1 – Administrative Claims**<br><br>**Description of Claims:** Administrative Claims are Claims for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtor's Estate and operating its business, (b) Allowed Claims for reasonable fees and out-of-pocket expenses of professionals retained in the Bankruptcy Case, and (c) all fees and charges assessed against the Estate under title 28, chapter 123, United States Code. Given that most of the business of the Debtor's corporate enterprise is conducted by its subsidiary, SunSouth Bank, the Debtor expects the Administrative Claims will comprise mostly professional fees and expenses and, in any case, be relatively minimal.<br><br>**Estimated Allowed Claims:** $95,000.00 | **Plan Treatment:** Generally, under the Plan each Holder of an Allowed Administrative Claim shall, in full and final satisfaction of such Allowed Administrative Claim, be paid on the later to occur of (a) the Effective Date or (b) the date on which an Administrative Claim shall become an Allowed Claim: (i) in full, in Cash, the amount of such Allowed Administrative Claim, or (ii) in such other amount and on such other terms and conditions as may be agreed between the Holder of such Administrative Claim and the Debtor. Allowed and uncontested Administrative Claims representing post-petition liabilities incurred in the ordinary course of business shall be paid by the Debtor in the ordinary course of its business in accordance with the terms and conditions of the particular transactions relating thereto during the Bankruptcy Case without need for application and allowance under section 503 of the Bankruptcy Code. |

10

| Class Description | Summary of Treatment Under the Plan |
|---|---|
| **Holder** / **Amount**<br>Memory & Day — $35,000.00<br>Bush Ross, P.A. — $50,000.00<br>Southard Financial — $10,000.00<br><br>**Estimated Recovery:** 100% | **Impairment and Voting:** Administrative Claims are not Impaired, as they are treated in accordance with the Bankruptcy Code and are not entitled to vote on the Plan. |
| **Class 2 – Priority Claims**<br><br>**Estimated Allowed Claims:** $0.00<br><br>**Estimated Recovery:** 100% | **Plan Treatment:** Allowed Priority Claims will be paid in full, in Cash, the later of: (a) the Effective Date; (b) the date of the Order allowing such Claim; or (c) the date that such Allowed Priority Claim would have been due if the Reorganization Case had not been commenced.<br><br>**Impairment and Voting:** Priority Claims are not Impaired, as they are treated in accordance with the Bankruptcy Code and are not entitled to vote on the Plan. |
| **Class 3 – Priority Tax Claims**<br><br>**Description of Claims:** Priority Tax Claims are Claims of Governmental Units or Persons holding tax deeds or similar instruments issued by a Governmental Unit on account of unpaid taxes that are not Secured Claims and are entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. Other than the amounts owed to the Alabama Department of Revenue, it is the Debtor's belief that all taxes are current or will be paid in the ordinary course.<br><br>Estimated Allowed Claims: $7,566.05<br><br>**Holder** / **Amount**<br>Alabama Department of Revenue — $7,566.05<br><br>**Estimated Recovery:** 100% | **Plan Treatment:** The Holders of Allowed Priority Tax Claims, if any, shall be entitled to receive the amount of such Holder's Allowed Claim, (a) in cash, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the Effective Date, or (b) in regular cash installment payments over a period not exceeding five years from the Petition Date of a total value, as of the Effective Date, equal to the Allowed amount of such Claim. Any Allowed Claims in this class that are secured by a valid, perfected, and enforceable lien on any of the Debtor's assets shall be collateralized by a continuation of the lien underlying such Claim and such obligation shall be and become due and payable upon the sale or other disposition of the collateral therefor. In addition, to the extent that any Allowed Claim is entitled to receive interest, such interest shall be calculated in accordance with applicable non-bankruptcy law pursuant to section 511 of the Bankruptcy Code. By providing this treatment, it is the Debtor's intent to fully comply with the requirements for Confirmation set forth in 1129(a)(9)(C).<br><br>**Impairment and Voting:** Priority Tax Claims are not Impaired, as they are treated in accordance with the Bankruptcy Code and are not entitled to vote on the Plan. |

Case 17-10371   Doc 14   Filed 02/17/17   Entered 02/17/17 17:49:05   Desc Main
Document     Page 16 of 211

| Class Description | Summary of Treatment Under the Plan |
|---|---|
| **Class 4 – Secured Claim of FNBB**<br><br>**Description of Claim:** The Allowed Secured Claim of FNBB arises from the FNBB Loan. As of February 15, 2017, SunSouth is indebted to FNBB in the amount of $2,451,345.11, comprised of a principal balance of $2,000,000.00 and accrued interest of $381,180.26, which interest continues to accrue at variable default rate of prime plus 1.75% (which is presently 5.5% and results in a per diem increase in the balance due of $305.56), together with $70,164.85 in amounts due to FNBB for its costs of collection, including reasonable attorney's fees (collectively, the "<u>FNBB Claim</u>"). The FNBB Claim is secured by a first-priority lien and pledge of all assets of SunSouth including, but not limited to, 100% of the issued and outstanding Bank Stock.<br><br>**Estimated Recovery:** 100% | **Plan Treatment:** The Allowed FNBB Claim shall be paid in full as follows: (a) on the Effective Date, FNBB shall receive a cash payment equal to the sum of $100,000.00, plus all accrued pre-petition and post-petition interest on the FNBB Claim, as calculated through the Effective Date at the interest rate of 3.25% per annum (the "<u>FNBB Confirmation Payment</u>"); (b) the remaining unpaid balance of the FNBB Claim after application of the FNBB Confirmation Payment shall accrue interest at 3.25% per annum, and the Reorganized Debtor shall pay FNBB accrued interest on the first business day following the end of each calendar quarter after the Effective Date; (c) the Reorganized Debtor shall pay FNBB additional principal payments of $100,000.00 on December 31, 2017, December 31, 2018, and December 31, 2019; (d) the Reorganized Debtor shall make a balloon payment of the outstanding remaining principal and accrued interest due on December 31, 2020; and (e) the Reorganized Debtor may pay the outstanding principal and accrued interest to FNBB in full at any time, without penalty.<br><br>**Liens:** FNBB shall retain its Lien securing the Allowed FNBB Claim. Upon payment in full of the Allowed FNBB Claim pursuant to the terms of the Plan, FNBB shall release its liens on all of its collateral.<br><br>**Capital Covenant:** Until the FNBB Claim is paid in full, the Bank shall maintain a well-capitalized "Leverage Ratio" (as defined in 12 C.F.R. § 325.2) of: 4.3% as of December 31, 2017; 4.4% as of December 31, 2018; and 5% as of December 31, 2019 and through maturity.<br><br>**Impairment and Voting:** The Class 4 Claim is Impaired, and the Holder of the Class 4 Claim is entitled to vote on the Plan. |
| **Class 5 – General Unsecured Claims**<br><br>**Estimated Allowed Claims:** $0.00<br><br>**Estimated Recovery:** 100% | **Plan Treatment:** On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such claim, each holder of an allowed Class 5 unsecured claim shall either (i) retain such claim with all legal, equitable, and contractual rights unaltered or (ii) receive such other treatment as to which the Debtor and such holder shall have agreed upon in writing.<br><br>**Impairment and Voting:** Class 5 Claims are Unimpaired, and the Holders of the Class 5 Claims are not entitled to vote on the Plan. |

Case 17-10371    Doc 14    Filed 02/17/17    Entered 02/17/17 17:49:05    Desc Main
Document    Page 17 of 211

| Class Description | Summary of Treatment Under the Plan |
|---|---|
| **Class 6 – TruPS Claims**<br><br>**Description of Claims:** This Class is composed of the subordinated, Allowed unsecured TruPS I Claim and TruPS II Claim.<br><br>**Estimated Allowed Claims:** $9,738,251.00<br><br>| Holder | Amount |<br>|---|---|<br>| TruPS I Trustee | $3,839,930.00 |<br>| TruPS II Trustee | $5,898,321.00 |<br><br>**Estimated Recovery:** To be determined by Court | **Plan Treatment:** On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such claim, holders of allowed TruPS Claims shall either: (i) receive the New Debentures in the New Debenture Principal Amount from the Reorganized Debtor; or (ii) receive such other treatment as to which the Debtor and such Holders shall have agreed upon in writing. In the event that the Debtor issues New Debentures on account of the Allowed TruPS Claims, the New Debentures Principal Amount shall be allocated Pro-Rata between the Allowed TruPS I Claim and the Allowed TruPS II Claim.<br><br>Unless otherwise agreed to in writing by the Holders of the Allowed TruPS Claims, the New Debentures shall be paid by the Reorganized Debtor upon the following terms: (a) the New Debenture Principal Amount shall bear no interest; (b) the New Debentures shall be subordinate to all Senior Indebtedness, as such term is defined in the TruPS Debentures, of the Reorganized Debtor; (c) the New Debenture Principal Amount shall be paid in equal quarterly disbursements beginning on the first business day of the second full calendar quarter after satisfaction of the FNBB Claim and quarterly thereafter on the first business day of each subsequent calendar quarter through the maturity date of the New Debentures; provided, however, that the such quarterly payments shall be subject to deferral in the event that the Reorganized Debtor has not obtained the requisite regulatory approvals to make distributions on account of such subordinated New Debentures; (d) notwithstanding the foregoing, the maturity date of the New Debentures shall be the eighth anniversary of the Effective Date and, on such maturity date, the Reorganized Debtor shall satisfy the remaining unpaid and outstanding portion of the New Debenture Principal Amount, including any quarterly payments otherwise deferred pursuant to the subparagraph (c) hereof; and (e) subject to obtaining the requisite regulatory approvals and the prior payment in full of the Allowed FNBB Claim, and at the sole discretion of the Reorganized Debtor, the Reorganized Debtor may elect to prepay any or all of the outstanding New Debenture Principal Amount without penalty prior to the maturity date thereof.<br><br>**Impairment and Voting:** The Class 6 Claim are Impaired, and the Holders of the Class 6 Claims are entitled to vote on the Plan. |

| Class Description | Summary of Treatment Under the Plan |
|---|---|
| **Class 7 – Guarantee Claims**<br><br>**Description of Claims:** In connection with the issuance of the junior subordinated debt securities, the Debtor guaranteed the obligations of the Trusts to their respective Trust Beneficiaries, including the distributions with respect to the Trust Preferred Securities (to the extent not paid by the Trusts) and any costs, expenses, or liabilities (with the exception of tax obligations) of the Trusts to the Trust Beneficiaries. The Debtor believes the liability associated with the Guarantee Claims is co-extensive with the TruPS Claims because the terms of the Trust I Debenture and Trust II Debenture mirror the economic terms of the Trust Preferred Securities in which the Trust Beneficiaries have an interest and the Debtor is not aware of any obligations of the Trusts other than the obligations to the holders of Trust Preferred Securities.<br><br>**Estimated Allowed Claims:** $9,738,251.00 | **Plan Treatment:** The Guarantee Claims shall be satisfied, released, and discharged based on the treatment of the Class 6 TruPS Claims.<br><br>**Impairment and Voting:** The Class 7 Claims are Impaired, and the Holders of the Class 7 Claims are entitled to vote on the Plan. |

| Holder | Amount |
|---|---|
| TruPS I Trustee | $3,839,930.00 |
| TruPS II Trustee | $5,898,321.00 |

| | |
|---|---|
| **Estimated Recovery:** $0.00 | |
| **Class 8 – Equity Interests**<br><br>**Description of Interests:** This Class consists of the existing pre-petition Equity Interests in the Debtor. | **Plan Treatment:** All existing Equity Interests in the Debtor shall be cancelled, forfeited, and/or extinguished on the Effective Date and shall not be entitled to any distribution whatsoever.<br><br>**Impairment and Voting:** Class 8 is Impaired under the Plan. The Holders of Class 8 Equity Interests are not entitled to vote to accept or reject the Plan under section 1126(g) of the Bankruptcy Code. |

The Reorganized Debtor shall make, and each holder of a Claim or Interest shall receive, the distributions or treatment provided for in the provisions of Article IV of the Plan in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all Claims against and Interests in the Debtor.

Notwithstanding any provision in the Plan to the contrary, consistent with section 1123(a)(4) of the Bankruptcy Code, any holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled under the Plan, any other distribution or treatment to which it and the Debtor may agree in writing.

## C. Means for Implementation of the Plan

### (1) Sources of Consideration for Plan Distributions and Restructuring Transaction

#### (i) New Investment

On the Effective Date, the Debtor will receive certain cash consideration from the New Investors in the form of the New Investment, and the New Investment will be utilized (a) to make payments required to be made under the Plan, (b) to recapitalize the Debtor's subsidiary, the Bank, and (c) in the Reorganized Debtor's operations.

Certain continuing directors and officers of the Debtor and/or SunSouth Bank may be participating in the New Investment. Such insiders will be participating at the same pricing and will be subject to the same restrictions on trading that apply to the largest among the New Investors. Independent directors of the Debtor who are not participating in the New Investment have reviewed these potential insider investments in the context of their consideration of approval of the transactions contemplated by the Plan.

#### (ii) New Common Stock and Trust Preferred Securities

On the Effective Date, in accordance with the provisions of the Plan, the Reorganized Debtor shall issue New Common Stock in the Reorganized Debtor to the New Investors. The Debtor, will issue new junior subordinated debt securities to the Trusts in the form of the New Debentures, in accordance with the terms of the Plan. All the shares of the New Common Stock and any securities issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and nonassessable.

#### (iii) Section 1145 Exemption

The issuance, under the terms of the Plan, of the new debt securities in satisfaction of the Allowed TruPS Claims and the New Common Stock to the New Investors on account of their new value contribution to the Debtor, shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by the provision of the relevant corporate documents or applicable law, regulation, order or rule, and shall thereby be exempt from the requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local laws requiring registration for the offer and sale of a security; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or related documents.

#### (iv) Cancellation of Securities

All indentures, notes, bonds, instruments, guarantees, certificates, agreements (including registration rights agreements), and other documents evidencing the existing preferred, common, and/or other stock of the Debtor, will be cancelled, and any obligations of the Debtor there under or in any way related thereto shall be fully satisfied, released, and discharged except as otherwise provided for by the Plan.

#### (v) Vesting of Assets

The property of the Debtor's Estate, together with any property of the Debtor that is not property of the Estate and that is not specifically disposed of pursuant to the Plan, shall vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules,

15

and the Bankruptcy Court. As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims and Interests except as specifically provided in the Plan or the Confirmation Order. Without limiting the generality of the foregoing, the Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay professional fees and expenses incurred after the Confirmation Date.

(vi)    Preservation of Rights of Action

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or the Estate may hold against any Person or entity. The Reorganized Debtor or its successor(s) may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights. Notwithstanding the foregoing, the Debtor hereby releases any claims, causes of action, or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code.

(vii)    Exemption from Certain Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers or mortgages from or by a Debtor to a Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(2)    <u>Post-Consummation Corporate Structure, Management, and Operation</u>

(i)    Continued Corporate Existence

The Reorganized Debtor shall continue to exist as a corporate entity under its articles of incorporation and bylaws in effect before the Effective Date, except as its articles of incorporation and bylaws are amended by the Plan.

(ii)    Articles of Incorporation and Bylaws

The articles of incorporation of the Reorganized Debtor will be amended to reflect (i) any necessary decrease in par value of common stock in order to allow the Debtor to complete the common equity capital raise in connection with the New Investment and the issuance of New Common Stock as contemplated by the Plan; and (ii) a limitation on issuance of non-voting equity interests pursuant to section 1123(a)(6) of the Bankruptcy Code. The articles of incorporation and bylaws of the Reorganized Debtor shall otherwise be amended to satisfy the provisions of the Plan, the Bankruptcy Code, and applicable state and federal law. The Amended Articles of Incorporation will be appended to the Investment Agreement, which is to be included with the Plan Supplement.

16

(iii)     Directors and Officers

On the Effective Date, the board of directors of the Reorganized Debtor shall be comprised of the same individuals who currently serve on the board of directors: the board of directors of the Reorganized Debtor shall be comprised of the seven individuals who currently serve on the board of directors: Dawn Wise Dunning-Theune; Milton Roger Peterson; James Steven Roy; Douglas Shane Sinquefield; Calvin Ray Turner, Jr.; and Henry Monty Weigel. If an investor-selected director has not received requisite regulatory approval or non-objection prior to the Effective Date, then such investor-selected director shall become a director as soon as practicable upon receipt of such approval. In the absence of such approval with respect to an investor-selected director or a vacancy in any director position, the applicable director position will be filled in accordance with the Reorganized Debtor's bylaws. The officers of the Debtor shall continue as officers of the Reorganized Debtor. The Reorganized Debtor's directors and officers may receive compensation consistent with the Reorganized Debtor's policies and practices.

Certain continuing directors and officers of the Debtor and/or SunSouth Bank may be participating in the New Investment. Such insiders will be participating at the same pricing and will be subject to the same restrictions on trading that apply to the largest among the New Investors. Independent directors of the Debtor who are not participating in the New Investment have reviewed these potential insider investments in the context of their consideration of approval of the transactions contemplated by the Plan.

(iv)     Corporate Action

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtor and/or the Reorganized Debtor shall enter into the restructuring transactions described herein and in the Plan and any ancillary documents. The Debtor and/or the Reorganized Debtor shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtor's business or the overall organizational structure of the Reorganized Debtor. The restructuring transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtor to be necessary or appropriate. The actions taken by the Debtor and/or the Reorganized Debtor to effect the restructuring transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion pursuant to applicable state law, including but not limited to the articles of incorporation and bylaws; (iv) the cancellation of shares; and (v) all other actions that the Debtor and/or the Reorganized Debtor determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the restructuring transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the restructuring transactions.

Without limiting the generality of the foregoing, the Debtor is authorized to amend and restate the articles of incorporation in order to, among other things, (A) adopt certain restrictions on acquisitions and dispositions of securities and (B) make certain other changes consistent with the Plan.

The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice-president or senior vice-president, or any other appropriate officer of the Debtor and of the Reorganized Debtor, as the case may be, shall each be authorized to execute, deliver, file, or record

17

any such agreements, instruments, or documents referenced in the Plan, including but not limited to those items referenced in Articles IV and VI of the Plan, and shall each be further authorized to take such other actions as may be necessary, desirable, or appropriate to effectuate and further evidence the terms and conditions of the Plan and the restructuring transactions contemplated in the Plan. The secretary or assistant secretary of the Debtor and of the Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

### D. Provisions Governing Distributions

(1) <u>Delivery of Distributions; Undeliverable or Unclaimed Distributions</u>

(i) Delivery of Distributions in General

The Reorganized Debtor shall make distributions to each holder of an Allowed Claim and an Allowed Interest at the address for each such holder reflected in the books and records of the Debtor. Distributions under the Plan shall be made only to the holders of Allowed Claims and Allowed Interests as of the Record Date.

(ii) Undeliverable and Unclaimed Distributions

(A) Holding of Undeliverable and Unclaimed Distributions

If any holder's distribution is returned as undeliverable, no further distributions to that holder shall be made unless and until the Reorganized Debtor receives notice of the holder's then-current address, at which time all outstanding distributions shall be made to the holder. Undeliverable distributions made through the Reorganized Debtor shall be returned to the Reorganized Debtor until such distributions are claimed. The Reorganized Debtor shall establish a segregated account to serve as the unclaimed distribution reserve, and all undeliverable and unclaimed distributions shall be deposited therein, for the benefit of all similarly situated Persons until such time as a distribution becomes deliverable, is claimed, or is forfeited under the terms of the Plan.

(B) Failure to Claim Undeliverable Distributions

Any undeliverable or unclaimed distribution under the Plan that does not become deliverable on or before the second anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Person otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefor against, or seeking to recover its distribution from, the Debtor, the Estate, the Reorganized Debtor, or their property. After the second anniversary of the Effective Date, the Reorganized Debtor shall withdraw any amounts remaining in the unclaimed distribution reserve for distribution in accordance with the Plan.

(2) <u>Calculation of Distribution Amounts of New Common Stock or Securities</u>

No fractional shares of New Common Stock or securities shall be issued or distributed under the Plan or by the Reorganized Debtor. Each Person entitled to receive New Common Stock or securities will receive the total number of whole shares of New Common Stock or securities to which such Person is entitled.

Case 17-10371    Doc 14    Filed 02/17/17    Entered 02/17/17 17:49:05    Desc Main
Document    Page 23 of 211

(3)     Withholding and Reporting Requirements

In connection with the Plan and all distributions hereunder, the Reorganized Debtor shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to those requirements. The Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with those withholding and reporting requirements. Notwithstanding any other provision of the Plan, (i) each holder of an Allowed Claim or Person that is to receive a distribution of its pro rata share of New Common Stock or a new debt security shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (ii) no distribution shall be made to or on behalf of such holder or Person pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtor's satisfaction, established an exemption therefrom. Any distribution of shares of New Common Stock or securities to be made pursuant to the Plan shall, pending the implementation of such arrangements, be treated as undeliverable pursuant to Article X thereof.

(4)     Setoffs

The Reorganized Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made in respect of that Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Claim's holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any claim that the Debtor or the Reorganized Debtor may have in connection with such Claim.

## E.     Treatment of Executory Contracts and Unexpired Leases

(1)     Rejection

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, Any executory contracts or unexpired leases that (a) have not been assumed by the Debtor with the Bankruptcy Court's approval on or prior to the Confirmation Date, and (b) are not the subject of a pending motion to assume on the Confirmation Date, shall, as of the Confirmation Date (subject to the occurrence of the Effective Date), be deemed to have been rejected by the Debtor. The Plan shall constitute a motion to reject such executory contracts and unexpired leases, and the Debtor shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan.

(2)     Assumption

The Plan provides for the assumption of (i) the Tax Sharing Agreement dated October 19, 2006, as amended November 23, 2010 and June 23, 2015, between the Debtor and the Bank and (ii) the Restructuring Support Agreement dated February 16, 2017 between the Debtor and FNBB.  All assumed agreements shall remain in full force and effect for the benefit of the Reorganized Debtor, and be enforceable by the Reorganized Debtor in accordance with their terms notwithstanding any provision in such assumed agreement that prohibits, restricts or conditions such assumption, assignment, or transfer. Any provision in the assumed agreements that purports to declare a breach or default based in whole or in

19

part on commencement or continuance of this Bankruptcy Case is hereby deemed unenforceable, and the assumed agreements shall remain in full force and effect. Any provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtor based on the filing of the Bankruptcy Case or the financial condition of the Debtor shall be unenforceable.

The Debtor shall be deemed to have assumed the Investment Agreements as of the Effective Date. To the extent that that the Debtor has entered into Investment Agreements post-petition subject to confirmation of the Plan, the Debtor shall be authorized to perform under such post-petition Investment Agreement as of the Effective Date.

(3)    <u>Payments Related to Assumption of Contracts and Leases</u>

Any monetary defaults under any executory contract and unexpired lease to be assumed shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, in one of the following ways: (a) by payment of the default amount in Cash on the Effective Date; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. Any party to an executory contract that does not file an objection to the Plan prior to the deadline for filing objections to the Plan established by order of the Bankruptcy Court shall be deemed to agree to the cure amount for such executory contract as reflected in Section 7.01 of the Plan. In the event of a dispute regarding (i) the cure amount for any executory contract to be assumed under the Plan, (ii) the ability of the Debtor to provide adequate assurance of future performance under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption.

(4)    <u>Indemnification Obligations</u>

Except as otherwise specifically provided in the Plan, any obligations or rights of the Debtor to indemnify its present and former directors, officers, or employees under its articles of incorporation, bylaws, or employee-indemnification policy, or under state law or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive and be unaffected by the Plan's confirmation, and remain an obligation of the Reorganized Debtor, regardless of whether the right to indemnification arose before or after the Petition Date.

(5)    <u>Treatment of Change of Control Provisions</u>

The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control of the Debtor.

F.    **Conditions Precedent to the Plan's Confirmation and Effective Date**

(1)    <u>Conditions to Confirmation</u>. The Plan's Confirmation is subject to the satisfaction of the following conditions precedent:

(i)    The proposed Confirmation Order shall be in a form and substance satisfactory to the Debtor and FNBB; and

20

(ii)    The Debtor shall have entered into additional subscriptions agreements with additional New Investment totaling not less than $1.25 million.

(2)    <u>Conditions to Effective Date</u>.    Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(i)    Each of the conditions to entry of the Confirmation Order shall have been satisfied;

(ii)    The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor and FNBB, confirming the Plan, as the same may have been modified;

(iii)    The Debtor shall have consummated the transactions contemplated by the Investment Agreements to be consummated on or prior to the Effective Date;

(iv)    The Debtor shall have received all required regulatory approvals to consummate the transactions contemplated by the Investment Agreements and in the Plan, the Plan Supplement, the Disclosure Statement, and any related ancillary documents; and

(v)    The Effective Date shall occur on or before the Consummation Deadline.

## G.    Modification and Withdrawal

The Debtor reserves the right to modify the Plan either before or after Confirmation to the fullest extent permitted under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. The Debtor may withdraw the Plan at any time before the Effective Date.

## H.    Retention of Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Bankruptcy Case and the Plan, to the fullest extent permitted by law, including jurisdiction to:

(1)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

(2)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

(3)    resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(4)    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and resolving any disputes concerning any distributions contemplated in or relating to the Plan;

21

(5)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(6)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(7)     resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Person's or Entity's obligations incurred in connection with the Plan;

(8)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan, except as otherwise provided herein;

(9)     resolve any cases, controversies, suits, or disputes with respect to the releases, injunction, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction, and other provisions;

(10)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(11)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement; and

(12)     enter an order and/or final decree concluding the chapter 11 case.

## I.     Effects of Confirmation

(1)     <u>Binding Effect</u>

The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims and Interests, and their respective successors and assigns, and all other parties in interest in this Bankruptcy Case.

(2)     <u>Discharge of the Debtor</u>

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, Interests in the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a

Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided in the Plan, any default by the Debtor with respect to any Claim or Interest that existed before or on account of the filing of the Bankruptcy Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests, subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

(3)   <u>Exculpation and Limitation of Liability</u>

As of the Effective Date, except as otherwise specifically provided in the Plan, to the fullest extent provided under section 1125(e) of the Bankruptcy Code, the Debtor, the Reorganized Debtor, and their respective successors, predecessors, control persons, members, agents, and present and former (to the extent each such Person provided services during post-petition period) officers, directors, and employees (and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such Persons) shall neither have nor incur any liability to any Person or Entity (including any Holder of a Claim, Interest, or Equity Interest) for any pre- or post-petition act taken or omitted to be taken in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, or occurrence of the Effective Date of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with, or in contemplation of, restructuring of Debtor. The Debtor and the Reorganized Debtor (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding any provision of this Article or the Plan, the Plan shall not effect a release, discharge, exculpation, injunction against the exercise of, or other impairment or extinction of (i) any rights or claims of the New Investors or the Debtor under the Investment Agreements or (ii) any claims by the United States Government or any of its agencies, or any state or local authority, including, without limitation, any claim arising under applicable securities or banking laws or regulations.

**J.    Miscellaneous Provisions**

(1)   <u>Payment of Statutory Fees</u>

All fees payable, pursuant to title 28, section 1930, United States Code, as agreed between the Debtor and the Bankruptcy Administrator or determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on the Effective Date or as soon thereafter as reasonably possible.

(2)   <u>Severability of Plan Provisions</u>

If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void, or unenforceable, the Debtor, at its option, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

(3)     Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person.

(4)     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Bankruptcy Case, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the Reorganized Debtor has made all distributions contemplated by the Plan and the Bankruptcy Court has entered an order closing the Bankruptcy Case.

## K.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (i) the laws of the state of Alabama shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of the Debtor shall govern corporate governance matters with respect to the Debtor, in either case without giving effect to the principles of conflicts of law thereof.

## V.     CERTAIN RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), including the "Risk Factors" and other matters discussed in the Financial Statements attached hereto, before deciding whether to vote to accept or to reject the Plan.

## A.     Failure to Confirm the Plan

If the Plan is not confirmed and consummated, there can be no assurance that the chapter 11 case will continue rather than be converted to a chapter 7 liquidation case. In fact, the Debtor believes that, absent confirmation of the Plan, the likely result may be liquidation.  In the event of a liquidation, holders of Allowed Secured Claims likely would receive fractions of the face amounts of their Allowed Claims, and all other creditors and stockholders likely would receive nothing.

## B.     Potential Adverse Effects of Chapter 11

While the Debtor will seek to have the stay in chapter 11 as brief as practicable so as to minimize any potential disruption to its operations, it is possible that, despite the belief and intent of the Debtor, the commencement of the Bankruptcy Case could materially adversely affect relationships between the Debtor and its customers and applicable regulatory agencies and bodies.

## C.     Underlying Risks at the Bank Level

(1)     Potential Credit Quality Decline

The Bank's ability to generate earnings is significantly affected by its ability to properly originate, underwrite and service loans. The Bank has sustained losses primarily because borrowers,

guarantors or related parties have failed to perform in accordance with the terms of their loans and the Bank failed to detect or respond to deterioration in asset quality in a timely manner. Overall, the Bank's net loan losses as a percentage of average loans was .98%, which is significantly greater that its peers' average of .32%. The Bank's most recent loan classification indicated total classified loans of $7.79 million, of which $7.13 million were classified substandard. Other real estate holdings totaled $2.27 million as of December 31, 2016, down from $3.88 million at the end of 2015 and a high of $11.77 million at year-end 2012. The Bank could sustain additional losses for these reasons.

Further problems with credit quality or asset quality could cause the Bank's interest income and net interest margin to further decrease, which could adversely affect the Bank's business, financial condition, and results of operations. Although the Bank believes credit quality indicators are showing signs of stabilization, further deterioration in the Alabama real estate market as a whole may cause management to adjust its opinion of the level of credit quality in the Bank's loan portfolio. Such a determination may lead to an additional increase in the Bank's provisions for loan losses, which could also adversely affect the Bank's business, financial condition, and results of operations.

(2)    Real Estate

A significant portion of the Bank's loan portfolio is secured by real estate. As of December 31, 2016, approximately 25% of the Bank's loans had real estate as a primary or secondary component of collateral. The real estate collateral in each case provides an alternate source of repayment in the event of default by the borrower and may deteriorate in value during the time the credit is extended. Further deterioration of the real estate market in the Bank's market areas could result in an increase in the number of borrowers who default on their loans and a reduction in the value of the collateral securing their loans, which in turn could have an adverse effect on the Bank's profitability and asset quality. If the Bank is required to liquidate the collateral securing a loan to satisfy the debt during a period of reduced real estate values, the Bank's earnings and capital could be adversely affected. Acts of nature, including hurricanes, tornados, earthquakes, fires, and floods, each of which may be exacerbated by global climate change and may cause uninsured damage and other loss of value to real estate that secures these loans, may also negatively impact the Bank's financial condition.

(3)    Allowance for Loan Losses

The Bank's success depends, to a significant extent, on the quality of its assets, particularly loans. Like other financial institutions, the Bank faces the risk that its customers will not repay their loans, that the collateral securing the payment of those loans may be insufficient to assure repayment, and that the Bank may be unsuccessful in recovering the remaining loan balances. The risk of loss varies with, among other things, general economic conditions, the type of loan, the creditworthiness of the borrower over the term of the loan and, for many of the Bank's loans, the value of the real estate and other assets serving as collateral. Management makes various assumptions and judgments about the collectability of the Bank's loan portfolio after considering these and other factors. Based in part on those assumptions and judgments, the Bank maintains an allowance for loan losses in an attempt to cover any loan losses that may occur. In determining the size of the allowance, the Bank also relies on an analysis of its loan portfolio based on historical loss experience, volume and types of loans, trends in classification, delinquencies and nonaccruals, national and local economic conditions, and other pertinent information, including the results of external loan reviews. Despite the Bank's efforts, its loan assessment techniques may fail to properly account for potential loan losses, and, as a result, the established loan loss reserves may prove insufficient. If the Bank is unable to generate income to compensate for these losses, they could have a material adverse effect on its operating results.

In addition, federal and state regulators periodically review the Bank's allowance for loan losses and may require it to increase its allowance for loan losses or recognize further loan charge-offs, based on judgments different than those of the Bank's management. Higher charge-off rates and an increase in the Bank's allowance for loan losses may hurt its overall financial performance and may increase its cost of funds. As of December 31, 2016, the Bank had nonaccrual loans totaling approximately $4.19 million. The Bank's loan loss reserve represented 4.17% of loans as of December 31, 2016, which is much higher than its peers' average of 1.41%. The high reserve is in part due to the NashYork Litigation discussed (and defined) below. The Bank's current and future allowances for loan losses may not be adequate to cover future loan losses given current and future market conditions.

(4)   <u>Liquidity Risks</u>

The goal of liquidity management is to ensure that the Bank can meet customer loan requests, customer deposit maturities and withdrawals, and other cash commitments under both normal operating conditions and under unpredictable circumstances of industry or market stress. To achieve this goal, the Bank's asset/liability committee establishes liquidity guidelines that require sufficient asset-based liquidity to cover potential funding requirements and to avoid over-dependence on volatile, less reliable funding sources.

Liquidity is essential to the Bank's business. An inability to raise funds through traditional deposits, borrowings, the sale of securities or loans, issuance of additional equity securities, and other sources could have a substantial negative impact on the Bank's liquidity. The Bank's access to funding sources in amounts adequate to finance its activities and with terms acceptable to it could be impaired by factors that impact the Bank specifically or the financial services industry in general. Factors that could detrimentally impact access to liquidity sources include a decrease in the level of the Bank's business activity as a result of a downturn in the markets in which the Bank's loans are concentrated, the change in the Bank's status from well-capitalized to significantly undercapitalized, or regulatory action against the Bank. The Bank's ability to borrow could also be impaired by factors that are not specific to it, such as the current disruption in the financial markets and negative views and expectations about the prospects for the financial services industry as a result of the continuing turmoil and deterioration in the credit markets.

Traditionally, the primary sources of funds of the Bank have been customer deposits and loan repayments. Because of the Consent Orders, the Bank may not accept brokered deposits unless a waiver is granted by the FDIC. The Bank may need to find other sources of liquidity to replace these deposits as they mature. Secondary sources of liquidity may include proceeds from Federal Home Loan Bank (the "<u>FHLB</u>") advances and federal funds lines of credit from correspondent banks. The Bank's credit risk rating at the FHLB has been negatively impacted, resulting in more restrictive borrowing requirements. Because the Bank is significantly undercapitalized, the Bank is required to pledge additional collateral for FHLB advances. As of December 31, 2016, the Debtor has an outstanding line of credit of $13.5 million with the FHLB, up from $10.75 million at the end of 2015.

The Bank actively monitors the depository institutions that hold its federal funds sold and due from banks cash balances. The Bank cannot provide assurances that access to its cash and cash equivalents and federal funds sold will not be impacted by adverse conditions in the financial markets. The Bank's emphasis is primarily on safety of principal, and it diversifies cash, due from banks, and federal funds sold among counterparties to minimize exposure relating to any one of these entities. The Bank routinely reviews the financials of its counterparties as part of its risk management process. Balances in the Bank's accounts with financial institutions in the U.S. may exceed the FDIC insurance limits. While the Bank monitors and adjusts the balances in its accounts as appropriate, these balances could be impacted if the correspondent financial institutions fail.

There can be no assurance that the Bank's sources of funds will be adequate for its liquidity needs, and it may be compelled to seek additional sources of financing in the future. Specifically, it may seek additional debt in the future to achieve its business objectives. There can be no assurance that additional borrowings, if sought, would be available to the Bank or, if available, would be on favorable terms. Bank and holding company stock prices have been negatively impacted by the recent adverse economic conditions, as has the ability of banks and holding companies to raise capital or borrow in the debt markets. If additional financing sources are unavailable or not available on reasonable terms, the Bank's business, financial condition, results of operations, cash flows, and future prospects could be materially adversely impacted.

(5)     Investment Portfolio Risk

The Bank's investment portfolio as of December 31, 2016 has been designated available-for-sale pursuant to U.S. GAAP relating to accounting for investments. Such principles require that unrealized gains and losses in the estimated fair value of the available-for-sale portfolio be "marked to market" and reflected as a separate item in shareholders' equity (net of tax) as accumulated other comprehensive income. This determination requires significant judgment, and actual results may be materially different than the Bank's estimate. As of December 31, 2016, the Bank maintained available-for-sale securities of $48,574,855, which was below book value by $163,000.

Management believes that several factors will affect the fair value of the Bank's portfolio. These include, but are not limited to, changes in interest rates or expectations of changes, the degree of volatility in the securities markets, inflation rates or expectations of inflation, and the slope of the interest rate yield curve (the yield curve refers to the differences between short-term and longer-term interest rates; a positively sloped yield curve means shorter-term rates are lower than longer-term rates). These and other factors may impact specific categories of the portfolio differently, and the Bank cannot predict the effect these factors may have on any specific category. Shareholders' equity will continue to reflect the unrealized gains and losses (net of tax) of these investments. If conditions in the credit markets deteriorate further, the Bank may be required to record unrealized losses in other comprehensive income (loss) or additional impairment on the Bank's investments in future quarters.

(6)     Interest Rate Risk

The Bank's profitability depends to a large extent on its net interest income, which is the difference between income on interest-earning assets such as loans and investment securities, and expense on interest-bearing liabilities such as deposits and other borrowings. The Bank is unable to predict changes in market interest rates, which are affected by many factors beyond the Bank's control, including inflation, recession, unemployment, money supply, domestic and international events and changes in the United States and other financial markets. The Bank's net interest income may be reduced if: (i) more interest-earning assets than interest-bearing liabilities reprice or mature during a time when interest rates are declining or (ii) more interest-bearing liabilities than interest-earning assets reprice or mature during a time when interest rates are rising.

Changes in the difference between short- and long-term interest rates may also harm business. For example, short-term and long-term interest rates shrink or disappear, as has occurred in the current interest rate policy environment, the spread between rates paid on deposits and received on loans could narrow significantly, decreasing the Bank's net interest income.

27

(7)     Key Personnel

The Bank's success is, and is expected to remain, highly dependent on its senior management team.  Management's extensive knowledge of the banking industry and relationships in the community generate business for the Bank.  The Bank may not be able to retain members of the senior management team or other key employees.  The loss of the services of any of them could have a material adverse effect on the Bank's business, financial condition, and results of operation.

(8)     Customer Information

The Bank provides its customers the ability to bank online.  The secure transmission of confidential information over the Internet is a critical element of online banking.  The Bank's network could be vulnerable to unauthorized access, computer viruses, phishing schemes, and other security problems.  The Bank may be required to spend significant capital and other resources to protect against the threat of security breaches and computer viruses, or alleviate problems caused by security breaches or viruses.  To the extent that the Bank's activities or the activities of its customers involve the storage and transmission of confidential information, security breaches and viruses could expose the Bank to claims, litigation and other possible liabilities.  Any inability to prevent security breaches or computer viruses could also cause existing customers to lose confidence in the Bank's system and could adversely affect its reputation and ability to generate deposits.

(9)     Litigation Risk

The Debtor and the Bank may be involved from time to time in a variety of litigation, investigations or similar matters arising out of its business.  Insurance may not cover all claims that may be asserted against the Debtor or the Bank, and any claims asserted against the Debtor or the Bank, regardless of merit or eventual outcome, may harm their reputation.  Should the ultimate judgments or settlements in any litigation or investigation significantly exceed insurance coverage, it could have a material adverse effect on the Debtor's and the Bank's business, financial condition, and results of operation.

The Bank is a party to an action styled *Earle Yaffa and Ronald J. Weiss, Executors of the Will of Joseph Flom, Jason Flom, and Elizabeth Yates v. SunSouth Bank, Ronald E. Gilley, and Ronnie Gilley Properties, LLC*, which was litigated in the District Court for the Northern District of Florida (the "NashYork Action").  In 2005, Ronnie Gilley, Joseph Flom, Jason, Flom, Elizabeth Yates, Elliot Levine, Herbert L. Graham, James C. Stroud, Dwight P. Wiles, and Gary Smith (collectively, the "NashYork Investors") were attracted to the real estate boom on the Florida gulf coast and the enormous profits that were being made at the time.  The NashYork Investors formed a joint venture to purchase property near Panama City Beach, Florida, and to construct townhomes and a commercial development called La Borgata.  NashYork, LLC ("NashYork") was created subsequently.  In December 2006, SunSouth Bank loaned NashYork approximately $22 million in connection with the development of La Borgata and assigned portions of the loan to a number of participating banks.  It retained 26% of the loan for itself.  Several of NashYork's investors guaranteed portions of the loan.  The development loan went into default after the gulf coast real estate market collapsed, and the Bank granted several extensions for the loan from December 2008 through May 2012, evidenced by, among other things, a renewal promissory note dated January 1, 2011, in the principal amount of $15,970,041.77.  The Bank ultimately requested to be paid upon the promissory note's maturity date in May 2012.  Certain NashYork Investors initiated litigation against the Bank and Ronnie Gilley, alleging that Gilley, an allegedly favored Bank customer, and the Bank defrauded them so that Gilley could steal money from them and pay Gilley's nonperforming loans.  Their operative complaint at the time of trial asserted claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO") and other related claims, including breach of fiduciary duty,

intentional misrepresentation, fraudulent concealment, and fraudulent inducement. In response, the Bank commenced a separate action against NashYork and other NashYork investors, including Elliot Levine, NashYork's manager. Those actions were consolidated and aretogether referred to as the "NashYork Litigation."

The NashYork Litigation was tried in early 2016. Unfortunately, the Bank did not prevail at trial, and, on March 21, 2016, a judgment was entered against the Bank and in favor of Earle Yaffa and Ronald J. Weiss, Executors of the Will of Joseph Flom, Jason Flom, and Elizabeth Yates, which rescinded their guaranties on account of their RICO and other claims, and against the Bank on its claims against those plaintiffs. The district court also ruled that the Bank is liable under RICO for attorneys' fees incurred by those plaintiffs. Judgment was also entered against the Bank on all of its claims and on Elliott Levine's counterclaims, but in favor of the Bank on NashYork's counterclaims. The Bank has taken an appeal of the judgment to the United States Court of Appeals for the Eleventh Circuit. If the judgment is affirmed on appeal, the Bank could be liable for its portion of the loan balance and the prevailing parties' attorneys' fees. Although the participant banks should bear their respective shares of the loan loss and attorneys' fees, there is the risk that at least some of the participants will seek to avoid their shares of the loan loss and attorneys' fees, leaving the Bank exposed to a potential liability in the $14 million range.

The uncertainty of the NashYork Litigation materially and adversely impacts the potential value of the Bank and the possibility of a sale transaction being consummated. With the exception of the NashYork Litigation, the Bank does not believe that any other threatened or pending litigation pose significant litigation risk or materially impact the Bank's value.

### D.     Absence of Public Market; Restriction on Transferability

The shares of common stock to be issued under the Plan are securities for which there is no market, largely due to the NashYork Litigation described above. Accordingly, there can be no assurance as to the development or liquidity of any market for the shares of the stock. If a trading market does not develop or is not maintained, holders of the shares may experience difficulty in reselling such securities or may be unable to sell them at all. If a market for the shares of the stock develops, any such market may be discontinued at any time.

The shares of the Reorganized Debtor's stock are being offered in reliance upon an exemption from registration under the Securities Act and applicable state securities laws. Therefore, the shares may be transferred or resold only in a transaction registered under or exempt from the Securities Act and applicable state securities laws. The liquidity of, and trading market for, the shares of such stock also may be adversely affected by general declines in the market or by declines in the market for similar securities. Such declines may adversely affect such liquidity and trading markets independent of the financial performance of, and prospect for, the Reorganized Debtor.

### E.     Dividends

The Debtor receives substantially all of its revenue from dividends from SunSouth Bank. Those dividends are the principal source of funds to pay dividends on the Debtor's common stock and interest and principal on its debt. Various federal and/or state laws and regulations limit the amount of dividends that SunSouth Bank and certain of its non-bank subsidiaries may pay the Debtor. If earnings of the Debtor's subsidiaries are not sufficient to make dividend payments to the Debtor while maintaining adequate capital levels, the Debtor's ability to make dividend payments will be negatively impacted. SunSouth Bank is currently precluded from paying dividends to the Debtor. Pursuant to the Consent Orders, the Debtor must obtain written approval from the Federal Reserve Bank of Atlanta before making any dividend payments. The Debtor does not anticipate that any dividends will be paid in the near term.

### F. Regional Concentration

The Debtor's regional concentration puts it particularly at risk for changes in economic conditions in its primary market of Alabama. The Debtor is therefore particularly vulnerable to adverse changes in economic conditions in Alabama.

### G. Regulatory Matters

The effectiveness of the Plan is conditioned on, among other things, the Debtor's receipt of all required regulatory approvals to consummate the transactions contemplated by the Investment Agreements and the Plan, the Disclosure Statement, and any related ancillary documents. The Debtor and SunSouth Bank are heavily regulated by federal and state agencies under various programs and regimes. If the Debtor cannot obtain the required approvals, the Plan may fail and the Debtor may be forced to pursue liquidation or other alternatives, in which case the recoveries to stakeholders will almost certainly be less than the recoveries available under the Plan. Moreover, even if the Plan is successful, the inability of the Debtor and/or SunSouth Bank to comply on a going-forward basis with, and potential future changes or modifications to, applicable statutes, regulations, and regulatory policies, could adversely affect the Reorganized Debtor's and/or the Bank's operations, including, among other things, limiting the types of financial services and products that may be offered and/or increasing operating costs. In addition, any failure to comply with applicable laws, regulations, and policies, could subject the Debtor and/or SunSouth Bank to sanctions, reputational damage, and other harm.

### H. Potential Dilution

The Debtor may need to incur additional debt or equity financing in the future to strengthen its capital position. The Debtor's ability to raise capital, if needed, will depend on, among other things, conditions in the capital markets at that time, which are outside of the Debtor's control and its financial performance. The Debtor cannot provide assurances that such financing will be available to it on acceptable terms or at all, or if the Debtor does raise more capital that it will not be dilutive to existing shareholders.

If the Debtor determines that it needs to raise more capital, its Board generally has the authority, without action or vote of the shareholders, to issue all or part of any authorized but unissued shares of stock for any corporate purpose, including issuance of equity-based incentives under or outside of the Debtor's equity compensation plans. Additionally, the Debtor is not restricted from issuing additional common stock or preferred stock, including any securities that are convertible into or exchangeable for, or that represent the right to receive, common stock or preferred stock or any substantially similar securities. If the Debtor issues preferred stock that has a preference over the common stock with respect to the payment of dividends or upon liquidation, dissolution or winding-up, or if it issues preferred stock with voting rights that dilute the voting power of the common stock, the rights of holders of the common stock could be adversely affected. Any issuance of additional shares of stock will dilute the percentage ownership interest of the shareholders and may dilute the book value per share of the Debtor's common stock. Shares the Debtor issues in connection with any such offering will increase the total number of shares and may dilute the economic and voting ownership interest of the Debtor's existing shareholders.

## VI.   <u>CONFIRMATION OF THE PLAN</u>

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11, including, among other things, that (a) the Plan properly classifies Claims and Interests, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Debtor has complied with applicable provisions of the Bankruptcy Code, (d) the Debtor has proposed the

Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is in the "best interests" of all holders of Claims or Interests in each Impaired Class, (h) all fees and expenses payable under title 28, section 1930 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date, and (i) the Plan provides for the continuation after the Effective Date of any retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time before Confirmation in accordance with sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits.

### A.    Voting Requirements

Under the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" (as that term is defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the Plan modifies the legal, equitable, or contractual rights of holders of Claims or Interests in the Class (other than by curing defaults and reinstating debt). Under section 1126(f) of the Bankruptcy Code, Classes of Claims and Interests that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan. Under section 1126(g) of the Bankruptcy Code, Classes of Claims and Interests whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An Impaired Class of Claims or Interests shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims and Allowed Interests actually voting in the Class have voted to accept the Plan, and (ii) the holders of more than one-half in number of the Allowed Claims or Allowed Interests actually voting in the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

Only the holders of Claims and Interests as of the Record Date, in the Classes entitled to vote on the Plan, shall be allowed to vote on the Plan. In addition, distributions to be made under the Plan shall be made only the holders of Allowed Claims and Allowed Interests as of the Record Date.

### B.    Feasibility of the Plan

In connection with confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This is the so-called "feasibility" test.

The Debtor will fund its reorganization, recapitalization, and operations primarily using the cash proceeds of the New Investment.  The Debtor believes that the Reorganized Debtor will be adequately capitalized with the New Investment, to make the payments required under the Plan on the Effective Date or as otherwise contemplated by the Plan, and to maintain operations on a going-forward basis.  In determining the feasibility of Plan, the Debtor has relied on the Pro-Formas attached to this Disclosure Statement as **Exhibit D**.  The Projections indicate that the Reorganized Debtor should have adequate cash flow to pay and service its debt obligations and to fund its operations.  Accordingly, the Debtor believes that the Plan complies with the standard of section 1129(a)(11) of the Bankruptcy Code.

The Pro Formas are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operations of the Reorganized Debtor and the Bank; industry performance; no material adverse changes in applicable legislation or regulations or the

31

administration thereof; no material adverse changes in general business and economic conditions; no material adverse changes in competition; adequate financing; the absence of material contingent or unliquidated litigation or other claims; and other matters, many of which will be beyond the control or knowledge of the Debtor and some or all of which may not materialize.

Aspects of the Plan are subject to approval or non-objection of one or more of these regulators under federal banking laws or the Consent Orders. The principal objectives of the U.S. bank regulatory system are to ensure the safety and soundness of banking institutions, to protect depositors and other customers, and to avoid loss to the FDIC Deposit Insurance Fund. Consummation of the Plan is consistent with these objectives. As part of its ongoing supervisory relationship, the Debtor has been in regular communication with its regulators regarding its efforts to recapitalize and to pursue the Plan. The regulators have not raised any objection, and the Debtor believes that it will be able to obtain the requisite regulatory consents to proceed with consummation of the Plan.

### C.    Best Interests Test

Even if the Plan were to be accepted by each class of holders of Claims and Interests, the Bankruptcy Code requires the Bankruptcy Court to find that the Plan is in the "best interests" of all holders of Claims or Interests that are impaired by the Plan that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each impaired class of claims or interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. Costs of a liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in the chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once a bankruptcy court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

### D. Liquidation Analysis

The sole material asset of the Debtor is its stock in the subsidiary Bank. Given the circumstances set forth in the Consent Orders and the level of capitalization at the Bank level, any purchaser of the Bank stock will need to make a substantial capital investment in the Bank. There can be no assurance that FDIC regulators would permit a chapter 7 trustee to sell a regulated bank. Given the results of the efforts of the Debtor's advisors to attract new capital investment to the Bank over the past 2 and a half years, the size of the Bank and the investment opportunity, the historical challenges that led to the Consent Orders, the depressed price reflective of a sale in a chapter 7 proceeding, the financial information set forth in **Exhibits C and D** hereto, and the Liquidation Analysis attached as **Exhibit E**, the Debtor believes that the Bank stock as held by the Debtor would yield no return to the Holders of Claims or Interests on liquidation.

The Debtor believes that each member of each Class of Claims and Interests will receive at least as much, if not more, under the Plan as they would receive if the Debtor was liquidated in a chapter 7 case. More specifically, a liquidation of the Debtor would significantly impair recoveries to all stakeholders and clearly is not in the best interests of estate constituencies. The Liquidation Analysis estimates that holders of TruPS Claims and all other creditors and stockholders would receive nothing in a liquidation. By contrast, under the Plan, new debt securities will be issued in satisfaction of the Allowed TruPS Claims, any Allowed Unsecured Claims are Unimpaired, and the FNBB Claim will be paid over time. Accordingly, it is clear that stakeholders will fare much better under the Plan than in a liquidation. The Plan therefore satisfies the best interests test.

### E. Confirmation Without Acceptance of All Impaired Classes – "Cramdown"

The Debtor will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code and reserves the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. Under section 1129(b) of the Bankruptcy Code, the Court may confirm a plan over the objection of a rejecting class, if, among other things, (a) at least one impaired class of claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (a) (i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interests of such class will receive or retain under the plan any property on account of such junior interest.

## VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the realistic alternatives likely will be a liquidation of the Debtor's assets in a liquidation under a chapter 7 bankruptcy.  The Debtor does not believe that a chapter 11 process under which some different plan is developed and proposed post-petition is viable. While a different chapter 11 is not a realistic alternative, the Debtor and its advisors did consider alternative structures.  Following a thorough marketing effort by the Debtor's financial advisors, the maximum expression of interest that the Debtor obtained for the sale of SunSouth Bank was less than the consideration and benefits to be realized under the Plan.

The Debtor believes that absent the infusion of new capital and the completion of the proposed restructuring, SunSouth Bank will remain subject to further action by regulators, possibly resulting in the chapter 7 liquidation of the Debtor.  The Debtor believes that in a liquidation under chapter 7, before creditors would receive any distributions, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtor's Estate. The assets available for distribution to creditors would be reduced by such additional expenses, as well as by certain Claims that may be entitled to priority in the context of a liquidation and/or might arise by reason of the liquidation.

**THE DEBTOR THEREFORE BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO CREDITORS THAN WOULD ANY OTHER ALTERNATIVE AND THAT IT SHOULD BE CONFIRMED PROMPTLY.**

## VIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A summary description of certain United States federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only United States federal income tax consequences of the Plan to the Debtor and certain holders of Claims or Interests are described below.

34

Except as described below, no opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any holder of a Claim or Interest. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to Non-U.S. Holders (as defined below) and all aspects of United States federal income taxation applicable to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders of Claims or Interests who are, or who hold their Claims or Interests through, pass-through entities, persons whose functional currency is not the United States dollar, dealers in securities or foreign currency, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction and persons who acquired their Claims or Interests pursuant to the exercise of employee stock options or otherwise as compensation). The following discussion assumes that holders of Claims or Interests hold their Claims or Interests as capital assets for United States federal income tax purposes. Furthermore, the following discussion does not address United States federal taxes other than income taxes.

For purposes of this discussion, a "Non-U.S. Holder" is a beneficial owner of a Claim or Interest that is neither a partnership (or other entity treated as a partnership for United States federal income tax purposes) nor (1) an individual who is a citizen or resident of the United States, (2) a corporation created or organized under the laws of the United States or any state or political subdivision thereof, (3) an estate, the income of which is subject to federal income taxation regardless of its source, or (4) a trust that (i) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (ii) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

If a partnership (including any entity treated as a partnership for United States federal income tax purposes) holds Claims or Interests, the United States federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan.

**Each holder of a Claim or Interest should consult its tax advisor regarding the United States federal, state, local, and any foreign tax consequences of the transactions described herein or in the Plan.**

### A. Certain United States Federal Income Tax Consequences to the Debtor

#### (1) Cancellation of Indebtedness Income

Under the Plan, the Debtor will issue new junior subordinated debt securities to the Trusts in satisfaction of the outstanding $9.7 million in junior subordinated debt securities and the Debtor's corresponding guaranty liability to the holders of trust preferred securities. Under general United States federal income tax principles, the Debtor will realize cancellation of indebtedness ("COD") income to the extent that its obligation to a holder is discharged pursuant to the Plan for an amount less than the adjusted issue price (in most cases, the amount the Debtor received upon incurring the obligation, with certain adjustments) of such holder's claim. Where the Debtor joins in the filing of a consolidated United States federal income tax return, applicable Treasury regulations require, in certain circumstances, that certain tax attributes of the consolidated subsidiaries of the Debtor and other members of the group be reduced. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income, if any, that is generated between the date of discharge and the end of the debtor's tax year and/or may be carried back to prior years). Because the Debtor will be a debtor in a bankruptcy case at the time it realizes COD income, the Debtor will not be required to include such COD income in its gross income, but rather it will be required to reduce certain of its tax attributes by the amount of COD income so excluded. Generally, the required attribute reduction will be applied to reduce the Debtor's net operating losses and net operating loss carryforwards (collectively, "NOLs").

#### (2) Utilization of Net Operating Losses

To the extent that NOL's exist net of the reductions required as a result of the exclusion of COD income (as discussed above), if a corporation experiences an "ownership change" (within the meaning of Section 382 of the Tax Code), the corporation's ability to utilize its NOLs and certain other tax attributes to offset future taxable income generally will be subject to certain limitations. Section 382 of the Tax Code may also limit a corporation's ability to use certain "net unrealized built-in losses" existing on the date of the ownership change but recognized within five years of the ownership change to offset future taxable income.

#### (3) Alternative Minimum Tax

A corporation may incur alternative minimum tax liability even in the case that NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible that the Debtor may be liable for the alternative minimum tax as a result of the consummation of the restructuring transactions pursuant to the Plan.

### B. Certain United States Federal Income Tax Consequences to Holders of Claims or Interests

The U.S. federal income tax consequences to holders of allowed claims arising from the distributions to be made in satisfaction of their claims pursuant to a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the holder of a claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the corporation; (d) whether such claim constitutes a security; (e) whether the holder of a claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the holder of a claim receives distributions under the bankruptcy plan in more than one

taxable year. For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place. In addition, where a gain or loss is recognized by the holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to the underlying claim. A holder who purchased its claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

(1)      <u>Consequences to Holders of Secured Claims.</u>

The Plan contemplates the retention of Liens by the Holders of Allowed Secured Claims, subject to the terms of the Plan. If an Allowed Secured Claim remains secured by a Lien on the Debtor's Assets, the Holder of such Claim should not recognize a gain or loss. If an Allowed Secured Claim is paid in full in Cash, the Holder should recognize a capital gain or loss (which capital gain or loss would be a long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its Claim for more than one year) in an amount equal to the amount of Cash received over the Holder's adjusted basis in the debt instrument(s) underlying its Allowed Secured Claim. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

(2)      <u>Consequences to Holders of Priority Claims.</u>

To the extent that the Holder of an Allowed Priority Claim receives a Distribution under the Plan, such Holder should recognize such Distribution as ordinary income and submit the appropriate withholdings based on that Holder's particular circumstances. The Disbursing Agent shall make any appropriate withholdings from such Distributions.

(3)      <u>Consequences to Holders of Unsecured Claims.</u>

To the extent the Holder of an Allowed General Unsecured Claim receives less than full payment on account of such Claim, the Holder of such Claim may be entitled to assert a bad debt deduction or worthless security deduction with respect to such Allowed Unsecured Claim. To the extent that any amount received by a Holder of an Allowed Unsecured Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of an Allowed Unsecured Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

(4)      <u>Consequences to the Holders of Interests.</u>

The Debtor is an Alabama C corporation, and Equity Interests are cancelled under the Plan. This may create a capital loss for the Holders of Equity Interests, depending on the individual situation of each representative Holder of Equity Interests in the Debtor. The Holders of Equity Interests in the Debtor should also consider possible federal income tax consequences set forth below and are urged to consult

with their tax advisors with respect to these issues.

### C. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND DOES NOT CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.**

## IX. RECOMMENDATION AND CONCLUSION

In the opinion of the Debtor, the Plan provides for a larger distribution to the Debtor's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to the Holders of Allowed Claims than proposed under the Plan. Accordingly, the Debtor believes that confirmation of the Plan is in the best interests of the Debtor, its Estate, and its Creditors. For these reasons, the Debtor recommends that Holders of Claims and Interests entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan. *The Debtor urges all Holders of Claims and Interests entitled to vote on the Plan to vote to accept the Plan and evidence their acceptance by duly completing and returning their respective Ballots so that they will actually be received by the Debtor on or before 5:00 p.m. (Central Time) on _____.*

Dated:  Dothan, Alabama
       February 17 2017

**SUNSOUTH BANCSHARES, INC.**

By:    */s/ H. Monty Weigel*_____
         H. Monty Weigel, President

and by its attorneys,

 */s/ Von G. Memory*_____
MEMORY & DAY
Von G. Memory
ASB-8137-071V
Post Office Box 4054
Montgomery, AL 36103-4054
Telephone (334) 834-8000
Facsimile  (334) 834-8001

BUSH ROSS, P.A.
Adam Lawton Alpert
Fla. Bar No. 0490857*
Post Office Box 3913
Tampa, Florida 33601-3913
Telephone (813) 224-9255
Facsimile (813) 223-9620
*Pro hac vice pending*

38

This Document Prepared by:

| | |
|---|---|
| Memory & Day | Bush Ross, P.A. |
| P.O. Box 4054 | P.O. Box 3919 |
| Montgomery, Alabama 36103 | Tampa, Florida 33601-3913 |
| Telephone (334) 834-8000 | Telephone (334) 834-8000 |
| Facsimile (334) 834-8001 | Facsimile (334) 834-8001 |

# EXHIBIT A

***Chapter 11 Plan of SunSouth Bancshares, Inc. Pursuant to
Sections 1121, 1122, and 1123 of the United States Bankruptcy Code***

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:** | **CASE NO. 17-10371** |
| **SUNSOUTH BANCSHARES, INC.,** | **CHAPTER 11** |
| **Debtor and Debtor-In-Possession.** | |

CHAPTER 11 PLAN OF
SUNSOUTH BANCSHARES, INC.
PURSUANT TO SECTIONS 1121, 1122, AND 1123
OF THE UNITED STATES BANKRUPTCY CODE

**Date: February 17, 2017**

MEMORY & DAY
Von G. Memory
ASB-8137-071V
Post Office Box 4054
Montgomery, AL 36103-4054
Telephone (334) 834-8000
Facsimile  (334) 834-8001

BUSH ROSS, P.A.
Adam Lawton Alpert
Fla. Bar No. 0490857*
Post Office Box 3913
Tampa, Florida 33601-3913
Telephone (813) 224-9255
Facsimile (813) 223-9620
*Pro hac vice pending*

# TABLE OF CONTENTS

**ARTICLE I:** ...................................................................................................... **1**

INTRODUCTION ............................................................................................. 1

**ARTICLE II:** .................................................................................................... **1**

DEFINITIONS ................................................................................................. 1

**ARTICLE III:** ................................................................................................. **8**

CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ............................ 8

**ARTICLE IV:** ................................................................................................. **8**

TREATMENT OF CLAIMS AND EQUITY INTERESTS ................................... 8

**ARTICLE V:** ................................................................................................... **12**

ACCEPTANCE OR REJECTION OF THE PLAN ........................................... 12

**ARTICLE VI:** ................................................................................................. **12**

MEANS OF EXECUTION AND IMPLEMENTATION ...................................... 12

**ARTICLE VII:** ................................................................................................ **17**

EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................. 17

**ARTICLE VIII:** ............................................................................................... **18**

RETENTION OF JURISDICTION .................................................................. 18

**ARTICLE IX:** ................................................................................................. **19**

EFFECTS OF CONFIRMATION .................................................................... 19

**ARTICLE X:** .................................................................................................. **21**

MISCELLANEOUS PROVISIONS .................................................................. 21

# ARTICLE I:
## INTRODUCTION

SUNSOUTH BANCSHARES, INC. (THE "<u>DEBTOR</u>") PROPOSES THIS PLAN OF REORGANIZATION ("<u>PLAN</u>") PURSUANT TO SECTIONS 1121, 1122, AND 1123 OF TITLE 11 OF THE UNITED STATES CODE (THE "<u>BANKRUPTCY CODE</u>"). ALL CREDITORS AND PARTIES-IN-INTEREST ARE ENCOURAGED TO CONSULT THE DISCLOSURE STATEMENT PREPARED BY DEBTOR, AS APPROVED BY THE BANKRUPTCY COURT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. NO OTHER SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

# ARTICLE II:
## DEFINITIONS

Whenever from the context it appears appropriate, each term stated in either the singular or the plural will include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, the feminine, and the neuter. Any term used in capitalized form that is not defined in the Plan but that is defined in section 101 of the Bankruptcy Code shall have the meaning ascribed to such term in the Bankruptcy Code. Unless the context requires otherwise, the following words and phrases will have the meanings set forth below when used in initially capitalized form in this Plan:

**2.01 "Administrative Claim"** means a claim for costs and expenses of administration under sections 503(b) or 507(b) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor, such as wages, salaries, or commissions, for services and payments for goods and other services and leased premises; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses awarded or Allowed under section 330(a) or section 331 of Bankruptcy Code; (c) all fees and charges assessed against the Estate pursuant to title 28, section 1930 of the United States Code; and (d) obligations designated as Allowed administrative expenses pursuant to an Order of the Bankruptcy Court.

**2.02 "Allowed"** means with respect to any Claim or Equity Interest, (a) any Claim (other than a Disputed Claim) or Equity Interest, proof of which was timely filed or, by Order of the Bankruptcy Court, was not required to be filed or (b) any Claim (other than a Disputed Claim) or Equity Interest that is listed in the Schedules as liquidated in the amount and not disputed or not contingent, and, in each such case in (a) and (b) herein, as to which either (1) no objection to the allowance thereof has been or may be filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or (2) the Claim or Equity Interest has been allowed by a Final Order of the Bankruptcy Court (but only to the extent of such allowance).

1

**2.03** **"Ballot"** means, with respect to any class of Allowed Claims or Allowed Equity Interests that are Impaired and entitled to vote under this Plan, the forms being distributed to Holders of Claims or Interests to be used for showing acceptance or rejection of the Plan concerning the solicitation of acceptances or rejections of the Plan proposed by Debtor.

**2.04** **"Bank Stock"** means all issued and outstanding capital stock of SunSouth Bank.

**2.05** **"Bankruptcy Case"** or **"Reorganization Case"** means the chapter 11 case for the Debtor that was filed on the Petition Date.

**2.06** **"Bankruptcy Code"** means Title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in title 11, section 101, *et seq*, of the United States Code and applicable portions of titles 18 and 28 of the United States Code.

**2.07** **"Bankruptcy Court"** means the United States District Court having jurisdiction over this chapter 11 case and to the extent of any reference made pursuant to title 28, section 157 of the United States Code and/or the general Order of such District Court, pursuant to title 28, section 151 of the United States Code, the bankruptcy unit of such District Court.

**2.08** **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to this Bankruptcy Case, promulgated under title 28, section 2075 of the United States Code and the general and local rules of the Bankruptcy Court.

**2.09** **"Business Day"** means any day other than a Saturday, Sunday, or a legal holiday as defined in Bankruptcy Rule 9006(a).

**2.10** **"Cash"** means cash, cash equivalents, and readily marketable securities or instruments, including, but not limited to bank deposits, certified or cashier's checks, time certificates of deposits issued by any bank, commercial paper, and readily marketable direct obligations of the United States of America or agencies or instrumentalities thereof.

**2.11** **"Causes of Action"** means any and all accounts, contracts rights, general intangibles and any and all rights, claims, or causes of action of any kind, whether legal or equitable, of the Debtor or the Estate for affirmative recovery of cash or other property of the estate (whether such causes of action are the subject of presently pending lawsuits, adversary proceedings, appeals, or otherwise) which accrue prior to or after the Confirmation Date, whether from mailers that occurred prior to or after the Confirmation Date, including, without limitation, any rights or claims under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and any state law rights or claims belonging to the Debtor or the Estate.

**2.12** **"Claim"** means (a) any right to (i) payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (ii) an equitable remedy for breach of performance if such breach causes a right to payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or (b) any claim arising any time before the Confirmation Date for the alleged responsibility of the Debtor for any environmental conditions

arising from an event that occurred before the Confirmation Date, despite when the clean-up of such environmental condition commenced. When used with respect to any litigation, the term "Claim" will also include any claim that has been or could be asserted in such litigation. Notwithstanding anything to the contrary set forth in this Plan, for purposes of this Plan, the term "Claim" will have the broadest possible meaning permitted by applicable law.

**2.13** **"Claimant"** or **"Claim Holder"** means the Holder of an Allowed Claim.

**2.14** **"Class"** means a category of Holders of Claims or Interests, which are substantially similar to other Holders of Claims, or Interests in such category.

**2.15** **"Committee"** means, if applicable, any committee of creditors holding unsecured claims or committee of equity security holders appointed by the United States trustee to serve in this Bankruptcy Case, pursuant to section 1102 of the Bankruptcy Code.

**2.16** **"Confirmation"** means the entry of the Confirmation Order.

**2.17** **"Confirmation Date"** means the date upon which the Confirmation Order is entered and docketed by the Bankruptcy Court, within the meaning Bankruptcy Rules 5003 and 9021.

**2.18** **"Confirmation Hearing"** means the hearing(s) which shall be held before the Bankruptcy Court in which the Debtor shall seek Confirmation of the Plan.

**2.19** **"Confirmation Order"** means the Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**2.20** **"Consent Orders"** means, collectively, (i) the Consent Order with the FDIC dated May 2, 2013, (ii) the Consent Order with the Alabama State Banking Department dated May 24, 2013, and (iii) Consent Order with Federal Reserve Bank of Atlanta and the Alabama State Banking Department dated September 20, 2013.

**2.21** **"Consummation Deadline"** means the deadline by which the Effective Date of the Plan must occur, which shall be July 31, 2017, or such later date as may be agreed by the Debtor and FNBB in writing.

**2.22** **"Debtor"** or "**SunSouth**" means SunSouth Bancshares, Inc.

**2.23** **"Debtor-in-Possession"** means the Debtor in its capacity as provided under section 1101(1) of the Bankruptcy Code, and with the status and rights conferred by sections 1107 and 1108 of the Bankruptcy Code.

**2.24** **"Disclosure Statement"** means the disclosure statement (including all annexes, exhibits, and schedules attached thereto or referenced therein), as such disclosure statement may be amended or modified from time to time as necessary for approval by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

Case 17-10371    Doc 14    Filed 02/17/17    Entered 02/17/17 17:49:05    Desc Main
Document    Page 50 of 211

**2.25** **"Disputed Claim"** means a Claim or any portion thereof, as to which written objection to the allowance or classification thereof has been timely filed by any party in interest and as to which no Final Order sustaining such objection or allowing or disallowing such Claim, in whole or in part, has been entered by the Bankruptcy Court. A Claim shall also be considered a Disputed Claim if (a) the amount of any proof of claim filed exceeds the amount listed by the Debtor in its Schedules, (b) the Schedules list such claim as disputed, contingent, or unliquidated, or (c) there is a dispute as to the classification of such claim.

**2.26** **"Distribution"** means payment to the various Holders of Allowed Claims and Equity Interests as provided in this Plan.

**2.27** **"Effective Date"** means the first Business Day on which no stay of the Confirmation Order is in effect and the conditions precedent to the occurrence of the Effective Date have either been satisfied or waived by such date and shall be the date upon which the Plan will be commenced. The Bankruptcy Court, as part of the Confirmation Order, may establish a different Effective Date.

**2.28** **"Equity Interest(s)" or "Interest(s)"** means any equity interest in the Debtor.

**2.29** "**Estate**" means the estate created pursuant to section 541 of the Bankruptcy Code.

**2.30** **"Final Order"** means an Order of the Bankruptcy Court or other court of competent jurisdiction, with respect to the subject matter which has not been reversed, stayed, modified, or amended and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken or as to which any appeal has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the Order was appealed or from which certiorari was sought.

**2.31** **"FNBB"** means First National Bankers Bank f/k/a Alabama Bankers Bank.

**2.32** **"FNBB Claim"** means the Allowed Claim of FNBB pursuant to the FNBB Loan and secured by the FNBB Liens. As of December 31, 2016, SunSouth was indebted to FNBB in the amount of $2,451,345.11, comprised of a principal balance of $2,000,000.00 and accrued interest of $381,180.26, which interest continues to accrue at variable default rate of prime plus 1.75% (which is presently 5.5% and results in a per diem increase in the balance due of $305.56), together with $70,164.85 in amounts due to FNBB for its pre-petition costs of collection, including reasonable attorney's fees.

**2.33** **"FNBB Loan"** means that certain commercial loan evidenced by a Promissory Note dated July 31, 2008 in the original principal amount of $5,000,000 and made pursuant to that Business Loan Agreement dated as of July 31, 2008, each as amended, supplemented or modified from time to time, by and between SunSouth, as borrower, and Alabama Banker's Bank, as lender and predecessor-in-interest to FNBB.

**2.34** **"FNBB Liens"** means the first-priority lien and pledge of all assets of the Debtor granted to FNBB by the Debtor pursuant to that certain Commercial Pledge Agreement dated

July 31, 2008, including but not limited to 100% of the Bank Stock held by FNBB pursuant to that certain Collateral Receipt dated July 31, 2008.

**2.35** **"Guarantee Claims"** means the claims arising from (i) section 4.1 of the Guarantee Agreement dated June 29, 2004, between the Debtor and TruPS I Trustee for the benefit of the Trust I Beneficiaries and (ii) section 4.1 of the Guarantee Agreement dated June 23, 2006, between the Debtor and TruPS II Trustee for the benefit of the Trust II Beneficiaries.

**2.36** **"Holder"** means a Person or Entity holding a Claim or Equity Interest.

**2.37** **"Impaired"** means any Claim or Interest impaired within the meaning of section 1124 of the Bankruptcy Code.

**2.38** **"Investment Agreements"** means the Investment Agreement and the additional subscription agreements totaling at least $1.25 million in connection with the New Investment, in the form to be included with the Plan Supplement.

**2.39** **"New Common Stock"** means common shares in the capital of the Reorganized Debtor authorized pursuant to the Plan.

**2.40** **"New Debenture"** means the junior subordinated debt security or securities issued by the Reorganized Debtor to the Holders of Allowed TruPS Claims in accordance with the terms of the Plan, in the form to be included with the Plan Supplement.

**2.41** **"New Debenture Principal Amount"** means the aggregate principal amount of the New Debenture(s) issued to the Holders of Allowed TruPS Claims, the sum of which shall equal the value of the Bank Stock, as determined by the Bankruptcy Court, less (i) the amount of Allowed Administrative Claims, (ii) the amount of Allowed Priority Claims, (iii) the amount of the FNBB Claim, and (iv) the amounts paid to the Holders of Class 5 Allowed Unsecured Claims.

**2.42** **"New Investment"** means cash consideration received by the Debtor from the New Investors in connection with the transactions set forth in the Investment Agreements.

**2.43** **"New Investors"** mean the counterparties to the Investment Agreements who are providing the New Investment in connection with the Debtor's restructuring.

**2.44** **"Order"** means an order or judgment of a court.

**2.45** **"Person"** means an individual, corporation, partnership, joint venture, trust, estate, unincorporated organization, governmental unit, or any agency or political subdivision of a governmental unit.

**2.46** **"Petition Date"** means February 17, 2017.

5

**2.47** **"Plan"** means this chapter 11 plan, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

**2.48** **"Plan Supplement"** means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed by the Debtor no later than fourteen days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications or supplements to the Plan Supplement, including but not limited to the following: (a) the form of the New Debentures; and (b) the Investment Agreements or similar operative documents setting forth the terms of the New Investment.

**2.49** **"Priority Claim"** means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code.

**2.50** **"Priority Tax Claim"** means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

**2.51** **"Pro Rata"** means the same proportion that the amount of any Allowed Claim or Equity Interest in a Class bears to the aggregate amount of all Claims or Equity Interests in such Class, including in such aggregate amount both the Allowed Claims and any then unresolved Disputed Claims in such Class as of the date of any distribution payment pursuant to the Plan.

**2.52** **"Rejection Claim"** means any Allowed Claim arising out of the rejection of a lease or executory contract, pursuant to section 365(h) of the Bankruptcy Code.

**2.53** **"Reorganized Debtor"** means the Debtor or any successor thereto on or after the Effective Date.

**2.54** **"Schedules"** means the schedules of assets and liabilities and the statement of financial affairs, as they may be amended and supplemented from time to time, filed by the Debtor pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007.

**2.55** **"Secured Claim"** means a Claim that is (a) secured in whole or part, as of the Petition Date, by a lien on property in which the Estate has an interest, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law or (b) subject to setoff under section 553 of the Bankruptcy Code, but only to the extent of the value of the Holder's interest in such property, or to the extent of the amount of the subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

**2.56** **"SunSouth Bank" or the "Bank"** means SunSouth Bank, an Alabama state banking corporation, 100% of the issued and outstanding capital stock of which is owned by the Debtor.

**2.57** **"TruPS Claims"** mean the Allowed amount of the TruPS I Claim and the TruPS II Claim.

6

**2.58**  "**TruPS I Claim**" means the Allowed amount of the subordinated, unsecured claim of the TruPS I Trustee on behalf of Trust I pursuant to the TruPS I Debenture. As of December 31, 2016, SunSouth was indebted to Trust I under the TruPS I Debenture in the amount of $3,839,930.00.

**2.59**  "**TruPS II Claim**" means the Allowed amount of the subordinated, unsecured claim of the TruPS II Trustee on behalf of Trust II pursuant to the TruPS II Debenture.  As of December 31, 2016, SunSouth was indebted to Trust II under the TruPS II Debenture in the amount of $5,898,321.00.

**2.60**  "**TruPS I Debenture**" means that certain Junior Subordinated Debt Security dated June 29, 2004 issued by SunSouth to the TruPS I Trustee on behalf of Trust I.

**2.61**   "**TruPS II Debenture**" means that certain Floating Rate Junior Subordinated Debt Security dated June 23, 2006 issued by SunSouth to the TruPS II Trustee on behalf of Trust II.

**2.62**  "**TruPS I Trustee**" means JPMorgan Chase Bank, as Trustee for SunSouth Bancshares Capital Trust I and holder of the Trust I Debenture and any successor in interest thereto, solely in the aforementioned capacities.

**2.63**  "**TruPS II Trustee**" means Wilmington Trust Company, as Trustee for SunSouth Bancshares Capital Trust II and holder of the Trust II Debenture and any successor in interest thereto, solely in the aforementioned capacities.

**2.64**  "**TruPS Debentures**" means the TruPS I Debenture and the TruPS II Debenture.

**2.65**  "**Trusts**" means Trust I and Trust II, collectively.

**2.66**  "**Trust I**" means SunSouth Bancshares Capital Trust I.

**2.67**  "**Trust II**" means SunSouth Bancshares Capital Trust II.

**2.68**  "**Trust Beneficiaries**" means the Trust I Beneficiaries and the Trust II Beneficiaries, collectively.

**2.69**  "**Trust I Beneficiaries**" means any holder of a preferred security issued by Trust I.

**2.70**  "**Trust II Beneficiaries**" means any holder of a preferred security issued by Trust II.

**2.71**  "**Unimpaired**" means any Claim that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**2.72**  "**Unsecured Claim**" means any Allowed Claim against the Debtor, other than an Administrative Claim, Priority Claim, or an Equity Interest Claim.

## ARTICLE III:
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

**3.01    Classification of Claims and Equity Interests.**

(a)    <u>Class One – Administrative Claims</u>. This Class is composed of Allowed Administrative Claims that include (a) actual, necessary costs and expenses of preserving the Debtor's Estate and operating its business, (b) Allowed Claims for reasonable fees and out-of-pocket expenses of professionals retained in the Bankruptcy Case, and (c) all fees and charges assessed against the Estate under title 28, chapter 123, United States Code.  This Class is Unimpaired and, therefore, a non-voting Class.

(b)    <u>Class Two – Priority Claims</u>. This Class is composed of all Allowed Priority Claims, which are entitled to priority pursuant to section 507 of the Bankruptcy Code, with the exception of Priority Tax Claims, and have not been paid during the pendency of the Bankruptcy Case. This Class is Unimpaired and, therefore, a non-voting Class.

(c)    <u>Class Three – Priority Tax Claims</u>.  This Class is composed of the Allowed Claims of Governmental Units that are not Secured Claims and are entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.  This Class is Unimpaired and, therefore, a non-voting Class.

(d)    <u>Class Four – FNBB Claim</u>. This Class is composed of the FNBB Claim, which is fully secured.  This Class is Impaired and, therefore, a voting Class.

(e)    <u>Class Five – General Unsecured Claims</u>. This Class is composed of all Allowed Unsecured Claims, other than the TruPS Claims and the Guarantee Claims. This Class is Unimpaired and, therefore, a non-voting Class.

(f)    <u>Class Six – TruPS Claims</u>. This Class is composed of the subordinated, Allowed unsecured TruPS Claims.  This Class is Impaired and, therefore, a voting Class.

(g)    <u>Class Seven – Guarantee Claims</u>.  This Class is composed of the unsecured Guarantee Claims arising from the Debtor's guarantee of the obligations of the Trusts to the Trust Beneficiaries.  This Class is Impaired and, therefore, a voting Class.

(h)    <u>Class Eight – Equity Interests</u>. This Class consists of the existing pre-petition Equity Interests in the Debtor. This Class is Impaired, but the Holders of Class 7 Equity Interests are not entitled to vote to accept or reject the Plan under section 1126(g) of the Bankruptcy Code.

## ARTICLE IV:
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.01    Treatment of Classes of Claims and Equity Interests.** The Classes of Claims and Equity Interests set forth in Article III above shall be treated in the following manner:

The Plan provides payment for four (4) types of claimants: administrative, secured, general unsecured, and subordinated unsecured claims. Subject to the Debtor receiving all required regulatory approvals to consummate the transactions contemplated by the Plan, upon the consummation of the Plan, the Reorganized Debtor will pay Allowed Claims primarily through the New Investment, which may be supplemented by dividends earned from the Bank Stock retained by the Reorganized Debtor.

      (a)    <u>Class One – Administrative Claims</u>.

      (i)    **Treatment.** Each Holder of an Allowed Administrative Claim shall, in full and final satisfaction of such Allowed Administrative Claim, be paid on the later to occur of (a) the Effective Date or (b) the date on which an Administrative Claim shall become an Allowed Claim: (i) in full, in Cash, the amount of such Allowed Administrative Claim, or (ii) in such other amount and on such other terms and conditions as may be agreed between the Holder of such Administrative Claim and the Debtor. Allowed and uncontested Administrative Claims representing post-petition liabilities incurred in the ordinary course of business shall be paid by the Debtor in the ordinary course of its business in accordance with the terms and conditions of the particular transactions relating thereto during the Bankruptcy Case without need for application and allowance under section 503 of the Bankruptcy Code.

      (ii)    **Impairment and Voting.** Administrative Claims are not Impaired, as they are treated in accordance with the Bankruptcy Code, and are not entitled to vote on the Plan.

      (b)    <u>Class Two – Priority Claims</u>.

      (i)    **Treatment.** Allowed Priority Claims, if any, will be paid in full, in Cash, the later of: (a) the Effective Date; (b) the date of the Order allowing such Claim; or (c) the date that such Allowed Priority Claim would have been due if the Reorganization Case had not been commenced.

      (ii)    **Impairment and Voting.** Priority Claims are not Impaired, as they are treated in accordance with the Bankruptcy Code and are not entitled to vote on the Plan.

      (c)    <u>Class Three – Priority Tax Claims</u>.

      (i)    **Treatment.** The Holders of Allowed Priority Tax Claims, if any, shall be entitled to receive the amount of such Holder's Allowed Claim, (a) in cash, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the Effective Date, or (b) in regular cash installment payments over a period not exceeding five years from the Petition Date of a total value, as of the Effective Date, equal to the Allowed amount of such Claim. Any Allowed Claims in this class that are secured by a valid, perfected, and enforceable lien on any of the Debtor's assets shall be collateralized by a continuation of the lien underlying such Claim in the same order and priority as in effect on the Petition Date, and such obligation shall, upon the sale or other disposition of the collateral therefor, be and become due and payable to the Holder of such Allowed

9

Priority Tax Claim and the holders of any other Claims secured by the same collateral in in the same order and priority as in effect on the Petition Date. In addition, to the extent that any Allowed Claim is entitled to receive interest, such interest shall be calculated in accordance with applicable non-bankruptcy law pursuant to section 511 of the Bankruptcy Code.

(ii)     **Impairment and Voting.**  Priority Tax Claims are not Impaired, as they are treated in accordance with the Bankruptcy Code and are not entitled to vote on the Plan.

(d)     Class Four – FNBB Claim.

(i)     **Treatment**.  The Allowed FNBB Claim shall be paid in full as follows: (a) on the Effective Date, FNBB shall receive a cash payment equal to the sum of $100,000.00, plus all accrued pre-petition and post-petition interest on the FNBB Claim, as calculated through the Effective Date at the interest rate of 3.25% per annum (the "FNBB Confirmation Payment"); (b) the remaining unpaid balance of the FNBB Claim after application of the FNBB Confirmation Payment shall accrue interest at 3.25% per annum, and the Reorganized Debtor shall pay FNBB accrued interest on the first business day following the end of each calendar quarter after the Effective Date; (c) the Reorganized Debtor shall pay FNBB additional principal payments of $100,000 on December 31, 2017, December 31, 2018, and December 31, 2019; (d) the Reorganized Debtor shall make a balloon payment of the outstanding remaining principal and accrued interest due on December 31, 2020; and (e) the Reorganized Debtor may pay the outstanding principal and accrued interest to FNBB in full at any time, without penalty.

(ii)     **Liens.**  Until the FNBB Claim is paid in full, FNBB shall retain its liens on its collateral in the same order and priority as existed on the Petition Date. Upon payment in full of the FNBB Claim pursuant to the terms of the Plan, FNBB shall release its liens on all of its collateral.

(iii)     **Capitalization Covenant.**  Until the FNBB Claim is paid in full, the Bank shall maintain a well-capitalized "Leverage Ratio" (as defined in 12 C.F.R. § 325.2) of: 4.3% as of December 31, 2017; 4.4% as of December 31, 2018; and 5% as of December 31, 2019 and through maturity.

(iv)     **Impairment and Voting.**  The FNBB Claim is Impaired, and the Holder of the FNBB Claim is entitled to vote on the Plan.

(e)     Class Five – General Unsecured Claims.

(i)     **Treatment.**  On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Claim, each Holder of an Allowed Class 5 Unsecured Claim shall either (i) retain such Claim with all legal, equitable, and contractual rights unaltered or (ii) receive such other treatment as to which the Debtor and such Holder shall have agreed upon in writing.

(ii) **Impairment and Voting.** Class 5 Claims are Unimpaired, and the Holders of the Class 5 Claims are not entitled to vote on the Plan.

(f)     <u>Class Six – TruPS Claims</u>.

(i)     **Treatment**.  On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such claim, holders of allowed TruPS Claims shall either: (i) receive the New Debentures in the New Debenture Principal Amount from the Reorganized Debtor; or (ii) receive such other treatment as to which the Debtor and such Holders shall have agreed upon in writing.  In the event that the Debtor issues New Debentures on account of the Allowed TruPS Claims, the New Debentures Principal Amount shall be allocated Pro-Rata between the Allowed TruPS I Claim and the Allowed TruPS II Claim.

Unless otherwise agreed to in writing by the Holders of the Allowed TruPS Claims, the New Debentures shall be paid by the Reorganized Debtor upon the following terms: (a) the New Debenture Principal Amount shall bear no interest; (b) the New Debentures shall be subordinate to all Senior Indebtedness, as such term is defined in the TruPS Debentures, of the Reorganized Debtor, which includes the FNBB Claim; (c) the New Debenture Principal Amount shall be paid in equal quarterly disbursements beginning on the first business day of the second full calendar quarter after satisfaction of the FNBB Claim and quarterly thereafter on the first business day of each subsequent calendar quarter through the maturity date of the New Debentures; provided, however, that the such quarterly payments shall be subject to deferral in the event that the Reorganized Debtor has not obtained the requisite regulatory approvals to make distributions on account of such subordinated New Debentures; (d) notwithstanding the foregoing, the maturity date of the New Debentures shall be the eighth anniversary of the Effective Date and, on such maturity date, the Reorganized Debtor shall satisfy the remaining unpaid and outstanding portion of the New Debenture Principal Amount, including any quarterly payments otherwise deferred pursuant to the subparagraph (c) hereof; and (e) subject to obtaining the requisite regulatory approvals and the prior payment in full of the FNBB Claim, and at the sole discretion of the Reorganized Debtor, the Reorganized Debtor may elect to prepay any or all of the outstanding New Debenture Principal Amount without penalty prior to the maturity date thereof.

(ii)     **Impairment and Voting**.  Class 6 Claims are Impaired, and the Holders of the Class 6 Claims are entitled to vote on the Plan.

(g)     <u>Class Seven – Guarantee Claims</u>.

(i)     **Treatment.**  The Guarantee Claims shall be satisfied, released, and discharged based on the treatment of the Class 6 TruPS Claims.

(ii)     **Impairment and Voting:**  Class 7 Claims are Impaired, and the Holders of the Class 7 Claims are entitled to vote on the Plan.

(h)     <u>Class Eight – Equity Interests in the Debtor</u>.

11

(i)     **Treatment.**  All existing Equity Interests in the Debtor will be cancelled, forfeited, and/or extinguished on the Effective Date and shall not be entitled to any distribution whatsoever.

(ii)     **Impairment and Voting**.  Class 8 is Impaired under the Plan.  The Holders of Class 8 Equity Interests are not entitled to vote to accept or reject the Plan under section 1126(g) of the Bankruptcy Code.

## ARTICLE V:
## ACCEPTANCE OR REJECTION OF THE PLAN

**5.01     Voting Classes.** Each Holder of an Allowed Claim in Classes 4, 6, and 7 shall be entitled to vote to accept or reject the Plan, unless otherwise ordered by the Bankruptcy Court.

**5.02     Deemed Acceptance.** Classes 1, 2, 3, and 5 are non-voting Classes. Therefore, Holders of Allowed Claims in Classes 1, 2, 3, and 5 are deemed to have accepted the Plan.

**5.03     Deemed Rejection.**  The Holders of Class 8 Equity Interests are not entitled to vote to accept or reject the Plan and are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

**5.04     Confirmability of the Plan.** The confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied with respect to the Debtor and the Plan. If the Bankruptcy Court determines that any provisions of the Plan are prohibited by the Bankruptcy Code, or renders the Plan unconfirmable under section 1129 of the Bankruptcy Code, the Debtor reserves the right to sever such provisions from the Plan, and to request that the Plan, as so modified, be confirmed.

**5.05     Non-consensual Confirmation.** In the event that any Class of Claims rejects the Plan, the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan over such rejection in accordance with section 1129(b) of the Bankruptcy Code.

**5.06     Controversy Concerning Impairment.** In the event of a controversy as to whether any Class of Claims or Equity Interests is Impaired under the Plan, the Bankruptcy Court will, after notice and an opportunity for hearing prior to the Confirmation Date, determine such controversy.

## ARTICLE VI:
## MEANS OF EXECUTION AND IMPLEMENTATION

**6.01     Conditions Precedent to the Plan's Confirmation and Effective Date.**

(a)     <u>Conditions to Confirmation</u>. The Plan's Confirmation is subject to the satisfaction of each of the following conditions precedent, unless waived in writing by the Debtor, FNBB, and the New Investors:

Case 17-10371   Doc 14   Filed 02/17/17   Entered 02/17/17 17:49:05   Desc Main
                Document      Page 59 of 211

(i)     The proposed Confirmation Order shall be in a form and substance satisfactory to the Debtor and FNBB.

(ii)    The Debtor shall have entered into additional subscriptions agreements with additional New Investment totaling not less than $1.25 million.

(b)     Conditions to Effective Date. Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent, unless waived in writing by the Debtor, FNBB, and the New Investors:

(i)     Each of the conditions to entry of the Confirmation Order shall have been satisfied.

(ii)    The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor and FNBB, confirming the Plan, as the same may have been modified with the consent of, or without objection by, FNBB.

(iii)   The Debtor shall have consummated the transactions contemplated by the Investment Agreements to be consummated on or prior to the Effective Date.

(iv)    The Debtor shall have received all required regulatory approvals to consummate the transactions contemplated by the Investment Agreements and in the Plan, the Plan Supplement, the Disclosure Statement, and any related ancillary documents.

(v)     The Effective Date shall occur on or before the Consummation Deadline.

**6.02    Plan Payments**. The Reorganized Debtor will make the payments contemplated under the Plan from Cash contributed through the New Investment, which may be supplemented by dividends earned from the Bank Stock.

**6.03    Default.** Any payment required to be made under the Plan shall not be in default if any such payment is made within thirty (30) days of the payment date provided under the Plan after written notice of default.

**6.04    Restructuring Transactions.** Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtor and/or the Reorganized Debtor shall enter into the restructuring transactions described herein and in the Disclosure Statement and any ancillary documents. The Debtor and/or the Reorganized Debtor shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtor's business or the overall organization structure of the Reorganized Debtor. The restructuring transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtor to be necessary or appropriate. The actions taken by the Debtor and/or the Reorganized Debtor to effect the restructuring transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan, the Disclosure Statement, and any ancillary

13

documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion pursuant to applicable state law, including but not limited to the articles of incorporation and bylaws; (iv) the cancellation of shares in the Debtor; and (v) all other actions that the Debtor and/or the Reorganized Debtor determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the restructuring transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the restructuring transactions.

Without limiting the generality of the foregoing, the Debtor is authorized to amend and restate the Articles of Incorporation in order to, among other things, (A) adopt certain restrictions on acquisitions and dispositions of securities issued by the Reorganized Debtor and (B) make certain other changes consistent with the Plan.

The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice-president or senior vice-president, or any other appropriate officer of the Debtor and of the Reorganized Debtor, as the case may be, shall each be authorized to execute, deliver, file, or record any such agreements, instruments, or documents referenced in the Plan, including but not limited to those items referenced in Articles IV and VI of the Plan, and shall each be further authorized to take such other actions as may be necessary, desirable, or appropriate to effectuate and further evidence the terms and conditions of the Plan and the restructuring transactions contemplated in the Plan. The secretary or assistant secretary of the Debtor and of the Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

**6.05    Continued Corporate Existence.** The Reorganized Debtor shall continue to exist after the Effective Date as a corporate entity, with all of the rights and powers of a corporation under applicable law in the jurisdiction(s) in which the Debtor is organized and otherwise formed and under its certificate(s) of incorporation and bylaws in effect before the Effective Date, as such documents may be amended by or pursuant to the Plan, or pursuant to any amended certificates of incorporation or amended bylaws.

**6.06    Corporate Action.**    All matters provided for under the Plan or the Plan Supplement involving the organizational structure of the Debtor or the Reorganized Debtor or action to be taken by or required of the Debtor or the Reorganized Debtor, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the shareholders, officers, or directors of such entity.

**6.07    Certificate of Incorporation and Bylaws.** The articles of incorporation of the Reorganized Debtor will be amended to reflect (i) any necessary decrease in par value of common stock in order to allow the Debtor to complete the common equity capital raise in connection with the New Investment and the issuance of New Common Stock as contemplated

by the Plan; and (ii) a limitation on issuance of non-voting equity interests pursuant to section 1123(a)(6) of the Bankruptcy Code. The articles of incorporation and bylaws of the Reorganized Debtor shall otherwise be amended to satisfy the provisions of the Plan and the Bankruptcy Code.

**6.08    Management of the Reorganized Debtor.** On the Effective Date, the board of directors of the Reorganized Debtor shall be comprised of the seven individuals who currently serve on the board of directors: Dawn Wise Dunning-Theune; Milton Roger Peterson; James Steven Roy; Douglas Shane Sinquefield; Calvin Ray Turner, Jr.; and Henry Monty Weigel. If an investor-selected director has not received requisite regulatory approval or non-objection prior to the Effective Date, then such investor-selected director shall become a director as soon as practicable upon receipt of such approval. In the absence of such approval with respect to an investor-selected director or a vacancy in any director position, the applicable director position will be filled in accordance with the Reorganized Debtor's bylaws. The officers of the Debtor shall continue as officers of the Reorganized Debtor. The Reorganized Debtor's directors and officers will receive compensation consistent with the Reorganized Debtor's policies and practices. Certain continuing directors and officers of the Debtor and/or SunSouth Bank may be participating in the New Investment. Such insiders will be participating at the same pricing and will be subject to the same restrictions on trading that apply to the largest among the New Investors.

**6.09    Cancellation of Securities.** All indentures, notes, bonds, instruments, guarantees, certificates, agreements (including registration rights agreements), and other documents evidencing the existing preferred common, and/or other stock of the Debtor, will be cancelled, and any obligations of the Debtor thereunder or in any way related thereto shall be fully satisfied, released, and discharged.

**6.10    Calculation of Distribution Amounts of New Common Stock.** No fractional shares of New Common Stock shall be issued or distributed under the Plan or by the Reorganized Debtor. Each Person entitled to receive New Common Stock will receive the total number of whole shares of New Common Stock to which such Person is entitled.

**6.11    Section 1145 Exemption.** The issuance of the New Common Stock to the New Investors and the New Debenture(s) to the Holders of Allowed Class 6 TruPS Claims under the terms of this Plan shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by the provision of the relevant corporate documents or applicable law, regulation, order or rule, and shall thereby be exempt from the requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local laws requiring registration for the offer and sale of a security; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or related documents.

**6.12    Vesting of Assets.** The property of the Debtor's Estate, together with any property of the Debtor that is not property of the Estate and that is not specifically disposed of pursuant to the Plan, shall vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court, but

Case 17-10371    Doc 14    Filed 02/17/17    Entered 02/17/17 17:49:05    Desc Main
Document      Page 62 of 211

subject to the rights of lienholders, as applicable, including FNBB. As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims and Equity Interests, except as specifically provided in the Plan or the Confirmation Order. Without limiting the generality of the foregoing, the Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay professional fees and expenses incurred after the Confirmation Date.

**6.13    Preservation of Causes of Action.** On the Effective Date, all rights, claims, and Causes of Action pursuant to (i) sections 54l, 542, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and (ii) all other claims and Causes of Action of the Debtor against any Holder of a Claim herein and against any third party shall be preserved and become property of Reorganized Debtor. On the Effective Date, the Reorganized Debtor shall be deemed the representative of the Estate under section 1123(b) of the Bankruptcy Code and will be authorized and shall have the power to commence and prosecute any and all Causes of Action, which were or could have been asserted by the Estate. The Reorganized Debtor may pursue such Causes of Action in the Bankruptcy Court and may retain such counsel, accountants, or other persons, as the Reorganized Debtor deems necessary in connection therewith or in connection with liquidation of Estate property or performance of the responsibilities of the Reorganized Debtor. All recoveries, if any, received from or in respect of the Causes of Action, whether by settlement, judgment or otherwise, shall become the property of the Reorganized Debtor to be distributed pursuant to the terms of the Plan. The cost and expenses, including legal fees and disbursements, incurred in connection with the prosecution of such causes of action, shall be paid by the Reorganized Debtor, without necessity of approval by the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtor may, in its sole discretion, litigate any avoidance or recovery actions and any other Causes of Action or rights to payments of claims that belong to the Debtor, and have not been released herein, that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date.  Notwithstanding the foregoing, the Debtor hereby releases any claims, causes of action, or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code.

**6.14    Exemption from Certain Transfer Taxes.** Pursuant to section 1146(c) of the Bankruptcy Code, any transfer of any property or the making or delivery of an instrument of transfer from or by a Debtor to a Reorganized Debtor or any other Person or entity pursuant to the Plan or the Plan Supplement shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.15    Recordable Order.**    The Confirmation Order shall be declared to be in recordable form and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

**ARTICLE VII:**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**7.01    Scheduled Executory Contracts and Unexpired Leases.**

| Counterparty | Contract | Status |
|---|---|---|
| SunSouth Bank | Tax Sharing Agreement dated October 19, 2006, as amended November 23, 2010 and June 23, 2015 | Assume |
| First National Bankers Bank | Restructuring Support Agreement dated February 16, 2017 | Assume |

**7.02    Assumption and Rejection of Executory Contracts and Unexpired Leases.**

(a)    Rejection.  Any executory contracts or unexpired leases that (a) have not been assumed by the Debtor with the Bankruptcy Court's approval on or prior to the Confirmation Date, and (b) are not the subject of a pending motion to assume on the Confirmation Date, shall, as of the Confirmation Date (subject to the occurrence of the Effective Date), be deemed to have been rejected by the Debtor.  The Plan shall constitute a motion to reject such executory contracts and unexpired leases, and the Debtor shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan.

(b)    Assumption.  The Debtor will assume the executory contracts identified in Section 7.01 of the Plan with the cure amounts set forth thereon paid in accordance with Section 7.03 below.

**7.03    Cure**.  Any monetary defaults under any executory contract and unexpired lease to be assumed shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, in one of the following ways: (a) by payment of the default amount in Cash on the Effective Date; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. Any party to an executory contract that does not file an objection to the Plan prior to the deadline for filing objections to the Plan established by order of the Bankruptcy Court shall be deemed to agree to the cure amount for such executory contract as reflected in Section 7.01 of the Plan.  In the event of a dispute regarding (i) the cure amount for any executory contract to be assumed under the Plan, (ii) the ability of the Debtor to provide adequate assurance of future performance under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption.

17

**7.04    Claims Under Rejected Executory Contracts and Unexpired Leases**.   The Bankruptcy Court shall determine the dollar amount, if any, of the Claim of any Person or Governmental Unit seeking damages by reason of the rejection of any executory contract or unexpired lease; provided, however, that such Person or Governmental Unit files a proof of claim with the Bankruptcy Court before thirty (30) calendar days following the Confirmation Date.  To the extent any such Claim is Allowed by the Bankruptcy Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as, an Allowed Unsecured Claim and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class or Classes pursuant to the Plan.  The Plan shall constitute notice to Persons and Governmental Units that may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the bar date for filing a proof of claim in connection therewith; provided, however, that the Debtor shall have no obligation to notify such Persons and Governmental Units that the Confirmation Date has occurred.

**7.05    Treatment of Change of Control Provisions.** The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control of the Debtor.

## ARTICLE VIII:
## <u>RETENTION OF JURISDICTION</u>

**8.01**    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over this Bankruptcy Case and any related adversary proceedings after the Effective Date as is legally permissible, including jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

(b)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

(c)    resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(d)    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and resolve any disputes concerning any distributions contemplated in or relating to the Plan;

(e)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(f)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(g)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Person's or Entity's obligations incurred in connection with the Plan;

(h)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation or enforcement of the Plan, except as otherwise provided herein;

(i)    resolve any cases, controversies, suits, or disputes with respect to the releases, injunction, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction, and other provisions;

(j)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(k)    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement; and

(l)    enter an order and/or final decree concluding the chapter 11 case.

## ARTICLE IX:
## EFFECTS OF CONFIRMATION

**9.01    Binding Effect.**  Except as otherwise expressly provided herein, on or after the Effective Date, the terms of the confirmed Plan of Reorganization shall bind all holders of Claims and interests, whether or not they accept the Plan.

**9.02    Discharge.**  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Equity Interests, and Causes of Action against the Debtor of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, Equity Interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of

19

representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a proof of claim or interest based upon such Claim, debt, right, or Equity Interest, is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Equity Interest based upon such Claim, debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim has accepted the Plan. Except as otherwise provided herein, any default by the Debtor with respect to any Claim or Equity Interest that existed before or on account of the filing of the Bankruptcy Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

**9.03    Exculpation and Limitation of Liability.**

**As of the Effective Date, except as otherwise specifically provided in the Plan, to the fullest extent provided under section 1125(e) of the Bankruptcy Code, the Debtor, the Reorganized Debtor, and their respective successors, predecessors, control persons, members, agents, and present and former (to the extent each such Person provided services during the post-petition period) officers, directors, and employees (and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such Persons) shall neither have nor incur any liability to any Person or Entity (including any Holder of a Claim, Interest, or Equity Interest) for any pre- or post-petition act taken or omitted to be taken in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, or occurrence of the Effective Date, of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with, or in contemplation of, restructuring of Debtor. The Debtor and the Reorganized Debtor (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Notwithstanding any provision of this Article or the Plan, the Plan shall not effect a release, discharge, exculpation, injunction against the exercise of, or other impairment or extinction of (i) any rights or claims of the New Investors or the Debtor under the Investment Agreements or (ii) any claims by the United States government or any of its agencies, or any state or local authority, including, without limitation, any claim arising under applicable securities or banking laws or regulations, or any rights or claims of FNBB as modified pursuant to the Plan.**

**9.04    No Liability for Tax Claims.**  Unless a taxing authority has asserted a Claim against the Debtor before the bar date or as Allowed under the Bankruptcy Code, no Claim of

such authority shall be Allowed against the Debtor for taxes, penalties, and/or interest arising out of the failure, if any, of the Debtor to have any tax return, including, but not limited to any income tax return in any prior year or arising out of an audit of any return for a period before the Petition Date.

**9.05    Post-Confirmation Injunction.** Except as set forth herein, on or after the Confirmation Date, every holder of a claim or interest against the Debtor shall be precluded and permanently enjoined from asserting against the Debtor, its officers, directors, professionals, agents, and their respective assets or properties, any further claim based on any document, instrument, judgment, award, order, act, omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date.

**9.06    Committee.** The appointment of all Committees, if any, will automatically terminate on the Effective Date of the Plan.

**9.07    Post-Confirmation Evidence of Claims and Interests.** Except as otherwise provided herein, upon the Effective Date, all notes, certificates, and the evidence of claims or interests shall represent the only right to participate in distributions made pursuant to the Plan.

**9.08    Continuation of Injunctions and Stays.** Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Bankruptcy Case, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the Reorganized Debtor has made all distributions contemplated by this Plan and the Bankruptcy Court has entered an order closing the Bankruptcy Case.

**9.09    Rights of Action.** Any rights or Causes of Action accruing to the Debtor and not otherwise released herein, shall become assets of the Reorganized Debtor. Reorganized Debtor may pursue those rights or causes of action as appropriate, in accordance with what is in the best interests, and for the benefit, of those creditors that will receive distribution from estate assets. It is expressly understood that the Board of Directors of the Reorganized Debtor may, in their judgment, by majority vote, settle or resolve any rights or causes of action by agreeing to permit the transferee to make an appropriate reduction in its claim so as to give credit for the amount otherwise recoverable from future distributions made pursuant to the Plan. After Confirmation, the Debtor or the Reorganized Debtor, as the case may be, in its sole discretion, shall be entitled to pursue, compromise, or abandon any or all of the Causes of Action, subject to the provisions of Section 6.13 hereof.

### ARTICLE X:
### MISCELLANEOUS PROVISIONS

**10.01    Payment of Fees and Expenses of Professional Persons.** After the Confirmation Date, Debtor will, in the ordinary course of business and without the necessity of approval by the Bankruptcy Court, pay the reasonable post-Confirmation Date fees and expenses of the professional persons employed by Debtor related to the implementation and confirmation of the Plan. No such fees and expenses will be paid, however, except upon receipt by the Debtor of a written invoice from the professional person, seeking a fee and expense reimbursement.

Case 17-10371    Doc 14    Filed 02/17/17    Entered 02/17/17 17:49:05    Desc Main
Document    Page 68 of 211

Any professional appointed by the Bankruptcy Court, who performed services on behalf of the estate, whose fees and costs may be charged against the estate, must file an application for approval of same not later than sixty (60) days subsequent to the confirmation order becoming final. Failure to file within the time permitted herein shall automatically and without further notice bar the professional person from bringing a claim against the bankruptcy estate and/or the confirmed Debtor.

**10.02   Severability of Plan Provisions.**   If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void, or unenforceable, the Debtor, at its option, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

**10.03   Successors and Assigns.**   The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person.

**10.04   Objections.**   Unless the Bankruptcy Court establishes another date, any objections to the allowance or classification of any claim or interest, shall be filed within thirty (30) business days of the Effective Date or be forever barred from filing such an objection.

**10.05   Distributions, Delivery, Unclaimed.**

(a)      Delivery of Distributions in General. Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as indicated on records of the Debtor or proof of claim filed of record. Except as otherwise provided by the Plan or the Bankruptcy Code, distributions shall be made in accordance with the provisions of the applicable indenture, participation agreement, loan agreement or analogous instrument or agreement, if any, and distributions will be made to any Holders of record as of the Distribution Date.

(b)      Undeliverable Distributions.

(1)      Holding of Undeliverable Distributions. If any Allowed Claim Holder's distribution is returned to the Debtor as undeliverable, no further distributions shall be made to such Holder unless and until the Debtor is notified, in writing, of such Holder's then-current address, such that the distribution becomes deliverable. Undeliverable distributions shall remain in the possession of the Debtor pursuant to the Plan until such time as a distribution becomes deliverable. Undeliverable payments shall not be entitled to any interest, dividends or other accruals of any kind.

(2)      Failure to Claim Undeliverable Distributions. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, the Debtor may file a listing of Holders of undeliverable distributions with the Bankruptcy Court. Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable distribution within five years after the Effective Date shall have his, her, or its Claim for such undeliverable distribution discharged and shall be forever barred from

22

asserting any such Claim against the Debtor or its property. In such cases, any payments held for distribution on account of such Claims shall be property of the Debtor, free of any restrictions thereon. Nothing contained in the Plan shall require the Debtor to attempt to locate any Holder of an Allowed Claim.

**10.06  Timing and Calculation of Amounts to be Distributed.** Beginning on the Effective Date, the Reorganized Debtor, at its sole discretion and as frequently, soon, reasonably practicable, and efficient under the circumstances, shall make the distributions to Holders of Allowed Claims in accordance with the Plan, specifically including the schedule for payment of the FNBB Allowed Claim set forth in Section 4.01(d).

**10.07  Fractional Distributions and De Minimis Distributions.** No cash payment of less than FIFTY AND NO/100 DOLLARS ($50.00) shall be made by the Debtor on account of any Allowed Claim, unless a specific request therefore is made, in writing, by the Holder of such Claim. In the event a Holder of an Allowed Claim is entitled to distribution that is not a whole dollar number, the actual payment or issuance made will reflect a rounding of such fractional portion of such distribution down or up to the nearest whole dollar, but in any case not to result in a distribution that exceeds any allowable total distribution authorized by the Plan.

**10.08  No Interest.** Except as expressly stated in the Plan or otherwise Allowed by Final Order of the Bankruptcy Court, no interest, penalty, or late charge arising after the Petition Date is to be Allowed on any Claim.

**10.09  No Attorney's Fees.** No attorney's fees shall be paid with respect to any Claim except as may be Allowed under section 506(b) of the Bankruptcy Code and by a Final Order of the Bankruptcy Court.

**10.10  Setoffs.** Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtor may, but shall not be required to, setoff against any Claim and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim and/or Claims of any nature whatsoever the Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Claim that the Debtor may have against such Holder.

**10.11  Payment of Statutory Fees.** All fees payable, pursuant to title 28, section 1930, United States Code, as agreed between the Debtor and the Bankruptcy Administrator or determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on the Effective Date or as soon thereafter as reasonably possible.

**10.12  Time.** In computing any period of time prescribed or allowed by the Plan, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is not a Business Day or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

**10.13  Transactions on Business Days.** If the Effective Date, or any other date on which a transaction may occur under the Plan, shall occur on a day that is not a Business Day,

the transactions contemplated by the Plan to occur on such day shall occur instead on the next succeeding Business Day.

**10.14  Governing Law.** Unless otherwise agreed in writing, or mandated by Federal Law, the laws of the State of Alabama shall govern the construction and implementation of the Plan and all agreements, documents, and instruments executed in connection with the Plan.

**10.15  Binding Effect.** The Plan, as amended or modified, upon the Confirmation Order becoming final and non-appealable, will be binding upon and inure to the benefit of the Debtor, the holders of Claims and Equity Interests, and their respective successors and assigns.

**10.16  Service of Documents and Notices.** Any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtor shall be sent by first class U.S. mail, postage prepaid, to:

SunSouth Bancshares, Inc.
Attn: H. Monty Weigel
108 Jamestown Boulevard
Dothan, Alabama 36301-6409

With copies to:

| Memory & Day | -and- | Bush Ross, P.A. |
| Attn: Von G. Memory, Esq. | | Attn: Adam Lawton Alpert, Esq. |
| P.O. Box 4054 | | Post Office Box 3913 |
| Montgomery, AL 36103 | | Tampa, Florida 33601-3913 |

**10.17  Amendments or Modification of the Plan; Severability.** Debtor may alter, amend, or modify the treatment of Claims provided for under the Plan; provided, however, that the Holders of such Allowed Claims agree or consent to any such alteration, amendment or modification to the extent that such modification adversely and materially impacts on the treatment of such Claim. If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void, or unenforceable, the Debtor, at its option, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable. The invalidity, voidness, or unenforceability of any such provision will in no way limit or affect the enforceability and operative effect of any other provisions of the Plan.

**10.18  Reservation.** If the Plan is not confirmed by the Bankruptcy Court for any reason, the rights of all parties in interest in the Reorganization Case shall be reserved in full. Furthermore, any concession reflected herein is made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Reorganization Case shall be bound or deemed prejudiced by any such concession.

**10.19  Additional Documents.** On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**10.20  Construction.** The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

**10.21  Section Headings.** The section headings contained in the Plan are for convenience and reference purposes only and will not affect in any way the meaning or interpretation of the Plan.

Respectfully submitted February 17, 2017.

**SUNSOUTH BANCSHARES, INC.**

By:     /s/ H. Monty Weigel
          H. Monty Weigel, President

This Document Prepared by:

| | |
|---|---|
| Memory & Day | Bush Ross, P.A. |
| P.O. Box 4054 | P.O. Box 3919 |
| Montgomery, Alabama 36103 | Tampa, Florida 33601-3913 |
| Telephone (334) 834-8000 | Telephone (334) 834-8000 |
| Facsimile (334) 834-8001 | Facsimile (334) 834-8001 |

## COMPSITE EXHIBIT B

*Consent Orders*

FEDERAL DEPOSIT INSURANCE CORPORATION
WASHINGTON, D.C.

| | | |
|---|---|---|
| In the Matter of | ) | CONSENT ORDER |
| | ) | |
| SUNSOUTH BANK | ) | |
| DOTHAN, ALABAMA | ) | FDIC-13-112b |
| | ) | |
| (INSURED STATE NONMEMBER BANK) | ) | |

The Federal Deposit Insurance Corporation ("FDIC") is the appropriate Federal banking agency for SunSouth Bank, Dothan, Alabama, ("Bank"), under section 3(q) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. § 1813(q).

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has executed a "STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT ORDER" ("CONSENT AGREEMENT"), dated May 1, 2013, that is accepted by the FDIC and the Superintendent of Banks, Alabama State Banking Department ("Department"). With the CONSENT AGREEMENT, the Bank has consented, without admitting or denying any charges of unsafe or unsound banking practices and violations of law or regulation relating to weaknesses in asset quality, management, earnings, capital, liquidity, and sensitivity to market risk, to the issuance of this Consent Order ("ORDER") by the FDIC and the Department. The Department may issue an ORDER pursuant to Code of Alabama Annotated Section 5-2A-12 (1980).

Having determined that the requirements for issuance of an order under section 8(b) of the Act, 12 U.S.C. § 1818(b) and the Code of Alabama Annotated Section 5-2A-12 (1980) have been satisfied, the FDIC and the Department hereby order that:

## BOARD OF DIRECTORS

1.    (a)    As of the effective date of this ORDER, the Board shall increase its participation in the affairs of the Bank, assuming full responsibility for the approval of sound policies and objectives and for the supervision of all of the Bank's activities, consistent with the role and expertise commonly expected for directors of banks of comparable size. This participation shall include meetings to be held no less frequently than monthly at which, at a minimum, the following areas shall be reviewed and approved: reports of income and expenses; new, overdue, renewal, insider, charged off, and recovered loans; investment activity; third-party activity; adoption or modification of operating policies; individual committee reports; audit reports; internal control reviews including management's responses; and compliance with this ORDER. Board meeting minutes shall document these reviews and approvals, including the names of any dissenting directors.

(b)    Within 30 days from the effective date of this ORDER, the Board shall establish a Board committee ("Directors' Committee"), consisting of at least five members, to oversee the Bank's compliance with this ORDER. At least three of the members of such committee shall be directors not employed in any capacity by the Bank other than as a director. The Directors' Committee shall formulate and review monthly reports detailing the Bank's actions with respect to compliance with this ORDER. The Directors' Committee shall present a report to the Board at each regularly scheduled Board meeting, and such report shall detail the Bank's adherence to this ORDER. Such report shall be recorded in the appropriate Board meeting minutes and shall be retained in the Bank's records. Establishment of this committee does not in any way diminish the responsibility of the entire Board to ensure compliance with the provisions of this ORDER.

(c)     Within 60 days from the effective date of this ORDER, the Bank shall add two

new, independent members to its Board.  The addition of any new director may be accomplished,

to the extent permissible by State statute or the Bank's by-laws, by means of appointment or

election at a regular or special meeting of the Bank's shareholders.  The Bank shall cause its

articles of incorporation, by-laws, and/or other governing corporate instruments, to be amended

as appropriate to reflect the addition of the new independent directors.

(d)     For purposes of this ORDER, an individual who is "independent" with respect to

the Bank shall be any individual who is not an officer of the Bank, or officer or director of any of

its affiliated organizations, a relative of an officer or director, and who does not own or control

more than five percent (5%) of the outstanding shares of the Bank.

(e)     Within 60 days of the effective date of this ORDER, the Audit Committee shall

also review all transactions between the Bank and its holding company and between the Bank

and any of the Bank's senior executive officers and directors, as those terms are defined in 12

C.F.R. § 303.101 ("Insiders"), all transactions involving affiliates of the Bank, all transactions

reported in accordance with 12 C.F.R. § 215.8, and all transactions with other entities in which

the Insiders hold a direct or indirect financial interest (collectively, " Insider Transactions") that

occurred since January 1, 2011, for potential conflicts of interest.  The Audit Committee

members shall recuse themselves from reviewing any Insider Transactions in which they are

involved.  Any identified potential conflicts of interest shall be reported immediately to the

Regional Director and the Superintendent of the Department (collectively, the "Supervisory

Authorities").  During the life of the ORDER, the Audit Committee shall continue to review and

document its review of all Insider Transactions on a monthly basis.  This documentation shall be

presented to the Board monthly and to the Supervisory Authorities in the Bank's Progress Reports submitted pursuant to Provision 24 of this ORDER.

(f)    Within 60 days from the effective date of this ORDER, the Board shall enhance the Bank's Code of Conduct Policy to include a methodology for determining appropriate disciplinary action for Bank employees and officers who violate the policy. The Bank shall submit the Code of Conduct Policy to the Supervisory Authorities for review and comment. Within 30 days from receipt of non-objection or any comments from the Supervisory Authorities, and after incorporation and adoption of all comments, the Board shall approve the policy, which approval shall be recorded in the Board meeting minutes. Thereafter, the Bank shall implement and fully comply with the policy.

## MANAGEMENT

2.    (a)    Within 90 days from the effective date of this ORDER, the Bank shall have and retain qualified management with the qualifications and experience commensurate with assigned duties and responsibilities at the Bank. Each member of management shall be provided appropriate written authority from the Board to implement the provisions of this ORDER. At a minimum, management shall include the following:

(i)    A chief executive officer with proven ability in managing a bank of comparable size and in effectively implementing lending, investment, and operating policies in accordance with safe and sound banking practices;

(ii)     A senior lending officer with a significant amount of appropriate lending, collection, and loan supervision experience, and experience in upgrading a low quality loan portfolio; and

(iii)     A chief operating officer and/or chief financial officer with a significant amount of appropriate experience in managing the operations of a bank of similar size and complexity in accordance with sound banking practices.

(b)     The qualifications of management shall be assessed on its ability to:

(i)     Comply with the requirements of this ORDER;

(ii)     Operate the Bank in a safe and sound manner;

(iii)     Comply with applicable laws and regulations; and

(iv)     Restore all aspects of the Bank to a safe and sound condition, including, but not limited to, asset quality, capital adequacy, earnings, management effectiveness, risk management, liquidity, and sensitivity to market risk.

(c)     During the life of this ORDER, the Bank shall notify the Supervisory Authorities in writing, of the resignation of any of the Bank's directors or senior executive officers. Further, the Bank shall obtain the prior, written approval of the Department before terminating, suspending, or removing any senior executive officer or director or entering into any compensation agreement or other agreement related to the resignation of any of the Bank's directors or senior executive officers. Prior to the addition of any individual to the Board, the employment of any individual as a senior executive officer, or changing the responsibilities of

any senior executive officer so that the person would assume a different senior executive officer position, the Bank shall comply with the requirements of section 32 of the Act, 12 U.S.C. § 1831i, 12 C.F.R. §§ 303.100-303.104. The Bank shall also obtain the written approval of the Department prior to the addition of any individual to the Board or the employment of any individual as an executive officer. If the Regional Director issues a notice of disapproval pursuant to 12 U.S.C. § 1831i, or the Department issues a letter of disapproval with respect to the proposed individual, then such individual may not be added to the Board or employed by the Bank.

(d)     Within 45 days from the effective date of this ORDER, the Bank shall retain a bank consultant who will develop a written analysis and assessment of the Bank's management needs ("Management Report") for the purpose of providing qualified management for the Bank. The Management Report shall address management's performance as it related to weaknesses in management, asset quality, earnings, capital, liquidity, and sensitivity to market risk identified in the Report of Examination dated November 26, 2012 ("Report").

(e)     The Management Report shall be developed within 75 days from the effective date of this ORDER and shall include, at a minimum:

(i)     Identification of both the type and number of officer positions needed to properly manage and supervise the affairs of the Bank;

(ii)     Identification and establishment of such Bank committees as are needed to provide guidance and oversight to active management;

(iii)    Written evaluation of all senior executive officers to determine whether such individuals possess the ability, experience and other qualifications required to perform present and anticipated duties, including, but not limited to, adherence to the Bank's established policies and practices, restoration of the Bank to a safe and sound condition, and maintenance of the Bank in a safe and sound condition thereafter;

(iv)    Evaluation of all Bank officers' compensation, including salaries, director fees, and other benefits;

(v)    Evaluation of the appropriateness of the dual employee program;

(vi)    Development of detailed position descriptions for each officer position at the Bank;

(vii)    A plan to recruit and hire any additional or replacement personnel with the requisite ability, experience and other qualifications to fill those officer or staff member positions consistent with the needs identified in the Management Plan;

(viii)    An evaluation of the Bank's plan for management succession; and

(ix)    An organizational chart.

(f)    Within 30 days from the effective date of this ORDER, the Bank shall provide the Supervisory Authorities with a copy of the proposed engagement letter or third party contract for review before it is executed.

(g)    The contract or engagement letter, at a minimum, shall include:

(i)       A description of the work to be performed under the contract or engagement letter, the fees for each significant element of the engagement, and the aggregate fee;

(ii)      The responsibilities of the firm or individual;

(iii)     An identification of the professional standards covering the work to be performed;

(iv)     Identification of the specific procedures to be used when carrying out the work to be performed;

(v)      The qualifications of the employee(s) who will perform the work;

(vi)     The time frame for completion of the work;

(vii)    Any restrictions on the use of the reported findings;

(viii)   A provision for unrestricted examiner access to work papers; and

(ix)     A certification that neither the firm, nor any individual involved in the work to be performed, is affiliated in any manner with the Bank.

(h)      Within 30 days from receipt of the Management Report, the Bank shall formulate a written plan ("Management Plan") that incorporates the findings of the Management Report, a plan of action in response to each recommendation contained in the Management Report, and a time frame for completing each action. At a minimum, the Management Plan shall:

(i)      Contain a recitation of the recommendations included in the Management Report;

(ii)      Incorporate a plan to provide necessary training and development for all employees;

      (iii)     Establish procedures to periodically review and update the Management Plan, as well as periodically review and assess the performance of each officer and staff member; and

      (iv)     Contain a current management succession plan.

Such Management Plan and its implementation shall be submitted to the Supervisory Authorities for review and comment.

CAPITAL

3.      (a)     During the life of this ORDER, the Bank shall maintain a Leverage Ratio of at least nine percent and a Total Risk-Based Capital Ratio of at least twelve percent as those capital ratios are defined in 12 C.F.R. Part 325.

      (b)     The level of Tier 1 Capital to be maintained pursuant to this paragraph shall be in addition to a fully funded allowance for loan and lease losses ("ALLL"), the adequacy of which shall be satisfactory to the Supervisory Authorities as determined at subsequent examinations and/or visitations.

      (c)     Within 60 days from the effective date of this ORDER, the Bank shall submit to the Supervisory Authorities a written capital plan. Such capital plan shall detail the steps that the Bank shall take to achieve and maintain the capital requirements set forth in this ORDER. In developing the capital plan, the Bank shall take into consideration:

      (i)     The volume of the Bank's adversely classified assets;

      (ii)     The nature and level of the Bank's asset concentrations;

(iii)     The adequacy of the Bank's ALLL;

(iv)     The anticipated level of retained earnings;

(v)     Anticipated and contingent liquidity needs; and

(vi)     The source and timing of additional funds to fulfill future capital needs.

(d)     In addition, the capital plan must include a contingency plan in the event that the Bank has failed to:

(i)     Maintain the minimum capital ratios required by this paragraph;

(ii)     Submit an acceptable capital plan as required by this paragraph; or

(iii)     Implement or adhere to a capital plan to which the Supervisory Authorities have made no written objection pursuant to this paragraph.

(e)     The contingency plan shall include a plan to sell or merge the Bank.  The Bank shall implement the contingency plan upon written notice from the Supervisory Authorities.

(f)     Any increase in Tier 1 Capital necessary to meet the requirements of this ORDER may be accomplished by the following:

(i)     Sale of common stock;

(ii)     Sale of noncumulative perpetual preferred stock;

(iii)     Direct contribution of cash by the Board, shareholders, and/or parent holding company;

(iv)     Any combination of the above means; or

(v)     Any other means acceptable to the Supervisory Authorities.

(g)     No increase in Tier 1 Capital that is necessary to meet the requirements of this ORDER may be accomplished through a deduction from the Bank's ALLL.

(h)     If all or part of any necessary increase in Tier 1 Capital required by this ORDER is accomplished by the sale of new securities, the Board shall take all necessary steps to implement a plan for the sale of such additional securities, including the voting of any shares owned or proxies held or controlled by them in favor of the plan. Should the implementation of the plan involve a public distribution of the Bank's securities (including a distribution limited only to the Bank's existing shareholders), the Bank shall prepare offering materials fully describing the securities being offered, including an accurate description of the financial condition of the Bank and the circumstances giving rise to the offering, and any other material disclosures necessary to comply with applicable federal securities laws. Prior to the implementation of the plan and, in any event, not less than 15 days prior to the dissemination of such materials, the plan and any materials used in the sale of the securities shall be submitted to the Alabama State Banking Department, 401 Adams Avenue, Suite 680, Montgomery, Alabama 36130-1201 and the FDIC, Division of Risk Management Supervision, Accounting and Securities Disclosure Section, 550 17th Street, N.W., Room MB-5073, Washington, D.C. 20429, for review. Any changes requested to be made in the plan or materials by the FDIC and/or the Department shall be made prior to the dissemination of the plan and materials. If the increase in Tier 1 Capital is provided by the sale of noncumulative perpetual preferred stock, then all terms and conditions of the issue, including but not limited to those terms and conditions relative to

interest rate and convertibility factor, shall be presented to the Supervisory Authorities for prior approval.

(i)     In complying with the provisions of the Capital paragraph of this ORDER, if all or part of any necessary increase in Tier 1 Capital required by this ORDER is accomplished by the sale of securities, the Bank shall provide written notice of any material events to any subscriber and/or purchaser of the Bank's securities until closing of the offering and disbursement of funds to the Bank from escrow.  A material event is an occurrence that would likely be viewed by a reasonable investor as directly affecting the decision to purchase, or not to purchase, the Bank's securities through an offering.  The written notice required by this paragraph shall be furnished within 10 days from the date a material event was planned or occurred, whichever is earlier, and shall be furnished to every subscriber and/or purchaser of the Bank's securities who received or was tendered the Bank's original offering information.

## CHARGE-OFF LOSS AND DOUBTFUL

4.     (a)     Within 10 days from the effective date of this ORDER, the Bank shall eliminate from its books, by charge-off or collection, all assets or portions of assets classified "Loss" and 50 percent of those assets or portions of assets classified "Doubtful" in the Report, that have not been previously collected or charged-off.  If an asset is classified "Doubtful," the Bank may, in the alternative, charge-off the amount that is considered uncollectible in accordance with the Bank's written analysis of loan or lease impairment.  Such analysis shall be accomplished in accordance with generally accepted accounting principles, the Federal Financial Institutions Examination Council's ("FFIEC") *Instructions for Preparation of Consolidated Reports of Condition and Income (FFIEC 031 and 041)*, http://www.ffiec.gov/, Interagency Statements of

Policy on the ALLL, and other applicable regulatory guidance that addresses the adequacy of the Bank's ALLL. Elimination of any of these assets through proceeds of other loans made by the Bank is not considered collection for purposes of this paragraph.

(b)     Additionally, while this ORDER remains in effect, the Bank shall, within 30 days from the receipt of any official Report of Examination of the Bank from the FDIC or the Department, eliminate from its books, by collection, charge-off, or other proper entry, the remaining balance of any asset classified "Loss" and 50 percent of those assets classified "Doubtful" unless otherwise approved in writing by the Supervisory Authorities. If an asset is classified "Doubtful," the Bank may, in the alternative, charge-off the amount that is considered uncollectible in accordance with the Bank's written analysis of loan or lease impairment.

## CLASSIFIED ASSET REDUCTION

5.     (a)     Within 60 days from the effective date of this ORDER and within 60 days from the receipt of any future regulatory examination report, the Bank shall submit a written plan to the Supervisory Authorities to reduce the remaining assets classified "Doubtful" and "Substandard" in the Report. The plan shall address each asset relationship so classified in the Report or any future regulatory Examination Report with a balance of $250,000 or greater and provide the following:

(i)     The name(s) under which each asset within the relationship is carried on the books of the Bank;

(ii)     Type of asset;

(iii)     Actions to be taken in order to reduce the classified asset; and

(iv)     Timeframes for accomplishing the proposed actions.

(b)     The plan shall also include, at a minimum:

(i)     A review of the financial position of each such borrower, including the source of repayment, repayment ability, and alternate repayment sources; and

(ii)     An evaluation of the available collateral for each such credit, including possible actions to improve the Bank's collateral position.

(c)     In addition, the Bank's plan shall contain a schedule detailing the projected reduction of total classified assets on a quarterly basis.  Further, the plan shall require the submission of monthly progress reports to the Board and mandate a review by the Board.

(d)     The Bank shall present the plan to the Supervisory Authorities for review. Within 30 days from the Supervisory Authorities' response, the plan, including any requested modifications or amendments, shall be adopted by the Board and the approval shall be recorded in the Board minutes.  The Bank shall then immediately implement the plan.

(e)     For purposes of the plan, the reduction of adversely classified assets as of the Report or any future regulatory Examination Report shall be detailed using quarterly targets expressed as a percentage of the Bank's Tier 1 Capital plus the Bank's ALLL and may be accomplished by:

(i)     Charge-off;

(ii)     Collection;

(iii)     Sufficient improvement in the quality of adversely classified assets so as to warrant removing any adverse classification, as determined by the FDIC or the Department; and/or

(iv)     Increase in the Bank's Tier 1 Capital.

## CONCENTRATIONS OF CREDIT

6.     (a)     Within 60 days from the effective date of this ORDER, the Bank shall develop and submit for review a written plan for systematically reducing and monitoring the Bank's concentrations of credit identified in the Report to an amount which is commensurate with the Bank's business strategy, management expertise, size, and location ("Concentration Reduction Plan").

(b)     The Concentration Reduction Plan shall comply with applicable guidance referenced in *Guidance for Managing Third-Party Risk,* FIL-44-2008.  The Concentration Reduction Plan shall address all items of criticism noted in the Report.  The Concentration Reduction Plan shall include, but not be limited to:

(i)     Dollar levels and percent of total capital to which the Bank shall reduce each concentration;

(ii)     Timeframes for achieving the reduction in dollar levels in response to the paragraph above;

(iii)     Provisions for controlling and monitoring of third-party relationships, including plans to address the rationale for third-party relationship levels as they relate to growth

and capital targets, segmentation, and testing of the Bank's loan portfolio to detect and limit

concentrations with similar risk characteristics; and

(iv)     Provisions for the submission of monthly written progress reports to the

Board for review and notation in minutes of the Board meetings.

(c)     The Concentration Reduction Plan shall be submitted to the Supervisory

Authorities for non-objection or comment.  Within 30 days from receipt of non-objection or any

comments from the Supervisory Authorities, and after incorporation and adoption of all

comments, the Board shall approve the Concentration Reduction Plan, which approval shall be

recorded in the Board meeting minutes.  Thereafter, the Bank shall implement and fully comply

with the Concentration Reduction Plan.

## LENDING

7.     Within 60 days from the effective date of this ORDER, the Board shall review, revise,

adopt, and implement its written lending and collection policy to provide effective guidance and

control over the Bank's lending and credit administration functions, which implementation shall

include the resolution of those exceptions enumerated in the Report.  The policy shall address the

recommendations in the Report related to loan policy and risk management practices.  The

written policy shall include specific guidelines for concentrations of credit, third-party

relationships, placing loans on nonaccrual status, limitations on interest reserves and deferred

payment plans, procedures to ensure that the Bank performs appropriate underwriting and loan

documentation procedures, and provisions which establish a written policy governing the Bank's

Other Real Estate portfolio.  In addition, the Bank shall obtain adequate and current

documentation for all loans in the Bank's loan portfolio.  Such policy and its implementation

shall be in a form and manner acceptable to the Supervisory Authorities at the initial review and at subsequent examinations and/or visitations.

NO ADDITIONAL CREDIT

8.    (a)    Beginning with the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower who has a loan or other extension of credit from the Bank that has been charged off or classified, in whole or in part, "Loss" or "Doubtful" and is uncollected.  The requirements of this paragraph shall not prohibit the Bank from renewing credit already extended to a borrower after full collection, in cash, of interest due from the borrower.

(b)    Additionally, during the life of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower who has a loan or other extension of credit from the Bank that has been classified, in whole or part, "Substandard."

(c)    The preceding limitations on additional credit shall not apply if the Bank's failure to extend further credit to a particular borrower would be detrimental to the best interests of the Bank.  Prior to the extension of any additional credit pursuant to this paragraph, either in the form of an extension or further advance of funds, such additional credit shall be approved by a majority of the Board or a designated committee thereof, who shall certify in writing that:

(i)    The failure of the Bank to extend such credit would be detrimental to the best interests of the Bank, including an explanatory statement of why it would be detrimental to the Bank's best interests;

(ii)     The Bank's position would be improved thereby, including an explanatory statement of how the Bank's position would be improved;

(iii)     An appropriate workout plan has been developed and will be implemented in conjunction with the additional credit to be extended; and

(iv)     That the extension of such credit does not violate Section 5-5A-22 of the Alabama Banking Code and adheres to State of Alabama Banking Board Regulation No. 14.

(d)     The signed certification shall be made a part of the meeting minutes of the Board or its designated committee and a copy of the signed certification shall be retained in the borrower's credit file.

(e)     Any additional extensions of credit to classified borrowers made under this provision shall be reported to the Supervisory Authorities at 90-day intervals with the other reporting requirements set forth in this ORDER. At a minimum, the 90-day reports shall include the name of the classified borrower, the amount of additional credit extended, and the total outstanding balance of credit extended to the classified borrower.

## OTHER REAL ESTATE

9.     Within 60 days from the effective date of this ORDER, the Board shall develop a written policy for managing the Other Real Estate of the Bank. Such policy shall be consistent with all applicable laws, regulations, and other regulatory guidelines regarding appraisals, including, but not limited to, the FDIC's appraisal regulations as described in 12 C.F.R. § 323, and *Guidance on Other Real Estate*, FIL-62-2008 (July 1, 2008) and the Department's *Statement of Policy on the*

*Matter of Booking and Holding of Other Real Estate*. The Bank shall submit the policy to the Supervisory Authorities for review. The Bank shall approve the policy, which approval shall be recorded in the Board meeting minutes. Thereafter, the Bank shall implement and fully comply with the policy.

## SPECIAL MENTION

10.     Within 60 days from the effective date of this ORDER, the Bank shall correct the cited deficiencies in the loans listed for "Special Mention" in the Report. The Board shall review and approve any renewals, extensions, or restructures of the loans listed as Special Mention in the Report.

## ALLOWANCE FOR LOAN AND LEASE LOSSES AND CALL REPORT

11.     (a)     Immediately upon the issuance of this ORDER, the Board shall make a provision to replenish the ALLL, which as of the date of the examination was underfunded as set forth in the Report.

(b)     Within 60 days from the effective date of this ORDER, the Board shall review the adequacy of the ALLL and establish a comprehensive policy for determining the adequacy of the ALLL. For the purpose of this determination, the adequacy of the ALLL shall be determined after the charge-off of all loans or other items classified "Loss". The policy shall provide for a review of the ALLL at least once each calendar quarter. Said review shall be completed in time to properly report the ALLL in the quarterly Consolidated Reports of Condition and Income. The review shall focus on the results of the Bank's internal loan review, loan and lease loss experience, trends of delinquent and non-accrual loans, an estimate of potential loss exposure of

significant credits, concentrations of credit, and present and prospective economic conditions.

The review should include a review of compliance with ASC 450 (Topic 450, "Contingencies")

and ASC 310-10-35 (Section 35, "Subsequent Measurement General," of Subtopic 310-10). The

policy shall adhere to the guidance set forth in the *Interagency Policy Statement on the*

*Allowance for Loan and Lease Losses*, FIL-105-2006 (Dec. 13, 2006). A deficiency in the

ALLL shall be remedied in the calendar quarter it is discovered, prior to submitting the next

Consolidated Report of Condition and Income, by a charge to current operating earnings. The

Board meeting minutes for the meeting at which such review is undertaken shall indicate the

results of the review. The Bank's policy for determining the adequacy of the ALLL and its

implementation shall be satisfactory to the Supervisory Authorities as determined at the initial

review and at subsequent examinations and/or visitations.

## CALL REPORTS

12.     (a)     Within 30 days from the effective date of this ORDER, the Board shall ensure

that all Consolidated Reports of Condition and Income filed with the FDIC on or after September

30, 2012, are reviewed and shall file, as necessary, amended Consolidated Reports of Condition

and Income, in accordance with the Reports of Condition and Income Instructions, which

accurately reflect the financial condition of the Bank as of the date of each report. Amended

Consolidated Reports of Condition and Income must be filed if previously submitted reports

were not filed in accordance with the Instructions for Preparation of Consolidated Reports of

Condition and Income.

        (b)     In addition, and during the life of this ORDER, the Bank shall file Consolidated

Reports of Condition and Income that accurately reflect the financial condition of the Bank as of

the reporting period specified. In particular, the reports shall incorporate any adjustment in the Bank's books made as a consequence of any official Report of Examination of the Bank from the FDIC or the Department during the reporting period.

## BUDGET

13.   (a)      Within 60 days from the effective date of this ORDER, the Bank shall implement a written plan and a comprehensive budget for all categories of income and expense for the calendar year ending December 31, 2013. The plan and budget required by this paragraph shall include formal goals and strategies, consistent with sound banking practices, and take into account the Bank's other written policies in order to improve the Bank's net interest margin, reduce discretionary expenses, control overhead, and improve and sustain earnings of the Bank. The plan shall include a description of the operating assumptions that form the basis for, and adequately support, major projected income and expense components. Thereafter, the Bank shall formulate such a plan and budget by November 30 of each subsequent year and submit the plan and budget to the Supervisory Authorities for review and comment by December 15 of each subsequent year. The plan and budget required by this ORDER shall be acceptable to the Supervisory Authorities at the initial review and at subsequent examinations and/or visitations.

(b)      On a monthly basis, the Board shall evaluate the Bank's actual performance in relation to the plan and budget required by this ORDER and shall record the results of the evaluation, and any actions taken by the Bank, in the minutes of the Board meeting at which such evaluation is undertaken. The actual performance compared to the budget shall be submitted to the Supervisory Authorities with the quarterly progress reports required by this ORDER.

## INTEREST RATE RISK POLICY

14.    Within 60 days from the effective date of this ORDER, the Bank shall develop and

implement a written policy for managing interest rate risk in a manner that is appropriate to the

size of the Bank and the complexity of its assets.  The policy shall comply with the *Joint Agency*

*Policy Statement on Interest Rate Risk*, FIL-52-96 (July 12, 1996), and the *FFIEC Advisory on*

*Interest Rate Management*, FIL-2-2010 (Jan. 20, 2010), and shall be consistent with the

comments and recommendations detailed in the Report.  The policy shall include guidelines

governing the means by which the interest rate risk position will be monitored, the establishment

of risk parameters, and periodic reporting to management and the Board regarding interest rate

risk, with adequate information provided to assess the level of risk.  Such policy and its

implementation shall be satisfactory to the Supervisory Authorities as determined at the initial

review and at subsequent examinations and/or visitations.

## LIQUIDITY AND FUNDS MANAGEMENT

15.    (a)    Within 60 days from the effective date of this ORDER, the Bank shall adopt and

implement a written plan to improve liquidity, contingency funding, interest rate risk, and asset

liability management.

(b)    The plan shall incorporate the guidance contained in *Liquidity Risk Management*,

FIL-84-2008 (Aug. 26, 2008).  The plan shall provide restrictions on the use of brokered and

internet deposits consistent with safe and sound banking practices.  The plan shall include

provisions that address the items of criticism in the Report.

(c)     A copy of the plan shall be acceptable to the Supervisory Authorities at the initial review and at subsequent examinations and/or visitations. The Bank shall adopt, implement, and follow the plan, and its implementation shall be in a form and manner acceptable to the Supervisory Authorities at the initial review and at subsequent examinations and/or visitations.

(d)     Beginning with the effective date of this ORDER, the Bank's management shall review its liquidity position to ensure that the Bank has sufficient liquid assets or sources of liquidity to meet current and anticipated liquidity needs. This review shall include an analysis of the Bank's sources and uses of funds (cash flow analysis). The results of this review shall be presented to the Board for review each month, with the review noted in the Board meeting minutes.

## STRATEGIC PLAN

16.     (a)     Within 120 days from the effective date of this ORDER, the Bank shall prepare and submit to the Supervisory Authorities an acceptable written business/strategic plan covering the overall operation of the Bank. At a minimum the plan shall establish objectives for the Bank's earnings performance, growth, balance sheet mix, liability structure, capital adequacy, and reduction of nonperforming and underperforming assets, together with strategies for achieving those objectives. The plan shall also identify capital, funding, managerial, and other resources needed to accomplish its objectives. Further, for third-party relationships the Board is required to determine how third-party activity will impact the Bank's overall condition including the impact on liquidity and incorporate such consideration in the plan. Such plan shall specifically provide for the following:

(i)      Goals for the composition of the loan portfolio by loan type, including strategies to diversify the type and improve the quality of loans held;

(ii)      Goals for the composition of the deposit base including strategies to reduce reliance on volatile and costly deposits;

(iii)      Plans for effective risk management and collection practices; and.

(iv)      Plans for effective third-party risk management practices should include:

a.  Comprehensive audit procedures;

b.  On-going due diligence of all third-party engagements; and

c.  A written assessment of third-party activity to be performed no less than quarterly, describing the activity's impact to asset quality, capital, earnings, liquidity, and sensitivity to market risk.  This assessment should be performed separately for each third-party engagement.

(b)      The Board shall approve the business/strategic plan, which approval shall be recorded in the Board meeting minutes for the meeting at which the business/strategic plan was approved.

## AUDIT PROGRAM

17.      Within 60 days from the effective date of this ORDER, the Bank shall adopt and implement a policy for the operation of the Bank in such a manner as to provide adequate internal routines and controls within the Bank, consistent with safe and sound banking practices, including audit procedures and controls sufficient for monitoring and controlling third-party relationships.  Such policy and its implementation shall, at a minimum, eliminate and/or correct

all internal routine and control and audit deficiencies as more fully set forth in the Report and shall be satisfactory to the Supervisory Authorities at the initial review and at subsequent examinations and/or visitations.

## BANK HOLDING COMPANY OR OTHER AFFILIATES

18.     (a)     Within 60 days from the effective date of this ORDER, the Bank shall implement a written policy, satisfactory to the Supervisory Authorities, to govern the relationship between the Bank and its holding company and/or affiliates. The policy shall limit the payment of any management, consulting, or other fees or funds of any nature, directly or indirectly, to or for the benefit of the Bank's holding company and/or affiliates, to only those fees or funds paid in connection with necessary services actually performed on behalf of or for the benefit of the Bank. The Bank shall maintain documentation to support the reasonableness of the fees paid.

(b)     As of the effective date of this ORDER, the Bank shall not make any payment to or for the benefit of the Bank's holding company or any other Bank affiliate or enter into any contract or other transaction directly or indirectly with any such affiliate without the prior written consent of the Supervisory Authorities.

## VIOLATIONS OF LAWS AND REGULATIONS AND CONTRAVENTIONS OF POLICY

19.     Within 60 days from the effective date of this ORDER, the Bank will eliminate and/or correct all violations of laws and regulations and contraventions of statements of policy in the Report and shall adopt and implement appropriate procedures to ensure future compliance with all such applicable Federal and State laws, regulations, and statements of policy.

## ASSET GROWTH

20.     While this ORDER is in effect, the Bank shall notify the Supervisory Authorities at least 60 days prior to undertaking asset growth that exceeds 5 percent or more per annum or initiating material changes in asset or liability composition.  In no event shall asset growth result in noncompliance with the capital maintenance provisions of this ORDER unless the Bank receives prior written approval from the Supervisory Authorities.  Further, throughout the effective life of the ORDER, the Bank shall not expand the relationship with any lending related third-party relationships without prior approval from the Supervisory Authorities at least 60 days prior to entering such contracts.

## BROKERED DEPOSITS

21.     Throughout the effective life of this ORDER, the Bank shall not accept, renew, or rollover any brokered deposit, as defined in 12 C.F.R. § 337.6(a)(2), unless it is in compliance with the requirements of 12 C.F.R. § 337.6(b) which governs the solicitation and acceptance of brokered deposits by insured depository institutions.  The Bank shall comply with the restrictions on the effective yields on deposits as described in 12 C.F.R. § 337.6.

## RESTRICTIONS OF CERTAIN PAYMENTS

22.     (a)     While this ORDER is in effect, the Bank shall not declare or pay dividends, bonuses, or make any other form of payment outside the ordinary course of business resulting in a reduction of capital, without the prior written approval of the Supervisory Authorities.  All requests for prior approval shall be received at least 30 days prior to the proposed dividend or bonus payment declaration date (or at least 5 days with respect to any request filed within the

first 30 days from the date of this ORDER) and shall contain, but not be limited to, an analysis of the impact such dividend or bonus payment would have on the Bank's capital, income, and/or liquidity positions.

(b)     During the term of this ORDER, the Bank shall not make any distributions of interest, principal or other sums on subordinated debentures, if any, without the prior written approval of the Supervisory Authorities.

## SHAREHOLDER DISCLOSURE

23.     Within 30 days from the effective date of this ORDER, the Bank shall send a copy of this ORDER, or otherwise furnish a description of this ORDER, to its parent holding company.  The description shall fully describe this ORDER in all material respects.

## PROGRESS REPORTS

24.     Within 30 days from the end of the first quarter following the effective date of this ORDER, and within 30 days from the end of each quarter thereafter, the Bank shall furnish written progress reports to the Supervisory Authorities detailing the form and manner of any actions taken to secure compliance with this ORDER and the results thereof.  Such reports shall include a copy of the Bank's Consolidated Reports of Condition and of Income.  Such reports may be discontinued when the corrections required by this ORDER have been accomplished and the Supervisory Authorities has released the Bank in writing from making further reports.  All progress reports and other written responses to this ORDER shall be reviewed by the Board and made a part of the appropriate Board meeting minutes.

The provisions of this ORDER shall not bar, stop, or otherwise prevent the FDIC or any other federal or state agency or department from taking any other action against the Bank or any of the Bank's current or former institution-affiliated parties.

This ORDER shall be effective on the date of issuance.

The provisions of this ORDER shall be binding upon the Bank, its institution-affiliated parties, and any successors and assigns thereof.

The provisions of this ORDER shall remain effective and enforceable except to the extent that and until such time as any provision has been modified, terminated, suspended, or set aside by the Supervisory Authorities.

Issued Pursuant to Delegated Authority

Dated: May 2, 2013

By:

/s/

_____

Thomas J. Dujenski
Regional Director
Division of Supervision and Consumer Protection
Federal Deposit Insurance Corporation

The Alabama Superintendent of Banks, having duly approved the foregoing ORDER, and the Bank, through its Board, agree that the issuance of said ORDER by the Federal Deposit Insurance Corporation shall be binding as between the Bank and the Alabama Superintendent of Banks to the same degree and legal effect that such ORDER would be binding on the Bank if the Alabama Superintendent of Banks had issued a separate ORDER that included and incorporated all the provisions of the foregoing ORDER pursuant to the provisions of the §5-2A-12, Code of Alabama, 1980.

Dated this 1st day of May, 2013.

/s/

_____

John D. Harrison
Superintendent of Banks
Alabama State Banking Department

ALABAMA STATE BANKING DEPARTMENT
MONTGOMERY, ALABAMA

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| SUNSOUTH BANCSHARES, INC. ) | ORDER |
| DOTHAN, ALABAMA ) | ASBD-2013-02 |
| ) | |
| ) | |

The Alabama State Banking Department (Department) is the chartering agency and designated regulator for SunSouth Bank, Dothan, Alabama (Bank). The Department also has regulatory authority over SunSouth Bancshares, Inc., Dothan, Alabama, (SunSouth) under Section 5-2A-12 of the Alabama Banking Code.

Pursuant to the authority vested in §5-2A-12, Code of Alabama, the Department by and through the Superintendent hereby orders the following:

BOARD OF DIRECTORS AND MANAGEMENT

1. SunSouth shall add the same two new independent members to its Board of Directors (Board) that are to be added to the Bank's Board of Directors, pursuant to the May 2, 2013, Consent Order stipulated to by the Bank's Board. The addition of any new director may be accomplished, to the extent permissible by State statute or SunSouth's by-laws, by means of appointment or election at a regular or special meeting of SunSouth's shareholders. SunSouth

shall cause its articles of incorporation, by-laws, and/or other governing corporate instruments, to be amended as appropriate to reflect the addition of the new independent directors.

2.  During the life of this ORDER, SunSouth shall notify the Department, in writing, of the resignation of any of SunSouth's directors or executive officers. Further, SunSouth shall obtain the prior, written approval of the Department before terminating, suspending, or removing any executive officer or director of SunSouth or the Bank or entering into any compensation agreement or other agreement related to the resignation of any of SunSouth's or the Bank's directors or executive officers. SunSouth shall also obtain the written approval of the Department prior to the addition of any individual to the Board or the Bank's Board of Directors or the employment of any individual as an executive officer at SunSouth or the Bank. If the Department issues a letter of disapproval with respect to the proposed individual, then such individual may not be added to the Board or to the Bank's Board of Directors or employed by SunSouth or the Bank.

## SUBSIDIARIES AND AFFILIATES

3.  Within 60 days from the effective date of this ORDER, SunSouth shall implement a written policy, satisfactory to the Department, to govern the relationship between SunSouth and the Bank and between SunSouth and all of its other affiliates. The policy shall limit the payment of any management, consulting, or other fees or funds of any nature, directly or indirectly, to or for the benefit of the Bank or any other affiliate, to only those fees or funds paid in connection with necessary services actually performed on behalf of or for the benefit of SunSouth. The policy shall also limit the receipt of any management, consulting, or other fees or funds of any nature, directly or indirectly, by SunSouth from the Bank or any other affiliate, to only those fees or

2

funds paid in connection with necessary services actually performed on behalf of or for the benefit of those parties by SunSouth  SunSouth shall maintain documentation to support the reasonableness of the fees paid and received.

4. As of the effective date of this ORDER, SunSouth shall not make any payment to or for the benefit of the Bank or any other affiliate or enter into any contract or other transaction directly or indirectly with any such affiliate without the prior written consent of the Department.

## RESTRICTIONS OF CERTAIN PAYMENTS

5. While this ORDER is in effect, SunSouth shall not declare or pay dividends, bonuses, or make any other form of payment outside the ordinary course of business resulting in a reduction of capital, without the prior written approval of the Department.  All requests for prior approval shall be received at least 30 days prior to the proposed dividend or bonus payment declaration date (or at least 5 days with respect to any request filed within the first 30 days from the date of this ORDER) and shall contain, but not be limited to, an analysis of the impact such dividend or bonus payment would have on the Bank's and SunSouth's capital, income, and liquidity positions.

## PROGRESS REPORTS

7. Within thirty (30) days from the end of the first quarter following the effective date of this ORDER, and within thirty (30) days from the end of each quarter thereafter, SunSouth shall furnish written progress reports to the Department and the Federal Reserve, detailing the form and manner of any actions taken to secure compliance with this ORDER and the results thereof.

3

Such reports may be discontinued when the corrections required by this ORDER have been accomplished and the Department has released SunSouth in writing from making further reports. All progress reports and other written responses to this ORDER shall be reviewed by the Board and made a part of the appropriate Board meeting minutes.

The provisions of this ORDER shall not bar, estop, or otherwise prevent the Department, the Federal Reserve, or any other State or Federal agency or department from taking any other action against SunSouth or the Bank or any of SunSouth's or the Bank's current or former institution-affiliated parties.

This ORDER shall be effective on the date of issuance.

The provisions of this ORDER shall be binding upon SunSouth, any affiliated parties, and any successors and assigns thereof.

The provisions of this ORDER shall remain effective and enforceable until a subsequent written Order of the Department modifies, terminates, suspends, or sets aside any or all provisions of this ORDER.

Dated this 24th day of May, 2013.

John D. Harrison
Superintendent of Banks
Alabama State Banking Department

4

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

THE STATE OF ALABAMA
ALABAMA STATE BANKING DEPARTMENT
MONTGOMERY, ALABAMA

| | |
|---|---|
| Written Agreement by and among<br><br>SUNSOUTH BANCSHARES, INC.<br>Dothan, Alabama<br><br>FEDERAL RESERVE BANK OF<br>ATLANTA<br>Atlanta, Georgia<br><br>and<br><br>ALABAMA STATE BANKING<br>DEPARTMENT<br>Montgomery, Alabama | Docket No. 13-028-WA-HC |

WHEREAS, SunSouth Bancshares, Inc., Dothan, Alabama ("SunSouth"), a registered

bank holding company, owns and controls SunSouth Bank, Dothan, Alabama (the "Bank"), a

state-chartered nonmember bank, and various nonbank subsidiaries;

WHEREAS, it is the common goal of SunSouth, the Federal Reserve Bank of Atlanta

(the "Reserve Bank"), and the Alabama State Banking Department (the "Department") to

improve the financial soundness of SunSouth so that SunSouth may serve as a source of strength

to the Bank;

WHEREAS, SunSouth, the Reserve Bank, and the Department have mutually agreed to

enter into this Written Agreement (the "Agreement"); and

WHEREAS, on September 11, 2013, the board of directors of SunSouth, at a duly constituted meeting, adopted a resolution authorizing and directing J. Steven Roy to enter into this Agreement on behalf of SunSouth and consenting to compliance with each and every provision of this Agreement by SunSouth and its institution-affiliated parties, as defined in sections 3(u) and 8(b)(3) of the Federal Deposit Insurance Act, as amended (the "FDI Act") (12 U.S.C. §§ 1813(u) and 1818(b)(3)).

NOW, THEREFORE, SunSouth, the Reserve Bank, and the Department agree as follows:

**Source of Strength**

1.      The board of directors of SunSouth shall take appropriate steps to fully utilize SunSouth's financial and managerial resources, pursuant to section 38A of the FDI Act (12 U.S.C. § 1831$o$-1) and section 225.4(a) of Regulation Y of the Board of Governors of the Federal Reserve System (the "Board of Governors") (12 C.F.R. § 225.4(a)), to serve as a source of strength to the Bank, including, but not limited to, taking steps to ensure that the Bank complies with the Consent Order issued by the Department and the Federal Deposit Insurance Corporation on  May 2, 2013 and any other supervisory action taken by the Bank's federal or state regulators.

**Dividends and Distributions**

2.      (a)      SunSouth shall not declare or pay any dividends without the prior written approval of the Reserve Bank, the Director of the Division of Banking Supervision and Regulation (the "Director") of the Board of Governors, and the Superintendent of the Department (the "Superintendent").

(b)     SunSouth shall not directly or indirectly take dividends or any other form of payment representing a reduction in capital from the Bank without the prior written approval of the Reserve Bank and the Department.

(c)     SunSouth and its nonbank subsidiaries shall not make any distributions of interest, principal, or other sums on subordinated debentures or trust preferred securities without the prior written approval of the Reserve Bank, the Director, and the Superintendent.

(d)     All requests for prior approval shall be received by the Reserve Bank and the Department at least 30 days prior to the proposed dividend declaration date, proposed distribution on subordinated debentures, and required notice of deferral on trust preferred securities.  All requests shall contain, at a minimum, current and projected information on SunSouth's capital, earnings, and cash flow; the Bank's capital, asset quality, earnings, and allowance for loan and lease losses; and identification of the sources of funds for the proposed payment or distribution.  For requests to declare or pay dividends, SunSouth must also demonstrate that the requested declaration or payment of dividends is consistent with the Board of Governors' Policy Statement on the Payment of Cash Dividends by State Member Banks and Bank Holding Companies, dated November 14, 1985 (Federal Reserve Regulatory Service, 4-877 at page 4-323).

**Debt and Stock Redemption**

3.     (a)     SunSouth and any nonbank subsidiary shall not, directly or indirectly, incur, increase, or guarantee any debt without the prior written approval of the Reserve Bank and the Department.  All requests for prior written approval shall contain, but not be limited to, a statement regarding the purpose of the debt, the terms of the debt, the planned source(s) for

Case 17-10371    Doc 14    Filed 02/17/17    Entered 02/17/17 17:49:05    Desc Main
Document      Page 109 of 211

debt repayment, and an analysis of the cash flow resources available to meet such debt repayment.

(b)     SunSouth shall not, directly or indirectly, purchase or redeem any shares of its stock without the prior written approval of the Reserve Bank and the Department.

**New Directors**

4.     (a)     SunSouth shall take all available actions necessary to increase the number of outside directors, and shall report quarterly to the Reserve Bank and the Department on efforts to secure new directors.

(b)     For the purposes of this Agreement, the term:  (i) "outside director" is defined as an individual, not an employee or executive officer of SunSouth or the Bank, who owns less than 10 percent of the outstanding voting stock of SunSouth or the Bank and who is not related in any manner to any shareholder who owns 10 percent or more of the outstanding voting stock of SunSouth or the Bank or any related interest of such a shareholder; and (ii) "executive officer" is defined as set forth in section 215.2(e) of Regulation O of the Board of Governors (12 C.F.R. 215.2(e)).

**Compliance with Laws and Regulations**

5.     (a)  In appointing any new director or senior executive officer, or changing the responsibilities of any senior executive officer so that the officer would assume a different senior executive officer position, SunSouth shall comply with the notice provisions of section 32 of the FDI Act (12 U.S.C. § 1831i) and Subpart H of Regulation Y of the Board of Governors (12 C.F.R. §§ 225.71 *et seq.*) and shall obtain the Department's approval.

(b)     SunSouth shall comply with the restrictions on indemnification and severance payments of section 18(k) of the FDI Act (12 U.S.C. § 1828(k)) and

Part 359 of the Federal Deposit Insurance Corporation's regulations (12 C.F.R. Part 359).

**Progress Reports**

6.      Within 45 days after the end of each calendar quarter following the date of this Agreement, the board of directors shall submit to the Reserve Bank and the Department written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Agreement and the results thereof and a parent company only balance sheet, income statement, and, as applicable, report of changes in stockholders' equity.

**Communications**

7.      All communications regarding this Agreement shall be sent to:

(a)      Mr. Allen Stanley
        Assistant Vice President
        Federal Reserve Bank of Atlanta
        1000 Peachtree Street, N.E.
        Atlanta, Georgia 30309

(b)      Mr. John D. Harrison
        Superintendent
        Alabama State Banking Department
        401 Adams Avenue, Suite 680
        Montgomery, Alabama 36104

(c)      Mr. J. Steven Roy
        Chairman of the Board
        SunSouth Bancshares, Inc.
        108 Jamestown Boulevard
        Dothan, Alabama 36302

**Miscellaneous**

8.      Notwithstanding any provision of this Agreement, the Reserve Bank and the Department may, in their sole discretion, grant written extensions of time to SunSouth to comply with any provision of this Agreement.

9.      The provisions of this Agreement shall be binding upon SunSouth and its institution-affiliated parties, in their capacities as such, and their successors and assigns.

10.     Each provision of this Agreement shall remain effective and enforceable until stayed, modified, terminated, or suspended in writing by the Reserve Bank and the Department.

11.     The provisions of this Agreement shall not bar, estop, or otherwise prevent the Board of Governors, the Reserve Bank, the Department or any other federal or state agency from taking any other action affecting SunSouth, the Bank, any nonbank subsidiary of SunSouth, or any of their current or former institution-affiliated parties and their successors and assigns.

12.     Pursuant to section 50 of the FDI Act (12 U.S.C. § 1831aa), this Agreement is enforceable by the Board of Governors under section 8 of the FDI Act (12 U.S.C. § 1818).

13.     This Agreement does not supersede any other enforcement action involving SunSouth and the Department.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the 20th day of September, 2013.


SUNSOUTH BANCSHARES, INC.              FEDERAL RESERVE BANK
                                        OF ATLANTA

By: /s/ J. Steven Roy_____       By: /s/ Allen Stanley_____
        J. Steven Roy                          Allen Stanley
        Chairman of the Board                  Assistant Vice President


                                       ALABAMA STATE BANKING
                                        DEPARTMENT


                                       By: /s/ John D. Harrison_____
                                               John D. Harrison
                                               Superintendent of Banks

6

**COMPSITE EXHIBIT C**

*Financial Statements*

# SUNSOUTH BANCSHARES, INC. AND SUBSIDIARIES

## CONSOLIDATED FINANCIAL REPORT

## DECEMBER 31, 2014

# SUNSOUTH BANCSHARES, INC.
# AND SUBSIDIARIES

## CONSOLIDATED FINANCIAL REPORT
## DECEMBER 31, 2014

### TABLE OF CONTENTS

Page

INDEPENDENT AUDITOR'S REPORT ................................................................................................................ 1

CONSOLIDATED FINANCIAL STATEMENTS

Consolidated balance sheets ................................................................................................................................ 2
Consolidated statements of operations ............................................................................................................... 3
Consolidated statements of comprehensive loss ............................................................................................... 4
Consolidated statements of stockholders' equity (deficit) ............................................................................... 5
Consolidated statements of cash flows ............................................................................................................... 6
Notes to consolidated financial statements ..................................................................................................7-41



# INDEPENDENT AUDITOR'S REPORT

**To the Board of Directors**
**SunSouth Bancshares, Inc.**
**Dothan, Alabama**

We have audited the accompanying consolidated financial statements of **SunSouth Bancshares, Inc. and Subsidiaries**, which comprise the consolidated balance sheets as of December 31, 2014 and 2013, and the related consolidated statements of operations, comprehensive loss, stockholders' equity (deficit), and cash flows for the years then ended, and the related notes to the consolidated financial statements.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### *Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of SunSouth Bancshares, Inc. and Subsidiaries as of December 31, 2014 and 2013, and the results of their operations and their cash flows for the years then ended, in accordance with accounting principles generally accepted in the United States of America.

### *Emphasis of Matter*

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has suffered declining levels of capital as a result of continuing losses from operations and is currently in default on debt obligations. Those conditions raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of these uncertainties. Our opinion is not modified with respect to these matters.

*Mauldin & Jenkins, LLC*

Birmingham, Alabama
June 1, 2015

2000 SOUTHBRIDGE PARKWAY, SUITE 501 • BIRMINGHAM, AL 35209 • 205-445-2880 • 888-277-0020 • FAX 205-445-2940 • www.mjcpa.com
MEMBERS OF THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS

# SUNSOUTH BANCSHARES, INC.
## AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEETS
### DECEMBER 31, 2014 AND 2013

| Assets | 2014 | 2013 |
|---|---:|---:|
| Cash and due from banks | $ 3,326,396 | $ 2,486,871 |
| Interest bearing deposits in banks | 385,824 | 18,945,087 |
| Federal funds sold | - | 775,000 |
| Total cash and cash equivalents | 3,712,220 | 22,206,958 |
| Securities available for sale | 35,569,882 | 10,185,338 |
| Restricted equity securities | 1,198,950 | 1,030,950 |
| Loans | 107,893,787 | 120,171,262 |
| Less allowance for loan losses | 2,752,765 | 2,712,126 |
| Loans, net | 105,141,022 | 117,459,136 |
| Premises and equipment | 2,926,954 | 3,487,127 |
| Foreclosed assets | 4,607,479 | 9,110,716 |
| Other assets | 1,357,855 | 2,375,598 |
| **Total assets** | $ 154,514,362 | $ 165,855,823 |

### Liabilities and Stockholders' Deficit

| | 2014 | 2013 |
|---|---:|---:|
| Deposits | | |
| Noninterest-bearing | $ 10,863,194 | $ 9,467,361 |
| Interest-bearing | 122,261,014 | 136,497,996 |
| Total deposits | 133,124,208 | 145,965,357 |
| Other borrowings | 14,250,000 | 10,231,976 |
| Junior subordinated debt | 8,248,000 | 8,248,000 |
| Other liabilities | 1,829,703 | 2,318,746 |
| **Total liabilities** | 157,451,911 | 166,764,079 |

Commitments and contingencies

| | 2014 | 2013 |
|---|---:|---:|
| Stockholders' deficit | | |
| Common stock, voting, $5 par value, 20,000 shares authorized; 4,778 and 4,774 shares issued and outstanding, respectively | 23,890 | 23,870 |
| Common stock, non-voting, $5 par value, 10,000 shares authorized; none issued and outstanding | - | - |
| Capital surplus | 12,721,959 | 12,721,779 |
| Accumulated deficit | (15,574,362) | (13,196,060) |
| Accumulated other comprehensive loss | (109,036) | (457,845) |
| **Total stockholders' deficit** | (2,937,549) | (908,256) |
| **Total liabilities and stockholders' deficit** | $ 154,514,362 | $ 165,855,823 |

**See Notes to Consolidated Financial Statements.**

# SUNSOUTH BANCSHARES, INC.
## AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF OPERATIONS
### YEARS ENDED DECEMBER 31, 2014 AND 2013

|  | 2014 | 2013 |
|---|---:|---:|
| **Interest income** | | |
| Loans, including fees | $ 5,854,307 | $ 7,184,640 |
| Taxable securities | 502,893 | 253,414 |
| Nontaxable securities | - | 2,931 |
| Other | 16,222 | 37,438 |
| **Total interest income** | 6,373,422 | 7,478,423 |
| | | |
| **Interest expense** | | |
| Deposits | 1,264,814 | 1,768,465 |
| Other borrowings | 372,997 | 431,867 |
| **Total interest expense** | 1,637,811 | 2,200,332 |
| | | |
| **Net interest income** | 4,735,611 | 5,278,091 |
| **Provision for loan losses** | 500,000 | 900,000 |
| **Net interest income after provision for loan losses** | 4,235,611 | 4,378,091 |
| | | |
| **Other income** | | |
| Service charges on deposit accounts | 152,091 | 114,043 |
| Gain on sale of securities, net | 15,281 | 17,080 |
| Gain on sale of loans | - | 16,315 |
| Management services fees | 133,000 | 120,000 |
| Other operating income | 62,699 | 161,046 |
| **Total other income** | 363,071 | 428,484 |
| | | |
| **Other expenses** | | |
| Salaries and employee benefits | 2,320,925 | 2,505,892 |
| Equipment and occupancy expenses | 542,247 | 597,426 |
| Deposit insurance premiums | 334,749 | 380,598 |
| Expenses and losses from foreclosed assets | 1,827,560 | 2,171,941 |
| Other operating expenses | 1,951,503 | 2,405,723 |
| **Total other expenses** | 6,976,984 | 8,061,580 |
| | | |
| **Loss before income tax expense** | (2,378,302) | (3,255,005) |
| | | |
| **Income tax expense** | - | 2,168,508 |
| | | |
| **Net loss** | $ (2,378,302) | $ (5,423,513) |

**See Notes to Consolidated Financial Statements.**

# SUNSOUTH BANCSHARES, INC.
## AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS
### YEARS ENDED DECEMBER 31, 2014 AND 2013

|  | 2014 | 2013 |
|---|---|---|
| Net loss | $ (2,378,302) | $ (5,423,513) |
| **Other comprehensive income (loss):** | | |
| Unrealized holding gains (losses) on securities available for sale arising during period, net of tax (benefit) of $209,616 and $(286,299) in 2014 and 2013, respectively | 358,451 | (489,576) |
| Reclassification adjustment for gains realized in net loss, net of tax of $5,639 and $6,303 in 2014 and 2013, respectively | (9,642) | (10,777) |
| Other comprehensive income (loss) | 348,809 | (500,353) |
| **Comprehensive loss** | $ (2,029,493) | $ (5,923,866) |

**See Notes to Consolidated Financial Statements.**

# SUNSOUTH BANCSHARES, INC.
## AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)
## YEARS ENDED DECEMBER 31, 2014 AND 2013

| | Common Stock | | Capital Surplus | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|
| | Shares | Par Value | | | | |
| **Balance, December 31, 2012** | 4,774 | $ 23,870 | $ 12,721,779 | $ (7,772,547) | $ 42,508 | $ 5,015,610 |
| Net loss | - | - | - | (5,423,513) | - | (5,423,513) |
| Other comprehensive loss | - | - | - | - | (500,353) | (500,353) |
| **Balance, December 31, 2013** | 4,774 | 23,870 | 12,721,779 | (13,196,060) | (457,845) | (908,256) |
| Net loss | - | - | - | (2,378,302) | - | (2,378,302) |
| Purchase of common stock | 4 | 20 | 180 | - | - | 200 |
| Other comprehensive income | - | - | - | - | 348,809 | 348,809 |
| **Balance, December 31, 2014** | 4,778 | $ 23,890 | $ 12,721,959 | $ (15,574,362) | $ (109,036) | $ (2,937,549) |

See Notes to Consolidated Financial Statements.

# SUNSOUTH BANCSHARES, INC.
## AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS
### YEARS ENDED DECEMBER 31, 2014 AND 2013

|  | 2014 | 2013 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Net loss | $ (2,378,302) | $ (5,423,513) |
| Adjustments to reconcile net loss to net cash | | |
| provided by operating activities: | | |
| Depreciation | 234,279 | 258,707 |
| Amortization of securities, net | 221,950 | 17,708 |
| Provision for loan losses | 500,000 | 900,000 |
| Deferred income taxes | - | 2,168,508 |
| Gain on sale of securities, net | (15,281) | (17,080) |
| Loss on redemption of restricted equity securities | - | 39,282 |
| Gain on sale of loans | - | (16,315) |
| Loss (gain) on sale of foreclosed assets, net | (33,299) | 4,966 |
| Write down of foreclosed assets | 1,630,146 | 1,721,805 |
| (Gain) loss on sale of premises and equipment | 21,322 | (37,002) |
| Net change in loans held for sale | - | 1,851,973 |
| Decrease in prepaid assets | 438,525 | 73,679 |
| (Increase) decrease in interest receivable | (56,515) | 70,157 |
| Increase in interest payable | 246,803 | 227,024 |
| Net other operating activities | (304,092) | 838,437 |
| Net cash provided by operating activities | 505,536 | 2,678,336 |
| | | |
| **INVESTING ACTIVITIES** | | |
| Purchases of securities available for sale | (28,164,762) | (5,940,919) |
| Proceeds from sale of securities available for sale | 1,700,242 | 1,424,276 |
| Proceeds from maturities of securities available for sale | 1,426,094 | 1,068,195 |
| Net (increase) decrease of restricted equity securities | (168,000) | 120,218 |
| Net decrease in loans | 11,838,628 | 6,643,707 |
| Proceeds from sale of foreclosed assets | 3,212,978 | 2,521,279 |
| Capitalized expenses on foreclosed assets | - | (200,050) |
| Purchase of premises and equipment | (72,754) | (155,089) |
| Proceeds from sale of premises and equipment | 50,225 | 77,206 |
| Net cash provided by (used in) investing activities | (10,177,349) | 5,558,823 |
| | | |
| **FINANCING ACTIVITIES** | | |
| Net increase (decrease) in deposits | (12,841,149) | 1,597,263 |
| Proceeds from other borrowings | 5,000,000 | 204,669 |
| Repayment of other borrowings | (981,976) | - |
| Proceeds from purchase of common stock | 200 | - |
| Net cash provided by (used in) financing activities | (8,822,925) | 1,801,932 |
| | | |
| Net increase (decrease) in cash and cash equivalents | (18,494,738) | 10,039,091 |
| | | |
| Cash and cash equivalents at beginning of year | 22,206,958 | 12,167,867 |
| | | |
| Cash and cash equivalents at end of year | $ 3,712,220 | $ 22,206,958 |
| | | |
| **SUPPLEMENTAL DISCLOSURE** | | |
| Cash paid during the year for: | | |
| Interest | $ 1,391,008 | $ 1,973,308 |
| | | |
| **NONCASH TRANSACTIONS** | | |
| Foreclosed assets acquired in settlement of loans | $ 494,027 | $ 1,731,674 |
| Transfer of bank premises to foreclosed assets | 327,102 | - |
| Internally financed sales of foreclosed assets | 514,541 | 372,213 |

See Notes to Consolidated Financial Statements.

Case 17-10371    Doc 14    Filed 02/17/17    Entered 02/17/17 17:49:05    Desc Main
Document      Page 121 of 211

# SUNSOUTH BANCSHARES, INC.
## AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 1.     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

### Nature of Business

SunSouth Bancshares, Inc. (the "Company" when referencing the consolidated entity or "Holding Company" when referencing it as a standalone entity) is a bank holding company whose business is conducted by its wholly-owned subsidiaries, SunSouth Bank (the "Bank"), SunSouth Bancshares Capital Trust I, and SunSouth Bancshares Capital Trust II. The Bank is a commercial bank located in Dothan, Houston County, Alabama. The Bank provides a full range of banking services in its primary market area of Houston County and Southeast Alabama. In addition, SunSouth Capital, Inc., a subsidiary of the Bank, offers lease financing services from their location in Destin, Okaloosa County, Florida.

### Basis of Presentation

The consolidated financial statements include the accounts of the Company and its subsidiaries. Significant intercompany transactions and balances have been eliminated in consolidation.

In preparing the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the balance sheet date and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Material estimates that are particularly susceptible to significant change in the near-term relate to the determination of the allowance for loan losses, the valuation of foreclosed assets, the valuation of deferred tax assets, other-than-temporary impairment of securities and the fair value of financial instruments.

The Company has evaluated all transactions, events, and circumstances for consideration or disclosure through June 1, 2015, the date these financial statements were available to be issued and has reflected or disclosed those items within the consolidated financial statements and related footnotes as deemed appropriate.

### Cash, Cash Equivalents and Cash Flows

For purposes of reporting consolidated cash flows, cash and cash equivalents include cash and balances due from banks, interest-bearing deposits in banks and federal funds sold. Cash flows from loans held for sale, loans and deposits are reported net.

The Bank maintains amounts due from banks which, at times, may exceed federally insured limits. The Bank has not experienced any losses in such accounts.

The Bank is required to maintain reserve balances in cash or on deposit with the Federal Reserve Bank, based on a percentage of deposits. The total of those reserve balance requirements was approximately $41,000 and $12,000 at December 31, 2014 and 2013, respectively. In addition, the Bank has pledged $250,000 of cash as collateral against borrowings as of December 31, 2014.

### Securities

Securities are classified as "available for sale" and recorded at fair value, with unrealized gains and losses excluded from operations and reported in other comprehensive loss. Purchase premiums and discounts are recognized in interest income using the interest method over the terms of the securities. Gains and losses on the sale of securities are recorded on the trade date and are determined using the specific identification method.

**NOTE 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

### Securities (Continued)

The Company evaluates investment securities for other-than-temporary impairment ("OTTI") using relevant accounting guidance on a regular basis. Consideration is given to (1) the length of time and the extent to which the fair value has been less than cost, (2) the financial condition and near term prospects of the issuer including an evaluation of credit ratings, (3) the impact of changes in market interest rates, (4) the intent of the Company to sell a security, and (5) whether it is more likely than not the Company will have to sell the security before recovery of its cost basis. If the Bank intends to sell an impaired security, or if it is more likely than not the Company will have to sell the security before recovery of its cost basis, the Company records an other-than-temporary loss in an amount equal to the entire difference between fair value and amortized cost in earnings. Otherwise, only the credit portion of the estimated loss is recognized in earnings, with the other portion of the loss recognized in other comprehensive loss.

### Restricted Equity Securities

The Company is required to maintain an investment in capital stock of various entities for business affiliation purposes. Based on redemption provisions, these stocks have no quoted market values and are carried at cost. At its discretion, these entities may declare dividends on the stocks. Management reviews for impairment based on the ultimate recoverability of the cost basis in these stocks.

### Loans

Loans that management has the intent and ability to hold for the foreseeable future or until maturity or pay-off are reported at their outstanding principal balances less deferred fees and costs on originated loans, purchased loan discounts and the allowance for loan losses. Interest income is accrued on the outstanding principal balance. Nonrefundable loan origination fees and costs are deferred and recognized into interest income over the life of the loans using a method which approximates a level yield. Purchased loan discounts are accreted into interest income over the estimated remaining life of the loan as long as the loan is not on nonaccrual status. Purchased loan discounts are recognized into income as a gain on sale of loans if the purchased loan is sold to a third party.

The accrual of interest on loans is discontinued when, in management's opinion, the borrower may be unable to meet payments as they become due, or at the time the loan is 90 days past due. Past due status is based on contractual terms of the loan. In all cases, loans are placed on nonaccrual or charged-off at an earlier date if collection of principal and interest is considered doubtful. All interest accrued but not collected for loans that are placed on nonaccrual or charged off is reversed against interest income or charged to the allowance, unless management believes that the accrual of interest is recoverable through the liquidation of collateral. Interest income on nonaccrual loans is recognized on the cash basis, until the loans are returned to accrual status. Loans are returned to accrual status when all the principal and interest amounts contractually due are brought current and the loan has been performing according to the contractual terms generally for a period of not less than six months.

**NOTE 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

### Loans (Continued)

A loan is considered impaired when it is probable, based on current information and events, the Company will be unable to collect all principal and interest payments due in accordance with the contractual terms of the loan agreement. Loans, for which the terms have been modified at the borrower's request, and for which the borrower is experiencing financial difficulties, are considered troubled debt restructurings and classified as impaired.

Factors considered by management in determining impairment include payment status, collateral value, and the probability of collecting scheduled principal and interest when due. Loans that experience insignificant payment delays and payment shortfalls are not classified as impaired. Impaired loans are measured by either the present value of expected future cash flows discounted at the loan's effective interest rate, the loan's obtainable market price, or the fair value of the collateral if the loan is collateral dependent. Interest on accruing impaired loans is recognized as long as such loans do not meet the criteria for nonaccrual status. Large groups of smaller balance homogeneous loans are collectively evaluated for impairment.

### Allowance for Loan Losses

The allowance for loan losses is established as losses are estimated to have occurred through a provision for loan losses charged to expense. Loan losses are charged against the allowance when management believes the uncollectibility of the loan balance is confirmed. Confirmed losses are charged off immediately. Subsequent recoveries, if any, are credited to the allowance.

The allowance is an amount that management believes will be adequate to absorb estimated losses relating to specifically identified loans, as well as probable credit losses inherent in the balance of the loan portfolio. The allowance for loan losses is evaluated on a regular basis by management and is based upon management's periodic review of the uncollectibility of loans in light of historical experience, the nature and volume of the loan portfolio, overall portfolio quality, review of specific problem loans, current economic conditions that may affect the borrower's ability to pay, estimated value of any underlying collateral and prevailing economic conditions. This evaluation is inherently subjective as it requires estimates that are susceptible to significant revision as more information becomes available. This evaluation does not include the effects of expected losses on specific loans or groups of loans that are related to future events or expected changes in economic conditions. While management uses the best information available to make its evaluation, future adjustments to the allowance may be necessary if there are significant changes in economic conditions. In addition, regulatory agencies, as an integral part of their examination process, periodically review the Company's allowance for loan losses, and may require the Company to make additions to the allowance based on their judgment about information available to them at the time of their examinations.

The allowance consists of specific and general components. The specific component relates to loans that are classified as impaired. For those loans that are classified as impaired, an allowance is established when the discounted cash flows, collateral value or observable market price of the impaired loan is lower than the carrying value of that loan. The general component covers non-impaired loans and is based on historical loss experience adjusted for qualitative factors. The qualitative factors considered by management include, among other factors (1) levels of trends in delinquencies and impaired loans; (2) levels and trends in charge-offs and recoveries; (3) trends in volume and terms of loans; (4) effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures and practices; (5) experience, ability, and depth of lending management and other relevant staff; (6) national and local economic trends and conditions; (7) industry conditions; and (8) effects of changes in credit concentrations.

## NOTE 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Troubled Debt Restructurings

A loan is considered a troubled debt restructuring ("TDR") based on individual facts and circumstances. The Company designates loan modifications as TDRs when for economic and legal reasons related to the borrower's financial difficulties, it grants a concession to the borrower that it would not otherwise consider. These concessions may include rate reductions, principal forgiveness, extension of maturity date and other actions intended to minimize potential losses.

In determining whether a borrower is experiencing financial difficulties, the Company considers if the borrower is in payment default or would be in payment default in the foreseeable future without the modification, the borrower declared or is in the process of declaring bankruptcy, the borrower's projected cash flows will not be sufficient to service any of its debt, or the borrower cannot obtain funds from sources other than the Company at a market rate for debt with similar risk characteristics.

In determining whether the Company has granted a concession, the Company assesses, if it does not expect to collect all amounts due, whether the current value of the collateral will satisfy the amounts owed, whether additional collateral or guarantees from the borrower will serve as adequate compensation for other terms of the restructuring, and whether the borrower otherwise has access to funds at a market rate for debt with similar risk characteristics.

### Premises and Equipment

Land is carried at cost. Premises and equipment are carried at cost less accumulated depreciation. Depreciation is computed principally on the straight-line method over the estimated useful lives of the assets which are estimated to be from 2 to 40 years.

### Transfers of Financial Assets

Transfers of financial assets are accounted for as sales, when control over the assets has been surrendered. Control over transferred assets is deemed to be surrendered when (1) the assets have been isolated from the Company, (2) the transferee obtains the right (free of conditions that constrain it from taking advantage of that right) to pledge or exchange the transferred assets, and (3) the Company does not maintain effective control over the transferred assets through an agreement to repurchase them before their maturity.

### Foreclosed Assets

Foreclosed assets acquired through or in lieu of loan foreclosure are held for sale and are initially recorded at fair value less estimated selling costs. Any write-down to fair value at the time of transfer to foreclosed assets is charged to the allowance for loan losses. Subsequent to foreclosure, valuations are periodically performed by management and the assets are carried at the lower of carrying amount or fair value less cost to sell. Costs of improvements are capitalized, whereas costs relating to holding foreclosed assets and any subsequent adjustments to the carrying value are expensed.

### Intangible Assets

Intangible assets with definite useful lives are initially measured at fair value and then amortized over their estimated useful lives to their estimated residual values. A non-compete agreement with a former executive officer entered into during 2012 is the only intangible asset with a definite useful life on the Company's balance sheet. The intangible asset has a balance of $69,445 and $152,788 as of December 31, 2014 and 2013, respectively, and is included in other assets in the accompanying consolidated balance sheets. The Company will record amortization expense of $69,445 in 2015 related to this agreement.

## NOTE 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Income Taxes

Income tax accounting guidance results in two components of income tax expense: current and deferred. Current income tax expense reflects taxes to be paid or refunded for the current period by applying the provisions of the enacted tax law to the taxable income or excess of deductions over revenues.   The Company determines deferred income taxes using the liability (or balance sheet) method.   Under this method, the net deferred tax asset or liability is based on the tax effects of the differences between the book and tax bases of assets and liabilities, and enacted changes in tax rates and laws are recognized in the period in which they occur.

Deferred income tax expense results from changes in deferred tax assets and liabilities between periods. Deferred tax assets are recognized if it is more likely than not, based on the technical merits, that the tax position will be realized or sustained upon examination.   The term more likely than not means a likelihood of more than 50 percent; the terms examined and upon examination also include resolution of the related appeals or litigation processes, if any.   A tax position that meets the more-likely-than-not recognition threshold is initially and subsequently measured as the largest amount of tax benefit that has a greater than 50 percent likelihood of being realized upon settlement with a taxing authority that has full knowledge of all relevant information.   The determination of whether or not a tax position has met the more-likely-than-not recognition threshold considers the facts, circumstances, and information available at the reporting date and is subject to management's judgment.   Deferred tax assets may be reduced by deferred tax liabilities and a valuation allowance if, based on the weight of evidence available, it is more likely than not that some portion or all of a deferred tax asset will not be realized.

### Profit Sharing Plan

Profit sharing plan costs are based on a percentage of individual employee's salary, not to exceed the amount that can be deducted for federal income tax purposes.

### Comprehensive Loss

Accounting principles generally require that recognized revenue, expenses, gains and losses be included in net loss.   Although certain changes in assets and liabilities, such as unrealized gains and losses on available for sale securities, are reported as a separate component of the equity section of the balance sheet, such items, along with net loss, are components of comprehensive loss.

### Fair Value of Financial Instruments

Fair values of financial instruments are estimates using relevant market information and other assumptions, as more fully disclosed in Note 16.   Fair value estimates involve uncertainties and matters of significant judgment.   Changes in assumptions or in market conditions could significantly affect the estimates.

## NOTE 2.    REGULATORY OVERSIGHT, CAPITAL ADEQUACY, RESULTS OF OPERATIONS, AND LIQUIDITY

The consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the discharge of liabilities in the normal course of business for the foreseeable future.   Due to the Company's 2014 and 2013 financial results and other matters discussed below, particularly those items under "Liquidity", the following items should be considered in connection with the Company's overall financial condition.

## NOTE 2. REGULATORY OVERSIGHT, CAPITAL ADEQUACY, RESULTS OF OPERATIONS, AND LIQUIDITY (Continued)

### Regulatory Oversight

On May 1, 2013, the Bank entered into a Consent Order (the "Agreement") with the Federal Deposit Insurance Corporation ("FDIC") and the Alabama State Banking Department. The Agreement will require the Bank to undertake certain actions within designated time frames, and to operate in compliance with the provisions thereof during the term of the Agreement. The Board of Directors and management of the Bank have already begun implementing many of these provisions and will fully support compliance with the Agreement. The significant items in the Agreement include but are not limited to:

- The Tier I Leverage Ratio and the Total Risk Based Capital Ratio must be maintained at a minimum of 9% and 12%, respectively.

- A plan to reduce adversely classified assets as well as a continuation of various policy and procedure changes, many of which have already been implemented, to improve credit monitoring, asset quality, earnings, liquidity and funds management and Board of Director oversight.

- No cash dividends may be paid on common stock without prior regulatory approval.

Compliance with the Agreement is to be monitored by a committee made up of members of the Board of Directors of the Company. The Bank is currently not in compliance with all components of the Agreement and failure to comply with the Agreement could result in further regulatory action and oversight.

### Capital Adequacy

As presented in the consolidated balance sheets, the Company's capital reflects a deficit balance of $2,937,549 as of December 31, 2014. However, because the Company qualifies as a Small Bank Holding Company under the Federal Reserve Board's Small Bank Holding Company Policy Statement, the capital position of the Bank, and not the Company, is measured for regulatory capital adequacy. Note 14, Regulatory Matters, provides a discussion and discloses in tabular form more detail about the Bank's regulatory capital levels.

A reconciliation of the Bank's capital as determined under generally accepted accounting principles ("GAAP") to regulatory capital at December 31, 2014 is as follows:

|  | Total | Tier I |
| --- | --- | --- |
|  | (Dollars in Thousands) | |
| Bank GAAP capital | $ 8,157 | $ 8,157 |
| Accumulated other comprehensive loss | 109 | 109 |
| Disallowed intangible assets | (69) | (69) |
| Allowable allowance for loan losses | 1,365 | - |
| Regulatory capital as disclosed in Note 14 | $ 9,562 | $ 8,197 |

### Results of Operations

For the year ended December 31, 2014, the Company reported a consolidated net loss of approximately $2.4 million. This loss was largely the result of losses and expenses associated with foreclosed assets and loan loss provisions. In 2014, the expenses and losses associated with foreclosed assets was $1.8 million and the loan loss provision was $500 thousand. As of December 31, 2014 and 2013, nonperforming assets, consisting of loans on nonaccrual status, loans past due ninety days or more and still accruing interest, troubled-debt restructurings and foreclosed assets, totaled $14.9 million and $20.2 million, respectively.

## NOTE 2.    REGULATORY OVERSIGHT, CAPITAL ADEQUACY, RESULTS OF OPERATIONS, AND LIQUIDITY (Continued)

### Results of Operations (Continued)

It is possible that nonperforming assets and losses could increase from current levels which will further hinder a return to profitability. Management has developed plans to improve the operating results of the Company, including reducing adversely classified and nonperforming assets, maintaining a stable net interest margin, and further reducing operating expenses.

### Liquidity

Because of limitations on intercompany transfers of funds (i.e. intercompany dividends) as a result of the regulatory order described above in "Regulatory Oversight", the overall liquidity of the Company must be analyzed separately at the Bank and at the Holding Company. Management monitors liquidity on a weekly basis.

The primary sources of liquidity for the Bank are cash and cash equivalents, increases in deposits, scheduled repayments of loans, unpledged investment securities and available borrowings with the Federal Home Loan Bank and other correspondent bank federal funds lines. As of December 31, 2014, the Bank had $3.5 million in unpledged cash and cash equivalents and approximately $19.9 million in unpledged marketable debt securities classified as available for sale. In addition, as of December 31, 2014, the Bank has available secured borrowings with the Federal Home Loan Bank of approximately $5.8 million and from unused secured federal funds lines at correspondent banks of $2.7 million. During 2015, approximately $1.9 million in brokered deposits will mature, of which $1.0 million has already matured and been paid out as of the date of this report, which the Bank will be unable to renew due to the regulatory order described above. Based on current and expected liquidity needs and sources, management expects the Bank to be able to meet all obligations as they become due.

The primary source of liquidity for the Holding Company is the receipt of dividends from the Bank. As discussed above, the Bank is restricted from paying dividends to the Holding Company without regulatory approval. As December 31, 2014, the Holding Company had $8,026 in available cash. As discussed in Note 9, Other Borrowings, the Holding Company has a note payable in the amount of $2,000,000 as of December 31, 2014 which requires quarterly interest payments and annual principal payments of $250,000 due each July 31. The Holding Company has been in default on this note since July 31, 2013 and the lender has called the note and unpaid interest due which totaled approximately $2,159,000 as of December 31, 2014. As of the date of this report, the note remains unpaid and in default. The Holding Company is attempting to raise capital in order to service this debt. However, because the collateral for this note is 100% of the capital stock of the Bank, failure to bring this note current could subject the Bank to foreclosure by the lender. The Company would be unable to continue operation if such action were pursued by the lender which raises substantial doubt about the Company's ability to continue as a going concern.

In addition, as discussed in Note 10, Junior Subordinated Debt, the Company has been deferring interest payments on its two trusts to the subordinated debt holders as allowed by the terms of the instruments. The deferral period was for twenty quarters which began in 2010. The deferral period ended on April 23, 2015 for Trust I and will end on June 23, 2015 for Trust II. The Company has not paid the interest due on Trust I, which is now in default, and will be unlikely to pay the interest due on Trust II on the due date. The total amount due on the two trusts including principal and interest on the due dates will total approximately $9.3 million. The Company is working with the debt holders to settle the obligations but failure to do so could force the debt holders to take certain actions to collect the debt including forcing the Company into bankruptcy. These actions, if pursued by the debt holders, also raise substantial doubt about the Company's ability to continue as a going concern.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2.    REGULATORY OVERSIGHT, CAPITAL ADEQUACY, RESULTS OF OPERATIONS, AND LIQUIDITY (Continued)**

### Summary

As noted above, the Company is actively working toward transactions designed to meet the expectations of the regulatory authorities, to re-capitalize the Bank so that it can re-attain profitable operations, to fully comply with the terms of the Agreement and to service the Holding Company's debt obligations. If operating losses continue to occur and capital levels continue to deteriorate or the Company is unable to execute its plans and raise the required capital needed to re-capitalize the Bank and service the Holding Company debt, these events could have a material and significant adverse effect on the Company's results of operations and financial position.

**NOTE 3.    SECURITIES**

The amortized cost and fair value of securities are summarized as follows:

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| **Securities Available for Sale** | | | | |
| **December 31, 2014:** | | | | |
| U.S. Government agency securities | $ 22,953,347 | $ 101,011 | $ (237,675) | $ 22,816,683 |
| State and municipal securities | 2,193,904 | 27,752 | (10,486) | 2,211,170 |
| Mortgage-backed securities | 10,095,431 | 12,423 | (65,825) | 10,042,029 |
| Trust preferred securities | 500,000 | - | - | 500,000 |
| | $ 35,742,682 | $ 141,186 | $ (313,986) | $ 35,569,882 |
| | | | | |
| December 31, 2013: | | | | |
| U.S. Government agency securities | $ 6,464,772 | $ - | $ (584,788) | $ 5,879,984 |
| State and municipal securities | 1,490,491 | - | (65,750) | 1,424,741 |
| Mortgage-backed securities | 2,455,662 | 83 | (75,132) | 2,380,613 |
| Trust preferred securities | 500,000 | - | - | 500,000 |
| | $ 10,910,925 | $ 83 | $ (725,670) | $ 10,185,338 |

Included in the above totals for trust preferred securities at December 31, 2014 and 2013 is $500,000 of a trust preferred security carried at cost. The security had no quoted market value because active and orderly markets for the security currently do not exist. Therefore, the security is carried at cost. Management reviews the security for impairment based on the ultimate recoverability of the cost basis in the security.

Securities with a carrying value of approximately $15,686,000 and $5,401,000 at December 31, 2014 and 2013, respectively, were pledged to secure public deposits, borrowings and for other purposes as required or permitted by law.

## NOTE 3.  SECURITIES (Continued)

The amortized cost and fair value of securities as of December 31, 2014, by contractual maturity are shown below.  Actual maturities may differ from contractual maturities in mortgage-backed securities because the mortgages underlying the securities may be called or repaid with or without penalty.  Therefore, these securities are not included in the maturity categories in the following summary.

|  | Securities Available for Sale | |
|---|---|---|
|  | Amortized Cost | Fair Value |
| Due from one to five years | $ 1,779,108 | $ 1,787,855 |
| Due from five to ten years | 6,204,905 | 6,192,500 |
| Due after ten years | 17,663,238 | 17,547,498 |
| Mortgage-backed securities | 10,095,431 | 10,042,029 |
|  | $ 35,742,682 | $ 35,569,882 |

Gains and losses on sales of securities consist of the following:

|  | Years Ended December 31, | |
|---|---|---|
|  | 2014 | 2013 |
| Gross gains on sales of securities available for sale | $ 15,281 | $ 17,080 |
| Gross losses on sales of securities available for sale | - | - |
| Net realized gains | $ 15,281 | $ 17,080 |

Restricted equity securities consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2014 | 2013 |
| Federal Home Loan Bank of Atlanta | $ 700,700 | $ 532,700 |
| First National Banker's Bankshares, Inc. | 250,250 | 250,250 |
| SunSouth Capital Trust I and II | 248,000 | 248,000 |
|  | $ 1,198,950 | $ 1,030,950 |

## Temporarily Impaired Securities

The following table shows the gross unrealized losses and fair value of the Company's investments with unrealized losses that are not deemed to be other-than-temporarily impaired, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position at December 31, 2014 and 2013.

**NOTE 3.  SECURITIES (Continued)**

### Temporarily Impaired Securities (Continued)

Securities that have been in a continuous unrealized loss position are as follows:

| | Less Than Twelve Months | | Over Twelve Months | | Total |
| --- | --- | --- | --- | --- | --- |
| | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Total Unrealized Losses |
| **December 31, 2014:** | | | | | |
| **U.S. Government agency securities** | $ 6,845,829 | $ (64,413) | $ 6,161,371 | $ (173,262) | $ (237,675) |
| **State and municipal securities** | 706,885 | (10,486) | - | - | (10,486) |
| **Mortgage-backed securities** | 634,694 | (65,825) | - | - | (65,825) |
| **Total temporarily impaired debt securities** | $ 8,187,408 | $ (140,724) | $ 6,161,371 | $ (173,262) | $ (313,986) |
| December 31, 2013: | | | | | |
| U.S. Government agency securities | $ 5,879,984 | $ (584,788) | $ - | $ - | $ (584,788) |
| State and municipal securities | 1,424,741 | (65,750) | - | - | (65,750) |
| Mortgage-backed securities | 2,376,338 | (75,132) | - | - | (75,132) |
| Total temporarily impaired debt securities | $ 9,681,063 | $ (725,670) | $ - | $ - | $ (725,670) |

The unrealized losses on twenty securities were caused by interest rate changes. Because the Company does not intend to sell the securities and it is not more likely than not that the Company will be required to sell the securities before recovery of the amortized cost bases, which may be maturity, the Company does not consider these securities to be other-than-temporarily impaired at December 31, 2014.

### Other-Than-Temporary Impairment

The Company conducts periodic reviews to identify and evaluate each investment security to determine whether an other-than-temporary impairment has occurred. For each security in the investment portfolio, a regular review is conducted to determine if an other-than-temporary impairment has occurred. Various factors are considered to determine if an other-than-temporary impairment has occurred. However, the most significant factors are default rates or interest deferral rates and the creditworthiness of the issuer. Other factors may include geographic concentrations, credit ratings, and other performance indicators of the underlying asset. The Company does not consider any securities as other-than-temporarily impaired as of December 31, 2014 or 2013.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 4.    LOANS

### Portfolio Segments and Classes

The composition of loans is summarized as follows:

|  | December 31, | |
|---|---|---|
|  | 2014 | 2013 |
| Real estate mortgages: | | |
| Construction and land development | $ 9,428,390 | $ 8,723,745 |
| 1-4 family first mortgages | 21,909,217 | 24,294,303 |
| Commercial | 19,431,909 | 21,310,589 |
| Other | 10,788,055 | 10,578,738 |
| Commercial loans | 18,592,514 | 21,046,763 |
| Leases | 24,298,137 | 23,931,794 |
| Consumer and other loans | 3,445,565 | 10,285,330 |
|  | 107,893,787 | 120,171,262 |
| Allowance for loan losses | (2,752,765) | (2,712,126) |
| Loans, net | $ 105,141,022 | $ 117,459,136 |

Included in the above loan totals by category at December 31, 2014 and 2013 were $268,765 and $372,835, respectively, of net deferred loan costs (net of origination fees) on originated loans and $306,731 and $1,205,411, respectively, of purchased discounts (net of premiums) on acquired loans. These acquired loans were initially measured at fair value, which includes estimated future credit losses expected to be incurred over the life of the loans.

The Company purchases loans from various sources such as other lenders at discounts commensurate with the credit risk of such loans. In addition, the Company participates in a program whereby it will purchase FHA insured, Title I consumer loans from a third party at premiums due to the underlying contractual yield of such loans.

The following table details the activity of the Company's loan discounts (net of premiums):

|  | Years Ended December 31, | |
|---|---|---|
|  | 2014 | 2013 |
| Balance, beginning of year | $ (1,205,411) | $ (1,583,075) |
| Discounts on purchased loans | (64,264) | (558,243) |
| Discounts accreted into interest income | 310,972 | 869,137 |
| Discounts applied against loans to offset loan losses | 651,972 | 66,770 |
| Balance, end of year | $ (306,731) | $ (1,205,411) |

For purposes of the disclosures required pursuant to ASC 310, the loan portfolio was disaggregated into segments and then further disaggregated into classes for certain disclosures. A portfolio segment is defined as the level at which an entity develops and documents a systematic method for determining its allowance for loan losses. There are four loan portfolio segments that include real estate loans, commercial loans, leases, and consumer loans. A class is generally determined based on the initial measurement attribute, risk characteristic of the loan, and an entity's method for monitoring and assessing credit risk. Classes within the real estate portfolio segment include construction and land development, 1-4 family first mortgages, commercial, and other. The portfolio segments of non-real estate commercial loans, leases, and consumer loans have not been further segregated by class.

## NOTE 4. LOANS (Continued)

### Portfolio Segments and Classes (Continued)

The following describe risk characteristics relevant to each of the portfolio segments:

**Real Estate Loans** - As discussed below, the Company offers various types of real estate loan products. All loans within this portfolio segment are particularly sensitive to the valuation of real estate:

- Construction and land development loans are repaid through cash flow related to the operation, sale or refinance of the underlying property. This portfolio class includes extensions of credit to real estate developers or investors where repayment is dependent on the sale of the real estate or income generated from the real estate collateral.

- 1-4 family first mortgage loans are repaid by various means such as a borrower's income, sale of the property, or rental income derived from the property.

- Commercial loans include owner-occupied commercial real estate loans and loans secured by income producing properties. Owner-occupied commercial real estate loans to operating businesses are long-term financing of land and buildings. These loans are viewed primarily as cash flow loans and the repayment of these loans is largely dependent on the successful operation of the business. Real estate loans for income-producing properties such as apartment buildings, office and industrial buildings, and retail shopping centers are repaid from rent income derived from the properties.

- Other real estate mortgage loans include real estate loans secured by farmland, multi-family housing and other. These are repaid by various means such as a borrower's income, sale of the property, or rental income derived from the property.

**Commercial Loans** - The commercial loan portfolio segment includes commercial, financial, and agricultural loans. These loans include those loans to commercial customers for use in normal business operations to finance working capital needs, equipment purchases, or expansion projects. Loans are repaid by business cash flows. Collection risk in this portfolio is driven by the creditworthiness of the underlying borrower, particularly cash flows from the borrowers' business operations.

**Leases** - These loans include those loans to commercial customers to finance equipment purchases and are typically repaid by business cash flows. Collection risk in this portfolio is driven by the creditworthiness of the underlying borrower, particularly cash flows from the borrowers' business operations.

**Consumer Loans** - The consumer loan portfolio segment includes direct consumer installment loans, overdrafts and other revolving credit loans, and educational loans. Loans in this portfolio are sensitive to unemployment and other key consumer economic measures.

### Credit Risk Management

Credit Administration and the Special Assets Manager are both involved in the credit risk management process and assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. This comprehensive process also assists in the prompt identification of problem credits. The Company has taken a number of measures to manage the portfolios and reduce risk, particularly in the more problematic portfolios.

## NOTE 4.    LOANS (Continued)

### Credit Risk Management (Continued)

The Company employs a credit risk management process with defined policies, accountability and routine reporting to manage credit risk in the loan portfolio segments. Credit risk management is guided by credit policies that provide for a consistent and prudent approach to underwriting and approvals of credits. Within the Board approved Loan Policy, procedures exist that elevate the approval requirements as credits become larger and more complex. All loans are individually underwritten, risk-rated, approved, and monitored.

Responsibility and accountability for adherence to underwriting policies and accurate risk ratings lies in each portfolio segment. For the consumer portfolio segment, the risk management process focuses on managing customers who become delinquent in their payments. For each portfolio segment, the risk management process focuses on underwriting new business and, on an ongoing basis, monitoring the credit of the portfolios. Loan Review and Credit Administration establish a timely schedule and scope for loan reviews. All loans over $200,000 are reviewed at least annually. These reviews ensure such loans have proper risk ratings and accrual status, and if necessary, ensure loans are transferred to the Special Assets manager.

Credit quality and trends in the loan portfolio segments are measured and monitored regularly. Detailed reports, by product, collateral, accrual status, etc., are reviewed by the Chief Credit Officer, the Officers Loan Committee, and the Directors Loan Committee.

The following categories are utilized by management to analyze and manage the credit quality and risk of the loan portfolio:

- **Pass** - includes obligations where the probability of default is considered low.

- **Special Mention** - includes obligations that exhibit potential credit weaknesses or downward trends deserving management's close attention. If left uncorrected, these potential weaknesses may result in the deterioration of the repayment prospects or credit position at a future date. These loans are not adversely classified and do not expose the Company to sufficient risk to warrant adverse classification.

- **Substandard** - includes obligations with defined weaknesses that jeopardize the orderly liquidation of debt. A substandard loan is inadequately protected by the current sound worth and paying capacity of the borrower or by the collateral pledged, if any. Normal repayment from the borrower is in jeopardy although no loss of principal is envisioned. There is a distinct possibility that a partial loss of interest and/or principal will occur if the deficiencies are not corrected. Loss potential, while existing in the aggregate amount of substandard loans, does not have to exist in individual loans classified substandard.

- **Doubtful** - includes obligations with all the weaknesses found in substandard loans with the added provision that the weaknesses make collection of debt in full, based on current existing facts, conditions, and values, highly questionable and improbable. Serious problems exist to the point where partial loss of principal is likely. The possibility of loss is extremely high, but because of certain important, reasonably specific pending factors that may work to strengthen the loan, the loans' classification as loss is deferred until a more exact status may be determined. There are no loans rated doubtful in the Company's portfolio as of December 31, 2014 and 2013.

- **Loss** - includes obligations incapable of repayment or unsecured debt. Such loans are considered uncollectible and of such little value, that continuance as an active asset is not warranted. Loans determined to be a loss are charged-off at the date of loss determination. Consequently, there are no loans with a loss rating in the Company's portfolio as of December 31, 2014 and 2013.

## NOTE 4.    LOANS (Continued)

### Credit Risk Management (Continued)

The following tables present credit quality indicators as described above for the loan portfolio segments and classes as of December 31, 2014 and 2013.

| | Pass | Special Mention | Substandard | Doubtful | Total |
|---|---|---|---|---|---|
| **December 31, 2014** | | | *(Dollars in Thousands)* | | |
| **Real estate mortgages:** | | | | | |
| Construction and land development | $ 7,959 | $ 995 | $ 475 | $ - | $ 9,429 |
| 1-4 family first mortgages | 15,399 | 4,269 | 2,241 | - | 21,909 |
| Commercial | 14,051 | 4,608 | 773 | - | 19,432 |
| Other | 9,425 | 933 | 430 | - | 10,788 |
| Commercial loans | 10,452 | 3,273 | 4,868 | - | 18,593 |
| Leases | 24,229 | - | 69 | - | 24,298 |
| Consumer and other loans | 3,156 | 146 | 143 | - | 3,445 |
| Total: | $ 84,671 | $ 14,224 | $ 8,999 | $ - | $ 107,894 |
| | | | | | |
| **December 31, 2013** | | | | | |
| **Real estate mortgages:** | | | | | |
| Construction and land development | $ 7,557 | $ 194 | $ 973 | $ - | $ 8,724 |
| 1-4 family first mortgages | 17,283 | 4,366 | 2,645 | - | 24,294 |
| Commercial | 16,308 | 4,455 | 547 | - | 21,310 |
| Other | 9,270 | 832 | 477 | - | 10,579 |
| Commercial loans | 13,674 | 2,125 | 5,248 | - | 21,047 |
| Leases | 23,841 | - | 91 | - | 23,932 |
| Consumer and other loans | 9,691 | 400 | 194 | - | 10,285 |
| Total: | $ 97,624 | $ 12,372 | $ 10,175 | $ - | $ 120,171 |

## NOTE 4.      LOANS (Continued)

### Past Due Loans

A loan is considered past due if any required principal and interest payments have not been received as of the date such payments were required to be made under the terms of the loan agreement. Generally, the Company places loans on non-accrual when there is a clear indication that the borrower's cash flow may not be sufficient to meet payments as they become due, which is generally when a loan is 90 days past due. The following tables present the aging of the recorded investment in loans and leases as of December 31, 2014 and 2013:

| | Current | Past Due Status (Accruing Loans) | | | | Nonaccrual | Total |
| | | 30-59 Days | 60-89 Days | 90+ Days | Total Past Due | | |
|---|---|---|---|---|---|---|---|
| **December 31, 2014** | | *(Dollars in Thousands)* | | | | | |
| Real estate mortgages: | | | | | | | |
| Construction and land development | $ 9,015 | $ - | $ - | $ - | $ - | $ 414 | $ 9,429 |
| 1-4 family first mortgages | 20,548 | 565 | 93 | - | 658 | 703 | 21,909 |
| Commercial | 18,659 | - | 271 | - | 271 | 502 | 19,432 |
| Other | 10,128 | 386 | - | - | 386 | 274 | 10,788 |
| Commercial loans | 13,932 | 97 | - | - | 97 | 4,564 | 18,593 |
| Leases | 23,810 | 429 | 59 | - | 488 | - | 24,298 |
| Consumer and other loans | 3,431 | - | - | 7 | 7 | 7 | 3,445 |
| Total: | $ 99,523 | $ 1,477 | $ 423 | $ 7 | $ 1,907 | $ 6,464 | $ 107,894 |
| | | | | | | | |
| **December 31, 2013** | | | | | | | |
| Real estate mortgages: | | | | | | | |
| Construction and land development | $ 7,817 | $ - | $ - | $ 901 | $ 901 | $ 6 | $ 8,724 |
| 1-4 family first mortgages | 23,067 | 588 | 84 | - | 672 | 555 | 24,294 |
| Commercial | 19,752 | 414 | - | 706 | 1,120 | 438 | 21,310 |
| Other | 10,123 | 140 | - | - | 140 | 316 | 10,579 |
| Commercial loans | 16,475 | 23 | 62 | 169 | 254 | 4,318 | 21,047 |
| Leases | 22,855 | 261 | 790 | 26 | 1,077 | - | 23,932 |
| Consumer and other loans | 9,650 | 291 | 253 | 75 | 619 | 16 | 10,285 |
| Total: | $ 109,739 | $ 1,717 | $ 1,189 | $ 1,877 | $ 4,783 | $ 5,649 | $ 120,171 |

### Allowance for Loan Loss

Changes in the allowance for loan losses are as follows:

| | Years Ended December 31, | |
| | 2014 | 2013 |
|---|---|---|
| Balance, beginning of year | $ 2,712,126 | $ 3,706,248 |
| Provision for loan losses | 500,000 | 900,000 |
| Loans charged off | (761,137) | (2,023,958) |
| Recoveries of loans previously charged off | 301,776 | 129,836 |
| Balance, end of year | $ 2,752,765 | $ 2,712,126 |

## NOTE 4.     LOANS (Continued)

### Allowance for Loan Loss (Continued)

The following tables further detail the change in the allowance for loan losses for the years ended December 31, 2014 and 2013 by portfolio segment.  Allocation of a portion of the allowance to one category of loans does not preclude its availability to absorb losses in other categories.

| | As of and for the Year Ended December 31, 2014 | | | | |
| | Real Estate | Commercial | Leases | Consumer | Total |
|---|---|---|---|---|---|
| | | | *(Dollars in Thousands)* | | |
| **Allowance for loan losses:** | | | | | |
| Balance, beginning of year | $ 1,246 | $ 964 | $ 440 | $ 62 | $ 2,712 |
| Provision (credit) for loan losses | (230) | 632 | 120 | (22) | 500 |
| Loans charged off | (105) | (450) | (148) | (58) | (761) |
| Recoveries of loans previously charged off | 222 | 38 | - | 42 | 302 |
| Balance, end of year | $ 1,133 | $ 1,184 | $ 412 | $ 24 | $ 2,753 |
| Ending balance: individually evaluated for impairment | $ 29 | $ 815 | $ - | $ - | $ 844 |
| Ending balance: collectively evaluated for impairment | 1,104 | 369 | 412 | 24 | 1,909 |
| Total ending balance | $ 1,133 | $ 1,184 | $ 412 | $ 24 | $ 2,753 |
| **Loans:** | | | | | |
| Ending balance: individually evaluated for impairment | $ 6,118 | $ 6,148 | $ 47 | $ 39 | $ 12,352 |
| Ending balance: collectively evaluated for impairment | 55,440 | 12,445 | 24,251 | 3,406 | 95,542 |
| Total ending balance | $ 61,558 | $ 18,593 | $ 24,298 | $ 3,445 | $ 107,894 |

| | As of and for the Year Ended December 31, 2013 | | | | |
| | Real Estate | Commercial | Leases | Consumer | Total |
|---|---|---|---|---|---|
| | | | *(Dollars in Thousands)* | | |
| **Allowance for loan losses:** | | | | | |
| Balance, beginning of year | $ 2,608 | $ 643 | $ 342 | $ 113 | $ 3,706 |
| Provision (credit) for loan losses | 26 | 582 | 301 | (9) | 900 |
| Loans charged off | (1,497) | (277) | (203) | (47) | (2,024) |
| Recoveries of loans previously charged off | 109 | 16 | - | 5 | 130 |
| Balance, end of year | $ 1,246 | $ 964 | $ 440 | $ 62 | $ 2,712 |
| Ending balance: individually evaluated for impairment | $ 18 | $ 596 | $ - | $ - | $ 614 |
| Ending balance: collectively evaluated for impairment | 1,228 | 368 | 440 | 62 | 2,098 |
| Total ending balance | $ 1,246 | $ 964 | $ 440 | $ 62 | $ 2,712 |
| **Loans:** | | | | | |
| Ending balance: individually evaluated for impairment | $ 6,071 | $ 6,144 | $ 34 | $ 43 | $ 12,292 |
| Ending balance: collectively evaluated for impairment | 58,836 | 14,903 | 23,898 | 10,242 | 107,879 |
| Total ending balance | $ 64,907 | $ 21,047 | $ 23,932 | $ 10,285 | $ 120,171 |

### Impaired Loans

A loan is considered impaired, in accordance with the impairment accounting guidance (FASB ASC 310-10-35-16), when based on current information and events, it is probable that the Company will be unable to collect all amounts due from the borrower in accordance with the contractual term of the loan. Impaired loans include loans modified in troubled debt restructuring where concessions have been granted to borrowers experiencing financial difficulties.  These concessions could include a reduction in the interest rate on the loan, payment extensions, forgiveness of principal, forbearance or other actions intended to maximize collection.

## NOTE 4.      LOANS (Continued)

### Impaired Loans (Continued)

The following tables detail the Company's impaired loans, by portfolio class as of December 31, 2014 and 2013:

| | Recorded Investment | Unpaid Principal Balance | Related Allowance | Average Recorded Investment | Interest Income Recognized in Year |
|---|---|---|---|---|---|
| **December 31, 2013** | | *(Dollars in Thousands)* | | | |
| **With no related allowance recorded:** | | | | | |
| Real estate mortgages: | | | | | |
| Construction and land development | $ 596 | $ 596 | $ - | $ 798 | $ 11 |
| 1-4 family first mortgages | 1,161 | 1,161 | - | 1,169 | 52 |
| Commercial | 3,422 | 3,422 | - | 3,476 | 156 |
| Other | 657 | 657 | - | 666 | 23 |
| Commercial loans | 1,477 | 1,477 | - | 1,532 | 67 |
| Leases | 47 | 47 | - | 52 | 3 |
| Consumer and other loans | 39 | 39 | - | 39 | 2 |
| Total with no allowance recorded: | 7,399 | 7,399 | - | 7,732 | 314 |
| **With allowance recorded:** | | | | | |
| Real estate mortgages: | | | | | |
| Construction and land development | - | - | - | - | - |
| 1-4 family first mortgages | 85 | 85 | 14 | 85 | 3 |
| Commercial | 129 | 129 | 1 | 128 | - |
| Other | 68 | 68 | 14 | 68 | 2 |
| Commercial loans | 4,671 | 4,671 | 815 | 4,648 | 15 |
| Leases | - | - | - | - | - |
| Consumer and other loans | - | - | - | - | - |
| Total with an allowance recorded: | 4,953 | 4,953 | 844 | 4,929 | 20 |
| Totals: | $ 12,352 | $ 12,352 | $ 844 | $ 12,661 | $ 334 |
| **December 31, 2013** | | | | | |
| **With no related allowance recorded:** | | | | | |
| Real estate mortgages: | | | | | |
| Construction and land development | $ 200 | $ 200 | $ - | $ 299 | $ 11 |
| 1-4 family first mortgages | 1,424 | 1,476 | - | 1,465 | 41 |
| Commercial | 3,392 | 3,528 | - | 3,836 | 162 |
| Other | 722 | 887 | - | 922 | 20 |
| Commercial loans | 5,503 | 5,503 | - | 5,539 | 74 |
| Leases | 34 | 34 | - | 40 | 2 |
| Consumer and other loans | 43 | 43 | - | 46 | 1 |
| Total with no allowance recorded: | 11,318 | 11,671 | - | 12,147 | 311 |
| **With allowance recorded:** | | | | | |
| Real estate mortgages: | | | | | |
| Construction and land development | - | - | - | - | - |
| 1-4 family first mortgages | - | - | - | - | - |
| Commercial | 311 | 311 | 13 | 318 | - |
| Other | 22 | 22 | 5 | 23 | 2 |
| Commercial loans | 641 | 641 | 596 | 652 | 13 |
| Leases | - | - | - | - | - |
| Consumer and other loans | - | - | - | - | - |
| Total with an allowance recorded: | 974 | 974 | 614 | 993 | 15 |
| Totals: | $ 12,292 | $ 12,645 | $ 614 | $ 13,140 | $ 326 |

NOTE 4.    LOANS (Continued)

### Troubled Debt Restructurings

Included in certain loan categories are impaired loans classified as troubled debt restructurings (TDRs) totaled $4,679,166 and $4,785,780, respectively, at December 31, 2014 and 2013. The restructuring of a loan is considered a TDR if both (i) the borrower is experiencing financial difficulties, and (ii) the creditor has granted a concession.

During 2014, the Company did not modify any loans with restructured terms but six loans totaling $849,865 modified at dates prior to 2014 defaulted on the restructured terms. During 2013, the Company modified one loan in the amount of $194,000 which is in compliance with the modified terms. No loans defaulted on the restructured terms during 2013.

NOTE 5.    FORECLOSED ASSETS

A summary of foreclosed assets are presented as follows:

| | Years Ended December 31, | |
| | 2014 | 2013 |
|---|---|---|
| Balance, beginning of year | $ 9,110,716 | $ 11,799,255 |
| Transfer of loans into foreclosed assets | 494,027 | 1,731,674 |
| Transfer of bank premises into foreclosed assets | 327,102 | - |
| Proceeds from sales of foreclosed assets | (3,212,978) | (2,521,279) |
| Capitalized expenses | - | 200,050 |
| Internally financed sales | (514,541) | (372,213) |
| Net (loss) gain on sales of foreclosed assets | 33,299 | (4,966) |
| Write down of foreclosed assets | (1,630,146) | (1,721,805) |
| Balance, end of year | $ 4,607,479 | $ 9,110,716 |

Expenses applicable to foreclosed assets include the following:

| | Years Ended December 31, | |
| | 2014 | 2013 |
|---|---|---|
| Net loss (gain) on sales of foreclosed assets | $ (33,299) | $ 4,966 |
| Write down of foreclosed assets | 1,630,146 | 1,721,805 |
| Operating and holding expenses | 230,713 | 445,170 |
| Total expenses | $ 1,827,560 | $ 2,171,941 |

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 6.   PREMISES AND EQUIPMENT

Premises and equipment is summarized as follows:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2014 | | 2013 | |
| Land and land improvements | $ | 972,943 | $ | 1,115,676 |
| Buildings | | 2,905,755 | | 3,247,725 |
| Furniture and equipment | | 2,229,711 | | 2,450,959 |
| | | 6,108,409 | | 6,814,360 |
| Accumulated depreciation | | (3,181,455) | | (3,327,233) |
| | $ | 2,926,954 | $ | 3,487,127 |

Depreciation expense for the years ended December 31, 2014 and 2013 amounted to $234,279 and $258,707, respectively.

## NOTE 7.   DEPOSITS

The aggregate amount of time deposits in denominations of $100,000 or more at December 31, 2014 and 2013 was $46,430,611 and $44,033,002, respectively. The Company had $12,271,000 and $21,725,000 in brokered time deposits at December 31, 2014 and 2013, respectively. The scheduled maturities of time deposits at December 31, 2014 are as follows:

| | | |
|---|---|---|
| 2015 | $ | 35,154,634 |
| 2016 | | 24,432,784 |
| 2017 | | 19,307,724 |
| 2018 | | 7,794,561 |
| 2019 | | 1,520,479 |
| | $ | 88,210,182 |

At December 31, 2014 and 2013, overdraft demand and savings deposits reclassified to loans totaled $2,841 and $59,004, respectively.

## NOTE 8.   INCOME TAXES

Income taxes consist of the following:

|  | Years Ended December 31, | | | |
|---|---|---|---|---|
|  | 2014 | | 2013 | |
| Current | $ | - | $ | - |
| Deferred | | (844,399) | | (1,239,694) |
| Valuation allowance | | 844,399 | | 3,408,202 |
| Income tax expense | $ | - | $ | 2,168,508 |

## NOTE 8.    INCOME TAXES (Continued)

Income tax differs from the amounts computed by applying the federal statutory income tax rate to loss before income taxes.  A reconciliation of the differences is as follows:

|  | Years Ended December 31, | |
|  | 2014 | 2013 |
|---|---|---|
| Income tax benefit at federal statutory tax rate | $ (808,621) | $ (1,106,702) |
| State income tax benefit | (94,606) | (138,383) |
| Tax free income | - | (2,757) |
| Taxable life insurance income | 54,127 | - |
| Other | 4,701 | 8,148 |
| Valuation allowance | 844,399 | 3,408,202 |
| Income tax expense | $ - | $ 2,168,508 |

Components of deferred tax assets and liabilities included in the consolidated balance sheet are as follows:

|  | December 31, | |
|  | 2014 | 2013 |
|---|---|---|
| Deferred tax assets: |  |  |
| Allowance for loan losses | $ 924,826 | $ 909,265 |
| Net operating loss carryforward | 3,006,453 | 2,295,189 |
| Nonaccrual loans | 572,059 | 343,495 |
| Foreclosed assets | 1,412,391 | 1,673,406 |
| Deferred interest expense | 435,692 | 317,011 |
| Securities available for sale | 63,764 | 267,741 |
| Depreciation | 29,269 | - |
| Other | - | 477 |
|  | 6,444,454 | 5,806,584 |
| Valuation allowance | (6,370,011) | (5,525,612) |
|  | 74,443 | 280,972 |
| Deferred tax liabilities: |  |  |
| Depreciation | - | 13,231 |
| Other | 10,679 | - |
|  | 10,679 | 13,231 |
| Net deferred tax assets | $ 63,764 | $ 267,741 |

The Company had a net operating loss carryforward for federal income taxes and state financial institution excise taxes (state income taxes) of approximately $7,800,000 and $8,230,000, respectively, as of December 31, 2014.  If unused, the federal net operating loss carryforward will expire beginning in 2031 and the state net operating loss carryforward will expire beginning in 2019.

The federal and state income tax returns of the Company for 2011, 2012, and 2013 are subject to examination, generally for three years after they were filed.

## NOTE 9. OTHER BORROWINGS

Other borrowings consist of the following:

| | December 31, | |
|---|---|---|
| | 2014 | 2013 |
| Federal Home Loan Bank advances with fixed interest rates ranging from 0.20% to 0.58% (weighted average rate of 0.34% at December 31, 2014), interest payable monthly or quarterly, and principal due at various maturities ranging from January 23, 2015 through July 19, 2015. | $ 12,250,000 | $ 7,250,000 |
| Note payable to a commercial bank with variable rate equal to 5.00% (default rate) as of December 31, 2014. | 2,000,000 | 2,000,000 |
| Line of credit | - | 981,976 |
| | $ 14,250,000 | $ 10,231,976 |

Because the note payable has been called by the lender, all other borrowings are due in 2015.

In addition, the Company has available secured unused federal funds lines of credit with various financial institutions totaling up to $6,300,000. As of December 31, 2014, the Company has pledged $3,170,355 in marketable securities for these lines and could borrow up to approximately $2,695,000 under these lines.

### FHLB Advances

The Company has pledged cash ($250,000), securities ($10,101,552), commercial real estate ($1,564,755) and residential real estate loans ($6,153,935) for a total lendable collateral value of approximately $18,070,000. The Company also has an undrawn letter of credit facility with the Federal Home Loan Bank in the amount of $5,750,000 that is also secured by the above collateral. The Company may borrow an additional $5.8 million from the FHLB under these arrangements.

### Note Payable

The Company has an outstanding note payable due to a commercial bank. The note bears an indexed interest rate equal to the prime rate as published in the Wall Street Journal less 0.25% (default rate is equal to 2.00% over the index or 5.00% at December 31, 2014). Interest is payable quarterly; principal payments are due in annual installments of $250,000 through July 31, 2020. The Company has pledged all of its stock in SunSouth Bank as collateral for this note. At December 31, 2014 and 2013, the balance outstanding was $2,000,000. The Company was unable to make the principal and interest payments due July 31, 2013 and 2014 or any subsequent quarterly interest payments and the note is currently in default and has been called by the lender. See Note 2 for additional information related to the status of this note.

## NOTE 9. OTHER BORROWINGS (Continued)

### Line of Credit

During 2012, the Company began participating in a lending program whereby consumer installment contracts are purchased by the Company "with paid deferred interest" ("WPDI"). Under this program, the borrower does not pay interest on the installment contract if the obligation is repaid within the "promotional" period which generally ranges from six months to twenty-four months depending on the terms of each contract. The Company purchases the WPDI installment contracts under a senior lender – junior lender structure whereby the Company retains the senior lender's 83.3% interest in each contract. The junior lender, an outside unrelated party, advances the Company funds to acquire its 16.7% interest in each contract under a line of credit with the Company and the Company will repay the funds to the junior lender as the contracts are paid off. The Company has a $1,000,000 revolving line of credit that is used to fund the junior lender's interest. The line is unsecured and bears interest at the rate of 12% and matures on June 26, 2015. The WPDI program was discontinued on March 27, 2014, and the line of credit was repaid.

## NOTE 10. JUNIOR SUBORDINATED DEBT

### SunSouth Bancshares Capital Trust I

The Company formed a wholly-owned grantor trust to issue cumulative trust preferred securities. The grantor trust has invested the proceeds of the trust preferred securities in junior subordinated debentures of the Company. The junior subordinated debentures can be redeemed prior to maturity at the option of the Company on or after July 23, 2009. The sole assets of the guarantor trust are the Junior Subordinated Deferrable Interest Debentures of the Company (the "debentures") held by the grantor trust. The debentures have the same interest rate (LIBOR plus 2.75%, floating) as the trust preferred securities. The Company has the right to defer interest payments on the debentures at any time or from time to time for a period not exceeding 20 consecutive quarters provided that no extension period may extend beyond the stated maturity of the related debentures. During any such extension period, distributions on the trust preferred certificates would also be deferred.

Payment of periodic cash distributions and payment upon liquidation or redemption with respect to the trust preferred securities are guaranteed by the Company to the extent of funds held by the grantor trust (the "Preferred Securities Guarantee"). The Preferred Securities Guarantee, when taken together with the Company's other obligations under the debentures, constitute a full and unconditional guarantee, on a subordinated basis, by the Company of payments due on the trust preferred securities.

The trust preferred securities and the related debentures were issued on June 25, 2004. Distributions on the trust preferred securities are paid quarterly on January 23, April 23, July 23 and October 23 of each year, beginning October 23, 2004. Interest on the debentures is paid on the corresponding dates. The aggregate principal amount of Trust I debentures outstanding at December 31, 2014 and 2013, was $3,093,000. Certain issue costs have been deferred and recorded in other assets in the accompanying consolidated balance sheets. The issue costs are being amortized over the life of the debentures, and the outstanding balance of the unamortized issue costs at December 31, 2014 and 2013, was approximately $48,750 and $51,250, respectively.

## NOTE 10.   JUNIOR SUBORDINATED DEBT (Continued)

### SunSouth Bancshares Capital Trust II

During 2006, the Company formed a second wholly-owned grantor trust to issue cumulative trust preferred securities. The grantor trust has invested the proceeds of the trust preferred securities in junior subordinated debentures of the Company. The junior subordinated debentures can be redeemed prior to maturity at the option of the Company on or after July 23, 2011. The sole assets of the guarantor trust are the Junior Subordinated Deferrable Interest Debentures of the Company (the "debentures") held by the grantor trust. The debentures have the same interest rate (LIBOR plus 1.58%, floating) as the trust preferred securities. The Company has the right to defer interest payments on the debentures at any time or from time to time for a period not exceeding 20 consecutive quarters provided that no extension period may extend beyond the stated maturity of the related debentures. During any such extension period, distributions on the trust preferred certificates would also be deferred.

Payment of periodic cash distributions and payment upon liquidation or redemption with respect to the trust preferred securities are guaranteed by the Company to the extent of funds held by the grantor trust (the "Preferred Securities Guarantee"). The Preferred Securities Guarantee, when taken together with the Company's other obligations under the debentures, constitutes a full and unconditional guarantee, on a subordinated basis, by the Company of payments due on the trust preferred securities.

The trust preferred securities and the related debentures were issued on June 23, 2006. Distributions on the trust preferred securities are paid quarterly on March 23, June 23, September 23, and December 23 of each year, beginning September 23, 2006. Interest on the Debentures is paid on the corresponding dates. The aggregate principal amount of Trust II debentures outstanding at December 31, 2014 and 2013 was $5,155,000. There were no issue costs associated with the issuance of the debentures.

### Interest Deferrals

The Company has elected to defer payments of interest on its two trust preferred securities and began an Extension Period for Trust I and Trust II in 2010. The Company elected to begin the Extension Period to enhance its ability to serve as a source of strength for its banking subsidiary, SunSouth Bank. The Company has expensed the interest due during the deferral period in the consolidated statement of operations. As of December 31, 2014 and 2013, $1,007,727 and $797,587, respectively, of interest has been accrued in the accompanying consolidated balance sheets. The interest deferral extension period expired on April 23, 2015 for Trust I and will expire on June 23, 2015 for Trust II at which time all deferred interest will be due which is expected to collectively total approximately $1,050,000.

## NOTE 11.   EMPLOYEE BENEFIT PLANS

### Profit Sharing Plan

The Company sponsors a 401(k) profit sharing plan covering substantially all employees subject to certain age and minimum service requirements. There were no contributions to the plan during 2014 or 2013.

### Stock Bonus Plan

The Company sponsors a stock bonus plan, which also allows the granting of stock options, with 3,000 shares reserved for issuance under the Plan. The Plan is administered by a Board appointed committee which determines the eligible participants, the number of shares to grant based upon the fair value of the underlying stock and all other terms of the awards. There were no shares or options awarded under the plan for the years ended December 31, 2014 and 2013 and there are no outstanding stock options. As of December 31, 2014, 1,203 shares are available to be granted.

## NOTE 12.    COMMITMENTS AND CONTINGENCIES

### Loan Commitments

The Company is a party to financial instruments with off-balance sheet risk in the normal course of business to meet the financing needs of its customers. These financial instruments include commitments to extend credit and standby letters of credit. The commitments involve, to varying degrees, elements of credit risk and interest rate risk in excess of the amount recognized in the balance sheets. The majority of all commitments to extend credit and standby letters of credit are variable rate instruments.

The Company's exposure to credit loss in the event of nonperformance by the other party to the financial instrument for commitments to extend credit and standby letters of credit is represented by the contractual amount of those instruments. The Company uses the same credit policies in making commitments as it does for on-balance sheet instruments. A summary of the Company's commitments is as follows:

| | December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Commitments to extend credit | $ 9,676,670 | $ 9,845,035 |
| Standby letters of credit | 74,175 | 83,778 |
| | $ 9,750,845 | $ 9,928,813 |

Commitments to extend credit are agreements to lend to a customer as long as there is no violation of any condition established in the contract. Commitments generally have fixed expiration dates or other termination clauses and may require payment of a fee. Since many of the commitments are expected to expire without being drawn upon, the total commitment amounts do not necessarily represent future cash requirements. The amount of collateral obtained, if deemed necessary by the Company upon extension of credit, is based on management's credit evaluation of the party. Collateral held varies, but may include accounts receivable, inventory, property and equipment, residential real estate and income-producing commercial properties.

Standby letters of credit are conditional commitments issued by the Company to guarantee the performance of a customer to a third party. Those letters of credit are primarily issued to support public and private borrowing arrangements. The credit risk involved in issuing letters of credit is essentially the same as that involved in extending loans to customers. Collateral held varies and is required in instances which the Company deems necessary.

At December 31, 2014 and 2013, the carrying amount of liabilities related to the Company's obligation to perform under letters of credit was insignificant. The Company has not been required to perform on any letters of credit, and the Company has not incurred any losses on letters of credit for the years ended December 31, 2014 and 2013.

### Contingencies

In the normal course of business, the Company is involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material effect on the Company's financial statements.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 13.     CONCENTRATIONS OF CREDIT

The Company originates primarily commercial, residential and consumer loans to customers in Houston County and surrounding counties.  The ability of the majority of the Company's customers to honor their contractual loan obligations is dependent on the economy in these areas.

Fifty-seven percent of the Company's loan portfolio is concentrated in loans secured by real estate, of which a substantial portion is secured by real estate in the Company's primary market area.  Additionally, fifteen percent of the Company's real estate loan portfolio is concentrated in real estate construction loans. Accordingly, the ultimate collectability of the loan portfolio and recovery of the carrying amount of foreclosed assets is susceptible to changes in real estate conditions in the Company's primary market area. The other concentrations of credit by type of loan are set forth in Note 4.

The Company's secured legal lending limit to any single borrower or group of related borrowers is 20% of total capital, as defined, or approximately $2,204,000.  The Company's unsecured legal lending limit to any single borrower or group of related borrowers is 10% of total capital, as defined, or approximately $1,102,000.

## NOTE 14.     REGULATORY MATTERS

The Bank is subject to certain restrictions on the amount of dividends that may be declared without prior regulatory approval.  At December 31, 2014, no amounts were available for dividend declaration without regulatory approval.

The Bank is subject to various regulatory capital requirements administered by the federal banking agencies.  Failure to meet minimum capital requirements can initiate certain mandatory, and possibly additional discretionary actions by regulators that, if undertaken, could have a direct material effect on the financial statements.  Under capital adequacy guidelines and the regulatory framework for prompt corrective action, the Bank must meet specific capital guidelines that involve quantitative measures of its assets, liabilities, and certain off-balance sheet items as calculated under regulatory accounting practices. Capital amounts and classification are also subject to qualitative judgments by the regulators about components, risk weightings, and other factors.

Quantitative measures established by regulation to ensure capital adequacy require the Bank to maintain minimum amounts and ratios of Total and Tier 1 capital to risk-weighted assets, as defined, and of Tier 1 capital to average assets (leverage ratio), as defined.  As of December 31, 2014, the Bank was operating under a regulatory agreement described more fully in Note 2 and was not in compliance with the regulatory capital requirements of that agreement.

As of December 31, 2014, the Bank was adequately capitalized under this regulatory framework.  To be categorized as well capitalized, the Bank must maintain minimum Total risk-based, Tier I risk-based and Tier I leverage ratios as set forth in the following table and must not be subject to any written agreement, order, capital directive, or prompt corrective action directive issued by the federal banking regulators.

## NOTE 14.  REGULATORY MATTERS (Continued)

The Bank's actual capital amounts and ratios are presented in the following table.

| | Actual | | For Capital Adequacy Purposes | | To Be Well Capitalized Under Prompt Corrective Action Provisions | |
|---|---|---|---|---|---|---|
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | | | *(Dollars in Thousands)* | | | |
| **December 31, 2014:** | | | | | | |
| **Total Capital to Risk Weighted Assets** | $ 9,562 | 8.87% | $ 8,626 | 8.00% | $ 10,782 | 10.00% |
| **Tier I Capital to Risk Weighted Assets** | $ 8,197 | 7.60% | $ 4,313 | 4.00% | $ 6,469 | 6.00% |
| **Tier I Capital to Average Assets** | $ 8,197 | 5.45% | $ 6,020 | 4.00% | $ 7,525 | 5.00% |
| December 31, 2013: | | | | | | |
| Total Capital to Risk Weighted Assets | $ 11,774 | 9.30% | $ 10,126 | 8.00% | $ 12,657 | 10.00% |
| Tier I Capital to Risk Weighted Assets | $ 10,178 | 8.04% | $ 5,063 | 4.00% | $ 7,594 | 6.00% |
| Tier I Capital to Average Assets | $ 10,178 | 5.99% | $ 6,792 | 4.00% | $ 8,490 | 5.00% |

In December 2010, the Basel Committee on Bank Supervision ("BCBS") finalized a set of international guidelines for determining regulatory capital known as "Basel III." In July 2013, the federal bank regulators approved final regulatory capital rules implementing BCBS's December 2010 capital framework as well as certain provisions of the Dodd-Frank Act. The new capital rules under Basel III also substantially revise the risk-based capital requirements applicable to banking institutions as compared to the general risk-based capital rules now in effect. The new capital rules revise the components of capital and address other issues affecting the numerator in regulatory capital ratios. The new capital rules also address asset risk weights and other issues affecting the denominator in regulatory capital ratios and replace the existing general risk-weighting approach. The new capital rules are effective for the Bank on January 1, 2015 (subject to a phase-in period).

The new capital rules, among other things, (i) introduce a new capital measure called "Common Equity Tier 1" ("CET1"), (ii) specify that Tier 1 capital consists of CET1 and "Additional Tier 1 capital" instruments meeting certain revised requirements, (iii) define CET1 narrowly by requiring that most deductions/adjustments to regulatory capital measures be made to CET1 and not to the other components of capital, and (iv) expand the scope of the deductions/adjustments to capital as compared to existing regulations.

Under the new capital rules, the minimum capital ratios as of January 1, 2015 will be as follows:

- 4.5% CET1 to risk-weighted assets;
- 6.0% Tier 1 capital (CET1 plus additional Tier 1 capital) to risk weighted assets; and
- 8.0% Total capital (Tier 1 capital plus Tier 2 capital) to risk-weighted assets; and
- 4.0% Tier 1 capital to total quarterly average assets, as defined, (leverage ratio).

The new capital rules also introduce a new capital conservation buffer designed to absorb losses during periods of economic stress. The capital conservation buffer is composed entirely of CET1, on top of these minimum risk-weighted asset ratios and will be subject to phase-in through January 1, 2019. Banking institutions with a ratio of CET1 to risk-weighted assets above the minimum but below the capital conservation buffer will face constraints on dividends, equity repurchases and compensation based on the amount of the shortfall. When fully phased-in on January 1, 2019, the new capital rules will require the Company and Bank to maintain such additional capital conservation buffer of 2.5% of CET1, effectively resulting in minimum ratios of (i) CET1 to risk-weighted assets of at least 7%, (ii) Tier 1 capital to risk-weighted assets of at least 8.5%, and (iii) Total capital to risk-weighted assets of at least 10.5%.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 14. REGULATORY MATTERS (Continued)

The new capital rules provide for a number of deductions from and adjustments to CET1. These include, for example, the requirement that mortgage servicing rights, certain deferred tax assets and significant investments in non-consolidated financial entities be deducted from CET1 to the extent that any one such category exceeds 10% of CET1 or all such items, in the aggregate, exceed 15% of CET1. Implementation of the deductions and other adjustments to CET1 will be subject to phase-in through January 1, 2019.

In addition, under the new capital rules, the Bank must maintain regulatory capital ratios of (i) CET1 to risk-weighted assets of at least 6.5%, (ii) Tier 1 capital to risk-weighted assets of at least 8.0%, (iii) Total capital to risk-weighted assets of at least 10.0% and (iv) Tier 1 capital to quarterly average assets (leverage ratio) of at least 5.0% to be considered well capitalized under the regulatory framework for prompt corrective action. These requirements are effective on January 1, 2015.

Management has evaluated all of the fully phased-in requirements of the new capital rules and the effects of these requirements on the Bank's capital structure. Management does not believe that these new requirements will have a significant impact on current regulatory capital.

## NOTE 15. RELATED PARTY TRANSACTIONS

In the ordinary course of business, the Company has and expects to continue to have loan transactions with its related parties. In the opinion of management, these transactions were on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with other customers, and in management's opinion, do not involve more than the normal risk of collectibility or present any other unfavorable features to the Company. Changes in related party loans for the years ended December 31, 2014 and 2013 are as follows:

|  | Years Ended December 31, | |
|  | 2014 | 2013 |
|---|---|---|
| Balance, beginning of year | $ 910,973 | $ 1,166,889 |
| Advances | 1,283,495 | 137,734 |
| Repayments | (917,362) | (247,428) |
| Changes in directors | (369,647) | (146,222) |
| Balance, end of year | $ 907,459 | $ 910,973 |

Deposits from related parties held by the Company at December 31, 2014 and 2013 were approximately $338,000 and $65,000, respectively.

The Company, through common ownership and common board of directors, maintained an affiliate relationship with Citizens Southern Bancshares, Inc. and its subsidiary, Citizens State Bank in Vernon, Alabama. The Company sold management services under a management services agreement to its affiliate which totaled $133,000 and $124,000 for the years ended December 31, 2014 and 2013, respectively. In the opinion of management, these goods and services were sold on terms commensurate with those that would be sold to unrelated entities. As of January 31, 2015, the management services agreement had been terminated between the Company and its affiliate.

## NOTE 16.    FAIR VALUE OF ASSETS AND LIABILITIES

### Determination of Fair Value

The Company uses fair value measurements to record fair value adjustments to certain assets and liabilities and to determine fair value disclosures.  In accordance with the *Fair Value Measurements and Disclosures* topic (FASB ASC 820), the fair value of a financial instrument is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.  Fair value is best determined based upon quoted market prices.  However, in many instances, there are no quoted market prices for the Company's various financial instruments.  In cases where quoted market prices are not available, fair values are based on estimates using present value or other valuation techniques.  Those techniques are significantly affected by the assumptions used, including the discount rate and estimates of future cash flows.  Accordingly, the fair value estimates may not be realized in an immediate settlement of the instrument.

The fair value guidance provides a consistent definition of fair value, which focuses on exit price in an orderly transaction (that is, not a forced liquidation or distressed sale) between market participants at the measurement date under current market conditions.  If there has been a significant decrease in the volume and level of activity for the asset or liability, a change in valuation technique or the use of multiple valuation techniques may be appropriate.  In such instances, determining the price at which willing market participants would transact at the measurement date under current market conditions depends on the facts and circumstances and requires the use of significant judgment.  The fair value is a reasonable point within the range that is most representative of fair value under current market conditions.

### Fair Value Hierarchy

In accordance with this guidance, the Company groups its financial assets and financial liabilities generally measured at fair value in three levels, based on the markets in which the assets and liabilities are traded and the reliability of the assumptions used to determine fair value.

**Level 1** - Valuation is based on quoted prices in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date.  Level 1 assets and liabilities generally include debt and equity securities that are traded in an active exchange market.  Valuations are obtained from readily available pricing sources for market transactions involving identical assets or liabilities.

**Level 2** - Valuation is based on inputs other than quoted prices included within level 1 that are observable for the asset or liability, either directly or indirectly.  The valuation may be based on quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the asset or liability.

**Level 3** - Valuation is based on unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.  Level 3 assets and liabilities include financial instruments whose value is determined using pricing models, discounted cash flow methodologies, or similar techniques, as well as instruments for which determination of fair value requires significant management judgment or estimation.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

## NOTE 16.    FAIR VALUE OF ASSETS AND LIABILITIES (Continued)

### Fair Value Hierarchy (Continued)

The following methods and assumptions were used by the Company in estimating the fair value of its financial instruments:

**Cash and Cash Equivalents**: Cash and cash equivalents include cash, due from banks and interest-bearing deposits in banks and federal funds sold and the carrying amount of these instruments approximate fair value.

**Securities**: Where quoted prices are available in an active market, securities are classified within level 1 of the valuation hierarchy. Level 1 securities include highly liquid government bonds and exchange-traded equities. If quoted market prices are not available, fair values are estimated using pricing models and discounted cash flows that consider standard input factors such as observable market data, benchmark yields, interest rate volatilities, broker/dealer quotes, and credit spreads. Examples of such instruments, which would generally be classified within level 2 of the valuation hierarchy, include U.S. Government agency securities and state and municipal securities. Mortgage-backed securities are included in level 2 if observable inputs are available. In other cases, such as trust preferred securities, where there is limited or no market activity or less transparency around inputs to the valuation, those securities are classified in level 3.

**Restricted Equity Securities**: The carrying amount of restricted equity securities with no readily determinable fair value approximates fair value based on the redemption provisions of the issuers which is cost.

**Loans**: The carrying amount of variable-rate loans that reprice frequently and have no significant change in credit risk approximates fair value. The fair value of fixed-rate loans is estimated based on discounted contractual cash flows, using interest rates currently being offered for loans with similar terms to borrowers with similar credit quality. The fair value of impaired loans is estimated based on discounted contractual cash flows or underlying collateral values, where applicable.

**Deposits**: The carrying amount of demand deposits, savings deposits, and variable-rate certificates of deposit approximates fair value. The fair value of fixed-rate certificates of deposit is estimated based on discounted contractual cash flows using interest rates currently being offered for certificates of similar maturities.

**Federal Home Loan Bank Advances**: The carrying value of fixed-rate advances approximates fair value due to the short-term nature of the instruments.

**Note Payable**: The carrying amount of the note payable approximates fair value.

**Line of Credit**: The carrying amount of the line of credit approximates fair value due to the short-term nature of this agreement.

**Junior Subordinated Debt**: The carrying amount of the variable rate junior subordinated debt approximates fair value.

**Accrued Interest**: The carrying amount of accrued interest approximates its fair value.

**Off-Balance Sheet Instruments**: The carrying amount of the off-balance sheet financial instruments is based on fees charged to enter into such agreements.

## NOTE 16.    FAIR VALUE OF ASSETS AND LIABILITIES (Continued)

### Assets Measured at Fair Value on a Recurring Basis

Following is a description of the valuation methodologies used for instruments measured at fair value on a recurring basis and recognized in the accompanying balance sheet, as well as the general classification of such instruments pursuant to the valuation hierarchy.

The following table presents financial assets measured at fair value on a recurring basis:

| | | Fair Value Measurements at December 31, 2014 Using | | |
| | Assets Measured at Fair Value | Quoted Prices In Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| --- | --- | --- | --- | --- |
| Available for sale securities | $ 35,569,882 | $ - | $ 35,069,882 | $ 500,000 |

| | | Fair Value Measurements at December 31, 2013 Using | | |
| | Assets Measured at Fair Value | Quoted Prices In Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| --- | --- | --- | --- | --- |
| Available for sale securities | $ 10,185,338 | $ - | $ 9,685,338 | $ 500,000 |

The changes in Level 3 assets, which consist of trust preferred securities, measured at fair value on a recurring basis are summarized as follows:

| | Years Ended December 31, | |
| | 2014 | 2013 |
| --- | --- | --- |
| Balance, beginning of year | $ 500,000 | $ 500,000 |
| Total losses included in: | | |
| Net loss | - | - |
| Balance, end of year | $ 500,000 | $ 500,000 |

**NOTE 16.    FAIR VALUE OF ASSETS AND LIABILITIES (Continued)**

### Assets Measured at Fair Value on a Nonrecurring Basis

Following is a description of the valuation methodologies used for instruments measured at fair value on a nonrecurring basis and recognized in the accompanying consolidated balance sheets, as well as the general classification of such instruments pursuant to the valuation hierarchy.

*Impaired Loans*

Loans considered impaired under ASC 310-10-35, *Receivables*, are loans for which, based on current information and events, it is probable that the Company will be unable to collect all principal and interest payments due in accordance with the contractual terms of the loan agreement. Impaired loans can be measured based on the present value of expected payments using the loan's original effective rate as the discount rate, the loan's observable market price, or the fair value of the collateral less selling costs if the loan is collateral dependent.

The fair value of impaired loans were primarily measured based on the value of the collateral securing these loans. Impaired loans are classified within Level 3 of the fair value hierarchy. Collateral may be real estate and/or business assets including equipment, inventory, and/or accounts receivable. The Company generally determines the value of real estate collateral based on independent appraisals performed by qualified licensed appraisers. These appraisals may utilize a single valuation approach or a combination of approaches including comparable sales and the income approach. Appraised values are discounted for costs to sell and may be discounted further based on management's historical knowledge, changes in market conditions from the date of the most recent appraisal, and/or management's expertise and knowledge of the customer and the customer's business. Such discounts by management are subjective and are typically significant unobservable inputs for determining fair value. Impaired loans are reviewed and evaluated on at least a quarterly basis for additional impairment and adjusted accordingly, based on the same factors discussed above.

Impaired loans, which are generally measured for impairment using the fair value of collateral, had a carrying amount of $12,351,996 and $12,292,413, with a specific valuation allowance of $844,122 and $614,056 at December 31, 2014 and 2013, respectively. Of the $12,351,996 and $12,292,413 impaired loan portfolio at December 31, 2014 and 2013, respectively, $5,255,120 and $1,704,965 was carried at fair value as a result of charge-offs and specific valuation allowances. The specific valuation allowances totaled $844,122 and $614,056 as of December 31, 2014 and 2013, respectively, resulting in a net carrying value of $4,410,998 and $1,090,910. The remaining $7,096,876 and $10,587,448 at December 31, 2014 and 2013, respectively, was carried at cost, as the fair value of the collateral on these loans exceeded the book value for each individual credit. Charge-offs and changes in specific valuation allowances on impaired loans carried at fair value resulted in additional allocated provision for loan losses of $500,000 and $802,921, respectively, for the years ended December 31, 2014 and 2013. Due to the subjective nature, incorporating both observable and unobservable inputs factored into the appraisal process, including various assumptions and expectations on cash flows, the Company's impaired loans that are carried at fair value are classified within Level 3 of the valuation hierarchy.

## NOTE 16.    FAIR VALUE OF ASSETS AND LIABILITIES (Continued)

### Assets Measured at Fair Value on a Nonrecurring Basis (Continued)

*Foreclosed Assets*

Foreclosed assets, consisting of properties obtained through foreclosure or in satisfaction of loans, are initially recorded at the lower of the loan's carrying amount or the fair value less estimated costs to sell upon transfer of the loans to foreclosed assets. Subsequently, foreclosed assets are carried at the lower of carrying value or fair value less costs to sell. Fair values are generally based on third party appraisals of the property and are classified within Level 3 of the fair value hierarchy. The appraisals are sometimes further discounted based on management's historical knowledge, and/or changes in market conditions from the date of the most recent appraisal, and/or management's expertise and knowledge of the customer and the customer's business. Such discounts are typically significant unobservable inputs for determining fair value. In cases where the carrying amount exceeds the fair value, less estimated costs to sell, a loss is recognized in noninterest expense.

The following tables present the financial instruments carried on the consolidated balance sheets by caption and by level in the fair value hierarchy at December 31, 2014 and 2013, for which a nonrecurring change in fair value has been recorded:

| | Carrying Value at December 31, 2014 | | | |
| --- | --- | --- | --- | --- |
| | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Impaired loans | $ 4,410,998 | $          - | $          - | $ 4,410,998 |
| Foreclosed assets | 4,064,770 | - | - | 4,064,770 |

| | Carrying Value at December 31, 2013 | | | |
| --- | --- | --- | --- | --- |
| | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Impaired loans | $ 1,090,910 | $          - | $          - | $ 1,090,910 |
| Foreclosed assets | 6,889,953 | - | - | 6,889,953 |

## NOTE 16. FAIR VALUE OF ASSETS AND LIABILITIES (Continued)

### Quantitative Disclosures for Level 3 Fair Value Measurements

The following table presents information related to Level 3 recurring fair value measurements at December 31, 2014 and 2013.

| Description | Fair Value at December 31, 2014 | Valuation Techniques | Unobservable Inputs |
|---|---|---|---|
| Trust preferred security | $ 500,000 | Comparison to similar instruments with similar risks | 1 Limited market activity 2 Security carried at cost |

| Description | Fair Value at December 31, 2013 | Valuation Techniques | Unobservable Inputs |
|---|---|---|---|
| Trust preferred security | $ 500,000 | Comparison to similar instruments with similar risks | 1 Limited market activity 2 Security carried at cost |

For Level 3 assets measured at fair value on a non-recurring basis as of December 31, 2014, the significant unobservable inputs used in the fair value measurements are presented below.

| | Carrying Amount | Valuation Technique | Significant Unobservable Input | Weighted Average of Input |
|---|---|---|---|---|
| **Nonrecurring:** | | | | |
| Impaired loans | $ 4,410,998 | Appraisal | Appraisal discounts (%) | 5-10 % |
| Foreclosed assets | 4,064,770 | Appraisal | Appraisal discounts (%) | 10-20 % |

### Fair Value of Financial Instruments

The carrying amount and estimated fair value of the Company's financial instruments are as follows:

| | December 31, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| **Financial assets:** | *(Dollars in Thousands)* | | | |
| Cash and cash equivalents | $ 3,712 | $ 3,712 | $ 22,207 | $ 22,207 |
| Securities available for sale | 35,570 | 35,570 | 10,185 | 10,185 |
| Restricted equity securities | 1,199 | 1,199 | 1,031 | 1,031 |
| Loans | 105,141 | 105,848 | 117,459 | 121,103 |
| Accrued interest receivable | 643 | 643 | 587 | 587 |
| **Financial liabilities:** | | | | |
| Deposits | 133,124 | 133,523 | 145,965 | 146,574 |
| Federal Home Loan Bank advances | 12,250 | 12,250 | 7,250 | 7,250 |
| Note payable | 2,000 | 2,000 | 2,000 | 2,000 |
| Line of credit | - | - | 982 | 982 |
| Junior subordinated debt | 8,248 | 8,248 | 8,248 | 8,248 |
| Accrued interest payable | 1,341 | 1,341 | 1,094 | 1,094 |

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 17. PARENT COMPANY FINANCIAL INFORMATION

The following information presents the condensed balance sheet of SunSouth Bancshares, Inc. as of December 31, 2014 and 2013, and the condensed statements of operations and cash flows for the years then ended.

### CONDENSED BALANCE SHEETS

|  | 2014 | 2013 |
|---|---|---|
| **Assets** | | |
| Cash | $ 8,026 | $ 8,826 |
| Investment in bank subsidiary | 8,157,692 | 9,873,732 |
| Other investments | 248,000 | 248,000 |
| Other assets | 48,750 | 51,250 |
| **Total assets** | $ 8,462,468 | $ 10,181,808 |
| **Liabilities and stockholders' deficit** | | |
| Junior subordinated debt | $ 8,248,000 | $ 8,248,000 |
| Other borrowings | 2,000,000 | 2,000,000 |
| Accrued interest payable | 1,152,017 | 842,064 |
| Stockholders' deficit | (2,937,549) | (908,256) |
| **Total liabilities and stockholders' deficit** | $ 8,462,468 | $ 10,181,808 |

### CONDENSED STATEMENTS OF OPERATIONS

|  | 2014 | 2013 |
|---|---|---|
| **Expense** | | |
| Interest | $ 312,453 | $ 270,994 |
| Other | 1,000 | 1,252 |
|  | 313,453 | 272,246 |
| Loss before loss of bank subsidiary | (313,453) | (272,246) |
| **Loss of bank subsidiary** | (2,064,849) | (4,933,351) |
| Loss before income tax expense | (2,378,302) | (5,205,597) |
| **Income tax expense** | - | 217,916 |
| **Net loss** | $ (2,378,302) | $ (5,423,513) |

**NOTE 17.    PARENT COMPANY FINANCIAL INFORMATION (Continued)**

CONDENSED STATEMENTS OF CASH FLOWS

|  | 2014 | 2013 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Net loss | $   (2,378,302) | $   (5,423,513) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Loss of bank subsidiary | 2,064,849 | 4,933,351 |
| Deferred income taxes | - | 217,916 |
| Increase in accrued interest payable | 309,953 | 237,994 |
| Net other operating activities | 2,500 | 2,499 |
| Net cash used in operating activities | (1,000) | (31,753) |
| **FINANCING ACTIVITIES** | | |
| Proceeds from purchase of common stock | 200 | - |
| Net cash provided by financing activities | 200 | - |
| Net decrease in cash | (800) | (31,753) |
| Cash at beginning of year | 8,826 | 40,579 |
| Cash at end of year | $      8,026 | $      8,826 |

# SUNSOUTH BANCSHARES, INC. AND SUBSIDIARIES

## CONSOLIDATED FINANCIAL REPORT

## DECEMBER 31, 2015

# SUNSOUTH BANCSHARES, INC.
# AND SUBSIDIARIES

## CONSOLIDATED FINANCIAL REPORT
## DECEMBER 31, 2015

### TABLE OF CONTENTS

Page

**INDEPENDENT AUDITOR'S REPORT** ...................................................................................................................... 1

**CONSOLIDATED FINANCIAL STATEMENTS**

Consolidated balance sheets ................................................................................................................................. 2
Consolidated statements of operations ............................................................................................................... 3
Consolidated statements of comprehensive loss................................................................................................ 4
Consolidated statements of stockholders' deficit.............................................................................................. 5
Consolidated statements of cash flows................................................................................................................ 6
Notes to consolidated financial statements .................................................................................................. 7-39



# INDEPENDENT AUDITOR'S REPORT

**To the Board of Directors**
**SunSouth Bancshares, Inc.**
**Dothan, Alabama**

We have audited the accompanying consolidated financial statements of **SunSouth Bancshares, Inc. and Subsidiaries**, which comprise the consolidated balance sheets as of December 31, 2015 and 2014, and the related consolidated statements of operations, comprehensive loss, stockholders' deficit, and cash flows for the years then ended, and the related notes to the consolidated financial statements.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### *Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of SunSouth Bancshares, Inc. and Subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for the years then ended, in accordance with accounting principles generally accepted in the United States of America.

### *Emphasis of Matter*

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has suffered declining levels of capital as a result of continuing losses from operations and is currently in default on debt obligations. Those conditions raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of these uncertainties. Our opinion is not modified with respect to these matters.

*Mauldin & Jenkins, LLC*

Birmingham, Alabama
May 16, 2016

2000 SOUTHBRIDGE PARKWAY, SUITE 501 • BIRMINGHAM • AL 35209 • 205-445-2880 • 888-277-0020 • FAX 205-445-2940 • www.mjcpa.com
MEMBERS OF THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS

Case 17-10371    Doc 14    Filed 02/17/17    Entered 02/17/17 17:49:05    Desc Main
Document      Page 159 of 211

# SUNSOUTH BANCSHARES, INC.
# AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS
## DECEMBER 31, 2015 AND 2014

| Assets | 2015 | 2014 |
|---|---|---|
| Cash and due from banks | $ 494,340 | $ 3,326,396 |
| Interest bearing deposits in banks | 45,369 | 385,824 |
| Total cash and cash equivalents | 539,709 | 3,712,220 |
| Securities available for sale | 56,633,517 | 35,569,882 |
| Securities held to maturity | 56,706 | - |
| Restricted equity securities | 1,093,950 | 1,198,950 |
| Loans | 87,579,040 | 107,893,787 |
| Less allowance for loan losses | 2,448,371 | 2,752,765 |
| Loans, net | 85,130,669 | 105,141,022 |
| Premises and equipment | 2,750,778 | 2,926,954 |
| Foreclosed assets | 3,882,958 | 4,607,479 |
| Other assets | 903,002 | 1,357,855 |
| **Total assets** | **$ 150,991,289** | **$ 154,514,362** |

### Liabilities and Stockholders' Deficit

| | 2015 | 2014 |
|---|---|---|
| Deposits | | |
| Noninterest-bearing | $ 9,765,221 | $ 10,863,194 |
| Interest-bearing | 121,325,804 | 122,261,014 |
| Total deposits | 131,091,025 | 133,124,208 |
| Federal funds purchased | 100,000 | - |
| Other borrowings | 12,750,000 | 14,250,000 |
| Junior subordinated debt | 8,248,000 | 8,248,000 |
| Other liabilities | 2,147,745 | 1,829,703 |
| **Total liabilities** | **154,336,770** | **157,451,911** |
| Commitments and contingencies | | |
| Stockholders' deficit | | |
| Common stock, voting, $5 par value, 20,000 shares authorized; 4,778 shares issued and outstanding | 23,890 | 23,890 |
| Common stock, non-voting, $5 par value, 10,000 shares authorized; none issued and outstanding | - | - |
| Capital surplus | 12,721,959 | 12,721,959 |
| Accumulated deficit | (16,053,961) | (15,574,362) |
| Accumulated other comprehensive loss | (37,369) | (109,036) |
| **Total stockholders' deficit** | **(3,345,481)** | **(2,937,549)** |
| **Total liabilities and stockholders' deficit** | **$ 150,991,289** | **$ 154,514,362** |

See Notes to Consolidated Financial Statements.

# SUNSOUTH BANCSHARES, INC.
# AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF OPERATIONS
## YEARS ENDED DECEMBER 31, 2015 AND 2014

| | 2015 | 2014 |
|---|---|---|
| **Interest income** | | |
| Loans, including fees | $ 5,127,502 | $ 5,854,307 |
| Taxable securities | 965,277 | 502,893 |
| Other | 62 | 16,222 |
| **Total interest income** | 6,092,841 | 6,373,422 |
| | | |
| **Interest expense** | | |
| Deposits | 1,144,976 | 1,264,814 |
| Other borrowings and subordinated debentures | 412,538 | 372,997 |
| **Total interest expense** | 1,557,514 | 1,637,811 |
| | | |
| **Net interest income** | 4,535,327 | 4,735,611 |
| **Provision for loan losses** | - | 500,000 |
| **Net interest income after provision for loan losses** | 4,535,327 | 4,235,611 |
| | | |
| **Other income** | | |
| Service charges on deposit accounts | 122,114 | 152,091 |
| Gain on sale of securities, net | 122,125 | 15,281 |
| Management services fees | 16,500 | 133,000 |
| Other operating income | 98,927 | 62,699 |
| **Total other income** | 359,666 | 363,071 |
| | | |
| **Other expenses** | | |
| Salaries and employee benefits | 2,353,065 | 2,320,925 |
| Equipment and occupancy expenses | 429,486 | 542,247 |
| Deposit insurance premiums | 344,516 | 334,749 |
| Expenses and losses from foreclosed assets | 396,485 | 1,827,560 |
| Other operating expenses | 1,851,040 | 1,951,503 |
| **Total other expenses** | 5,374,592 | 6,976,984 |
| | | |
| **Loss before income tax expense** | (479,599) | (2,378,302) |
| | | |
| **Income tax expense** | - | - |
| | | |
| **Net loss** | $ (479,599) | $ (2,378,302) |

**See Notes to Consolidated Financial Statements.**

# SUNSOUTH BANCSHARES, INC.
# AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS
## YEARS ENDED DECEMBER 31, 2015 AND 2014

|  | 2015 | 2014 |
|---|---|---|
| **Net loss** | $ **(479,599)** | $ (2,378,302) |
| **Other comprehensive income:** | | |
| Unrealized holding gains on securities available for sale arising during period, net of tax of $86,973 and $209,616 in 2015 and 2014, respectively | **148,728** | 358,451 |
| Reclassification adjustment for gains realized in net loss, net of tax of $45,064 and $5,639 in 2015 and 2014, respectively | **(77,061)** | (9,642) |
| Other comprehensive income | **71,667** | 348,809 |
| **Comprehensive loss** | $ **(407,932)** | $ (2,029,493) |

**See Notes to Consolidated Financial Statements.**

# SUNSOUTH BANCSHARES, INC.
# AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIT
## YEARS ENDED DECEMBER 31, 2015 AND 2014

| | Common Stock | | Capital Surplus | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|
| | Shares | Par Value | | | | |
| **Balance, December 31, 2013** | 4,774 | $ 23,870 | $ 12,721,779 | $ (13,196,060) | $ (457,845) | $ (908,256) |
| Net loss | - | - | - | (2,378,302) | - | (2,378,302) |
| Purchase of common stock | 4 | 20 | 180 | - | - | 200 |
| Other comprehensive income | - | - | - | - | 348,809 | 348,809 |
| **Balance, December 31, 2014** | 4,778 | 23,890 | 12,721,959 | (15,574,362) | (109,036) | (2,937,549) |
| Net loss | - | - | - | (479,599) | - | (479,599) |
| Other comprehensive income | - | - | - | - | 71,667 | 71,667 |
| **Balance, December 31, 2015** | 4,778 | $ 23,890 | $ 12,721,959 | $ (16,053,961) | $ (37,369) | $ (3,345,481) |

**See Notes to Consolidated Financial Statements.**

# SUNSOUTH BANCSHARES, INC.
# AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS
## YEARS ENDED DECEMBER 31, 2015 AND 2014

|  | 2015 | 2014 |
|---|---|---|
| **OPERATING ACTIVITIES** |  |  |
| Net loss | $ **(479,599)** | $ (2,378,302) |
| Adjustments to reconcile net loss to net cash |  |  |
| provided by operating activities: |  |  |
| Depreciation | **206,631** | 234,279 |
| Amortization of securities, net | **740,639** | 221,950 |
| Provision for loan losses | **-** | 500,000 |
| Gain on sale of securities, net | **(122,125)** | (15,281) |
| Gain on sale of foreclosed assets, net | **(61,732)** | (33,299) |
| Write down of foreclosed assets | **344,784** | 1,630,146 |
| (Gain) loss on sale of premises and equipment | **(28,597)** | 21,322 |
| Decrease in prepaid assets | **115,707** | 438,525 |
| Increase in interest receivable | **(119,542)** | (56,515) |
| Increase in interest payable | **308,115** | 246,803 |
| Net other operating activities | **426,706** | (304,092) |
| Net cash provided by operating activities | **1,330,987** | 505,536 |
| **INVESTING ACTIVITIES** |  |  |
| Purchases of securities available for sale | **(39,150,130)** | (28,164,762) |
| Proceeds from sale of securities available for sale | **10,890,511** | 1,700,242 |
| Proceeds from maturities of securities available for sale | **6,692,076** | 1,426,094 |
| Proceeds from maturities of securities held to maturity | **24,844** | - |
| Net (increase) decrease of restricted equity securities | **105,000** | (168,000) |
| Net decrease in loans | **18,434,570** | 11,838,628 |
| Proceeds from sale of foreclosed assets | **1,940,293** | 3,212,978 |
| Capitalized expenses on foreclosed assets | **(5,621)** | - |
| Purchase of premises and equipment | **(164,371)** | (72,754) |
| Proceeds from sale of premises and equipment | **162,513** | 50,225 |
| Net cash used in investing activities | **(1,070,315)** | (10,177,349) |
| **FINANCING ACTIVITIES** |  |  |
| Net decrease in deposits | **(2,033,183)** | (12,841,149) |
| Net increase in federal funds purchased | **100,000** | - |
| Proceeds from other borrowings | **10,750,000** | 5,000,000 |
| Repayment of other borrowings | **(12,250,000)** | (981,976) |
| Proceeds from purchase of common stock | **-** | 200 |
| Net cash used in financing activities | **(3,433,183)** | (8,822,925) |
| Net decrease in cash and cash equivalents | **(3,172,511)** | (18,494,738) |
| Cash and cash equivalents at beginning of year | **3,712,220** | 22,206,958 |
| Cash and cash equivalents at end of year | $ **539,709** | $ 3,712,220 |
| **SUPPLEMENTAL DISCLOSURE** |  |  |
| Cash paid during the year for: |  |  |
| Interest | $ **1,249,399** | $ 1,391,008 |
| **NONCASH TRANSACTIONS** |  |  |
| Foreclosed assets acquired in settlement of loans | $ **1,506,703** | $ 494,027 |
| Transfer of bank premises to foreclosed assets | $ **-** | $ 327,102 |
| Internally financed sales of foreclosed assets | $ **13,500** | $ 514,541 |
| Transfer of loans to held to maturity securities | $ **82,580** | $ - |

**See Notes to Consolidated Financial Statements.**

# SUNSOUTH BANCSHARES, INC.
## AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS


## NOTE 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Nature of Business

SunSouth Bancshares, Inc. (the "Company" when referencing the consolidated entity or "Holding Company" when referencing it as a standalone entity) is a bank holding company whose business is conducted by its wholly-owned subsidiaries, SunSouth Bank (the "Bank"), SunSouth Bancshares Capital Trust I, and SunSouth Bancshares Capital Trust II. The Bank is a commercial bank located in Dothan, Houston County, Alabama. The Bank provides a full range of banking services in its primary market area of Houston County and Southeast Alabama.

### Basis of Presentation

The consolidated financial statements include the accounts of the Company and its subsidiaries. Significant intercompany transactions and balances have been eliminated in consolidation.

In preparing the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the balance sheet date and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Material estimates that are particularly susceptible to significant change in the near-term relate to the determination of the allowance for loan losses, the valuation of foreclosed assets, the valuation of deferred tax assets, other-than-temporary impairment of securities and the fair value of financial instruments.

The Company has evaluated all transactions, events, and circumstances for consideration or disclosure through May 16, 2016, the date these financial statements were available to be issued and has reflected or disclosed those items within the consolidated financial statements and related footnotes as deemed appropriate.

### Cash, Cash Equivalents and Cash Flows

For purposes of reporting consolidated cash flows, cash and cash equivalents include cash and balances due from banks and interest-bearing deposits in banks. Cash flows from restricted equity securities, loans, federal funds purchased and deposits are reported net.

The Bank maintains amounts due from banks which, at times, may exceed federally insured limits. The Bank has not experienced any losses in such accounts.

The Bank is required to maintain reserve balances in cash or on deposit with the Federal Reserve Bank, based on a percentage of deposits. The total of those reserve balance requirements was approximately $0 and $41,000 at December 31, 2015 and 2014, respectively.

### Securities

Certain debt securities that management has the positive intent and ability to hold to maturity are classified as "held to maturity" and recorded at amortized cost. Securities not classified as held to maturity are classified as "available for sale" and recorded at fair value, with unrealized gains and losses excluded from operations and reported in other comprehensive loss. Purchase premiums and discounts are recognized in interest income using the interest method over the terms of the securities. Gains and losses on the sale of securities are recorded on the trade date and are determined using the specific identification method.

## NOTE 1.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Securities (Continued)

The Company evaluates investment securities for other-than-temporary impairment ("OTTI") using relevant accounting guidance on a regular basis. Consideration is given to (1) the length of time and the extent to which the fair value has been less than cost, (2) the financial condition and near term prospects of the issuer including an evaluation of credit ratings, (3) the impact of changes in market interest rates, (4) the intent of the Company to sell a security, and (5) whether it is more likely than not the Company will have to sell the security before recovery of its cost basis. If the Bank intends to sell an impaired security, or if it is more likely than not the Company will have to sell the security before recovery of its cost basis, the Company records an other-than-temporary loss in an amount equal to the entire difference between fair value and amortized cost in earnings. Otherwise, only the credit portion of the estimated loss is recognized in earnings, with the other portion of the loss recognized in other comprehensive loss.

### Restricted Equity Securities

The Company is required to maintain an investment in capital stock of various entities for business affiliation purposes. Based on redemption provisions, these stocks have no quoted market values and are carried at cost. At its discretion, these entities may declare dividends on the stocks. Management reviews for impairment based on the ultimate recoverability of the cost basis in these stocks.

### Loans

Loans that management has the intent and ability to hold for the foreseeable future or until maturity or pay-off are reported at their outstanding principal balances less deferred fees and costs on originated loans, purchased loan discounts and the allowance for loan losses. Interest income is accrued on the outstanding principal balance. Nonrefundable loan origination fees and costs are deferred and recognized into interest income over the life of the loans using a method which approximates a level yield. Purchased loan discounts are accreted into interest income over the estimated remaining life of the loan as long as the loan is not on nonaccrual status. Purchased loan discounts are recognized into income as a gain on sale of loans if the purchased loan is sold to a third party.

The accrual of interest on loans is discontinued when, in management's opinion, the borrower may be unable to meet payments as they become due, or at the time the loan is 90 days past due. Past due status is based on contractual terms of the loan. In all cases, loans are placed on nonaccrual or charged-off at an earlier date if collection of principal and interest is considered doubtful. All interest accrued but not collected for loans that are placed on nonaccrual or charged off is reversed against interest income or charged to the allowance, unless management believes that the accrual of interest is recoverable through the liquidation of collateral. Interest income on nonaccrual loans is recognized on the cash basis, until the loans are returned to accrual status. Loans are returned to accrual status when all the principal and interest amounts contractually due are brought current and the loan has been performing according to the contractual terms generally for a period of not less than six months.

A loan is considered impaired when it is probable, based on current information and events, the Company will be unable to collect all principal and interest payments due in accordance with the contractual terms of the loan agreement. Loans, for which the terms have been modified at the borrower's request, and for which the borrower is experiencing financial difficulties, are considered troubled debt restructurings and classified as impaired.

Factors considered by management in determining impairment include payment status, collateral value, and the probability of collecting scheduled principal and interest when due. Loans that experience insignificant payment delays and payment shortfalls are not classified as impaired. Impaired loans are measured by either the present value of expected future cash flows discounted at the loan's effective interest rate, the loan's obtainable market price, or the fair value of the collateral if the loan is collateral dependent. Interest on accruing impaired loans is recognized as long as such loans do not meet the criteria for nonaccrual status. Large groups of smaller balance homogeneous loans are collectively evaluated for impairment.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Allowance for Loan Losses

The allowance for loan losses is established as losses are estimated to have occurred through a provision for loan losses charged to expense. Loan losses are charged against the allowance when management believes the uncollectibility of the loan balance is confirmed. Confirmed losses are charged off immediately. Subsequent recoveries, if any, are credited to the allowance.

The allowance is an amount that management believes will be adequate to absorb estimated losses relating to specifically identified loans, as well as probable credit losses inherent in the balance of the loan portfolio. The allowance for loan losses is evaluated on a regular basis by management and is based upon management's periodic review of the uncollectibility of loans in light of historical experience, the nature and volume of the loan portfolio, overall portfolio quality, review of specific problem loans, current economic conditions that may affect the borrower's ability to pay, estimated value of any underlying collateral and prevailing economic conditions. This evaluation is inherently subjective as it requires estimates that are susceptible to significant revision as more information becomes available. This evaluation does not include the effects of expected losses on specific loans or groups of loans that are related to future events or expected changes in economic conditions. While management uses the best information available to make its evaluation, future adjustments to the allowance may be necessary if there are significant changes in economic conditions. In addition, regulatory agencies, as an integral part of their examination process, periodically review the Company's allowance for loan losses, and may require the Company to make additions to the allowance based on their judgment about information available to them at the time of their examinations.

The allowance consists of specific and general components. The specific component relates to loans that are classified as impaired. For those loans that are classified as impaired, an allowance is established when the discounted cash flows, collateral value or observable market price of the impaired loan is lower than the carrying value of that loan. The general component covers non-impaired loans and is based on historical loss experience adjusted for qualitative factors. The qualitative factors considered by management include, among other factors (1) levels of trends in delinquencies and impaired loans; (2) levels and trends in charge-offs and recoveries; (3) trends in volume and terms of loans; (4) effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures and practices; (5) experience, ability, and depth of lending management and other relevant staff; (6) national and local economic trends and conditions; (7) industry conditions; and (8) effects of changes in credit concentrations.

### Troubled Debt Restructurings

A loan is considered a troubled debt restructuring ("TDR") based on individual facts and circumstances. The Company designates loan modifications as TDRs when for economic and legal reasons related to the borrower's financial difficulties, it grants a concession to the borrower that it would not otherwise consider. These concessions may include rate reductions, principal forgiveness, extension of maturity date and other actions intended to minimize potential losses.

In determining whether a borrower is experiencing financial difficulties, the Company considers if the borrower is in payment default or would be in payment default in the foreseeable future without the modification, the borrower declared or is in the process of declaring bankruptcy, the borrower's projected cash flows will not be sufficient to service any of its debt, or the borrower cannot obtain funds from sources other than the Company at a market rate for debt with similar risk characteristics.

In determining whether the Company has granted a concession, the Company assesses, if it does not expect to collect all amounts due, whether the current value of the collateral will satisfy the amounts owed, whether additional collateral or guarantees from the borrower will serve as adequate compensation for other terms of the restructuring, and whether the borrower otherwise has access to funds at a market rate for debt with similar risk characteristics.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Premises and Equipment

Land is carried at cost.  Premises and equipment are carried at cost less accumulated depreciation.  Depreciation is computed principally on the straight-line method over the estimated useful lives of the assets which are estimated to be from 2 to 40 years.

### Transfers of Financial Assets

Transfers of financial assets are accounted for as sales, when control over the assets has been surrendered.  Control over transferred assets is deemed to be surrendered when (1) the assets have been isolated from the Company, (2) the transferee obtains the right (free of conditions that constrain it from taking advantage of that right) to pledge or exchange the transferred assets, and (3) the Company does not maintain effective control over the transferred assets through an agreement to repurchase them before their maturity.

### Foreclosed Assets

Foreclosed assets acquired through or in lieu of loan foreclosure are held for sale and are initially recorded at fair value less estimated selling costs.  Any write-down to fair value at the time of transfer to foreclosed assets is charged to the allowance for loan losses.  Subsequent to foreclosure, valuations are periodically performed by management and the assets are carried at the lower of carrying amount or fair value less cost to sell.  Costs of improvements are capitalized, whereas costs relating to holding foreclosed assets and any subsequent adjustments to the carrying value are expensed.

### Intangible Assets

Intangible assets with definite useful lives are initially measured at fair value and then amortized over their estimated useful lives to their estimated residual values.  A non-compete agreement with a former executive officer entered into during 2012 was the only intangible asset with a definite useful life on the Company's balance sheet.  The intangible asset has a balance of $0 and $69,445 as of December 31, 2015 and 2014, respectively, and is included in other assets in the accompanying consolidated balance sheets.

### Income Taxes

Income tax accounting guidance results in two components of income tax expense: current and deferred.  Current income tax expense reflects taxes to be paid or refunded for the current period by applying the provisions of the enacted tax law to the taxable income or excess of deductions over revenues.  The Company determines deferred income taxes using the liability (or balance sheet) method.  Under this method, the net deferred tax asset or liability is based on the tax effects of the differences between the book and tax bases of assets and liabilities, and enacted changes in tax rates and laws are recognized in the period in which they occur.

Deferred income tax expense results from changes in deferred tax assets and liabilities between periods.  Deferred tax assets are recognized if it is more likely than not, based on the technical merits, that the tax position will be realized or sustained upon examination.  The term more likely than not means a likelihood of more than 50 percent; the terms examined and upon examination also include resolution of the related appeals or litigation processes, if any.  A tax position that meets the more-likely-than-not recognition threshold is initially and subsequently measured as the largest amount of tax benefit that has a greater than 50 percent likelihood of being realized upon settlement with a taxing authority that has full knowledge of all relevant information.  The determination of whether or not a tax position has met the more-likely-than-not recognition threshold considers the facts, circumstances, and information available at the reporting date and is subject to management's judgment.  Deferred tax assets may be reduced by deferred tax liabilities and a valuation allowance if, based on the weight of evidence available, it is more likely than not that some portion or all of a deferred tax asset will not be realized.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Comprehensive Loss

Accounting principles generally require that recognized revenue, expenses, gains and losses be included in net loss. Although certain changes in assets and liabilities, such as unrealized gains and losses on available for sale securities, are reported as a separate component of the equity section of the balance sheet, such items, along with net loss, are components of comprehensive loss.

### Fair Value of Financial Instruments

Fair values of financial instruments are estimates using relevant market information and other assumptions, as more fully disclosed in Note 16. Fair value estimates involve uncertainties and matters of significant judgment. Changes in assumptions or in market conditions could significantly affect the estimates.

## NOTE 2. REGULATORY OVERSIGHT, CAPITAL ADEQUACY, RESULTS OF OPERATIONS, AND LIQUIDITY

The consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the discharge of liabilities in the normal course of business for the foreseeable future. Due to the Company's 2015 and 2014 financial results and other matters discussed below, particularly those items under "Liquidity", the following items should be considered in connection with the Company's overall financial condition. Additionally, the Company is contemplating filing for bankruptcy protection in order to seek relief from certain debt obligations should ongoing negotiations with the debt holders not result in a settlement of the debt. ASC 205-30, *Presentation of Financial Statements – Liquidation Basis of Accounting*, provides guidance when a Company is contemplating such actions and would require that the assets and liabilities of the Company be adjusted to amounts expected to be realized upon settlement with claimants if adopted. However, the liquidation basis of accounting is not appropriate when a liquidation event is not imminent or the Company is expected to emerge from liquidation status. Therefore, the Company has not applied liquidation accounting because a bankruptcy filing is not considered imminent as of the date of this report due to ongoing negotiations with the debt holders and the Company is expected to emerge from bankruptcy protection as an operating entity.

### Regulatory Oversight

On May 1, 2013, the Bank entered into a Consent Order (the "Agreement") with the Federal Deposit Insurance Corporation ("FDIC") and the Alabama State Banking Department. The Agreement will require the Bank to undertake certain actions within designated time frames, and to operate in compliance with the provisions thereof during the term of the Agreement. The Board of Directors and management of the Bank have already begun implementing many of these provisions and will fully support compliance with the Agreement. The significant items in the Agreement include but are not limited to:

- The Tier I Leverage Ratio and the Total Risk Based Capital Ratio must be maintained at a minimum of 9% and 12%, respectively.

- A plan to reduce adversely classified assets as well as a continuation of various policy and procedure changes, many of which have already been implemented, to improve credit monitoring, asset quality, earnings, liquidity and funds management and Board of Director oversight.

- No cash dividends may be paid on common stock without prior regulatory approval.

Compliance with the Agreement is to be monitored by a committee made up of members of the Board of Directors of the Company. The Bank is currently not in compliance with all components of the Agreement and failure to comply with the Agreement could result in further regulatory action and oversight.

**NOTE 2.**     **REGULATORY OVERSIGHT, CAPITAL ADEQUACY, RESULTS OF OPERATIONS, AND LIQUIDITY (Continued)**

### Capital Adequacy

As presented in the consolidated balance sheets, the Company's capital reflects a deficit balance of $3,345,481 as of December 31, 2015. However, because the Company qualifies as a Small Bank Holding Company under the Federal Reserve Board's Small Bank Holding Company Policy Statement, the capital position of the Bank, and not the Company, is measured for regulatory capital adequacy. Note 14, Regulatory Matters, provides a discussion and discloses in tabular form more detail about the Bank's regulatory capital levels.

A reconciliation of the Bank's capital as determined under generally accepted accounting principles ("GAAP") to regulatory capital at December 31, 2015 is as follows:

|  | Total | | Tier I & CET1 | |
| --- | --- | --- | --- | --- |
|  | *(Dollars in Thousands)* | | | |
| Bank GAAP capital | $ | 8,328 | $ | 8,328 |
| Accumulated other comprehensive loss |  | 37 |  | 37 |
| Allowable allowance for loan losses |  | 1,034 |  | - |
| Regulatory capital as disclosed in Note 14 | $ | 9,399 | $ | 8,365 |

### Results of Operations

For the year ended December 31, 2015, the Company reported a consolidated net loss of approximately $480,000. This loss was largely the result of expenses associated with foreclosed assets. In 2015, the expenses and losses associated with foreclosed assets was approximately $396,000. As of December 31, 2015 and 2014, nonperforming assets, consisting of loans on nonaccrual status, loans past due ninety days or more and still accruing interest, troubled-debt restructurings and foreclosed assets, totaled $10.9 million and $14.9 million, respectively.

It is possible that nonperforming assets and losses could increase from current levels which will further hinder a return to profitability. Management has developed plans to improve the operating results of the Company, including reducing adversely classified and nonperforming assets, maintaining a stable net interest margin, and further reducing operating expenses.

### Liquidity

Because of limitations on intercompany transfers of funds (i.e. intercompany dividends) as a result of the regulatory order described above in "Regulatory Oversight", the overall liquidity of the Company must be analyzed separately at the Bank and at the Holding Company. Management monitors liquidity on a weekly basis.

The primary sources of liquidity for the Bank are cash and cash equivalents, increases in deposits, scheduled repayments of loans, unpledged investment securities and available borrowings with the Federal Home Loan Bank and other correspondent bank federal funds lines. As of December 31, 2015, the Bank had $540 thousand in unpledged cash and cash equivalents and approximately $20 million in unpledged marketable debt securities classified as available for sale. In addition, as of December 31, 2015, the Bank has available secured borrowings with the Federal Home Loan Bank of approximately $11 million and from unused secured federal funds lines at correspondent banks of $2.8 million. During 2016, approximately $4.5 million in brokered deposits will mature, of which $1.0 million has already matured and been paid out as of the date of this report, which the Bank will be unable to renew due to the regulatory order described above. Based on current and expected liquidity needs and sources, management expects the Bank to be able to meet all obligations as they become due.

NOTE 2.    REGULATORY OVERSIGHT, CAPITAL ADEQUACY, RESULTS OF
           OPERATIONS, AND LIQUIDITY (Continued)

### Liquidity (Continued)

The primary source of liquidity for the Holding Company is the receipt of dividends from the Bank. As discussed above, the Bank is restricted from paying dividends to the Holding Company without regulatory approval. As December 31, 2015, the Holding Company had $805 in available cash. As discussed in Note 9, Other Borrowings, the Holding Company has a note payable in the amount of $2,000,000 as of December 31, 2015 which requires quarterly interest payments and annual principal payments of $250,000 due each July 31. The Holding Company has been in default on this note since July 31, 2013 and the lender has called the note and unpaid interest due which totaled approximately $2,245,000 as of December 31, 2015. As of the date of this report, the note remains unpaid and in default. The Holding Company is attempting to raise capital in order to service this debt. However, because the collateral for this note is 100% of the capital stock of the Bank, failure to bring this note current could subject the Bank to foreclosure by the lender. The Company would be unable to continue operation if such action were pursued by the lender which raises substantial doubt about the Company's ability to continue as a going concern.

In addition, as discussed in Note 10, Junior Subordinated Debt, the Company was deferring interest payments on its two trusts to the subordinated debt holders as allowed by the terms of the instruments. The deferral period was for twenty quarters which began in 2010. Therefore, the deferral period ended in 2015 for Trust I and Trust II. The Company has not paid the interest due on Trust I and Trust II, which are now in default. The total amount due on the two trusts including principal and unpaid interest is approximately $9.5 million as of December 31, 2015. The Company is working with the debt holders to settle the obligations but failure to do so could force the debt holders to take certain actions to collect the debt including forcing the Company into bankruptcy. Likewise, the Company may voluntarily file for bankruptcy protection to seek relief from this debt. These actions, if pursued by either party, also raise substantial doubt about the Company's ability to continue as a going concern.

### Summary

As noted above, the Company is actively working toward transactions designed to meet the expectations of the regulatory authorities, to re-capitalize the Bank so that it can re-attain profitable operations, to fully comply with the terms of the Agreement and to service the Holding Company's debt obligations. If operating losses continue to occur and capital levels continue to deteriorate or the Company is unable to execute its plans and raise the required capital needed to re-capitalize the Bank and service the Holding Company debt, these events could have a material and significant adverse effect on the Company's results of operations, financial position and its ability to continue operations.

## NOTE 3.    SECURITIES

The amortized cost and fair value of securities are summarized as follows:

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| **Securities Available for Sale** | | | | |
| **December 31, 2015:** | | | | |
| **U.S. Government agency securities** | **$ 16,772,328** | **$ 23,752** | **$ (88,205)** | **$ 16,707,875** |
| **State and municipal securities** | **1,612,754** | **23,727** | **(20,590)** | **1,615,891** |
| **Mortgage-backed securities** | **37,807,659** | **193,279** | **(191,187)** | **37,809,751** |
| **Trust preferred securities** | **500,000** | **-** | **-** | **500,000** |
| | **$ 56,692,741** | **$ 240,758** | **$ (299,982)** | **$ 56,633,517** |
| | | | | |
| December 31, 2014: | | | | |
| U.S. Government agency securities | $ 22,953,347 | $ 101,011 | $ (237,675) | $ 22,816,683 |
| State and municipal securities | 2,193,904 | 27,752 | (10,486) | 2,211,170 |
| Mortgage-backed securities | 10,095,431 | 12,423 | (65,825) | 10,042,029 |
| Trust preferred securities | 500,000 | - | - | 500,000 |
| | $ 35,742,682 | $ 141,186 | $ (313,986) | $ 35,569,882 |

Included in the above totals for trust preferred securities at December 31, 2015 and 2014 is $500,000 of a trust preferred security carried at cost. The security had no quoted market value because active and orderly markets for the security currently do not exist. Therefore, the security is carried at cost. Management reviews the security for impairment based on the ultimate recoverability of the cost basis in the security.

In addition, the Company previously participated in a program whereby it purchased pools of FHA insured, Title I mortgage loans from a third party at premiums due to the underlying contractual yield of such loans. Prior to 2015, these loans were classified within the loan portfolio. However, during 2015, management reclassified these loans totaling $82,580 from loans to securities held to maturity because these pools of loans more closely resemble a mortgage-backed security rather than a loan. The outstanding balance of these loan pools is $56,706 as of December 31, 2015. These pools are fully insured by the Federal Housing Administration (FHA). However, these securities have no quoted market values because established markets for these securities do not currently exist.

Securities with a carrying value of approximately $36,447,000 and $15,686,000 at December 31, 2015 and 2014, respectively, were pledged to secure public deposits, borrowings, federal funds lines and for other purposes as required or permitted by law.

The amortized cost and fair value of securities as of December 31, 2015, by contractual maturity are shown below. Actual maturities may differ from contractual maturities in mortgage-backed securities because the mortgages underlying the securities may be called or repaid with or without penalty. Therefore, these securities are not included in the maturity categories in the following summary.

| | Securities Available for Sale | |
|---|---|---|
| | Amortized Cost | Fair Value |
| Due from one to five years | $     3,164,117 | $     3,152,881 |
| Due from five to ten years | 11,962,257 | 11,942,896 |
| Due after ten years | 3,758,708 | 3,727,989 |
| Mortgage-backed securities | 37,807,659 | 37,809,751 |
| | $   56,692,741 | $   56,633,517 |

**NOTE 3.     SECURITIES (Continued)**

Gains and losses on sales of securities consist of the following:

|  | Years Ended December 31, | |
|---|---|---|
|  | 2015 | 2014 |
| Gross gains on sales of securities available for sale | $ 135,882 | $ 15,281 |
| Gross losses on sales of securities available for sale | (13,757) | - |
| Net realized gains | $ 122,125 | $ 15,281 |

Restricted equity securities consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2015 | 2014 |
| Federal Home Loan Bank of Atlanta | $ 595,700 | $ 700,700 |
| First National Banker's Bankshares, Inc. | 250,250 | 250,250 |
| SunSouth Capital Trust I and II | 248,000 | 248,000 |
|  | $ 1,093,950 | $ 1,198,950 |

The above investment in SunSouth Capital Trust I and II is related to the Company's outstanding junior subordinated debentures more fully described in Note 10. These investments represent common trust securities that SunSouth Capital Trust I and II sold to the Company in connection with the issuance of the subordinated debentures. These instruments bear the same rate of interest as the subordinated debentures and the payments due the Company are due on the same dates as the interest payments on the debentures. However, no interest payments have been received by the Company from the Trusts for these securities because the debentures have been in deferral and are now in default. Therefore, no interest income has been recorded by the Company for these securities during the deferral and subsequent default period. Upon settlement of the debenture obligations, the principal amount of these securities would be offset against the principal amount of the subordinated debentures.

**Temporarily Impaired Securities**

The following table shows the gross unrealized losses and fair value of the Company's investments with unrealized losses that are not deemed to be other-than-temporarily impaired, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position at December 31, 2015 and 2014.

Securities that have been in a continuous unrealized loss position are as follows:

|  | Less Than Twelve Months | | Over Twelve Months | | Total |
|---|---|---|---|---|---|
|  | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Unrealized Losses |
| **December 31, 2015:** | | | | | |
| **U.S. Government agency securities** | $ 11,286,239 | $ (83,466) | $ 1,494,851 | $ (4,739) | $ (88,205) |
| **State and municipal securities** | 691,852 | (20,590) | - | - | (20,590) |
| **Mortgage-backed securities** | 19,546,655 | (163,871) | 1,042,550 | (27,316) | (191,187) |
| **Total temporarily impaired debt securities** | $ 31,524,746 | $ (267,927) | $ 2,537,401 | $ (32,055) | $ (299,982) |

**NOTE 3.**  **SECURITIES (Continued)**

### Temporarily Impaired Securities

| | Less Than Twelve Months | | Over Twelve Months | | |
| --- | --- | --- | --- | --- | --- |
| | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Total Unrealized Losses |
| December 31, 2014: | | | | | |
| U.S. Government agency securities | $ 6,845,829 | $ (64,413) | $ 6,161,371 | $ (173,262) | $ (237,675) |
| State and municipal securities | 706,885 | (10,486) | - | - | (10,486) |
| Mortgage-backed securities | 634,694 | (65,825) | - | - | (65,825) |
| Total temporarily impaired debt securities | $ 8,187,408 | $ (140,724) | $ 6,161,371 | $ (173,262) | $ (313,986) |

The unrealized losses on thirty-three securities were caused by interest rate changes. Because the Company does not intend to sell the securities and it is not more likely than not that the Company will be required to sell the securities before recovery of the amortized cost bases, which may be maturity, the Company does not consider these securities to be other-than-temporarily impaired at December 31, 2015.

### Other-Than-Temporary Impairment

The Company conducts periodic reviews to identify and evaluate each investment security to determine whether an other-than-temporary impairment has occurred. For each security in the investment portfolio, a regular review is conducted to determine if an other-than-temporary impairment has occurred. Various factors are considered to determine if an other-than-temporary impairment has occurred. However, the most significant factors are default rates or interest deferral rates and the creditworthiness of the issuer. Other factors may include geographic concentrations, credit ratings, and other performance indicators of the underlying asset. The Company does not consider any securities as other-than-temporarily impaired as of December 31, 2015 or 2014.

**NOTE 4.**  **LOANS**

### Portfolio Segments and Classes

The composition of loans is summarized as follows:

| | December 31, | |
| --- | --- | --- |
| | **2015** | 2014 |
| Real estate mortgages: | | |
| Construction and land development | **$ 8,091,416** | $ 9,428,390 |
| 1-4 family first mortgages | **19,283,854** | 21,909,217 |
| Commercial | **13,098,981** | 19,431,909 |
| Other | **5,980,530** | 10,788,055 |
| Commercial loans | **23,135,905** | 20,444,354 |
| Leases | **16,798,936** | 24,298,137 |
| Consumer and other loans | **1,189,418** | 1,593,725 |
| | **87,579,040** | 107,893,787 |
| Allowance for loan losses | **(2,448,371)** | (2,752,765) |
| Loans, net | **$ 85,130,669** | $ 105,141,022 |

## NOTE 4.  LOANS (Continued)

### Portfolio Segments and Classes (Continued)

Included in the above loan totals by category at December 31, 2015 and 2014 were $150,569 and $268,765, respectively, of net deferred loan costs (net of origination fees) on originated loans and $228,775 and $306,731, respectively, of purchased discounts (net of premiums) on acquired loans. These acquired loans were initially measured at fair value, which includes estimated future credit losses expected to be incurred over the life of the loans.

The following table details the activity of the Company's loan discounts (net of premiums):

|  | Years Ended December 31, | |
|  | **2015** | 2014 |
|---|---|---|
| Balance, beginning of year | $ **(306,731)** | $ (1,205,411) |
| Discounts on purchased loans | **-** | (64,264) |
| Discounts accreted into interest income | **84,223** | 310,972 |
| Discounts applied against loans to offset loan losses | **-** | 651,972 |
| Transfer of FHA Title I premiums to securities | **(6,267)** | - |
| Balance, end of year | $ **(228,775)** | $ (306,731) |

For purposes of the disclosures required pursuant to ASC 310, the loan portfolio was disaggregated into segments and then further disaggregated into classes for certain disclosures. A portfolio segment is defined as the level at which an entity develops and documents a systematic method for determining its allowance for loan losses. There are four loan portfolio segments that include real estate loans, commercial loans, leases, and consumer loans. A class is generally determined based on the initial measurement attribute, risk characteristic of the loan, and an entity's method for monitoring and assessing credit risk. Classes within the real estate portfolio segment include construction and land development, 1-4 family first mortgages, commercial, and other. The portfolio segments of non-real estate commercial loans, leases, and consumer loans have not been further segregated by class.

The following describe risk characteristics relevant to each of the portfolio segments:

**Real Estate Loans** - As discussed below, the Company offers various types of real estate loan products. All loans within this portfolio segment are particularly sensitive to the valuation of real estate:

- Construction and land development loans are repaid through cash flow related to the operation, sale or refinance of the underlying property. This portfolio class includes extensions of credit to real estate developers or investors where repayment is dependent on the sale of the real estate or income generated from the real estate collateral.

- 1-4 family first mortgage loans are repaid by various means such as a borrower's income, sale of the property, or rental income derived from the property.

- Commercial loans include owner-occupied commercial real estate loans and loans secured by income producing properties. Owner-occupied commercial real estate loans to operating businesses are long-term financing of land and buildings. These loans are viewed primarily as cash flow loans and the repayment of these loans is largely dependent on the successful operation of the business. Real estate loans for income-producing properties such as apartment buildings, office and industrial buildings, and retail shopping centers are repaid from rent income derived from the properties.

- Other real estate mortgage loans include real estate loans secured by farmland, multi-family housing and other. These are repaid by various means such as a borrower's income, sale of the property, or rental income derived from the property.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 4. LOANS (Continued)

### Portfolio Segments and Classes (Continued)

**Commercial Loans -** The commercial loan portfolio segment includes commercial, financial, and agricultural loans. These loans include those loans to commercial customers for use in normal business operations to finance working capital needs, equipment purchases, or expansion projects. Loans are repaid by business cash flows. Collection risk in this portfolio is driven by the creditworthiness of the underlying borrower, particularly cash flows from the borrowers' business operations.

**Leases -** These loans include those loans to commercial customers to finance equipment purchases and are typically repaid by business cash flows. Collection risk in this portfolio is driven by the creditworthiness of the underlying borrower, particularly cash flows from the borrowers' business operations. The Company has discontinued this lending product and will manage the collection of the remainder of the portfolio in the normal course of business under the terms of each lease agreement.

**Consumer Loans -** The consumer loan portfolio segment includes direct consumer installment loans, overdrafts and other revolving credit loans, and educational loans. Loans in this portfolio are sensitive to unemployment and other key consumer economic measures.

## Credit Risk Management

Credit Administration and the Special Assets Manager are both involved in the credit risk management process and assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. This comprehensive process also assists in the prompt identification of problem credits. The Company has taken a number of measures to manage the portfolios and reduce risk, particularly in the more problematic portfolios.

The Company employs a credit risk management process with defined policies, accountability and routine reporting to manage credit risk in the loan portfolio segments. Credit risk management is guided by credit policies that provide for a consistent and prudent approach to underwriting and approvals of credits. Within the Board approved Loan Policy, procedures exist that elevate the approval requirements as credits become larger and more complex. All loans are individually underwritten, risk-rated, approved, and monitored.

Responsibility and accountability for adherence to underwriting policies and accurate risk ratings lies in each portfolio segment. For the consumer portfolio segment, the risk management process focuses on managing customers who become delinquent in their payments. For each portfolio segment, the risk management process focuses on underwriting new business and, on an ongoing basis, monitoring the credit of the portfolios. Loan Review and Credit Administration establish a timely schedule and scope for loan reviews. All loans over $200,000 are reviewed at least annually. These reviews ensure such loans have proper risk ratings and accrual status, and if necessary, ensure loans are transferred to the Special Assets manager.

Credit quality and trends in the loan portfolio segments are measured and monitored regularly. Detailed reports, by product, collateral, accrual status, etc., are reviewed by the Chief Credit Officer, the Officers Loan Committee, and the Directors Loan Committee.

The following categories are utilized by management to analyze and manage the credit quality and risk of the loan portfolio:

- **Pass -** includes obligations where the probability of default is considered low.

- **Special Mention** - includes obligations that exhibit potential credit weaknesses or downward trends deserving management's close attention. If left uncorrected, these potential weaknesses may result in the deterioration of the repayment prospects or credit position at a future date. These loans are not adversely classified and do not expose the Company to sufficient risk to warrant adverse classification.

## NOTE 4.    LOANS (Continued)

### Credit Risk Management (Continued)

- **Substandard** - includes obligations with defined weaknesses that jeopardize the orderly liquidation of debt.  A substandard loan is inadequately protected by the current sound worth and paying capacity of the borrower or by the collateral pledged, if any.  Normal repayment from the borrower is in jeopardy although no loss of principal is envisioned.  There is a distinct possibility that a partial loss of interest and/or principal will occur if the deficiencies are not corrected.  Loss potential, while existing in the aggregate amount of substandard loans, does not have to exist in individual loans classified substandard.

- **Doubtful** - includes obligations with all the weaknesses found in substandard loans with the added provision that the weaknesses make collection of debt in full, based on current existing facts, conditions, and values, highly questionable and improbable.  Serious problems exist to the point where partial loss of principal is likely.  The possibility of loss is extremely high, but because of certain important, reasonably specific pending factors that may work to strengthen the loan, the loans' classification as loss is deferred until a more exact status may be determined.

- **Loss** - includes obligations incapable of repayment or unsecured debt.  Such loans are considered uncollectible and of such little value, that continuance as an active asset is not warranted.  Loans determined to be a loss are charged-off at the date of loss determination.  Consequently, the Company does not maintain an ongoing recorded balance within this risk category and there are no loans with a loss rating in the Company's portfolio as of December 31, 2015 and 2014.

The following tables present credit quality indicators as described above for the loan portfolio segments and classes as of December 31, 2015 and 2014.

| | Pass | Special Mention | Substandard | Doubtful | Total |
|---|---|---|---|---|---|
| **December 31, 2015** | | *(Dollars in Thousands)* | | | |
| **Real estate mortgages:** | | | | | |
| **Construction and land development** | $ 6,249 | $ 1,831 | $ 11 | $ - | $ 8,091 |
| **1-4 family first mortgages** | 16,068 | 2,228 | 988 | - | 19,284 |
| **Commercial** | 9,021 | 3,701 | 377 | - | 13,099 |
| **Other** | 4,570 | 379 | 1,032 | - | 5,981 |
| **Commercial loans** | 16,415 | 1,325 | 5,396 | - | 23,136 |
| **Leases** | 15,420 | 532 | 265 | 582 | 16,799 |
| **Consumer and other loans** | 805 | 159 | 96 | 129 | 1,189 |
| **Total:** | $ 68,548 | $ 10,155 | $ 8,165 | $ 711 | $ 87,579 |
| | | | | | |
| December 31, 2014 | | | | | |
| Real estate mortgages: | | | | | |
| Construction and land development | $ 7,959 | $ 995 | $ 475 | $ - | $ 9,429 |
| 1-4 family first mortgages | 15,399 | 4,269 | 2,241 | - | 21,909 |
| Commercial | 14,051 | 4,608 | 773 | - | 19,432 |
| Other | 9,425 | 933 | 430 | - | 10,788 |
| Commercial loans | 12,303 | 3,273 | 4,868 | - | 20,444 |
| Leases | 24,229 | - | 69 | - | 24,298 |
| Consumer and other loans | 1,305 | 146 | 143 | - | 1,594 |
| Total: | $ 84,671 | $ 14,224 | $ 8,999 | $ - | $ 107,894 |

## NOTE 4.    LOANS (Continued)

### Past Due Loans

A loan is considered past due if any required principal and interest payments have not been received as of the date such payments were required to be made under the terms of the loan agreement.  Generally, the Company places loans on non-accrual when there is a clear indication that the borrower's cash flow may not be sufficient to meet payments as they become due, which is generally when a loan is 90 days past due. The following tables present the aging of the recorded investment in loans and leases as of December 31, 2015 and 2014:

| | Current | 30-59 Days | 60-89 Days | 90+ Days | Total Past Due | Nonaccrual | Total |
|---|---|---|---|---|---|---|---|
| **December 31, 2015** | | | | *(Dollars in Thousands)* | | | |
| **Real estate mortgages:** | | | | | | | |
| **Construction and land development** | $ 8,080 | $ - | $ - | $ - | $ - | $ 11 | $ 8,091 |
| **1-4 family first mortgages** | 19,112 | 2 | 14 | - | 16 | 156 | 19,284 |
| **Commercial** | 12,722 | - | - | - | - | 377 | 13,099 |
| **Other** | 5,074 | 689 | 40 | - | 729 | 178 | 5,981 |
| **Commercial loans** | 19,114 | 11 | 1 | 49 | 61 | 3,961 | 23,136 |
| **Leases** | 16,088 | 129 | - | - | 129 | 582 | 16,799 |
| **Consumer and other loans** | 1,098 | 91 | - | - | 91 | - | 1,189 |
| **Total:** | $ 81,288 | $ 922 | $ 55 | $ 49 | $ 1,026 | $ 5,265 | $ 87,579 |
| | | | | | | | |
| December 31, 2014 | | | | | | | |
| Real estate mortgages: | | | | | | | |
| Construction and land development | $ 9,015 | $ - | $ - | $ - | $ - | $ 414 | $ 9,429 |
| 1-4 family first mortgages | 20,548 | 565 | 93 | - | 658 | 703 | 21,909 |
| Commercial | 18,659 | - | 271 | - | 271 | 502 | 19,432 |
| Other | 10,128 | 386 | - | - | 386 | 274 | 10,788 |
| Commercial loans | 15,783 | 97 | - | - | 97 | 4,564 | 20,444 |
| Leases | 23,810 | 429 | 59 | - | 488 | - | 24,298 |
| Consumer and other loans | 1,580 | - | - | 7 | 7 | 7 | 1,594 |
| Total: | $ 99,523 | $ 1,477 | $ 423 | $ 7 | $ 1,907 | $ 6,464 | $ 107,894 |

The columns under the heading are spanned by **Past Due Status (Accruing Loans)** covering 30-59 Days, 60-89 Days, 90+ Days, and Total Past Due.

### Allowance for Loan Loss

Changes in the allowance for loan losses are as follows:

| | Years Ended December 31, | |
|---|---|---|
| | **2015** | 2014 |
| Balance, beginning of year | $ 2,752,765 | $ 2,712,126 |
| Provision for loan losses | - | 500,000 |
| Loans charged off | (713,797) | (761,137) |
| Recoveries of loans previously charged off | 409,403 | 301,776 |
| Balance, end of year | $ 2,448,371 | $ 2,752,765 |

## NOTE 4.  LOANS (Continued)

### Allowance for Loan Loss (Continued)

The following tables further detail the change in the allowance for loan losses for the years ended December 31, 2015 and 2014 by portfolio segment.  Allocation of a portion of the allowance to one category of loans does not preclude its availability to absorb losses in other categories.

| | As of and for the Year Ended December 31, 2015 | | | | |
|---|---|---|---|---|---|
| | Real Estate | Commercial | Leases | Consumer | Total |
| | *(Dollars in Thousands)* | | | | |
| **Allowance for loan losses:** | | | | | |
| **Balance, beginning of year** | $ 1,133 | $ 1,184 | $ 412 | $ 24 | $ 2,753 |
| **Provision (credit) for loan losses** | (269) | 127 | 158 | (16) | - |
| **Loans charged off** | (447) | (143) | (116) | (8) | (714) |
| **Recoveries of loans previously charged off** | 365 | 28 | - | 16 | 409 |
| **Balance, end of year** | $ 782 | $ 1,196 | $ 454 | $ 16 | $ 2,448 |
| **Ending balance: individually evaluated for impairment** | $ 107 | $ 999 | $ 170 | $ - | $ 1,276 |
| **Ending balance: collectively evaluated for impairment** | 675 | 197 | 284 | 16 | 1,172 |
| **Total ending balance** | $ 782 | $ 1,196 | $ 454 | $ 16 | $ 2,448 |
| **Loans:** | | | | | |
| **Ending balance: individually evaluated for impairment** | $ 3,014 | $ 5,632 | $ 875 | $ - | $ 9,521 |
| **Ending balance: collectively evaluated for impairment** | 43,441 | 17,504 | 15,924 | 1,189 | 78,058 |
| **Total ending balance** | $ 46,455 | $ 23,136 | $ 16,799 | $ 1,189 | $ 87,579 |

| | As of and for the Year Ended December 31, 2014 | | | | |
|---|---|---|---|---|---|
| | Real Estate | Commercial | Leases | Consumer | Total |
| | *(Dollars in Thousands)* | | | | |
| Allowance for loan losses: | | | | | |
| Balance, beginning of year | $ 1,246 | $ 964 | $ 440 | $ 62 | $ 2,712 |
| Provision (credit) for loan losses | (230) | 632 | 120 | (22) | 500 |
| Loans charged off | (105) | (450) | (148) | (58) | (761) |
| Recoveries of loans previously charged off | 222 | 38 | - | 42 | 302 |
| Balance, end of year | $ 1,133 | $ 1,184 | $ 412 | $ 24 | $ 2,753 |
| Ending balance: individually evaluated for impairment | $ 29 | $ 815 | $ - | $ - | $ 844 |
| Ending balance: collectively evaluated for impairment | 1,104 | 369 | 412 | 24 | 1,909 |
| Total ending balance | $ 1,133 | $ 1,184 | $ 412 | $ 24 | $ 2,753 |
| Loans: | | | | | |
| Ending balance: individually evaluated for impairment | $ 6,118 | $ 6,148 | $ 47 | $ 39 | $ 12,352 |
| Ending balance: collectively evaluated for impairment | 55,440 | 14,296 | 24,251 | 1,555 | 95,542 |
| Total ending balance | $ 61,558 | $ 20,444 | $ 24,298 | $ 1,594 | $ 107,894 |

### Impaired Loans

A loan is considered impaired, in accordance with the impairment accounting guidance (FASB ASC 310-10-35-16), when based on current information and events, it is probable that the Company will be unable to collect all amounts due from the borrower in accordance with the contractual term of the loan.  Impaired loans include loans modified in troubled debt restructuring where concessions have been granted to borrowers experiencing financial difficulties.  These concessions could include a reduction in the interest rate on the loan, payment extensions, forgiveness of principal, forbearance or other actions intended to maximize collection.

## NOTE 4.  LOANS (Continued)

### Impaired Loans (Continued)

The following tables detail the Company's impaired loans, by portfolio class as of December 31, 2015 and 2014:

| | Recorded Investment | Unpaid Principal Balance | Related Allowance | Average Recorded Investment | Interest Income Recognized in Year |
|---|---|---|---|---|---|
| **December 31, 2015** | | | *(Dollars in Thousands)* | | |
| **With no related allowance recorded:** | | | | | |
| **Real estate mortgages:** | | | | | |
| **Construction and land development** | $ 159 | $ 159 | $ - | $ 178 | $ 6 |
| **1-4 family first mortgages** | 656 | 656 | - | 660 | 28 |
| **Commercial** | 1,003 | 1,003 | - | 1,025 | 39 |
| **Other** | 338 | 338 | - | 346 | 10 |
| **Commercial loans** | 95 | 95 | - | 95 | 4 |
| **Leases** | 283 | 283 | - | 326 | 12 |
| **Consumer and other loans** | - | - | - | - | - |
| **Total with no allowance recorded:** | 2,534 | 2,534 | - | 2,630 | 99 |
| **With allowance recorded:** | | | | | |
| **Real estate mortgages:** | | | | | |
| **Construction and land development** | - | - | - | - | - |
| **1-4 family first mortgages** | - | - | - | - | - |
| **Commercial** | 129 | 129 | 1 | 129 | - |
| **Other** | 729 | 729 | 106 | 739 | 35 |
| **Commercial loans** | 5,537 | 5,537 | 999 | 5,569 | 77 |
| **Leases** | 592 | 592 | 170 | 627 | 3 |
| **Consumer and other loans** | - | - | - | - | - |
| **Total with an allowance recorded:** | 6,987 | 6,987 | 1,276 | 7,064 | 115 |
| **Totals:** | $ 9,521 | $ 9,521 | $ 1,276 | $ 9,694 | $ 214 |
| December 31, 2014 | | | | | |
| With no related allowance recorded: | | | | | |
| Real estate mortgages: | | | | | |
| Construction and land development | $ 596 | $ 596 | $ - | $ 798 | $ 11 |
| 1-4 family first mortgages | 1,161 | 1,161 | - | 1,169 | 52 |
| Commercial | 3,422 | 3,422 | - | 3,476 | 156 |
| Other | 657 | 657 | - | 666 | 23 |
| Commercial loans | 1,477 | 1,477 | - | 1,532 | 67 |
| Leases | 47 | 47 | - | 52 | 3 |
| Consumer and other loans | 39 | 39 | - | 39 | 2 |
| Total with no allowance recorded: | 7,399 | 7,399 | - | 7,732 | 314 |
| With allowance recorded: | | | | | |
| Real estate mortgages: | | | | | |
| Construction and land development | - | - | - | - | - |
| 1-4 family first mortgages | 85 | 85 | 14 | 85 | 3 |
| Commercial | 129 | 129 | 1 | 128 | - |
| Other | 68 | 68 | 14 | 68 | 2 |
| Commercial loans | 4,671 | 4,671 | 815 | 4,648 | 15 |
| Leases | - | - | - | - | - |
| Consumer and other loans | - | - | - | - | - |
| Total with an allowance recorded: | 4,953 | 4,953 | 844 | 4,929 | 20 |
| Totals: | $ 12,352 | $ 12,352 | $ 844 | $ 12,661 | $ 334 |

## NOTE 4.    LOANS (Continued)

### Troubled Debt Restructurings

Included in certain loan categories are impaired loans classified as troubled debt restructurings (TDRs) that totaled $1,683,177 and $4,679,166, respectively, at December 31, 2015 and 2014.  The restructuring of a loan is considered a TDR if both (i) the borrower is experiencing financial difficulties, and (ii) the creditor has granted a concession.

During 2015, the Company did not modify any loans with restructured terms but three loans (one commercial real estate and two commercial loans) totaling $249,205 modified at dates prior to 2015 defaulted on the restructured terms.  During 2014, the Company did not modify any loans with restructured terms but six loans (one 1-4 family first mortgage, two commercial real estate and three commercial loans) totaling $849,865 modified at dates prior to 2014 defaulted on the restructured terms.

## NOTE 5.    FORECLOSED ASSETS

A summary of foreclosed assets are presented as follows:

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2015 | 2014 |
| Balance, beginning of year | $ 4,607,479 | $ 9,110,716 |
| Transfer of loans into foreclosed assets | 1,506,703 | 494,027 |
| Transfer of bank premises into foreclosed assets | - | 327,102 |
| Proceeds from sales of foreclosed assets | (1,940,293) | (3,212,978) |
| Capitalized expenses | 5,621 | - |
| Internally financed sales | (13,500) | (514,541) |
| Net gain on sales of foreclosed assets | 61,732 | 33,299 |
| Write down of foreclosed assets | (344,784) | (1,630,146) |
| Balance, end of year | $ 3,882,958 | $ 4,607,479 |

Foreclosed assets by type is as follows:

|  | December 31, | |
| --- | --- | --- |
|  | 2015 | 2014 |
| Construction and land development properties | $ 1,359,148 | $ 1,615,580 |
| Residential real estate properties | 364,898 | 542,982 |
| Commercial real estate properties | 2,158,912 | 2,448,917 |
|  | $ 3,882,958 | $ 4,607,479 |

Expenses applicable to foreclosed assets include the following:

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2015 | 2014 |
| Net gain on sales of foreclosed assets | $ (61,732) | $ (33,299) |
| Write down of foreclosed assets | 344,784 | 1,630,146 |
| Operating and holding expenses | 113,433 | 230,713 |
| Total expenses | $ 396,485 | $ 1,827,560 |

## NOTE 6.    PREMISES AND EQUIPMENT

Premises and equipment is summarized as follows:

|  | December 31, | |
|---|---|---|
|  | **2015** | 2014 |
| Land and land improvements | $        **857,602** | $        972,943 |
| Buildings | **2,916,289** | 2,905,755 |
| Furniture and equipment | **2,348,723** | 2,229,711 |
|  | **6,122,614** | 6,108,409 |
| Accumulated depreciation | **(3,371,836)** | (3,181,455) |
|  | $      **2,750,778** | $      2,926,954 |

Depreciation expense for the years ended December 31, 2015 and 2014 amounted to $206,631 and $234,279, respectively.

## NOTE 7.    DEPOSITS

The aggregate amount of time deposits in denominations of $250,000 or more at December 31, 2015 and 2014 was $8,757,367 and $10,819,923, respectively.  The Company had $10,333,000 and $12,271,000 in brokered time deposits at December 31, 2015 and 2014, respectively.  The scheduled maturities of time deposits at December 31, 2015 are as follows:

| | |
|---|---|
| 2016 | $    44,987,414 |
| 2017 | 22,213,589 |
| 2018 | 9,058,746 |
| 2019 | 2,699,052 |
| 2020 | 645,124 |
| | $    79,603,925 |

At December 31, 2015 and 2014, overdraft demand and savings deposits reclassified to loans totaled $5,942 and $2,841, respectively.   At December 31, 2015, the Company had a concentration of deposits from one public depositor totaling approximately $7,112,000. The Company is maintaining adequate liquidity sources to meet any withdrawal demands of this depositor.

## NOTE 8.    INCOME TAXES

Income taxes consist of the following:

|  | Years Ended December 31, | |
|---|---|---|
|  | **2015** | 2014 |
| Current | $                **-** | $                - |
| Deferred | **(175,283)** | (844,399) |
| Valuation allowance | **175,283** | 844,399 |
| Income tax expense | $                **-** | $                - |

**NOTE 8.      INCOME TAXES (Continued)**

Income tax differs from the amounts computed by applying the federal statutory income tax rate to loss before income taxes.  A reconciliation of the differences is as follows:

|  | Years Ended December 31, | |
|---|---|---|
|  | **2015** | 2014 |
| Income tax benefit at federal statutory tax rate | **$      (163,064)** | $      (808,621) |
| State income tax benefit | **(19,502)** | (94,606) |
| Taxable life insurance income | **-** | 54,127 |
| Other | **7,283** | 4,701 |
| Valuation allowance | **175,283** | 844,399 |
| Income tax expense | **$              -** | $              - |

Components of deferred tax assets and liabilities included in the consolidated balance sheet are as follows:

|  | December 31, | |
|---|---|---|
|  | **2015** | 2014 |
| Deferred tax assets: | | |
| Allowance for loan losses | **$      808,274** | $      924,826 |
| Net operating loss carryforward | **2,997,982** | 3,006,536 |
| Nonaccrual loans | **784,447** | 572,059 |
| Foreclosed assets | **749,282** | 903,590 |
| Deferred interest and amortization | **576,979** | 435,692 |
| Deferred expenses | **76,580** | - |
| Contributions | **20,040** | 18,815 |
| Depreciation | **20,028** | - |
| Securities available for sale | **21,854** | 63,764 |
|  | **6,055,466** | 5,925,282 |
| Valuation allowance | **(6,026,839)** | (5,851,556) |
|  | **28,627** | 73,726 |
| Deferred tax liabilities: | | |
| Depreciation | **-** | 9,962 |
| Other | **6,773** | - |
|  | **6,773** | 9,962 |
| Net deferred tax assets | **$      21,854** | $      63,764 |

The Company had a net operating loss carryforward for federal income taxes and state financial institution excise taxes (state income taxes) of approximately $7,781,000 and $8,217,000, respectively, as of December 31, 2015.  If unused, the federal net operating loss carryforward will expire beginning in 2031 and the state net operating loss carryforward will expire beginning in 2019.

The federal and state income tax returns of the Company for 2012, 2013, and 2014 are subject to examination, generally for three years after they were filed.

## NOTE 9.    OTHER BORROWINGS

Other borrowings consist of the following:

| | December 31, | |
| --- | --- | --- |
| | **2015** | 2014 |
| Federal Home Loan Bank advances with fixed interest rates ranging from 0.39% to 0.45% (weighted average rate of 0.42% at December 31, 2015), interest payable monthly or quarterly, and principal due at various maturities ranging from January 15, 2016 through February 15, 2016. | **$   10,750,000** | $   12,250,000 |
| Note payable to a commercial bank with variable rate equal to 5.25% (default rate) as of December 31, 2015. | **2,000,000** | 2,000,000 |
| | **$   12,750,000** | $   14,250,000 |

Because the note payable has been called by the lender, all other borrowings are due in 2016.

### FHLB Advances

The Company has pledged approximately $17,420,000 of marketable debt securities, $1,334,000 of commercial real estate loans and $5,515,000 of residential real estate loans resulting in a total lendable collateral value of approximately $21,825,000. The Company may borrow an additional $11.1 million from the FHLB under these arrangements.

### Note Payable

The Company has an outstanding note payable due to a commercial bank. The note bears an indexed interest rate equal to the prime rate as published in the Wall Street Journal less 0.25% (default rate is equal to 2.00% over the index or 5.25% at December 31, 2015). Interest is payable quarterly; principal payments are due in annual installments of $250,000 through July 31, 2020. The Company has pledged all of its stock in SunSouth Bank as collateral for this note. At December 31, 2015 and 2014, the balance outstanding was $2,000,000. The Company has been unable to make principal and interest payments due since July 31, 2013 and the note is currently in default and has been called by the lender. See Note 2 for additional information related to the status of this note.

### Correspondent Lines of Credit

In addition, the Company has available secured federal funds lines of credit with various financial institutions totaling up to $6,300,000. As of December 31, 2015 and 2014, the Company had $100,000 and $0, respectively, amounts outstanding under these arrangements. As of December 31, 2015, the Company has pledged approximately $3,500,000 in marketable debt securities for these lines and could borrow an additional amount of up to approximately $2,867,000 under these lines.

## NOTE 10.     JUNIOR SUBORDINATED DEBT

### SunSouth Bancshares Capital Trust I

The Company formed a wholly-owned grantor trust to issue cumulative trust preferred securities. The grantor trust has invested the proceeds of the trust preferred securities in junior subordinated debentures of the Company. The junior subordinated debentures can be redeemed prior to maturity at the option of the Company on or after July 23, 2009. The sole assets of the guarantor trust are the Junior Subordinated Deferrable Interest Debentures of the Company (the "debentures") held by the grantor trust. The debentures have the same interest rate (LIBOR plus 2.75%, floating) as the trust preferred securities. The Company has the right to defer interest payments on the debentures at any time or from time to time for a period not exceeding 20 consecutive quarters provided that no extension period may extend beyond the stated maturity of the related debentures. During any such extension period, distributions on the trust preferred certificates would also be deferred.

Payment of periodic cash distributions and payment upon liquidation or redemption with respect to the trust preferred securities are guaranteed by the Company to the extent of funds held by the grantor trust (the "Preferred Securities Guarantee"). The Preferred Securities Guarantee, when taken together with the Company's other obligations under the debentures, constitute a full and unconditional guarantee, on a subordinated basis, by the Company of payments due on the trust preferred securities.

The trust preferred securities and the related debentures were issued on June 25, 2004. Distributions on the trust preferred securities are paid quarterly on January 23, April 23, July 23 and October 23 of each year, beginning October 23, 2004. Interest on the debentures is paid on the corresponding dates. The aggregate principal amount of Trust I debentures outstanding at December 31, 2015 and 2014, was $3,093,000. Certain issue costs were being deferred over the life of the debentures and recorded in other assets in the accompanying consolidated balance sheets. However, during 2015, all remaining unamortized issue costs were expensed because the debentures are in default. As a result, the unamortized issue costs at December 31, 2015 and 2014, totaled $0 and $48,750, respectively.

### SunSouth Bancshares Capital Trust II

During 2006, the Company formed a second wholly-owned grantor trust to issue cumulative trust preferred securities. The grantor trust has invested the proceeds of the trust preferred securities in junior subordinated debentures of the Company. The junior subordinated debentures can be redeemed prior to maturity at the option of the Company on or after July 23, 2011. The sole assets of the guarantor trust are the Junior Subordinated Deferrable Interest Debentures of the Company (the "debentures") held by the grantor trust. The debentures have the same interest rate (LIBOR plus 1.58%, floating) as the trust preferred securities. The Company has the right to defer interest payments on the debentures at any time or from time to time for a period not exceeding 20 consecutive quarters provided that no extension period may extend beyond the stated maturity of the related debentures. During any such extension period, distributions on the trust preferred certificates would also be deferred.

Payment of periodic cash distributions and payment upon liquidation or redemption with respect to the trust preferred securities are guaranteed by the Company to the extent of funds held by the grantor trust (the "Preferred Securities Guarantee"). The Preferred Securities Guarantee, when taken together with the Company's other obligations under the debentures, constitutes a full and unconditional guarantee, on a subordinated basis, by the Company of payments due on the trust preferred securities.

The trust preferred securities and the related debentures were issued on June 23, 2006. Distributions on the trust preferred securities are paid quarterly on March 23, June 23, September 23, and December 23 of each year, beginning September 23, 2006. Interest on the Debentures is paid on the corresponding dates. The aggregate principal amount of Trust II debentures outstanding at December 31, 2015 and 2014 was $5,155,000. There were no issue costs associated with the issuance of the debentures.

## NOTE 10.  JUNIOR SUBORDINATED DEBT (Continued)

### Interest Deferrals

The Company elected to defer payments of interest on its two trust preferred securities and began an Extension Period for Trust I and Trust II in 2010.  The Company elected to begin the Extension Period to enhance its ability to serve as a source of strength for its banking subsidiary, SunSouth Bank.  The Company has expensed the interest due during the deferral period and subsequent default period in the consolidated statement of operations.  As of December 31, 2015 and 2014, $1,230,298 and $1,007,727, respectively, of interest has been accrued in the accompanying consolidated balance sheets.  The interest deferral extension period expired in 2015 for Trust I and Trust II at which time all deferred interest was due.  The Company has been unable to service the interest payments due on the debentures since the deferral period ended and the debentures outstanding under Trust I and Trust II are in default.  See Note 2 for additional information related to the status of these debentures.

## NOTE 11.  EMPLOYEE BENEFIT PLANS

### Profit Sharing Plan

The Company sponsors a 401(k) profit sharing plan covering substantially all employees subject to certain age and minimum service requirements.  There were no contributions to the plan during 2015 or 2014.

### Stock Bonus Plan

The Company sponsors a stock bonus plan, which also allows the granting of stock options, with 3,000 shares reserved for issuance under the Plan.  The Plan is administered by a Board appointed committee which determines the eligible participants, the number of shares to grant based upon the fair value of the underlying stock and all other terms of the awards.  There were no shares or options awarded under the plan for the years ended December 31, 2015 and 2014 and there are no outstanding stock options.  As of December 31, 2015, 1,203 shares are available to be granted.

## NOTE 12.  COMMITMENTS AND CONTINGENCIES

### Loan Commitments

The Company is a party to financial instruments with off-balance sheet risk in the normal course of business to meet the financing needs of its customers.  These financial instruments include commitments to extend credit and standby letters of credit.  The commitments involve, to varying degrees, elements of credit risk and interest rate risk in excess of the amount recognized in the balance sheets.  The majority of all commitments to extend credit and standby letters of credit are variable rate instruments.

The Company's exposure to credit loss in the event of nonperformance by the other party to the financial instrument for commitments to extend credit and standby letters of credit is represented by the contractual amount of those instruments.  The Company uses the same credit policies in making commitments as it does for on-balance sheet instruments.  A summary of the Company's commitments is as follows:

|  | December 31, | |
|---|---|---|
|  | 2015 | 2014 |
| Commitments to extend credit | $ 5,652,914 | $ 9,676,670 |
| Standby letters of credit | 54,175 | 74,175 |
|  | $ 5,707,089 | $ 9,750,845 |

## NOTE 12.      COMMITMENTS AND CONTINGENCIES (Continued)

### Loan Commitments (Continued)

Commitments to extend credit are agreements to lend to a customer as long as there is no violation of any condition established in the contract. Commitments generally have fixed expiration dates or other termination clauses and may require payment of a fee. Since many of the commitments are expected to expire without being drawn upon, the total commitment amounts do not necessarily represent future cash requirements. The amount of collateral obtained, if deemed necessary by the Company upon extension of credit, is based on management's credit evaluation of the party. Collateral held varies, but may include accounts receivable, inventory, property and equipment, residential real estate and income-producing commercial properties.

Standby letters of credit are conditional commitments issued by the Company to guarantee the performance of a customer to a third party. Those letters of credit are primarily issued to support public and private borrowing arrangements. The credit risk involved in issuing letters of credit is essentially the same as that involved in extending loans to customers. Collateral held varies and is required in instances which the Company deems necessary.

At December 31, 2015 and 2014, the carrying amount of liabilities related to the Company's obligation to perform under letters of credit was insignificant. The Company has not been required to perform on any letters of credit, and the Company has not incurred any losses on letters of credit for the years ended December 31, 2015 and 2014.

### Contingencies

The nature of the Company's business ordinarily results in a certain amount of claims, litigation, and legal and administrative cases and proceedings, all of which are considered incidental to the normal conduct of business particularly that of a financial institution. When the Company determines it has meritorious defenses to the claims asserted, it vigorously defends itself.

The Company assesses its liabilities and contingencies in connection with outstanding legal proceedings utilizing the latest information available. For matters where it is more likely than not the Company will incur a loss and the amount can be reasonably estimated, an accrual is established for the estimated loss. Once established, the accrual is adjusted as appropriate to reflect any relevant developments.

The Bank is currently a defendant in an ongoing lawsuit filed by the guarantors of an outstanding loan. The suit was brought to trial and a verdict was reached in the first quarter of 2016 in favor of the guarantors that released them from their repayment obligation and released certain cash collateral pledged by the guarantors that had substantially secured the loan. However, management will appeal the verdict and feels it has a strong case to overturn the verdict due to certain procedural deficiencies and shortcomings of the trial including the claims and findings of the jury. As of March 31, 2016, management evaluated the Company's exposure to the lawsuit and its prospects for a successful appeal and accrued an appropriate amount based upon this evaluation. Note 18, Subsequent Event, provides more details related to this matter.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 13.    CONCENTRATIONS OF CREDIT

The Company originates primarily commercial, residential and consumer loans to customers in Houston County and surrounding counties.  The ability of the majority of the Company's customers to honor their contractual loan obligations is dependent on the economy in these areas.

Fifty-three percent of the Company's loan portfolio is concentrated in loans secured by real estate, of which a substantial portion is secured by real estate in the Company's primary market area.  Accordingly, the ultimate collectability of the loan portfolio and recovery of the carrying amount of foreclosed assets is susceptible to changes in real estate conditions in the Company's primary market area.  The other concentrations of credit by type of loan are set forth in Note 4.

The Company's secured legal lending limit to any single borrower or group of related borrowers is 20% of total capital, as defined, or approximately $2,163,000.  The Company's unsecured legal lending limit to any single borrower or group of related borrowers is 10% of total capital, as defined, or approximately $1,081,000.

## NOTE 14.    REGULATORY MATTERS

The Bank is subject to certain restrictions on the amount of dividends that may be declared without prior regulatory approval.  At December 31, 2015, no amounts were available for dividend declaration without regulatory approval.

The Bank is subject to various regulatory capital requirements administered by the federal banking agencies.  Failure to meet minimum capital requirements can initiate certain mandatory, and possibly additional discretionary actions by regulators that, if undertaken, could have a direct material effect on the Bank's financial statements.  Under capital adequacy guidelines and the regulatory framework for prompt corrective action, the Bank must meet specific capital guidelines that involve quantitative measures of its assets, liabilities, and certain off-balance sheet items as calculated under regulatory accounting practices.  Capital amounts and classification are also subject to qualitative judgments by the regulators about components, risk weightings, and other factors.

In December 2010, the Basel Committee on Bank Supervision (BCBS) finalized a set of international guidelines for determining regulatory capital known as "Basel III."  In July 2013, the federal bank regulators approved final regulatory capital rules implementing BCBS's December 2010 capital framework as well as certain provisions of the Dodd-Frank Act. The new capital rules under Basel III substantially revised the risk-based capital requirements applicable to banking institutions as well as the components of capital, general risk-weighting of assets approach and addressed other issues affecting regulatory capital ratios.  Basel III, among other things, introduced a new narrowly defined capital measure called "Common Equity Tier 1" (CET1).  Basel III became effective for the Bank on January 1, 2015 (subject to a phase-in period for various components).

Basel III also introduced a capital conservation buffer designed to absorb losses during periods of economic stress. When fully phased-in on January 1, 2019, the capital conservation buffer of 2.5% will be added on top of each of the minimum risk-based capital ratios in effect for 2015.  The implementation of the capital conservation buffer will begin on January 1, 2016 at the 0.625% level and will be phased-in over a three-year period (increasing by that amount on each subsequent January 1, until it reaches 2.5% on January 1, 2019) as presented in the following chart.  Banking institutions with a ratio of CET1 to risk-weighted assets above the minimum but below the capital conservation buffer will face constraints on dividends, equity repurchases and compensation based on the amount of the shortfall.

**NOTE 14.     REGULATORY MATTERS (Continued)**

Under Basel III, the minimum capital ratios, including the phase-in of the capital conservation buffer, for capital adequacy purposes are as follows:

| Year | Total Capital to Risk-Weighted Assets | Tier 1 Capital to Risk-Weighted Assets | CET1 Capital to Risk-Weighted Assets | Tier 1 Capital to Average Total Assets |
|------|---------|---------|---------|---------|
| 2015 | 8.000 % | 6.000 % | 4.500 % | 4.000 % |
| 2016 | 8.625 % | 6.625 % | 5.125 % | 4.000 % |
| 2017 | 9.250 % | 7.250 % | 5.750 % | 4.000 % |
| 2018 | 9.875 % | 7.875 % | 6.375 % | 4.000 % |
| 2019 | 10.500 % | 8.500 % | 7.000 % | 4.000 % |

In addition, Basel III changed the minimum regulatory capital ratios to be considered well capitalized under the regulatory framework for prompt corrective action. These new requirements are presented in the following regulatory capital table and were fully effective on January 1, 2015.

As discussed above, quantitative measures established by regulation to ensure capital adequacy require the Bank to maintain minimum amounts and ratios of Total, Tier 1 and CET1 capital to risk-weighted assets, as defined, and of Tier 1 capital to average total assets (leverage ratio), as defined. As of December 31, 2015, the Bank was operating under a regulatory agreement described more fully in Note 2 and was not in compliance with the regulatory capital requirements of that agreement.

As of December 31, 2015, the Bank was classified as "adequately capitalized" under the regulatory framework for prompt corrective action, which is one tier less than "well capitalized." To be categorized as "well capitalized", the Bank must maintain minimum Total, Tier 1 and CET1 risk-based capital ratios and Tier 1 leverage capital ratios as set forth in the following table and must not be subject to any written agreement, order, capital directive, or prompt corrective action directive issued by the federal banking regulators.

The Bank's actual capital amounts and ratios are presented in the following table.

| | Actual Amount | Actual Ratio | For Capital Adequacy Purposes Amount | For Capital Adequacy Purposes Ratio | To Be Well Capitalized Under Prompt Corrective Action Provisions Amount | To Be Well Capitalized Under Prompt Corrective Action Provisions Ratio |
|---|---|---|---|---|---|---|
| | | | *(Dollars in Thousands)* | | | |
| **As of December 31, 2015 (<u>under Basel III</u>):** | | | | | | |
| **Total Capital to Risk-Weighted Assets** | $ 9,399 | 11.56% | $ 6,503 | 8.00% | $ 8,129 | 10.00% |
| **Tier 1 Capital to Risk-Weighted Assets** | $ 8,365 | 10.29% | $ 4,878 | 6.00% | $ 6,503 | 8.00% |
| **CET1 Capital to Risk-Weighted Assets** | $ 8,365 | 10.29% | $ 3,658 | 4.50% | $ 5,284 | 6.50% |
| **Tier 1 Capital to Average Total Assets** | $ 8,365 | 5.42% | $ 6,178 | 4.00% | $ 7,723 | 5.00% |
| | | | | | | |
| As of December 31, 2014 (<u>under Basel I</u>): | | | | | | |
| Total Capital to Risk Weighted Assets | $ 9,562 | 8.87% | $ 8,626 | 8.00% | $ 10,782 | 10.00% |
| Tier I Capital to Risk Weighted Assets | $ 8,197 | 7.60% | $ 4,313 | 4.00% | $ 6,469 | 6.00% |
| Tier I Capital to Average Assets | $ 8,197 | 5.45% | $ 6,020 | 4.00% | $ 7,525 | 5.00% |

## NOTE 15.　RELATED PARTY TRANSACTIONS

In the ordinary course of business, the Company has and expects to continue to have loan transactions with its related parties.  In the opinion of management, these transactions were on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with other customers, and in management's opinion, do not involve more than the normal risk of collectibility or present any other unfavorable features to the Company.  Changes in related party loans for the years ended December 31, 2015 and 2014 are as follows:

|  | Years Ended December 31, | |
|---|---|---|
|  | 2015 | 2014 |
| Balance, beginning of year | $ 907,459 | $ 910,973 |
| Advances | 695,705 | 1,283,495 |
| Repayments | (609,183) | (917,362) |
| Changes in related parties | (242,560) | (369,647) |
| Balance, end of year | $ 751,421 | $ 907,459 |

Deposits from related parties held by the Company at December 31, 2015 and 2014 were approximately $819,000 and $338,000, respectively.

The Company, through common ownership and common board of directors, maintained an affiliate relationship with Citizens Southern Bancshares, Inc. and its subsidiary, Citizens State Bank in Vernon, Alabama.  The Company sold management services under a management services agreement to its affiliate which totaled $16,500 and $133,000 for the years ended December 31, 2015 and 2014, respectively.  In the opinion of management, these goods and services were sold on terms commensurate with those that would be sold to unrelated entities.  As of January 31, 2015, the management services agreement had been terminated between the Company and its affiliate.

## NOTE 16.　FAIR VALUE OF ASSETS AND LIABILITIES

### Determination of Fair Value

The Company uses fair value measurements to record fair value adjustments to certain assets and liabilities and to determine fair value disclosures.  In accordance with the *Fair Value Measurements and Disclosures* topic (FASB ASC 820), the fair value of a financial instrument is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.  Fair value is best determined based upon quoted market prices.  However, in many instances, there are no quoted market prices for the Company's various financial instruments.  In cases where quoted market prices are not available, fair values are based on estimates using present value or other valuation techniques.  Those techniques are significantly affected by the assumptions used, including the discount rate and estimates of future cash flows.  Accordingly, the fair value estimates may not be realized in an immediate settlement of the instrument.

The fair value guidance provides a consistent definition of fair value, which focuses on exit price in an orderly transaction (that is, not a forced liquidation or distressed sale) between market participants at the measurement date under current market conditions.  If there has been a significant decrease in the volume and level of activity for the asset or liability, a change in valuation technique or the use of multiple valuation techniques may be appropriate.  In such instances, determining the price at which willing market participants would transact at the measurement date under current market conditions depends on the facts and circumstances and requires the use of significant judgment.  The fair value is a reasonable point within the range that is most representative of fair value under current market conditions.

## NOTE 16.  FAIR VALUE OF ASSETS AND LIABILITIES (Continued)

### Fair Value Hierarchy

In accordance with this guidance, the Company groups its financial assets and financial liabilities generally measured at fair value in three levels, based on the markets in which the assets and liabilities are traded and the reliability of the assumptions used to determine fair value.

**Level 1** - Valuation is based on quoted prices in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date. Level 1 assets and liabilities generally include debt and equity securities that are traded in an active exchange market. Valuations are obtained from readily available pricing sources for market transactions involving identical assets or liabilities.

**Level 2** - Valuation is based on inputs other than quoted prices included within level 1 that are observable for the asset or liability, either directly or indirectly. The valuation may be based on quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the asset or liability.

**Level 3** - Valuation is based on unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities. Level 3 assets and liabilities include financial instruments whose value is determined using pricing models, discounted cash flow methodologies, or similar techniques, as well as instruments for which determination of fair value requires significant management judgment or estimation.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

The following methods and assumptions were used by the Company in estimating the fair value of its financial instruments:

**Cash and Cash Equivalents**: Cash and cash equivalents include cash, due from banks and interest-bearing deposits in banks and federal funds sold and the carrying amount of these instruments approximate fair value.

**Securities**: Where quoted prices are available in an active market, securities are classified within level 1 of the valuation hierarchy. Level 1 securities include highly liquid government bonds and exchange-traded equities. If quoted market prices are not available, fair values are estimated using pricing models and discounted cash flows that consider standard input factors such as observable market data, benchmark yields, interest rate volatilities, broker/dealer quotes, and credit spreads. Examples of such instruments, which would generally be classified within level 2 of the valuation hierarchy, include U.S. Government agency securities and state and municipal securities. Mortgage-backed securities are included in level 2 if observable inputs are available. In other cases, such as trust preferred securities, where there is limited or no market activity or less transparency around inputs to the valuation, those securities are classified in level 3.

**Restricted Equity Securities**: The carrying amount of restricted equity securities with no readily determinable fair value approximates fair value based on the redemption provisions of the issuers which is cost.

**Loans**: The carrying amount of variable-rate loans that reprice frequently and have no significant change in credit risk approximates fair value. The fair value of fixed-rate loans is estimated based on discounted contractual cash flows, using interest rates currently being offered for loans with similar terms to borrowers with similar credit quality. The fair value of impaired loans is estimated based on discounted contractual cash flows or underlying collateral values, where applicable.

## NOTE 16.    FAIR VALUE OF ASSETS AND LIABILITIES (Continued)

### Fair Value Hierarchy (Continued)

**Deposits**:  The carrying amount of demand deposits, savings deposits, and variable-rate certificates of deposit approximates fair value.  The fair value of fixed-rate certificates of deposit is estimated based on discounted contractual cash flows using interest rates currently being offered for certificates of similar maturities.

**Federal Funds Purchased**:  The carrying amount of federal funds purchased approximates fair value due to the short-term nature of this agreement.

**Federal Home Loan Bank Advances**:  The carrying value of fixed-rate advances approximates fair value due to the short-term nature of the instruments.

**Note Payable**:  The carrying amount of the note payable approximates fair value.

**Junior Subordinated Debt**:  The carrying amount of the variable rate junior subordinated debt approximates fair value.  However, the carrying amount does not contemplate any settlement of the debt at amounts less than par.

**Accrued Interest**:  The carrying amount of accrued interest approximates its fair value.

**Off-Balance Sheet Instruments**:  The carrying amount of the off-balance sheet financial instruments is based on fees charged to enter into such agreements.

### Assets Measured at Fair Value on a Recurring Basis

Following is a description of the valuation methodologies used for instruments measured at fair value on a recurring basis and recognized in the accompanying balance sheets, as well as the general classification of such instruments pursuant to the valuation hierarchy.

The following table presents financial assets measured at fair value on a recurring basis:

|  | Assets Measured at Fair Value | Fair Value Measurements at December 31, 2015 Using | | |
|---|---|---|---|---|
|  |  | Quoted Prices In Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| **Available for sale securities** | $   **56,633,517** | $        **-** | $   **56,133,517** | $   **500,000** |

|  | Assets Measured at Fair Value | Fair Value Measurements at December 31, 2014 Using | | |
|---|---|---|---|---|
|  |  | Quoted Prices In Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Available for sale securities | $   35,569,882 | $        - | $   35,069,882 | $   500,000 |

**NOTE 16.     FAIR VALUE OF ASSETS AND LIABILITIES (Continued)**

### Assets Measured at Fair Value on a Recurring Basis (Continued)

The changes in Level 3 assets, which consist of trust preferred securities, measured at fair value on a recurring basis are summarized as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2015** | | 2014 |
| Balance, beginning of year | **$     500,000** | $ | 500,000 |
| Total losses included in: | | | |
| Net loss | **-** | | - |
| Balance, end of year | **$     500,000** | $ | 500,000 |

### Assets Measured at Fair Value on a Nonrecurring Basis

Following is a description of the valuation methodologies used for instruments measured at fair value on a nonrecurring basis and recognized in the accompanying consolidated balance sheets, as well as the general classification of such instruments pursuant to the valuation hierarchy.

*Impaired Loans*

Loans considered impaired under ASC 310-10-35, *Receivables*, are loans for which, based on current information and events, it is probable that the Company will be unable to collect all principal and interest payments due in accordance with the contractual terms of the loan agreement. Impaired loans can be measured based on the present value of expected payments using the loan's original effective rate as the discount rate, the loan's observable market price, or the fair value of the collateral less selling costs if the loan is collateral dependent.

The fair value of impaired loans were primarily measured based on the value of the collateral securing these loans. Impaired loans are classified within Level 3 of the fair value hierarchy. Collateral may be real estate and/or business assets including equipment, inventory, and/or accounts receivable. The Company generally determines the value of real estate collateral based on independent appraisals performed by qualified licensed appraisers. These appraisals may utilize a single valuation approach or a combination of approaches including comparable sales and the income approach. Appraised values are discounted for costs to sell and may be discounted further based on management's historical knowledge, changes in market conditions from the date of the most recent appraisal, and/or management's expertise and knowledge of the customer and the customer's business. Such discounts by management are subjective and are typically significant unobservable inputs for determining fair value. Impaired loans are reviewed and evaluated on at least a quarterly basis for additional impairment and adjusted accordingly, based on the same factors discussed above.

Impaired loans, which are generally measured for impairment using the fair value of collateral, had a carrying amount of $9,520,968 and $12,351,996, with a specific valuation allowance of $1,276,408 and $844,122 at December 31, 2015 and 2014, respectively.  Of the $9,520,968 and $12,351,996 impaired loan portfolio at December 31, 2015 and 2014, respectively, $6,987,046 and $5,255,120 was carried at fair value as a result of charge-offs and specific valuation allowances.  The specific valuation allowances totaled $1,276,408 and $844,122 as of December 31, 2015 and 2014, respectively, resulting in a net carrying value of $5,710,637 and $4,410,998.  The remaining $2,533,922 and $7,096,876 at December 31, 2015 and 2014, respectively, was carried at cost, as the fair value of the collateral on these loans exceeded the book value for each individual credit.  Charge-offs and changes in specific valuation allowances on impaired loans carried at fair value resulted in additional allocated provision for loan losses of $0 and $500,000, respectively, for the years ended December 31, 2015 and 2014.  Due to the subjective nature, incorporating both observable and unobservable inputs factored into the appraisal process, including various assumptions and expectations on cash flows, the Company's impaired loans that are carried at fair value are classified within Level 3 of the valuation hierarchy.

**NOTE 16.    FAIR VALUE OF ASSETS AND LIABILITIES (Continued)**

### Assets Measured at Fair Value on a Nonrecurring Basis (Continued)

*Foreclosed Assets*

Foreclosed assets, consisting of properties obtained through foreclosure or in satisfaction of loans, are initially recorded at the lower of the loan's carrying amount or the fair value less estimated costs to sell upon transfer of the loans to foreclosed assets. Subsequently, foreclosed assets are carried at the lower of carrying value or fair value less costs to sell. Fair values are generally based on third party appraisals of the property and are classified within Level 3 of the fair value hierarchy. The appraisals are sometimes further discounted based on management's historical knowledge, and/or changes in market conditions from the date of the most recent appraisal, and/or management's expertise and knowledge of the customer and the customer's business. Such discounts are typically significant unobservable inputs for determining fair value. In cases where the carrying amount exceeds the fair value, less estimated costs to sell, a loss is recognized in noninterest expense.

The following tables present the financial instruments carried on the consolidated balance sheets by caption and by level in the fair value hierarchy at December 31, 2015 and 2014, for which a nonrecurring change in fair value has been recorded:

| | | Carrying Value at December 31, 2015 | | |
|---|---|---|---|---|
| | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| **Impaired loans** | $ 5,710,637 | $ - | $ - | $ 5,710,637 |
| **Foreclosed assets** | 1,543,869 | - | - | 1,543,869 |
| | | Carrying Value at December 31, 2014 | | |
| | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Impaired loans | $ 4,410,998 | $ - | $ - | $ 4,410,998 |
| Foreclosed assets | 4,064,770 | - | - | 4,064,770 |

### Quantitative Disclosures for Level 3 Fair Value Measurements

The following table presents information related to Level 3 recurring fair value measurements at December 31, 2015 and 2014.

| Description | Fair Value at December 31, 2015 | Valuation Techniques | Unobservable Inputs |
|---|---|---|---|
| **Trust preferred security** | $ 500,000 | **Comparison to similar instruments with similar risks** | **1 Limited market activity 2 Security carried at cost** |
| Description | Fair Value at December 31, 2014 | Valuation Techniques | Unobservable Inputs |
| Trust preferred security | $ 500,000 | Comparison to similar instruments with similar risks | 1 Limited market activity 2 Security carried at cost |

## NOTE 16.    FAIR VALUE OF ASSETS AND LIABILITIES (Continued)

### Quantitative Disclosures for Level 3 Fair Value Measurements (Continued)

For Level 3 assets measured at fair value on a non-recurring basis as of December 31, 2015, the significant unobservable inputs used in the fair value measurements are presented below.

| | Carrying Amount | Valuation Technique | Significant Unobservable Input | Weighted Average of Input |
|---|---|---|---|---|
| **Nonrecurring:** | | | | |
| Impaired loans | $ 5,710,637 | Appraisal | Appraisal discounts (%) | 5-10 % |
| Foreclosed assets | 1,543,869 | Appraisal | Appraisal discounts (%) | 10-20 % |

For Level 3 assets measured at fair value on a non-recurring basis as of December 31, 2014, the significant unobservable inputs used in the fair value measurements are presented below.

| | Carrying Amount | Valuation Technique | Significant Unobservable Input | Weighted Average of Input |
|---|---|---|---|---|
| Nonrecurring: | | | | |
| Impaired loans | $ 4,410,998 | Appraisal | Appraisal discounts (%) | 5-10 % |
| Foreclosed assets | 4,064,770 | Appraisal | Appraisal discounts (%) | 10-20 % |

### Fair Value of Financial Instruments

The carrying amount and estimated fair value of the Company's financial instruments are as follows:

| | December 31, 2015 | | December 31, 2014 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| **Financial assets:** | *(Dollars in Thousands)* | | | |
| Cash and cash equivalents | $ 540 | $ 540 | $ 3,712 | $ 3,712 |
| Securities available for sale | 56,634 | 56,634 | 35,570 | 35,570 |
| Securities held to maturity | 57 | 57 | - | - |
| Restricted equity securities | 1,094 | 1,094 | 1,199 | 1,199 |
| Loans | 85,131 | 87,055 | 105,141 | 105,848 |
| Accrued interest receivable | 763 | 763 | 643 | 643 |
| | | | | |
| **Financial liabilities:** | | | | |
| Deposits | 131,091 | 131,212 | 133,124 | 133,523 |
| Federal funds purchased | 100 | 100 | - | - |
| Federal Home Loan Bank advances | 10,750 | 10,750 | 12,250 | 12,250 |
| Note payable | 2,000 | 2,000 | 2,000 | 2,000 |
| Junior subordinated debt | 8,248 | 8,248 | 8,248 | 8,248 |
| Accrued interest payable | 1,649 | 1,649 | 1,341 | 1,341 |

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 17.  PARENT COMPANY FINANCIAL INFORMATION

The following information presents the condensed balance sheets of SunSouth Bancshares, Inc. as of December 31, 2015 and 2014, and the condensed statements of operations and cash flows for the years then ended.

### CONDENSED BALANCE SHEETS

|  | 2015 | 2014 |
|---|---|---|
| **Assets** | | |
| Cash | $ 805 | $ 8,026 |
| Investment in bank subsidiary | 8,328,479 | 8,157,692 |
| Other investments | 248,000 | 248,000 |
| Other assets | - | 48,750 |
| **Total assets** | $ 8,577,284 | $ 8,462,468 |
| **Liabilities and stockholders' deficit** | | |
| Junior subordinated debt | $ 8,248,000 | $ 8,248,000 |
| Other borrowings | 2,000,000 | 2,000,000 |
| Accrued interest payable | 1,474,765 | 1,152,017 |
| Accrued expenses | 200,000 | - |
| Stockholders' deficit | (3,345,481) | (2,937,549) |
| **Total liabilities and stockholders' deficit** | $ 8,577,284 | $ 8,462,468 |

### CONDENSED STATEMENTS OF OPERATIONS

|  | 2015 | 2014 |
|---|---|---|
| **Expense** | | |
| Interest | $ 371,492 | $ 312,453 |
| Other | 207,227 | 1,000 |
|  | 578,719 | 313,453 |
| Loss before income (loss) of bank subsidiary | (578,719) | (313,453) |
| **Income (loss) of bank subsidiary** | 99,120 | (2,064,849) |
| Loss before income tax expense | (479,599) | (2,378,302) |
| **Income tax benefit** | - | - |
| **Net loss** | $ (479,599) | $ (2,378,302) |

## NOTE 17. PARENT COMPANY FINANCIAL INFORMATION (Continued)

### CONDENSED STATEMENTS OF CASH FLOWS

|  | 2015 | 2014 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Net loss | $ **(479,599)** | $ (2,378,302) |
| Adjustments to reconcile net loss to net | | |
| cash used in operating activities: | | |
| (Earnings) losses of bank subsidiary | **(99,120)** | 2,064,849 |
| Increase in accrued interest payable | **322,748** | 309,953 |
| Increase in accrued expenses | **200,000** | - |
| Amortization of deferred debt issue costs | **48,750** | 2,500 |
| Net cash used in operating activities | **(7,221)** | (1,000) |
| **FINANCING ACTIVITIES** | | |
| Proceeds from purchase of common stock | **-** | 200 |
| Net cash provided by financing activities | **-** | 200 |
| Net decrease in cash | **(7,221)** | (800) |
| Cash at beginning of year | **8,026** | 8,826 |
| Cash at end of year | $ **805** | $ 8,026 |

## NOTE 18. SUBSEQUENT EVENT

Effective as of March 31, 2016, the Bank further impaired a $3.8 million nonaccrual commercial loan due to certain ongoing legal developments with the credit more fully described in Note 12, Commitments and Contingencies. As of March 31, 2016, the Bank charged-off against the allowance for loan losses approximately $483,000 of specific reserves on the credit and then recorded an additional specific reserve on the credit due to the ongoing legal matters in the amount of $1.4 million that resulted in a provision for loan loss of $875,000 for the first quarter of 2016. As a result of this charge to operations, the Bank incurred a net loss for the first quarter of 2016 of approximately $843,000 (unaudited) which resulted in the Bank's Tier I leverage ratio decreasing to 4.94% (unaudited) as of March 31, 2016.

## SunSouth Bancshares, Inc
## Balance Sheet
### As of December 31, 2016

|  | Accrual Basis |
|---|---|
|  | **Dec 31, 16** |
| **ASSETS** |  |
| **Current Assets** |  |
| **Checking/Savings** |  |
| **SunSouth Bank Checking** | 810.50 |
| **Total Checking/Savings** | 810.50 |
|  |  |
| **Other Current Assets** |  |
| Deferred Tax Asset | 709,264.00 |
| Reserve for Deferred Tax Asset | -709,264.00 |
| **Total Other Current Assets** | 0.00 |
| **Total Current Assets** | 810.50 |
|  |  |
| **Other Assets** |  |
| Inv in SS Bshares Cap Trust I | 93,000.00 |
| Inv in SS Bshares Cap Trust II | 155,000.00 |
| Investment in SunSouth Bank | 5,833,653.56 |
| **Total Other Assets** | 6,081,653.56 |
|  |  |
| **TOTAL ASSETS** | **6,082,464.06** |
|  |  |
| **LIABILITIES & EQUITY** |  |
| **Liabilities** |  |
| **Current Liabilities** |  |
| **Other Current Liabilities** |  |
| Accrued Interest Payable | 1,857,434.30 |
| Accrued Legal Fees Payable | 200,000.00 |
| **Total Other Current Liabilities** | 2,057,434.30 |
| **Total Current Liabilities** | 2,057,434.30 |
|  |  |
| **Long Term Liabilities** |  |
| ABB Loan | 2,000,000.00 |
| Jr Subordinated Debentures | 3,093,000.00 |
| Jr Subordinated Debentures II | 5,155,000.00 |
| **Total Long Term Liabilities** | 10,248,000.00 |
|  |  |
| **Total Liabilities** | 12,305,434.30 |
|  |  |
| **Equity** |  |
| Common Stock | 23,895.00 |
| Retained Earnings | -16,053,955.63 |
| Surplus | 12,721,958.98 |
| Unrealized Gain(Loss) AFS Secur | -103,397.25 |
| Net Income | -2,811,471.34 |
| **Total Equity** | -6,222,970.24 |
|  |  |
| **TOTAL LIABILITIES & EQUITY** | **6,082,464.06** |

| 12/31/2016 | 9/30/2016 |
|---|---|
| **Book Value** | **Book Value** |
| **(1,301.88)** | **(1,117.00)** |

# SunSouth Bancshares, Inc
# Profit & Loss
### January through December 2016

|  | Accrual Basis |
|---|---|
|  | **Jan - Dec 16** |
| **Ordinary Income/Expense** |  |
| **Income** |  |
| **Equity Income(Loss) - SSB** | -2,428,796.52 |
| **Total Income** | -2,428,796.52 |
|  |  |
| **Expense** |  |
| **Interest Exp - ABB Loan** | 122,721.94 |
| **Interest Exp - Jr. Sub Debt** | 126,730.49 |
| **Interest Exp - Jr. Sub Debt II** | 133,222.39 |
| **Total Expense** | 382,674.82 |
|  |  |
| **Net Ordinary Income** | -2,811,471.34 |
|  |  |
| **Net Income** | **-2,811,471.34** |

| | December 2016 Actual | December Current Budget | Variance | November 2016 Actual | Variance | December 2015 Actual | Variance | Year To Date December 2016 Average | Year To Date December 2015 Average |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Real Estate Loans | 46,485,302 | 51,290,000 | (4,804,698) | 47,437,593 | (952,291) | 47,308,104 | (822,802) | 47,709,459 | 53,592,342 |
| Commercial Loans | 41,814,606 | 24,045,000 | 17,769,606 | 39,096,919 | 2,717,687 | 22,710,364 | 19,104,242 | 32,354,230 | 22,069,103 |
| Individual Loans | 532,102 | 1,416,000 | (883,898) | 544,670 | (12,568) | 1,051,296 | (519,194) | 769,334 | 1,245,889 |
| Agricultural Loans | 246,683 | 405,000 | (158,317) | 250,388 | (3,105) | 388,619 | (141,936) | 345,478 | 439,590 |
| Other Loans & Leases | 6,894,581 | 7,172,000 | (277,419) | 7,445,804 | (551,223) | 16,120,656 | (9,226,075) | 11,076,704 | 20,787,828 |
| Gross Loans and Leases | 95,973,274 | 84,328,000 | 11,645,274 | 94,775,374 | 1,197,900 | 87,579,039 | 8,394,235 | 92,257,205 | 98,134,752 |
| Less: Unearned Income | | | | | | | | 0 | 0 |
| Ln&Ls Allowance & Allocated Trsf Risk | 4,002,143 | 2,439,000 | 1,563,143 | 3,980,225 | 21,918 | 2,448,371 | 1,553,772 | 3,019,310 | 2,692,005 |
| Net Loans and Leases | 91,971,131 | 81,889,000 | 10,082,131 | 90,795,149 | 1,175,982 | 85,130,669 | 6,840,462 | 89,237,895 | 95,442,747 |
| U.S. Treasury and Agency Securities | 40,265,185 | 48,741,000 | (8,475,815) | 39,242,201 | 1,022,984 | 46,967,859 | (6,702,674) | 40,712,506 | 37,440,543 |
| Municipal Securities | 1,587,967 | 1,631,000 | (43,033) | 1,592,273 | (4,306) | 1,615,891 | (27,924) | 1,620,318 | 1,968,326 |
| Foreign Debt Securities | | | | | | | | 0 | 0 |
| All Other Securities | 6,761,654 | 9,349,000 | (2,587,346) | 6,878,311 | (116,657) | 8,952,422 | (2,190,768) | 7,960,352 | 8,393,083 |
| Interest-bearing Bank Balances | 63,106 | 25,000 | 38,106 | 28,036 | 35,070 | 45,369 | 17,737 | 143,460 | 217,595 |
| Federal Funds Sold and Repos | | | | | | | | 0 | 0 |
| Trading Account Assets | | | | | | | | 0 | 0 |
| Total Investments | 48,677,912 | 59,746,000 | (11,068,088) | 47,740,822 | 937,090 | 57,581,542 | (8,903,630) | 50,436,635 | 48,019,548 |
| Total Earning Assets | 140,649,044 | 141,635,000 | (985,956) | 138,535,971 | 2,113,073 | 142,712,211 | (2,063,167) | 139,674,530 | 143,462,295 |
| | | | | | | | | | |
| Nonint-bearing Cash & Due From Banks | 1,414,536 | 1,172,421 | 242,115 | 1,808,095 | (393,559) | 479,042 | 935,494 | 2,509,697 | 2,747,783 |
| Acceptances | | | | | | | | 0 | 0 |
| Premises, Fixed Assets, Capital Leases | 2,636,880 | 2,501,000 | 135,880 | 2,651,057 | (14,177) | 2,750,778 | (113,898) | 2,699,435 | 2,824,892 |
| Other Real Estate Owned | 2,270,863 | 4,013,000 | (1,742,137) | 2,899,314 | (628,451) | 3,882,958 | (1,612,095) | 3,345,522 | 4,234,004 |
| Investment in Unconsolidated Subs | | | | | | | | 0 | 0 |
| Other Assets | 1,260,308 | 1,070,000 | 190,308 | 1,159,468 | 100,840 | 903,005 | 357,303 | 1,084,889 | 1,176,291 |
| Total Assets | 148,231,630 | 150,391,421 | (2,159,791) | 147,053,906 | 1,177,724 | 150,727,994 | (2,496,364) | 149,314,071 | 154,445,266 |
| | | | | | | | | | |
| **Liabilities** | | | | | | | | | |
| Demand Deposits | 8,852,560 | 10,277,000 | (1,424,440) | 9,310,734 | (458,174) | 9,750,729 | (898,169) | 10,200,419 | 10,396,017 |
| Now and ATS Accounts | 7,252,207 | 7,456,000 | (203,793) | 6,999,926 | 252,281 | 7,023,327 | (471,120) | 7,455,103 | 6,472,550 |
| Money Market Deposit Accounts | 37,375,207 | 28,380,000 | 8,995,207 | 36,531,368 | 843,839 | 26,913,765 | 10,461,442 | 36,229,096 | 23,331,897 |
| Other Savings Deposits | 7,109,115 | 8,221,000 | (1,111,885) | 7,273,904 | (164,789) | 7,084,788 | 24,327 | 7,130,831 | 6,893,151 |
| Time Deposit Under $100,000 | 25,962,757 | 28,924,000 | (2,961,243) | 26,161,440 | (198,683) | 27,066,298 | (1,103,541) | 26,037,017 | 28,030,945 |
| Core Deposits | 86,551,846 | 83,258,000 | 3,293,846 | 86,277,372 | 274,474 | 78,538,907 | 8,012,939 | 82,115,366 | 75,124,560 |
| Time Deposit of $100,000 or More | 35,814,338 | 38,568,000 | (2,753,662) | 36,023,502 | (209,164) | 42,204,626 | (6,390,288) | 38,978,031 | 45,548,882 |
| All Brokered Deposits | 5,836,000 | 5,836,000 | 0 | 5,836,000 | 0 | 10,333,000 | (4,497,000) | 8,271,546 | 11,271,449 |
| Total Deposits | 128,202,184 | 127,662,000 | 540,184 | 128,136,875 | 65,309 | 131,076,533 | (2,874,349) | 129,364,943 | 131,944,891 |
| Federal Funds Purch and Repos | | | | | | 100,000 | (100,000) | 28,005 | 63,219 |
| Other Borrowings | 13,500,000 | 13,000,000 | 500,000 | 11,875,000 | 1,625,000 | 10,250,000 | 2,750,000 | 13,105,700 | 13,190,271 |
| Acceptances & Other Liabilities | 695,792 | 646,000 | 49,792 | 889,219 | (193,427) | 472,982 | 222,810 | 857,197 | 715,639 |
| Total Liabilities(Including Mortgage) | 142,397,976 | 141,308,000 | 1,089,976 | 140,901,094 | 1,496,882 | 142,399,515 | (1,539) | 141,620,346 | 145,911,420 |
| Subordinated Notes and Debentures | | | | | | | | 0 | 0 |
| Equity Capital | 5,833,654 | 9,083,421 | (3,249,767) | 6,152,813 | (319,115) | 8,328,479 | (2,494,825) | 7,693,725 | 8,533,846 |
| Total Liabilities and Capital | 148,231,630 | 150,391,421 | (2,159,791) | 147,053,906 | 1,177,724 | 150,727,994 | (2,496,364) | 149,314,071 | 154,445,266 |
| | | | | | | | | | |
| **Memoranda** | | | | | | | | | |
| Held-to-Maturity Securities | 39,951 | 0 | 39,951 | 40,718 | (767) | 56,706 | (16,755) | 46,884 | 58,578 |
| Available-for-Sale Securities | 48,574,855 | 59,721,000 | (11,146,145) | 47,672,068 | 902,787 | 57,479,467 | (8,904,612) | 50,246,292 | 47,743,375 |

**Statement of Income (high level summary)**

**(Whole Dollars) - Statement of Income for Board**

| | December, 2016 Actual | December Current Budget | Variance | December, 2016 Actual | November, 2016 Actual | Variance | Year To Date December, 2016 Actual | Year To Date December Current Budget | Variance |
|---|---|---|---|---|---|---|---|---|---|
| **Interest Income** | | | | | | | | | |
| Interest and Fees on Loans and Leases | 350,043 | 375,129 | (25,086) | 350,043 | 343,331 | 6,712 | 4,363,926 | 4,707,000 | (343,074) |
| Interest and Dividends on Securities | 73,495 | 85,000 | (11,505) | 73,495 | 63,981 | 9,514 | 947,675 | 1,020,000 | (72,325) |
| Short-term Investments | 83 | 0 | 83 | 83 | 56 | 27 | 461 | 0 | 461 |
| **Total Interest Income** | 423,621 | 460,129 | (36,508) | 423,621 | 407,368 | 16,253 | 5,312,062 | 5,727,000 | (414,938) |
| **Interest Expense** | | | | | | | | | |
| Interest on Deposits | 92,546 | 91,343 | 1,203 | 92,546 | 88,636 | 3,910 | 1,070,412 | 1,116,000 | (45,588) |
| Interest on Borrowed Funds | 7,306 | 3,000 | 4,306 | 7,306 | 6,097 | 1,209 | 65,644 | 36,000 | 29,644 |
| **Total Interest Expense** | 99,852 | 94,343 | 5,509 | 99,852 | 94,733 | 5,119 | 1,136,057 | 1,152,000 | (15,943) |
| **Net Interest Income** | 323,769 | 365,786 | (42,017) | 323,769 | 312,635 | 11,134 | 4,176,006 | 4,575,000 | (398,994) |
| Provision for Loan Losses | 15,000 | 15,000 | 0 | 15,000 | 38,000 | (23,000) | 2,408,000 | 0 | 2,408,000 |
| **Net Interest Income less Provision** | 308,769 | 365,786 | (57,017) | 308,769 | 274,635 | 34,134 | 1,768,006 | 4,575,000 | (2,806,994) |
| **Noninterest Income** | | | | | | | | | |
| Other Income | (2,926) | 20,000 | (22,926) | (2,926) | 52,296 | (55,222) | 377,748 | 240,000 | 137,748 |
| Securities Gains (Losses) | 0 | 0 | 0 | 0 | 0 | 0 | 102,899 | 0 | 102,899 |
| **Total Noninterest Income** | (2,926) | 20,000 | (22,926) | (2,926) | 52,296 | (55,222) | 480,647 | 240,000 | 240,647 |
| **Noninterest Expense** | | | | | | | | | |
| Personnel | 170,026 | 167,500 | 2,526 | 170,026 | 175,093 | (5,067) | 2,236,345 | 2,010,000 | 226,345 |
| Occupancy, Net | 19,423 | 23,000 | (3,577) | 19,423 | 19,565 | (142) | 257,834 | 276,000 | (18,166) |
| Furniture and Equipment, Net | 9,020 | 13,500 | (4,480) | 9,020 | 8,818 | 202 | 124,514 | 162,000 | (37,486) |
| Other Operating Expense | 221,656 | 173,500 | 48,156 | 221,656 | 122,352 | 99,304 | 2,058,705 | 2,082,000 | (23,295) |
| **Total Noninterest Expense** | 420,126 | 377,500 | 42,626 | 420,126 | 325,828 | 94,298 | 4,677,400 | 4,530,000 | 147,400 |
| **Income (Loss) Before Taxes** | (114,283) | 8,286 | (122,569) | (114,283) | 1,103 | (115,386) | (2,428,747) | 285,000 | (2,713,747) |
| Income Tax Provision | 50 | 0 | 50 | 50 | 0 | 50 | 50 | 0 | 50 |
| **Income (Loss) Before Extraordinary Items** | (114,333) | 8,286 | (122,619) | (114,333) | 1,103 | (115,436) | (2,428,797) | 285,000 | (2,713,797) |
| Extraordinary Items, Net | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net Income** | (114,333) | 8,286 | (122,619) | (114,333) | 1,103 | (115,436) | (2,428,797) | 285,000 | (2,713,797) |

# EXHIBIT D

## *Pro Formas*

**SunSouth Bancshares, Inc.**
**Balance Sheet**
**(Dollars in Thousands)**

| | Actual 12/31/2016 | QTD Projected 3/31/2017 | QTD Projected 6/30/2017 | Projected (1) 6/30/2017 | YTD Projected 12/31/2017 | QTD Projected 9/30/2017 | QTD Projected 12/31/2017 | QTD Projected 3/31/2018 | QTD Projected 6/30/2018 | QTD Projected 9/30/2018 | QTD Projected 12/31/2018 | QTD Projected 3/31/2019 | QTD Projected 6/30/2019 | QTD Projected 9/30/2019 | Projected 12/31/2019 | Projected 12/31/2020 | Projected 12/31/2021 | Projected 12/31/2022 | Projected 12/31/2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | | | | | | | | | | | | |
| Cash | 1 | 1 | 347 | 327 | 206 | 187 | 187 | 187 | 147 | 28 | 9 | 1,960 | 1,971 | 1,077 | 0 | 446 | 433 | 421 | 408 |
| Investment in subsidiary (SunSouth Bank) | 5,833 | 5,888 | 6,318 | 6,373 | 6,429 | 6,485 | 6,541 | 6,597 | 6,652 | 6,662 | 6,734 | 9,816 | 9,898 | 9,981 | 9,816 | 10,427 | 11,004 | 11,728 | 12,341 |
| Other investment | 248 | 248 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 31 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income tax receivable (payable) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 62 | 93 | 113 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred tax asset | 1,247 | 1,284 | 164 | 171 | 179 | 187 | 194 | 201 | 209 | 209 | 185 | 181 | 137 | 113 | 0 | 0 | 0 | 0 | 0 |
| Deferred tax asset valuation allowance | (1,247) | (1,284) | (164) | (171) | (179) | (187) | (194) | (201) | (209) | (209) | (185) | (181) | (137) | (113) | 0 | 0 | 0 | 0 | 0 |
| **Total Assets** | 6,082 | 6,137 | 6,665 | 6,700 | 6,635 | 6,672 | 6,708 | 6,744 | 6,744 | 6,680 | 6,776 | 11,868 | 11,983 | 11,958 | | 10,872 | 11,437 | 12,149 | 12,749 |
| | | | | | | | | | | | | | | | | | | | |
| **Liabilities and Stockholder's Equity** | | | | | | | | | | | | | | | | | | | |
| Subordinated debentures (TruPS) | 8,248 | 8,248 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| FMBI borrowing | 2,000 | 2,000 | 1,900 | 1,900 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,700 | 1,700 | 1,700 | 1,700 | 1,600 | 1,600 | 0 | 0 | 0 | 0 |
| Accrued interest payable | 1,857 | 1,664 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Liabilities | 200 | 200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Liabilities** | 12,305 | 12,112 | 1,900 | 1,900 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,700 | 1,700 | 1,700 | 1,700 | 1,600 | 1,600 | 0 | 0 | 0 | 0 |
| Total Stockholder's Equity (Deficit) | (6,223) | (6,355) | 4,765 | 4,800 | 4,835 | 4,872 | 4,908 | 4,944 | 4,944 | 4,980 | 5,076 | 10,168 | 10,283 | 10,358 | | 10,872 | 11,437 | 12,149 | 12,749 |
| **Total Liabilities & Stockholders Equit** | 6,082 | 6,137 | 6,665 | 6,700 | 6,635 | 6,672 | 6,708 | 6,744 | 6,744 | 6,680 | 6,776 | 11,868 | 11,983 | 11,958 | | 10,872 | 11,437 | 12,149 | 12,749 |

**SunSouth Bancshares, Inc.**
**Statements of Income**
**(Dollars in Thousands)**

| | YTD Actual 12/31/2016 | QTD Projected 3/31/2017 | QTD Projected 6/30/2017 | QTD Projected 9/30/2017 | QTD Projected 12/31/2017 | YTD Projected 12/31/2017 | QTD Projected 3/31/2018 | QTD Projected 6/30/2018 | QTD Projected 9/30/2018 | QTD Projected 12/31/2018 | YTD Projected 12/31/2018 | QTD Projected 3/31/2019 | QTD Projected 6/30/2019 | QTD Projected 9/30/2019 | YTD Projected 12/31/2019 | YTD Projected 12/31/2020 | YTD Projected 12/31/2021 | YTD Projected 12/31/2022 | YTD Projected 12/31/2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dividends from subsidiary | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Equity in subsidiary's earnings | 0 | 55 | 55 | 56 | 56 | 221 | 56 | 56 | 56 | 55 | 223 | 82 | 82 | 82 | 329 | 446 | 577 | 724 | 613 |
| Gain from debt extinguishment and restructur | 0 | 0 | 9,716 | 0 | 0 | 9,716 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total income** | 0 | 55 | 9,771 | 56 | 56 | 9,937 | 56 | 56 | 56 | 55 | 223 | 82 | 82 | 82 | 329 | 446 | 577 | 724 | 613 |
| | | | | | | | | | | | | | | | | | | | |
| Interest expense | 0 | 97 | 16 | 15 | 15 | 144 | 15 | 15 | 15 | 14 | 59 | 14 | 14 | 14 | 55 | 52 | 0 | 0 | 0 |
| Other operating expenses | 0 | 0 | (25) | 5 | 5 | (15) | 5 | 5 | 5 | 5 | 20 | 5 | 5 | 5 | 20 | 20 | 20 | 20 | 20 |
| **Total expense** | 0 | 97 | (9) | 20 | 20 | 129 | 20 | 20 | 20 | 19 | 79 | 19 | 19 | 19 | 75 | 72 | 20 | 20 | 20 |
| Income tax (benefit) | 0 | 0 | (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (31) | (31) | (32) | (125) | (140) | (8) | (8) | 0 |
| **Net Income (loss)** | 0 | (42) | 9,780 | 35 | 36 | 9,808 | 36 | 36 | 36 | 36 | 144 | 94 | 94 | 94 | 379 | 514 | 565 | 712 | 601 |

**Notes:**

[1] Assume Company will file and emerge from Chapter 11 bankruptcy by June 30, 2017.

[2] Gain from debt extinguishment and restructure consists of $58,000,000 in TruPS subordinated debt, $5,159,000 of related accrued interest payable on the TruPS, and reversal of accrued interest due on FMBI note to reflect new rate of 3.25% back to default date of July 31, 2013, the adjustment from which will total $157,000 through March 31, 2017.

[3] Interest payment to FMBI for the quarter ended June 30, 2017 will consist of all prior and current amounts due at the new rate of 3.25%.

[4] Interest on FMBI note accrued at 5.50% (default rate) through quarter ended March 31, 2017 and then at 3.25% for the quarter ended June 30, 2017 and thereafter. Assume paid at each quarter end. Interest on TruPS subordinated debt accrued through March 31, 2017 and then forgiven through bankruptcy reorganization.

[5] Operating expenses will consist of reimbursing the Bank for expenses related to the bankruptcy reorganization process in the estimated amount of $175,000. Operating expenses will total an estimated $5,000 per quarter for the normal operation of the holding company thereafter. The $25,000 of remaining accrual for reorganizational expenses has been reversed in the second quarter of 2017.

[6] Quarterly tax provision (benefit) is based on 38% of operating expenses of Company. The forgiveness of debt income is treated as nontaxable as it is discharged through bankruptcy. Tax benefits will be recognized by the holding company as the holding company's NOLs, are utilized against the taxable income of the Bank. This utilization is expected to occur in 2019 and 2020 as indicated in the following table. Once utilized, the holding company will recognized tax benefits from operating expenses going forward.

**SunSouth Bank**
**Balance Sheets**

| | Actual 12/31/2016 | Projected 12/31/2017 | Projected 12/31/2018 | Projected 12/31/2019 | Projected 12/31/2020 | Projected 12/31/2021 | Projected 12/31/2022 | Projected 12/31/2023 | Projected 12/31/2024 |
|---|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | | |
| Cash and due from Banks | 1,478 | 2,503 | 2,547 | 2,670 | 2,663 | 2,547 | 2,591 | 4,662 | 7,440 |
| Federal Funds Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investments | 48,615 | 45,658 | 46,115 | 46,576 | 47,041 | 47,512 | 47,987 | 47,987 | 47,987 |
| Loans | 95,973 | 99,296 | 104,261 | 109,474 | 114,948 | 120,695 | 126,730 | 126,730 | 126,730 |
| Less: Allowance for Loan Losses | (4,002) | (4,214) | (4,164) | (4,114) | (4,064) | (4,014) | (3,964) | (3,814) | (3,664) |
| Premises & Equipment | 2,637 | 2,460 | 2,270 | 2,080 | 1,890 | 1,700 | 1,510 | 1,510 | 1,510 |
| Other | 3,531 | 1,858 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| **Total Assets** | 148,232 | 147,561 | 152,528 | 158,186 | 163,978 | 169,940 | 176,354 | 178,575 | 181,503 |
| **Liabilities and Stockholder's Equity:** | | | | | | | | | |
| Deposits and Other Borrowings | 141,702 | 140,130 | 145,044 | 147,498 | 152,233 | 158,617 | 164,583 | 166,191 | 168,516 |
| Other Liabilities | 696 | 1,085 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| **Total Liabilities** | 142,398 | 141,215 | 146,044 | 148,498 | 153,233 | 159,617 | 165,583 | 167,191 | 169,516 |
| **Total Stockholder's Equity** | 5,834 | 6,430 | 6,653 | 9,982 | 10,428 | 11,006 | 11,729 | 12,342 | 12,944 |
| **Total Liabilities & Stockholders Equity** | 148,232 | 147,645 | 152,697 | 158,480 | 163,661 | 170,623 | 177,312 | 179,533 | 182,460 |

**SunSouth Bank**
**Average Balance Sheets**

| Average Balances: | Actual 12/31/2016 | Projected 12/31/2017 | Projected 12/31/2018 | Projected 12/31/2019 | Projected 12/31/2020 | Projected 12/31/2021 | Projected 12/31/2022 | Projected 12/31/2023 | Projected 12/31/2024 |
|---|---|---|---|---|---|---|---|---|---|
| Federal Funds Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investments | 45,598 | 47,137 | 45,886 | 46,345 | 46,809 | 47,277 | 47,749 | 47,987 | 47,987 |
| Loans | 92,479 | 97,635 | 101,778 | 106,867 | 112,211 | 117,821 | 123,712 | 126,730 | 126,730 |
| Earning Assets | 138,077 | 144,771 | 147,665 | 153,212 | 159,019 | 165,098 | 171,462 | 174,717 | 174,717 |
| Total Assets | 146,867 | 147,897 | 150,045 | 155,357 | 161,082 | 166,959 | 173,147 | 177,464 | 180,039 |
| Deposits | 129,018 | 140,916 | 142,587 | 146,271 | 149,866 | 155,425 | 161,600 | 165,387 | 167,354 |
| Equity | 6,384 | 6,132 | 6,542 | 8,318 | 10,205 | 10,717 | 11,367 | 12,035 | 12,643 |

**SunSouth Bank**
Statements of Income

| | Actual 12/31/2016 | Projected 12/31/2017 | Projected 12/31/2018 | Projected 12/31/2019 | Projected 12/31/2020 | Projected 12/31/2021 | Projected 12/31/2022 | Projected 12/31/2023 | Projected 12/31/2024 |
|---|---|---|---|---|---|---|---|---|---|
| Interest Income & Fees on Loans | 5,312 | 5,541 | 6,006 | 6,691 | 7,422 | 8,201 | 9,031 | 9,724 | 10,215 |
| Interest Expense | 1,136 | 1,217 | 1,529 | 1,952 | 2,404 | 2,884 | 3,394 | 3,851 | 4,343 |
| Net Interest Income | 4,176 | 4,324 | 4,477 | 4,739 | 5,018 | 5,317 | 5,637 | 5,873 | 5,872 |
| Provision for Loan Losses | 2,408 | 100 | 100 | 100 | 100 | 100 | 100 | 0 | 0 |
| Net Interest Income after Provision for Loan Losses | 1,768 | 4,224 | 4,377 | 4,639 | 4,918 | 5,217 | 5,537 | 5,873 | 5,872 |
| Noninterest Income, including gain on loan sales | 481 | 467 | 495 | 525 | 556 | 590 | 625 | 662 | 702 |
| Noninterest Expenses | 4,678 | 4,470 | 4,649 | 4,835 | 5,028 | 5,229 | 5,438 | 5,547 | 5,603 |
| Income before Income Taxes | (2,429) | 221 | 223 | 329 | 446 | 577 | 724 | 988 | 972 |
| Income Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 375 | 369 |
| Net Income | (2,429) | 221 | 223 | 329 | 446 | 577 | 724 | 613 | 603 |

**SunSouth Bank**
**Ratio Analysis**

| | Projected 12/31/2016 | Projected 12/31/2017 | Projected 12/31/2018 | Projected 12/31/2019 | Projected 12/31/2020 | Projected 12/31/2021 | Projected 12/31/2022 | Projected 12/31/2023 | Projected 12/31/2024 |
|---|---|---|---|---|---|---|---|---|---|
| **Earnings and Profitability:** | | | | | | | | | |
| **Percent of Average Assets:** | | | | | | | | | |
| Interest Income | 3.62% | 3.75% | 4.05% | 4.35% | 4.65% | 4.95% | 5.25% | 5.55% | 5.85% |
| Interest Expense | 0.77% | 0.82% | 1.07% | 1.32% | 1.57% | 1.82% | 2.07% | 2.32% | 2.57% |
| Net Interest Income | 2.84% | 2.92% | 2.97% | 3.02% | 3.07% | 3.12% | 3.17% | 3.22% | 3.27% |
| Noninterest Income | 0.33% | 0.32% | 0.33% | 0.34% | 0.35% | 0.35% | 0.36% | 0.37% | 0.39% |
| Noninterest Expense | 3.19% | 3.02% | 3.10% | 3.11% | 3.12% | 3.13% | 3.14% | 3.13% | 3.11% |
| Return on Average Assets | -1.65% | 0.15% | 0.15% | 0.21% | 0.28% | 0.35% | 0.42% | 0.35% | 0.33% |
| Return of Average Equity | -38.05% | 3.60% | 3.41% | 3.96% | 4.37% | 5.39% | 6.36% | 5.09% | 4.77% |
| | | | | | | | | | |
| **Margin Analysis:** | | | | | | | | | |
| Average Earning Assets to Average Assets | 94.01% | 97.89% | 98.41% | 98.62% | 98.72% | 98.89% | 99.03% | 98.45% | 97.04% |
| Interest Income to Average Earning Assets | 3.85% | 3.83% | 4.07% | 4.37% | 4.67% | 4.97% | 5.27% | 5.57% | 5.85% |
| Interest Expense to Average Earning Assets | 0.82% | 0.84% | 1.04% | 1.27% | 1.51% | 1.75% | 1.98% | 2.20% | 2.49% |
| Net Interest Income to Ave. Earning Assets | 3.02% | 2.99% | 3.03% | 3.09% | 3.16% | 3.22% | 3.29% | 3.36% | 3.36% |
| Yield on Average Earning Assets | 3.85% | 3.83% | 4.07% | 4.37% | 4.67% | 4.97% | 5.27% | 5.57% | 5.85% |
| Net Cost of Deposits | 0.88% | 0.86% | 1.07% | 1.33% | 1.60% | 1.86% | 2.10% | 2.33% | 2.59% |
| Net Interest Rate Spread | 2.97% | 2.96% | 2.99% | 3.03% | 3.06% | 3.11% | 3.17% | 3.24% | 3.25% |
| | | | | | | | | | |
| **Capital:** | | | | | | | | | |
| Tier One Leverage Ratio | 4.04% | 4.35% | 4.43% | 6.43% | 6.47% | 6.59% | 6.77% | 6.95% | 7.19% |
| Tier 1 Capital (To Risk-Weighted Assets) | 8.39% | 7.92% | 6.71% | 8.41% | 7.95% | 8.10% | 8.31% | 8.64% | 8.91% |
| Total Capital Ratio (To Risk-Weighted Assets) | 9.55% | 13.12% | 10.91% | 11.88% | 11.05% | 11.05% | 11.12% | 11.31% | 11.44% |
| Risk Assets to Total Assets | 47.75% | 55.00% | 65.00% | 75.00% | 80.00% | 80.00% | 80.00% | 80.00% | 80.00% |
| | | | | | | | | | |
| **Earning Assets as a % of Total Assets:** | | | | | | | | | |
| Federal Funds Sold | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Investments | 32.80% | 30.94% | 30.23% | 29.44% | 28.69% | 27.96% | 27.21% | 26.87% | 26.44% |
| Loans | 64.75% | 67.29% | 68.36% | 69.21% | 70.10% | 71.02% | 71.86% | 70.97% | 69.82% |
| | 97.54% | 98.23% | 98.59% | 98.65% | 98.79% | 98.98% | 99.07% | 97.84% | 96.26% |
| | | | | | | | | | |
| Ending Total Assets: | 148,232 | 147,561 | 152,528 | 158,186 | 163,978 | 169,940 | 176,354 | 178,575 | 181,503 |

# EXHIBIT E

*Liquidation Analysis*

# SUNSOUTH BANCSHARES, INC.
## Liquidation Analysis

This Liquidation Analysis was formulated based on information considered accurate as of February 17, 2017. This Liquidation Analysis is intended to quantify estimated recoveries that could be expected by creditors holding claims against the Debtor if the Plan were not confirmed and the Debtor's assets were instead liquidated by a chapter 7 trustee on the Effective Date of the Plan (assumed as of August 1, 2017). The column headed "Estimated Liquidation Value" represents the Debtor's estimate of the value that could be obtained, net of sales expenses, in a chapter 7 liquidation where a chapter 7 trustee has the duty to convert the assets of the estate to cash as quickly as possible under 11 U.S.C. § 704(a)(1).

| | Estimated Liquidation Value | Note # |
|---|---:|:---:|
| **Estimated Liquidation Value – Encumbered Assets** | | |
| Cash on Hand | 810.50 | 1 |
| Stock in SunSouth Bank | 1,141,500.00 | 2 |
| Common Stock in SunSouth Bancshares Capital Trust I | - | 3 |
| Common Stock in SunSouth Bancshares Capital Trust II | - | 3 |
| **Total Proceeds From Encumbered Assets** | **1,142,310.50** | |
| | | |
| **Secured Claims** | | |
| FNBB | 2,451,345.11 | 4 |
| | | |
| **Total Amount of Secured Claims** | **2,451,345.11** | |
| | | |
| **Estimated Unsecured Deficiency After Payment of Secured Claims from Encumbered Assets** | **(1,309,034.61)** | |
| | | |
| **Estimated Ch. 7 Priority and Administrative Expenses** | | |
| Chapter 7 Trustee Fees Pursuant to 11 U.S.C. § 326 | 5,000.00 | 5 |
| Chapter 7 Trustee's Counsel (Estimated) | 10,000.00 | |
| Other Chapter 7 Administrative Expense Claims | - | |
| Chapter 11 Administrative Expense Claims | 50,000.00 | 6 |
| Other Priority Claims | 7,566.05 | |
| | | |
| **Total Amount of Ch. 7 Priority and Administrative Expenses** | **72,566** | |
| | | |
| **Proceeds Available for Unsecured Claims in Chapter 7** | **0.00** | 7 |

629163303.XLSX

## GENERAL NOTES APPLICABLE TO LIQUIDATION ANALYSIS

A.   This Liquidation Analysis was formulated based on information considered accurate as of February 17, 2017. This Liquidation Analysis is intended to quantify estimated recoveries that could be expected by creditors holding claims against the Debtor if the Plan were not confirmed and the Debtor's assets were instead liquidated by a chapter 7 trustee on the Effective Date of the Plan (assumed as of August 1, 2017). The column headed "Estimated Liquidation Value" represents the Debtor's estimate of the value that could be obtained, net of sales expenses, in a chapter 7 liquidation where a chapter 7 trustee has the duty to convert the assets of the estate to cash as quickly as possible under 11 U.S.C. § 704(a)(1).

B.   This Liquidation Analysis is based upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtor, are inherently subject to significant economic factors, market conditions, personal uncertainties, and contingencies beyond the control of the Debtor. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtor's assets were to be liquidated and actual results could vary materially and adversely from those contained herein. The liquidation values represent the Debtor's best estimate of those values based on currently available information, and the Debtor reserves the right to modify this Liquidation Analysis based on additional information becoming available.

C.   This analysis assumes the conversion of the current chapter 11 case to a chapter 7 case with the liquidation or abandonment of the Debtor's assets by a chapter 7 trustee in a significantly abbreviated timeframe. In that event, a chapter 7 trustee would be appointed to administer the estate. The chapter 7 trustee is independent and would be entitled to make all of his or her own decisions regarding the liquidation of the estate's assets, the hiring of professionals, the pursuit of claims or litigation, the payment of or objection to claims, and the distribution of any ultimate dividend. The trustee would also be required to perform duties, such as filing tax returns, that under the Plan will be undertaken by the Debtor. The chapter 7 trustee would be compensated from the liquidation of assets of the chapter 7 estate as a first priority claim in accordance with the Bankruptcy Code. The estimated costs of such a hypothetical liquidation are generally contemplated in the "Estimated Liquidation Values" and are, in some instances, specifically described in the Notes that accompany this Liquidation Analysis.

D.   There can be no assurances made that all of the Debtor's assets will be completely liquidated during the shortened liquidation period in a chapter 7. In many instances, the chapter 7 trustee may elect to simply abandon certain assets determined to have no value to the Debtor's bankruptcy estate.

F.   This Liquidation Analysis is without prejudice to the Debtor's ability to object to the characterization, amount, secured status or classification of any claim or asset and is not to be deemed an admission or concession of any issue of fact or law.

## NOTES TO LIQUIDATION ANALYSIS:

1.   The Cash on Hand contains any cash existing on the Petition Date and any revenues received since the Petition Date, less authorized operating expenses.

2.  The Debtor pledged the Bank Stock to secure its obligations to FNBB. Although the Debtor believes that the fair market value of the Bank Stock is $2,283,000, the Debtor believes that the liquidation value of the Bank Stock is significantly less as a result of numerous factors, including the need for any potential buyer to invest significant additional capital in the Bank, uncertainty as to existing and potential liability related to the Nash York Litigation, various risk factors articulated in the Disclosure Statement; and the Debtor's lack of ability to garner interest in an arms'-length sale of the Bank Stock. As a result, the chapter 7 trustee would face significant challenges in selling the Bank Stock, including the lack of any willing purchasers. Accordingly, the Debtor has discounted the fair market value of the Bank Stock by 50% to estimate the liquidation value of the Bank Stock.

3.  The Debtor's common stock in the Trusts has no value, as the interest is subordinate to the preferred capital stock issued by the Trusts. The Debtor's other assets are not sufficient to satisfy the secured claim of FNBB, so no distributions would be made to the holders of capital stock. Simply stated, the holders of capital stock and common stock in the Trusts are out of the money in a liquidation scenario.

4.  The Debtor anticipates that FNBB would assert a secured claim against all of the Debtor's property and that the value of the property would not satisfy FNBB's secured claim. In the event that the Plan is not confirmed, FNBB's claim would increase, as FNBB would no longer be required to compromise their claim and interest would continue to accrue at the default rate.

5.  The Debtor estimates that even if all assets are not encumbered by FNBB's lien, the residual funds of the estate would be subsumed by chapter 7 and chapter 11 administrative expenses, making a distribution to holders of general unsecured claims even more remote. The Debtor has estimated chapter 7 Administrative Expenses, although these estimates are somewhat speculative.

6.  These Administrative Expenses account for the estimated Bankruptcy Administrator's quarterly fees through an additional two quarters, and for the Debtor's estimated professional and legal fees through confirmation of the Plan (after crediting any retainers and the minimum commission to be paid to the Debtor's sales agent pursuant to agreement approved by the Bankruptcy Court).

7.  In contrast, the Plan provides for the payment of FNBB's claim over time, funded in part by the $1.25 million New Investment. The Plan also contemplates the payment of all Allowed Administrative Claims and Allowed Priority Claims and the unimpairment of all Allowed Unsecured Claims. The Holders of the Allowed TruPS claim will receive a new debenture, which will be paid in accordance with the terms of the Plan, while they would receive nothing in the context of a chapter 7 liquidation.